**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK LEONE, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>        v.<br><br>ASP ISOTOPES INC., PAUL E. MANN, and HEATHER KIESSLING,<br><br>        Defendants. | Case No. 1:24-cv-09253-CM<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION AND OVERVIEW ............................................................. 1

II.    JURISDICTION AND VENUE ................................................................................... 3

III.   PARTIES ....................................................................................................................... 4

IV.    BACKGROUND ........................................................................................................... 6

       A.    Overview Of Isotope Separation & The Uranium Enrichment Market ................ 6

       B.    ASPI's Business Centered On Acquiring The Assets And Personnel Of
             Klydon, An R&D Stage Isotope Separation Company ........................................... 7

       C.    ASPI Was Small, Unprofitable, And Depended On Investors To Fund Its
             Operations ................................................................................................................. 10

       D.    Defendants Touted Uranium Enrichment As A Core Operation For ASPI .......... 12

V.     DEFENDANTS CONCEALED THAT ASPI'S URANIUM RESEARCH WAS
       ENTIRELY THEORETICAL—THE COMPANY HAD NEVER WORKED
       WITH URANIUM ......................................................................................................... 14

VI.    ASPI SOLD $18.6 MILLION OF ARTIFICIALLY INFLATED STOCK DURING
       THE CLASS PERIOD ................................................................................................... 18

VII.   MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING
       THE CLASS PERIOD ................................................................................................... 18

       A.    September 26, 2024 Conference Call And Investor Presentation ......................... 19

       B.    October 17, 2024 Press Release Regarding Commissioning Of Quantum
             Enrichment Plant ..................................................................................................... 23

       C.    October 30, 2024 Press Release Regarding Term Sheet With TerraPower
             For Construction of HALEU Production Facility ................................................... 24

       D.    October 30, 2024 Conference Call .......................................................................... 25

       E.    November 19, 2024 POWER Magazine Interview ................................................. 26

       F.    November 22, 2024 Revised Investor Presentation ............................................... 27

VIII.  THE TRUTH EMERGES, CAUSING DRAMATIC DECLINES IN ASPI'S
       STOCK PRICE .............................................................................................................. 28

       A.    The November 26, 2024 Fuzzy Panda Research Report ........................................ 28

B.      Defendant Mann's November 27, 2024 Interview With Canaccord Genuity
............................................................................................................. 31

IX.    ADDITIONAL SCIENTER ALLEGATIONS .............................................. 35

X.     LOSS CAUSATION .................................................................................... 36

XI.    CLASS ACTION ALLEGATIONS ............................................................. 36

XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-
       MARKET DOCTRINE) .............................................................................. 38

XIII.  NO SAFE HARBOR .................................................................................... 40

XIV.   FIRST CLAIM ............................................................................................. 40

XV.    SECOND CLAIM ........................................................................................ 41

XVI.   PRAYER FOR RELIEF .............................................................................. 42

XVII.  JURY TRIAL DEMANDED ....................................................................... 42

## EXHIBIT LIST

Exhibit 1 –    Certification of Lead Plaintiff Mark Leone

Exhibit 2 –    Certification of Plaintiff Alexander Corredor Prada

Exhibit 3 –    Certification of Plaintiff Ivan Agapchev

Exhibit 4 –    ASP Isotopes, Corporate Overview slide presentation (Sept. 26, 2024)

Exhibit 5 –    Fuzzy Panda Research, ASP Isotopes (ASPI): Failed Tech + Paid Stock
               Promotion + "Microcap Fraudsters" (Honig &Stetson) = Nuclear Meltdown (Nov.
               26, 2024)

Lead Plaintiff Mark Leone[1] and plaintiffs Alexander Corredor Prada and Ivan Agapchev (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following based upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by ASP Isotopes, Inc. ("ASPI" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by ASPI; (c) interviews with former employees of ASPI and its predecessor company, Klydon Proprietary Ltd ("Klydon"); and (d) review of other publicly available information concerning ASPI.

## I.     NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased the publicly traded common stock of ASPI between September 26, 2024 and November 26, 2024, both dates inclusive (the "Class Period"), and who were damaged thereby. Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

---

[1] While preparing this amended complaint, Lead Counsel learned that the certification (Dkt No. 7-2) filed in connection with Mark Leone's motion for appointment as Lead Plaintiff inadvertently omitted certain transactions in ASPI stock, which resulted in an overstatement of his financial losses (Leone's recalculated losses total approximately $150,000 for the class period set forth in the initial complaint). Those transactions have been included in the revised certification filed herewith as **Exhibit 1**.

2.      ASPI is a small, unprofitable company based in South Africa that is listed on the Nasdaq stock exchange and obtains cash from U.S. investors to fund its operations. Its business centers on isotope enrichment—the costly and complex process of separating from each other slightly different types of atoms of the same chemical element.

3.      Leading up to and throughout the Class Period, Defendants touted ASPI's enrichment technology and its purported suitability for enrichment of uranium for use in nuclear power generators. For example, ASPI's CEO, Defendant Paul Mann, told investors that "we think our quantum enrichment technology is perfect for enriching uranium," and Defendants published data comparing uranium enrichment using ASPI's technology to other enrichment methods. ASPI stated that "*[o]ur team have used lasers to enrich . . . Uranium,*" that its technology for uranium enrichment was already in the "R&D Stage," and that it had "Proven Proprietary Technology" allowing it to meet growing demand in the nuclear energy industry.

4.      In October 2024, ASPI published press releases misleadingly promoting the commissioning of its first "quantum enrichment" plant to enrich Ytterbium, and its entry into a term sheet to build a plant to produce High Assay Low Enriched Uranium ("HALEU") and supply HALEU to a U.S.-based customer for a 10-year period. These announcements caused a dramatic surge in ASPI's stock price, which Defendants promptly capitalized on by selling $18.6 million worth of ASPI stock to the public at an artificially inflated price.

5.      On November 26, 2024, Fuzzy Panda Research published a report based on research including interviews with nuclear energy industry executives and consultations with an applied physicist, which revealed significant problems facing ASPI's claimed uranium enrichment technology, causing a 23.5% decline in ASPI's stock price that day. On November 27, 2024 Defendant Mann participated in an interview with a Canaccord Genuity stock analyst, in an attempt

to rebut the claims made in the Fuzzy Panda Research report. However, in the course of the interview Mann revealed, to the analyst's evident surprise, that *ASPI had never enriched uranium or tested its technology on uranium*, not even on a laboratory scale. On this news, ASPI's share price fell 14.2% on November 27, 2024.

6.      As a result of Defendants' misleading statements and omissions, and the resulting precipitous decline in the market value of ASPI common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The alleged misstatements entered and subsequent damages took place within this Judicial District. ASPI's common stock trades on the Nasdaq Capital Market ("Nasdaq"), which is headquartered in this Judicial District. ASPI director Todd Wider, M.D. is based in New York, serving as an active, honorary member of the medical staff of Mount Sinai Hospital, where he worked for over 20 years. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.    PARTIES

11.    Lead Plaintiff Mark Leone, as set forth in the attached certification (**Exhibit 1**), purchased ASPI common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.    Plaintiff Alexander Corredor Prada, as set forth in the attached certification (**Exhibit 2**), purchased ASPI common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. Alexander Corredor Prada filed the initial complaint in this action (Dkt No. 1).

13.    Plaintiff Ivan Agapchev, as set forth in the attached certification (**Exhibit 3**), purchased ASPI common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.    Defendant ASP Isotopes, Inc. is incorporated in Delaware and states in SEC filings that its principal executive offices are located at 601 Pennsylvania Avenue NW, South Building, Suite 900, Washington, DC, which Defendant Mann has described as a Regus virtual office. According to Defendant Mann, as of November 2024 ASPI had two employees (its CFO and another finance employee) in the United States, both located in or near Connecticut. The majority of ASPI's operations and personnel are located in South Africa. ASPI's common stock is listed and trades on the Nasdaq under the ticker symbol "ASPI".

15.    Defendant Paul E. Mann co-founded ASPI in September 2021 and has served as its Chairman and CEO and a member of its board of directors since incorporation. An ASPI investor presentation states that he has "20+ years of experience on Wall Street investing in healthcare and

chemicals companies at Soros Fund Management, Highbridge Capital and Morgan Stanley." He has served as a director or officer of other public companies including PolarityTE, Inc., Abeona Therapeutics, and Healthtech Solution Inc. Defendant Mann's LinkedIn profile lists his location as Washington, DC, and he signed ASPI's 2024 proxy statement, "Paul E. Mann, Chair of the Board, Washington, DC, October 18, 2024." His employment agreement states that his "services shall be performed principally at his personal residence, subject to any required business travel." Defendant Mann is also the CEO and Chairman of Quantum Leap Energy LLC, a wholly owned subsidiary of ASPI formed to conduct its operations relating to so-called "Quantum Enrichment" laser technology.

16.    Defendant Mann, because of his positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Defendant Mann was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his positions and access to material non-public information available to him, Defendant Mann knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that Defendants made were then materially false and/or misleading. Defendant Mann is liable for the false statements pleaded herein.

17.    The Company and Defendant Mann are referred to herein, collectively, as the "Defendants."

**IV.    BACKGROUND**

    **A.    Overview Of Isotope Separation & The Uranium Enrichment Market**

    18.    Chemical elements are comprised of atoms. Atoms have a nucleus containing protons and neutrons, which is orbited by electrons. All atoms with the same number of protons are the same element and share similar chemical properties (*e.g.*, hydrogen has one proton, uranium has 92). Atoms with the same number of protons but different numbers of neutrons are called isotopes (*e.g.*, uranium-235 has 92 protons and 143 neutrons, whereas uranium-238 has 92 protons and 146 neutrons). Different isotopes of the same element can have different physical properties giving rise to different applications. For example, uranium-235 can sustain a nuclear chain reaction which can generate power or be used in nuclear weapons, whereas uranium-238 cannot.

    19.    Isotope enrichment is the process of separating isotopes of the same element from each other. While different elements can be separated from each other through chemical processes due to their differing chemical properties, the chemical similarity of different isotopes of the same element generally requires more difficult and costly means of separation. Commercial applications of the use of enriched isotopes include generation of nuclear power, nuclear medicine (introducing radioactive materials to the body for use in medical imaging and diagnosis), and radiation therapy (introducing radioactive materials to the body to selectively kill cancer cells).

    20.    One established method of isotope separation uses gas centrifuges. Because isotopes of the same element have different numbers of neutrons, they have different mass. For example, uranium-238 has approximately 1% more mass than uranium-235. A gas centrifuge relies on centrifugal force in a rapidly spinning cylinder to move heavier isotopes to the cylinder's outer wall, with lighter isotopes remaining closer to its center. Feed gas is introduced into the centrifuge, and the heavier and lighter gas streams are extracted, using tubes located at different positions in the centrifuge. Numerous centrifuges are employed in a cascade to achieve successively greater

levels of enrichment. The vast majority of uranium presently used in nuclear power generation is enriched through centrifuges processing uranium hexafluoride ($UF_6$) as the feed gas. Naturally occurring uranium is approximately 99.3% U-238 and 0.7% U-235.

21.     The commercial market for uranium enrichment is competitive, and dominated by established companies with substantial resources and governmental ownership, all of which use large scale centrifuge plants: Rosatom (owned by the Russian government); Orano SA (majority owned by the French government); and Urenco (majority owned by the Dutch and British governments). The China National Nuclear Corporation, or CNNC, also has significant enrichment capacity and employs centrifuge plants.

22.     As stated by prospective U.S.-based centrifuge uranium enrichment supplier Centrus Energy Corp. (which itself is much larger, better established, and financially supported than ASPI), competitors such as Rosatom, Orano, and Urenco:

> have greater financial resources than we do. Foreign competitors enjoy financial and other support from their government owners, which may enable them to be less cost or profit-sensitive than we are. In addition, decisions by foreign competitors may be influenced by political and economic policy considerations rather than commercial considerations. For example, foreign competitors may elect to increase their production or exports of . . . uranium products . . . even when not justified by market conditions, thereby depressing prices and reducing demand . . .

**B.     ASPI's Business Centered On Acquiring The Assets And Personnel Of Klydon, An R&D Stage Isotope Separation Company**

23.     ASPI was incorporated in Delaware in September 2021 to acquire assets and license intellectual property rights from Klydon, a private company based in South Africa, related to the production of molybdenum-100 using Klydon's Aerodynamic Separation Process ("ASP") technology.

24.     When Klydon's business was taken over by ASPI, Klydon was financially distressed and it had unsuccessfully sought to restructure its debt. ASPI eventually acquired certain

7

Klydon assets through a "business rescue" process, which Defendant Mann has described as "basically the South African version of bankruptcy." Beginning in September 2019 Klydon was investigated by a forensic account ("Forensic Accountant"),[2] working on behalf of a Klydon investor. For six weeks Forensic Accountant investigated Klydon, interviewing its leaders and members of its finance team, and reviewing financial reports, investor agreements, and other documentation. According to Forensic Accountant, when she[3] investigated Klydon in 2019 "very little was happening. The project had effectively stopped – which is why [the investor] wanted an investigation done there."

25.    Klydon's ASP technology employs a technique similar to a so-called "stationary-wall centrifuge," in which the outer wall of the separation device does not move. The isotope material in feed gas form enters a stationary tube, and then follows a flow pattern that results in two gas vortexes occurring around the geometrical axis of the separator as shown below:



The isotope material spins rapidly, resulting in separation. The gas flows to the ends of the separator where different the portions of gas, containing different mixes of isotopes, are collected.

_____

[2] Forensic Accountant has worked as an accountant and certified fraud examiner for over 20 years, including roles at a Big Four accounting firm and at a major public company.

[3] The pronouns "she" and "her" will be used to refer to anonymized sources herein regardless of their actual gender in order to conceal their identities.

26.    In January 2022 ASPI licensed from Klydon intellectual property rights related to the production of uranium-235 using ASP technology. In July 2022 ASPI licensed from Klydon intellectual property rights related to the production of all isotopes using the ASP technology. Also in July 2022, ASPI acquired from Klydon a dormant pilot plant for processing of silicon-28 using ASP technology, located in Pretoria, South Africa.

27.    On November 1, 2021, an ASPI subsidiary named ASP Isotopes South Africa (Proprietary) Ltd ("ASP South Africa") and Klydon entered into a contract under which Klydon was to design and build a plant to enrich molybdenum in South Africa. Klydon failed to perform as required by the contract, and on November 30, 2022 ASP South Africa and Klydon entered arrangements under which Klydon pledged its assets to secure its performance by December 31, 2022. Klydon failed to meet that deadline, and according to ASPI's SEC filings the Company "did not believe that the amounts owed by Klydon were realizable." In April 2023 ASPI perfected its interests in Klydon's assets, acquiring certain intellectual property and Klydon's interest in four entities which were inactive and in the process of being dissolved.

28.    As ASPI stated in SEC filings, "[w]e are dependent on technology, know-how, and proprietary materials licensed from Klydon."

29.    According to Former ASPI Employee 1 who worked at Klydon and then ASPI (*see infra* paragraph 49), ASPI "took over the employees of Klydon," and "[t]hey forced us to end our contracts with Klydon and take up our contracts with ASPI." Similarly, Former Klydon Employee 1 (*see infra* paragraph 48) described ASP Isotopes and Klydon as "all the same team," stating "I think the guys from Klydon went to ASP."

30.    Numerous Klydon employees became ASPI employees. For example, Klydon was co-founded by Dr. Einar Ronander (who served as its Executive Chairperson) and Dr. Hendrik

Strydom (who served as its CEO), in or about 1993. Ronander served as Chief Scientific Adviser

to ASPI (beginning in January 2022 until he was later pushed out of the Company, *see infra* ¶49),

and Strydom served as Chief Technology Officer and a director of ASPI (from January 2022

through present). ASPI's Head of Engineering (from 2023 to present), Hendrik (Heino) Van Wyk,

served as Process Engineer and Engineering Manager at Klydon (from April 2022 to December

2022). ASPI's Medical Director (from November 2023 to present) and CEO of its PET Labs

subsidiary (from 2014 to present), Gerdus Kemp, served as Medical Director of Klydon. ASPI's

Head of Chemistry, Ben Swanepoel, served as a chemist at Klydon.

### C.    ASPI Was Small, Unprofitable, And Depended On Investors To Fund Its Operations

31.    ASPI completed its initial public offering on November 15, 2022, selling 1.25

million shares of common stock for $4.00 each, raising gross proceeds of $5 million.

32.    Throughout its brief history, ASPI has generated little or no revenue, and large and

growing losses:

|          | 2021*      | 2022        | 2023         | 2024         |
|----------|------------|-------------|--------------|--------------|
| **Revenue**  | $0         | $0          | $433,026     | $3,944,226   |
| **Net Loss** | $2,607,927 | $4,945,139  | $16,286,234  | $35,113,240  |

*2021 figures are for September 13, 2021 (inception) through December 31, 2021

33.    The revenue reported by ASPI beginning in 2023 was not generated by the

Company through the production and sale of isotopes, but rather by ASPI's ownership interest in

Pet Labs Pharmaceuticals Proprietary Limited ("PET Labs"). In October 2023, ASPI entered into

an agreement to purchase 51% of the shares of PET Labs for an aggregate price of $2 million.

ASPI described PET Labs as:

> a South African radiopharmaceutical operations company dedicated to nuclear
> medicine and the science of radiopharmaceutical production. PET Labs focuses on

the production of fluorinated radioisotopes and active pharmaceutical ingredients. PET Labs currently operates a single cyclotron in Pretoria, South Africa.

ASPI admitted in SEC filings that it had "not generated any revenue to date attributable to isotopes (and only limited revenues attributable to PET Labs), and we continue to incur significant research and development and other expenses related to our ongoing operations. As a result, we are not profitable and have incurred losses since our inception in September 2021."

34.     As stated by ASPI's auditor, EisnerAmper LLP, in connection with the Company's 2023 financial statements, "the Company has incurred recurring operating losses and negative cash flows from operating activities that raise substantial doubt about its ability to continue as a going concern."

35.     As further stated in ASPI's SEC filings:

Until such time as we can generate significant revenue from sales of our future isotopes or nuclear medical doses for PET scanning, if ever, we expect to finance our cash needs through public or private equity or debt financings or other capital sources, including potential collaborations, licenses and other similar arrangements. However, we may be unable to raise additional funds or enter into such other arrangements when needed on favorable terms or at all.

36.     ASPI paid for stock promotion services to publish information about the Company. One such promoter, RedChip Companies Inc., describes itself as "an investor relations firm hired by certain companies to increase investor awareness to the small-cap equity community." RedChip features ASPI on its website, and has published promotional videos about the Company including multiple interviews with Defendant Mann. A disclaimer on RedChip's website states:

ASP Isotopes (ASPI) agreed to pay RedChip Companies, Inc., a $12,500 monthly cash fee and $50,000 of Rule 144 stock, deemed earned immediately after the IPO, beginning in August 2022, for 12 months of RedChip investor awareness services. ASPI also agreed to pay RedChip a $50,000 fee for a national TV ad campaign aired May 10 to May 24, 2024.

ASPI and Defendant Mann also repeatedly published videos promoting the Company through the Emerging Growth Conference, which discloses on its website that "[i]n addition to any other services provided by EG, Companies that present on the Emerging Growth Conference pay Emerging Growth $12,500.00 quarterly."

37.    From the November 2022 IPO up to the beginning of the Class Period in September 2024, ASPI and its subsidiaries repeatedly sold stock, warrants, and convertible notes, to fund the Company's operations, in the aggregate totaling tens of millions of dollars.

38.    ASPI has been a small company at all times, reporting only 31 full-time employees as of March 2023 (prior to ASPI acquiring its interest in PET Labs). ASPI disclosed in its Form 10-K filed with the SEC on April 29, 2024 that, as of year-end 2023, "we employed 76 people on a full-time basis. Of the total employees, 6 employees are in research and development, 33 employees are in engineering, construction and manufacturing, 20 employees are in plant operations and 17 employees are in general management." In investor presentations published during the Class period, ASPI stated that it had "over 70 employees."

**D.    Defendants Touted Uranium Enrichment As A Core Operation For ASPI**

39.    Leading up to and during the Class Period, Defendants repeatedly emphasized the key importance of uranium enrichment to ASPI.

40.    For example, in an investor presentation filed with the SEC on September 26, 2024 (**Exhibit 4**), ASPI prominently featured "Nuclear Energy," specifically enrichment of uranium, as one of three areas of focus for the Company, alongside nuclear medicine and enrichment of silicon-28 for semiconductor manufacturing. *See id.* at 3.

41.    The presentation highlighted the potential for soaring demand for enriched uranium, as governments around the world seek to meet their declared targets for reduction of greenhouse gas emissions. *See id.* at 26. The presentation stated "Uranium supply has been in a

state of sustained deficit since 2018," and showed that prices for uranium enrichment had more than doubled over the last four years. *See id.* at 30.

42.    Also on September 26, 2024, Defendant Mann spoke on an ASPI conference call hosted by the Emerging Growth Conference paid stock promotion service. Mann stated:

> we're a company operates in three industries, the medical industry, the semiconductor industry and the nuclear energy industry . . . we do that via three verticals in the company, ASP isotopes . . . produces stable isotopes . . . PET labs which makes isotopes for the medical industry . . . and then Quantum Leap Energy is a division we started about a year ago that's going to focus on nuclear fuels for the future, specifically high assay low enriched uranium.

Later in the call, Mann further stated, "most investors are more excited about the nuclear energy opportunity than stable isotopes."

43.    In the Q&A portion of the call, Mann was asked "how many advanced nuclear power companies are you currently in partnership discussions with?" He replied in relevant part "we have signed 2 MOU's both with large US based SMR [small modular reactor] companies. Collectively they need about $37 billion of HALEU [high assay low enriched uranium] between now and 2037."

44.    Defendants also emphasized the importance of their so-called "quantum enrichment" technology. In a September 28, 2023 press release announcing plans to use quantum enrichment for uranium, ASPI stated:

> The Company has incorporated a new subsidiary, Quantum Leap Energy LLC (QLE) . . . which will focus on producing advanced nuclear fuels.
>
> Specifically, QLE will concentrate on producing HALEU for use in Small Modular Reactors by 2027 and Lithium-6, which will be necessary for Nuclear Fusion. This production will come from the development of the Quantum Enrichment Process. Quantum Enrichment Process, an isotope enrichment method under development by our scientists, is a laser-based enrichment method, which we believe will have both the lowest levelized cost of HALEU production, the lowest cash operating cost of HALEU production, low capital expenditure, and efficient construction cycles. This will make the Quantum Enrichment Process ideal for enriching smaller-to-mid

size quantities or flexible and growing amounts of specialized materials (HALEU and Lithium-6), as opposed to existing isotope enrichers who rely on a more extensive and slower process to produce commodity products.

45.    ASPI's September 26, 2024 investor presentation explained quantum enrichment in the following slide:



46.    Defendant Mann stated in the September 26, 2024 conference call, "we think our quantum enrichment technology is perfect for enriching uranium."

## V.    DEFENDANTS CONCEALED THAT ASPI'S URANIUM RESEARCH WAS ENTIRELY THEORETICAL—THE COMPANY HAD NEVER WORKED WITH URANIUM

47.    Throughout the Class Period, Defendants knew, but failed to disclose to investors, that neither ASPI nor its predecessor Klydon had ever experimented with or tested their technology on uranium. These undisclosed facts severely undermined Defendants' misleading public statements during the Class Period such as those touting experience using lasers to enrich uranium, and publishing data comparing quantum enrichment to other uranium enrichment methods. Defendants' misrepresentations and omissions materially misled not only the investing public, but

14

even a professional stock analyst specializing in the sustainable energy industry who covered ASPI.

48.     Former Klydon Employee 1 ("FKE1") was a Process Engineer at Klydon from March 2017 to December 2017, reporting to Engineering Manager Japie Grant. FKE1 has a masters degree in chemical engineering, and worked on Klydon's experiments. FKE1 "didn't work on uranium," and "nobody" at Klydon did during her tenure there. While FKE1 believes there is a "possibility" Klydon's technology would work on uranium, she "never" spoke about this with anybody at Klydon.

49.     Former ASPI Employee 1 ("FAE1") was Head of Empirical Research at Klydon from July 2007, and eventually transitioned from working at Klydon to ASPI in connection with ASPI's acquisition of Klydon. At ASPI she was Assistant to the Manager of R&D, Xandra van Heerden, until FAE1's employment was terminated in January 2024. FAE1 worked directly with Defendant Mann and ASPI's COO, Robert Ainscow, among others, and attended weekly management meetings with Mann relating to ASPI's planned molybdenum plant. According to FAE1, regarding ASPI's laser technology, at the time she left the Company, "[t]hey were only planning it. They were working on the theory behind the experiments, and on the design for the test facility." According to FAE1, "[CTO] Hendrik Strydom and [laboratory manager] Hendrik Kloppers were working alone on lasers, with some input from [Chief Scientific Advisor] Einar Ronander," in an effort probably headed by Defendant Mann. FAE1 stated that "Einar was working on the theoretical side" and "[i]f a project is not even, on a laboratory scale, proved, then it's a long time before it can be used in a plant." According to FAE1, the laser technology "may not be economically feasible," and "there has been a lot of talk from Hendrik Strydom and Einar Ronander that it would be economical and would be better than centrifuge. But that has not been

15

proven." FAE1 stated that Ronander was pushed out of ASPI, and that after Ronander had gone on medical leave his office was locked, and "they wouldn't give him access to any documents."

50.    On November 27, 2024, at the end of the Class Period, Defendant Mann participated in an interview with Canaccord Genuity analyst George Gianarikas, in an attempt to respond to the claims made in the Fuzzy Panda Research report published the previous day.[4] *See* ¶¶103-112, *infra*.

51.    During the interview Gianarikas asked, "[s]o we'll get to TerraPower in a second, but to the extent TerraPower wants to use, just assume this for the sake of the argument, only use ASP for its HALEU needs, right? One reactor will need tens if not hundreds of modules from ASP."[5] Defendant Mann responded in relevant part, "[y]es, we don't actually know the exact number yet because *we haven't actually enriched uranium*. And so until we've actually tried the process out with uranium and worked out an enrichment factor . . . difficult for us to know exact numbers."[6]

52.    Later in the interview, following up on a series of questions regarding ASPI's memorandum of understanding ("MOU") with TerraPower and TerraPower's due diligence into ASPI's technology, the following exchange took place:

---

[4] Gianarikas was a Managing Director and Senior Analyst at Canaccord Genuity with 24 years of experience in the finance industry, including several years as a senior equity analyst focused on the sustainable energy industry. He had direct access to ASPI and Defendant Mann due to his role as an analyst covering the Company, and due to the close relationship between ASPI and Canaccord Genuity in which Canaccord served as sole underwriter and bookrunner for ASPI stock offerings on July 15, 2024 (selling 13.8 million shares for gross proceeds of $34.5 million) and November 4, 2024 (selling 2,754,250 shares for gross proceeds of $18.6 million).

[5] TerraPower is an early stage nuclear power reactor design and development company founded by Bill Gates. Among its projects is to develop small modular reactors ("SMRs") to provide nuclear energy.

[6] Quotes in this complaint have been cleaned up. All emphasis is added unless otherwise indicated.

**Gianarikas:** *So anyone who's signing an MOU like this has looked at the results of what you've done, sort of at a lab scale in enriching uranium, which you've done at a lab scale, right?*[7]

**Mann:** We've actually got commercial plants as well. So we've got three commercial plants in South Africa that are enriching today.

**Gianarikas:** *But I'm referring to uranium only.*

**Mann:** Say again?

**Gianarikas:** *I'm referring to uranium only.* I'm not talking about the other . . .

**Mann:** I mean, again, you know, *we need to get a license before we're able to test our processes on the uranium . . . we need to get into Pelindaba and start working on uranium before we know definitively how, what the process looks like.* But you know we have a very good idea. The team have done it in the day, 20-30 years ago, so they'll be able to do. But I mean again we are enriching isotopes today so people can look at [unintelligible]

**Gianarikas:** So what would TerraPower base their optimism on then?

**Mann:** I guess, we show enrichment of isotopes in all our plants and how we do it. And they have experts, they may have experts who have done it as well, maybe they were involved in the AVLIS [atomic vapor laser isotope separation] program, maybe they've been down to visit us. So . . . based on that.

53.     As shown by the comments of former employees of Klydon and ASPI, and as later publicly admitted by Defendant Mann in response to the Fuzzy Panda Research report, neither ASPI nor its predecessor Klydon had ever worked with or tested their technology on uranium, even on a laboratory scale. As shown by the comments of professional stock analyst Gianarikas, this was in stark contrast to what Defendants had conveyed to the market, giving a materially

---

[7] Further confirming that Gianarikas understood ASPI to have already enriched uranium on a laboratory scale, in an October 17, 2024 interview with Yahoo! Finance he stated "we recently initiated coverage on a company called ASP Isotopes. Now ASP is a really, really interesting company housed in South Africa and *they have basically lab scale technology . . . that . . . hopefully they can bring out commercially.* And if they do, there's enormous promise to their potential for uranium enrichment because *they're using some laser beams instead of traditional centrifuges to enrich uranium.*"

misleading impression of the state of ASPI's technology and the prospects for its commercial success.

## VI.    ASPI SOLD $18.6 MILLION OF ARTIFICIALLY INFLATED STOCK DURING THE CLASS PERIOD

54.    Because ASPI had minimal revenue and rapidly increasing, multi-million dollar losses during the Class Period, and because its plans required spending at least tens or hundreds of millions of dollars on R&D and construction of isotope enrichment facilities, it needed to obtain correspondingly large amounts of funding from investors.

55.    Just prior to the beginning of the Class Period, on September 25, 2024, ASPI's stock closed at a price of $2.83 per share. As Defendants made misleading statements concerning ASPI's business and uranium enrichment, ASPI's stock price increased dramatically, including a 15% single day gain on October 17, 2024 when ASPI announced the commissioning of its first quantum enrichment facility, and a further 20% single day gain on October 30, 2024 when ASPI announced a term sheet with TerraPower for construction of a uranium enrichment facility.

56.    Capitalizing on this artificially inflated stock price surge, on October 31, 2024 ASPI filed with the SEC a preliminary prospectus supplement for the sale of its common stock. On November 1, 2024 ASPI and Canaccord Genuity LLC entered an underwriting agreement for the sale, signed by Defendant Mann on behalf of ASPI. On November 4, 2024, ASPI filed with the SEC the final prospectus supplement for the offering, and announced that on that day it had completed the sale of 2,754,250 shares of common stock at a public offering price of $6.75 per share, raising gross process of $18.6 million.

## VII.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

57.    During the Class Period, Defendants made multiple statements that misleadingly misrepresented and/or omitted to disclose that neither ASPI nor its predecessor Klydon had ever

experimented with or tested their technology on uranium. These undisclosed facts severely undermined Defendants' misleading public statements during the Class Period.

### A.    September 26, 2024 Conference Call And Investor Presentation

58.    The Class Period begins on September 26, 2024. That morning ASPI filed with the SEC a Form 8-K current report signed by Defendant Mann, which attached as an exhibit a slide deck presentation titled "ASP Isotopes Corporate Overview" and dated September 2024. A copy of the presentation was also made available on ASPI's website. *See* **Exhibit 4**. Also on the morning of September 26, Defendant Mann spoke on an ASPI conference call hosted by the Emerging Growth Conference paid stock promotion service, in which he gave prepared remarks while presenting the slide deck, and then responded to questions.

59.    Page 26 of the presentation bears the heading "HALEU Supply: A Growing Concern for SMRs" and states "[w]e believe that our proprietary Single Stage Quantum Enrichment Technology provides an ideal solution…" Similarly, in his prepared remarks in the conference call Defendant Mann stated that "we think our quantum enrichment technology is perfect for enriching uranium."

60.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendants had no reasonable basis for the professed belief that quantum enrichment technology provides an ideal solution for HALEU supply, or a perfect solution for enriching uranium, because Defendants had never attempted to use any ASPI technology on uranium.

61.    Page 28 of the presentation bears the heading "Comparing and Contrasting Enrichment Methods," and presents the following data purporting to compare uranium enrichment under various methods including ASPI's quantum enrichment technology:[8]



**Comparing and Contrasting Enrichment Methods**

| | Gaseous Diffusion | Centrifugation | Atomic Vapor laser Isotope Seperation (AVLIS) | Separation of Isotopes by Laser Excitation | Quantum Leap Energy |
|---|---|---|---|---|---|
| Cost | High Capital Cost | Capital 1/10 of Diffusion | Low Capital, Small Size | Low Capital, Small Size | Low Capital, Small Size |
| Speed | High Pressure | High Speed | U Metal 3000K | Adiabatic expansion nozzles (10-20K) | U Metal 3000K |
| Technology Notes | High Technology | Rotor Design & Material | Selective Photoionization | Laser Excitation Transmission by Skimmer | Enhanced Resonant Multiphoton Ionization |
| Selectivity | Selectivity α ≥ 1.003 | Selectivity α ≥ 1.15 | Selectivity α ≥ 10-50 | Selectivity α ≥ 2-20 | Selectivity α ≥ 50 |
| SWU | 2500 kWh/SWU | 50 kWh/SWU | 40 kWh/SWU | Estimate < 50 kWh/SWU | 40 kWh/SWU |
| Stages Required | 500 Stages to reactor grade | 50 Stages | 1-2 Stages | 1-2 Stages | Single Stage |

© ASP Isotopes Inc.                                                                                      ASP isotopes    28

On the conference call Defendant Mann stated in connection with this slide and the following page 29 of the presentation:

> this kind of contrasts and compares different types of enrichment and you'll see *the most important line here is the selectivity line, the alpha line*, and so the selectivity for centrifuge, it's about 1.15. And so that's good, and . . . when you put it into a cascade, you compound that 1.15 across the cascade, and that gives you your desired enrichment. But *for quantum leap or quantum enrichment, selectivity is greater than 50*. And here's an example of quantum enrichment in a real world application. This is Lithium 6 and lithium 7, so you'll see in the top chart there. That's Lithium 6 is at 7% and Lithium 7 is at 93% and after a single pass through our enrichment chamber, the Lithium 6 is now over 90%. And so that's an enrichment factor of 112. So *when we say greater than 50, we mean substantially greater than 50.*

---

[8] The reference in the table to "U Metal 3000K" is to the temperature of 3,000 degrees on the Kelvin scale at which Defendant Mann has stated that solid metal uranium (chemical symbol "U") vaporizes into a gas.

62.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendants had no reasonable basis to make claims about the enrichment selectivity or energy required per separative work unit ("SWU")[9] for quantum enrichment of uranium, because they had never attempted to use any ASPI technology on uranium.

63.    Page 29 of the presentation bears the heading "Quantum Enrichment: Real World Experience" and states:

Our team have used lasers to enrich many different metals
- Uranium
- Lithium (the only isotopes where results have been published)
- Zirconium
- Zinc

64.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, neither ASPI nor its predecessor Klydon had any real world experience enriching uranium with lasers or otherwise. As later admitted by Defendant Mann, "[t]he team have done it in the day, 20-30 years ago."

65.    Page 32 of the presentation bears the heading "Potential to Close the Loop on Nuclear Waste" and states "Depleted tails from other uranium enrichers produce nuclear waste. The management of this waste is becoming a problem. We believe that our technology can process this waste into HALEU." The page also presents a table showing that ASPI's work on uranium-235 using both quantum enrichment and ASP technology is currently in the "R&D Stage":

---

[9] A separative work unit is the standard measure of the effort required to separate U-235 and U-238. It is measured in units of kilograms and can then be manipulated to determine cost per SWU and kWh (kilowatt hour) per SWU.



66.     The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded: (i) Defendants had no reasonable basis for the professed belief that ASPI's technology can process depleted uranium tails into HALEU, because Defendants had never attempted to use any ASPI technology on uranium, let alone depleted tails; and (ii) ASPI's quantum enrichment and ASP technologies as applied to uranium-235 were entirely theoretical and lacked any real-world research and development.

67.     Page 33 of the presentation bears the heading "Investment Overview" and states under the sub-heading "Proven Proprietary Technology" that "ASPI's advanced technologies leverage 20 years of R&D history to enrich isotopes in varying levels of atomic mass, allowing it to meet the growing demand in the Nuclear Medicine, Semiconductors, and Nuclear Energy industries."

68.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, ASPI's technology was not "proven" with respect to the nuclear energy industry because ASPI had never worked with uranium, and its technology had never been tested on uranium.

**B.    October 17, 2024 Press Release Regarding Commissioning Of Quantum Enrichment Plant**

69.    On the morning of October 17, 2024, ASPI published a press release titled "ASP Isotopes Inc. Enriches Ytterbium-176 During Commissioning Phase of First Quantum Enrichment Facility and Expects to Offer Highly Enriched Ytterbium-176 for Commercial Sale in 2025." Later that day, ASPI filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Mann.

70.    The press release "announced the successful enrichment of Ytterbium-176 using Quantum Enrichment, a novel laser isotope enrichment technique," and stated that:

> The Company believes that this proprietary technology is not only more efficient and scalable than other enrichment technologies, but also has considerable advantages with respect to capital efficiency and industrial pollution. Additionally, ASP Isotopes believes that because of this milestone achievement *it is likely that other important isotopes can be produced using the Quantum Enrichment technology with the same benefits*.

71.    The press release further stated that "ASPI believe its Quantum Enrichment process will be able to produce HALEU (High Assay Low Enriched Uranium) at an attractive price, allowing new nuclear energy to become available at a 'green discount' to carbon-intensive electricity production processes."

72.    On this news, on October 17, 2024, ASPI's stock closed at $4.04 per share, up 15.4% from the previous day's closing price.

73.     The statements identified in paragraphs 70-71 were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendants had no reasonable basis for the professed belief that quantum enrichment technology would be able to produce HALEU at an attractive price, because Defendants had never attempted to use ASPI's technology on uranium.

**C.    October 30, 2024 Press Release Regarding Term Sheet With TerraPower For Construction of HALEU Production Facility**

74.     On the morning of October 30, 2024, ASPI published a press release titled "ASP Isotopes Inc. enters into Term Sheet with TerraPower, LLC for Construction of a HALEU Production Facility." Later that day, ASPI filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Mann.

75.     The press release stated that ASPI "has entered into a term sheet with TerraPower, a nuclear innovation company and advanced nuclear energy developer, related to the construction of a uranium enrichment facility capable of producing High Assay Low-Enriched Uranium (HALEU) and the future supply of HALEU to TerraPower, as a customer of Quantum Leap Energy LLC (QLE)."

76.     The press release further stated that "the parties anticipate entering into a long-term supply agreement for the HALEU expected to be produced at this facility pursuant to which the customer would purchase all the HALEU produced at the facility over a 10-year period after the expected completion of the facility."

77.     The press release also stated that ASPI "believes that its enrichment technologies can be deployed in a new HALEU facility for considerably lower capital costs, and in much less

time, compared to the construction of an enrichment facility using a traditional centrifuge process of HALEU production."

78.    The press release quoted Defendant Mann stating "Over the last several decades, the scientists at ASP Isotopes have developed some of the world's most advanced isotope enrichment technologies. This term sheet is further validation of our belief that ASP Isotopes can offer scalable and capital efficient technology solutions to the supply challenges which exist in global isotope markets."

79.    On this news, on October 30, 2024, ASPI's stock closed at $6.90 per share, up 19.8% from the previous day's closing price, on extremely high trading volume. Only four days later ASPI would complete a sale of its shares at the artificially inflated price of $6.75 per share, for gross proceeds of $18.6 million.

80.    The statements identified in the paragraphs 75-78 were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, there was no reasonable basis for their purported belief that ASPI could construct a commercially viable HALEU facility, and would produce commercial quantities of HALEU, given that Defendants had never attempted to use ASPI's technology on uranium.

### D.    October 30, 2024 Conference Call

81.    Also on the morning of October 30, 2024, Defendant Mann spoke on an ASPI conference call hosted by the Emerging Growth Conference, in which he gave prepared remarks while presenting ASPI's corporate overview slide deck, and then responded to questions. Mann's prepared remarks were similar to the misleading statements he made on the September 26, 2024 conference call.

82.    During the question and answer session, the host relayed a listener's question, "Is criticality an issue with your QE process enriching U-235?"[10] Mann replied in part:

> So, criticality is the problem in any enrichment process involving U-235. You have to demonstrate to the regulators and to the people who provide your license you'll never going to be able to hit criticality. *One of the advantages of our QE process is that we do it in batches, so rather than having a continuous process of hundreds of kilograms of product inside the plant at a time, you only have a small amount of product being enriched at a time.* And so we believe we can demonstrate very clearly to regulators that there's no chance of hitting criticality.

83.    The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, Defendants had never used their quantum enrichment process, or any process, on uranium.

**E.    November 19, 2024 POWER Magazine Interview**

84.    On November 19, 2024, POWER magazine published to its website an article titled "Mobility, Flexibility, Scalability: SMRs Forging Nuclear's Future," which included an interview with ASPI's vice president of fundraising and business development, Viktor Petkov.[11]

85.    In response to the question "What *current technology* is your company working on with regard to supporting the market for SMRs?", Petkov replied in part "ASP Isotopes (ASPI) is focusing on producing critical nuclear fuels necessary for the operation of small modular reactors.

---

[10] Criticality refers to the point at which a nuclear chain reaction becomes self-sustaining, which can give rise to a substantial and dangerous release of energy and/or radiation.

[11] According to his LinkedIn profile, Petkov has served as ASPI's Vice President of Business Development & Funding from March 2024 to present, and his duties include "Leading the company's Business Development and Funding functions, with a primary focus on Europe and North America. Responsibilities include driving customer engagements, *managing equity investor relations*, and securing partnerships with debt funding providers." ASPI's website lists Petkov as a member of the Company's "Senior Management."

These include HALEU (High-Assay Low-Enriched Uranium), Lithium-6 and Lithium-7, Chlorine-37, and Thorium Fluoride."

86.    In response to the interviewer's next question, "Do you have a timeline for commercial operation of your technology?", Petkov replied:

*Our technology is fully prepared for deployment*, pending the necessary approvals to operate an isotope enrichment facility. We are targeting 2025/2026 for the production of Lithium-6 and Lithium-7. ASPI is actively engaged in discussions with multiple governments to secure authorization for the construction of a uranium enrichment plant, which will produce HALEU. Once the required permits are obtained, we anticipate that the facility could be operational within 12 to 18 months.

87.    The statements identified in paragraphs 85-86 were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as Defendants knew or recklessly disregarded, ASPI was not currently working on uranium with its technology and never had, so its technology was not prepared for commercial deployment.

88.    On November 25, 2024, ASPI posted from its account (@ASPIsotopes) on X (formerly known as Twitter):

Great article about the role of SMRs in the future of nuclear energy from @POWERmagazine, including ASP Isotopes' VP of Funding & Business Development Viktor Petkov providing insights about how ASPI works with SMR designers and developers. Read here: https://powermag.com/mobility-flexibility-scalability-smrs-forging-nuclears-future/

**F.    November 22, 2024 Revised Investor Presentation**

89.    ASPI published to its website a revised version of the September 26, 2024 investor presentation, with ASPI's website listing its date as November 22, 2024 (although the presentation's first page still said "September 2024"). The presentation was identical to the September 26, 2024 version, except that it removed page 9 titled "QE Technology: Illustrative Laser System," which contained pictures of lasers and laboratory equipment.

90.     The November 22, 2024 investor presentation contained the same misleading statements as the September 26, 2024 presentation, which were materially false and misleading for the same reasons stated above in Part VII.A.

## VIII.   THE TRUTH EMERGES, CAUSING DRAMATIC DECLINES IN ASPI'S STOCK PRICE

91.     On November 26, 2024 and November 27, 2024, the material risks and adverse information previously concealed by Defendants' false and misleading statements and omissions materialized and were revealed. As a result, ASPI's investors suffered steep losses, with the Company's stock price declining by a total of 34.4% over those two days.

### A.     The November 26, 2024 Fuzzy Panda Research Report

92.     On the morning of November 26, 2024, Fuzzy Panda Research published online a report titled "ASP Isotopes (ASPI): Failed Tech + Paid Stock Promotion + "Microcap Fraudsters" (Honig &Stetson) = Nuclear Meltdown." *See* **Exhibit 5**. Based on research including interviews with nuclear energy industry executives and consultations with an applied physicist, Fuzzy Panda Research revealed significant problems facing ASPI's claimed uranium enrichment technology.

93.     In response to the question, "Who would you rank at the bottom?", the report quoted a "TerraPower Former Executive in Procurement" as stating "Probably ASP Isotopes … [ASPI] still have to build the manufacturing facility. [ASPI] still have to qualify the process. ASPI is missing the manufacturing; They are missing the processes as well; They still have to develop the HALEU … the most important part."

94.     The report quoted a "TerraPower Former Executive" as stating regarding ASPI's projected timeline, "It's too optimistic. And not real … That's my view on it. And again, I have been around. I've worked on real projects, and I've seen how things work."

95.     The report quoted a "Former Centrus C-Level Executive" stating "We could have bought it [ASPI] for a couple million, and we didn't think it was worth it. So, at $500 million [market cap], you're scratching your head."

96.     Citing a former employee of Klydon, the report stated that "they told us that Klydon had also tried and failed at selling the tech to Cameco. The former Klydon employee told us Cameco's scientists were 'very skeptical of the technology' and Cameco 'did NOT think it would work on uranium'."[12]

97.     Fuzzy Panda Research revealed that ASPI's quantum enrichment technology appears to be based on AVLIS (atomic vapor laser isotope separation), a proposed enrichment method that was previously researched by governments around the world but discontinued after billions of dollars of investment failed to produce desired results. The report showed that ASPI's illustration of quantum enrichment technology used in investor presentations was simply a re-creation of an illustration of AVLIS technology from a 2008 U.S. Nuclear Regulatory Commission report.

98.     Fuzzy Panda Research asked an "applied physicist who recently worked at Los Almos National Laboratory" to explain the basic problems with AVLIS technology, and quoted the physicist as stating "Quantum laser enrichment requires uranium in a gas form. The temperature required to make uranium a gas will damage other sensitive parts of the experiment such as . . . the parts used for separating the gaseous uranium."

---

[12] Cameco, based in Canada, is one of the world's largest uranium mining companies, with over 35 years of experience, billions of dollars in annual revenue, and hundreds of millions of pounds of mineral reserves. Cameco is also the 49% owner of Global Laser Enrichment LLC, a U.S.-based company researching laser technology for uranium enrichment, which has commenced demonstration testing to validate large-scale enrichment performance, and expects to generate hundreds of kilograms of enriched uranium.

99.    As Fuzzy Panda Research further explained in the report:

The fundamental issue with an AVLIS-based technology is that it requires uranium metal as a feedstock, as opposed to uranium hexafluoride (UF6) which is a gas and is used as the feedstock in all other current enrichment technologies. Uranium metal causes many challenges because ASPI needs to vaporize the metal at an extreme temperature of 3,400°C. Atomic vapor is extremely corrosive and has been shown to destroy the material within the separator device. When the U.S. Government set up an AVLIS pilot plant, the vapor destroyed the equipment within the separator device and required refurbishing the separator every 400 hours (22 times a year), making it costly and uneconomical.

100.    The report quoted Dr. Michael Goldsworthy, CEO of Silex Systems Limited and inventor of its Separation of Isotopes by Laser Excitation ("SILEX") technology, as stating that "I can't see any different way to do AVLIS … AVLIS will take lots of time and money to do again … I have very low hopes for ASPI".[13]

101.    In the afternoon on November 26, 2024, ASPI issued its first public response to the Fuzzy Panda Research report. Defendants' only statement in the brief press release addressing the substance of the claims made by Fuzzy Panda Research was that "[b]ased upon ASP Isotopes's and its legal counsel's preliminary review and evaluation of the report, the Company believes the report includes speculative conjecture and claims that are inaccurate or filled with innuendo in an attempt to mislead investors about ASP Isotopes's technology, leadership and future growth." That is, Defendants cast vague aspersions, while failing to dispute *any* of the report's particular claims, and failing to provide any information to support Defendants' prior misleading statements regarding the use of ASPI's technology for uranium enrichment.

---

[13] Silex Systems Limited is the 51% owner of Global Laser Enrichment LLC ("GLE"). The SILEX technology being developed by GLE has significant differences to ASPI's proposed quantum enrichment technology, including that SILEX uses uranium hexafluoride gas a feedstock, instead of needing to vaporize pure uranium metal at extremely high temperature.

102.    On this news, ASPI's share price fell $1.80 as compared to the prior day closing price, or 23.5%, to close at $5.85 per share on November 26, 2024, on heavy trading volume.

**B.    Defendant Mann's November 27, 2024 Interview With Canaccord Genuity**

103.    On the morning of November 27, 2024, Defendant Mann participated in an interview with Canaccord Genuity analyst George Gianarikas, in an attempt to respond to the claims made in the Fuzzy Panda Research report published the previous day.

104.    During the interview Gianarikas asked, "[s]o we'll get to TerraPower in a second, but to the extent TerraPower wants to use, just assume this for the sake of the argument, only use ASP for its HALEU needs, right? One reactor will need tens if not hundreds of modules from ASP." Defendant Mann responded: in relevant part, "[y]es, we don't actually know the exact number yet because *we haven't actually enriched uranium*. And so until we've actually tried the process out with uranium and worked out an enrichment factor . . . difficult for us to know exact numbers."

105.    Later in the interview, following up on a series of questions regarding ASPI's MOU with TerraPower and TerraPower's due diligence into ASPI's technology, the following exchange took place:

> **Gianarikas:** *So anyone who's signing an MOU like this has looked at the results of what you've done, sort of at a lab scale in enriching uranium, which you've done at a lab scale, right*?
>
> **Mann:** We've actually got commercial plants as well. So we've got three commercial plants in South Africa that are enriching today.
>
> **Gianarikas:** *But I'm referring to uranium only*.
>
> **Mann:** Say again?
>
> **Gianarikas:** *I'm referring to uranium only*. I'm not talking about the other . . .
>
> **Mann:** I mean, again, you know, *we need to get a license before we're able to test our processes on the uranium . . . we need to get into Pelindaba and start working*

*on uranium before we know definitively how, what the process looks like.* But you know we have a very good idea. The team have done it in the day, 20-30 years ago, so they'll be able to do. But I mean again we are enriching isotopes today so people can look at [unintelligible]

**Gianarikas:** So what would TerraPower base their optimism on then?

**Mann:** I guess, we show enrichment of isotopes in all our plants and how we do it. And they have experts, they may have experts who have done it as well, maybe they were involved in the AVLIS program, maybe they've been down to visit us. So . . . based on that.

106.    Earlier in the interview, Gianarikas asked, "Is your quantum enrichment process based on AVLIS enrichment technology?" Defendant Mann admitted that it was, at least in part, while unsuccessfully attempting to distinguish ASPI's technology, and failing to identify any work ASPI had done experimenting with uranium:

That's, a little bit, but not really. That's a bit like saying it is a car today in 2024 based on a car in 1990 . . . AVLIS we feel was a very simple, very simplistic we feel. So the spectroscopy we use is a lot more complex than what AVLIS used. We have a team of scientists who work on spectroscopy, working out what wavelengths we have to use to ionize particular isotopes. And it means we can ionize isotopes that aren't necessarily [unintelligible] ground state, which is where a problem of AVLIS was. The beam shaping has changed a lot over the last 20 years, 30 years. We have a very sophisticated group of scientists at [unintelligible] University who do our beam shaping for us. And the lasers have changed a lot as well. Back in the AVLIS day people used copper vapor lasers, whereas now you know the lasers are much more powerful, have much higher repetition rates and you know they're very different. So there's a number of differences between what AVLIS was and what we do today. They're both laser based technologies though, but they're somewhat different.

107.    In a follow up question regarding whether and how ASPI had improved on AVLIS technology, Gianarikas asked, "And how did you develop on AVLIS, or the Company or South Africa do that as its enrichment industry sort of remained dormant, for at least from what my understanding is for a while, how did you improve on something when you really, I guess, allegedly weren't working on it?" Defendant Mann replied, implicitly acknowledging that work to improve on AVLIS was not conducted for many years:

You know, we've actually hired out of retirement quite a lot of the team who were involved in the enrichment back in the day. So one of our one of our main scientists, he's 73. He retired 10 years ago and we've hired him back . . . We hired a lot of those people back again. You know, and I think for a lot of them, you know, back in the 90s kind of the rug got pulled from under their feet, they suddenly stopped having to do they were doing. Their dream was to build bigger, more complex plants. And now that's what they're doing now.

108.    Gianarikas questioned Mann as to doubts about the commercial viability AVLIS technology, and how ASPI had overcome those challenges. Mann responded by evasively referring to work on the laser component of an AVLIS system, without citing any work that ASPI had done processing uranium (because there was none):

**Gianarikas:** You can read this stuff online where people at least have tried AVLIS enrichment technology, laser based, quantum enrichment sort of enrichment technology. It hasn't worked right, it just hasn't really worked successfully. And I think what investors, what we are really looking to understand is well, how can you do it? If there's been country level efforts, billions I'm assuming of dollars spent on this stuff, suddenly this company from South Africa says "we can do it." You know like well, how do we feel comfortable with that? We'll get to a lot more questions in a second, but can you just talk about why you feel comfortable that it works? And you did it with Ytterbium, right? You're doing it right now at least in the facility that you've built, but how do we know that the technology is transferable to uranium? And how do we know that after all these other independent parties have tried to do it, suddenly you've figured it out?

**Mann:** So let's remember that everyone else was trying to do it back in the 90s, early part of 2000s, so 30 years ago. That was one of the longest bear markets we've ever seen in uranium and in isotopes. So I think most of those programs may well have shut down for commercial reasons because it's very challenging to compete against a country, who are basically selling downgraded weapons grade material at basically zero cost. That's a very challenging market to compete against. Also, I would not want to use AVLIS or lasers to produce LEU and compete against a Russian centrifuge.[14] That's tough. That's a very tough business to do. And then secondly, what I said earlier about technology moving on. I mean technology doesn't stay stationary, it accelerates and moves, and technologies evolve over time. As I said earlier, the lasers are very different now to what they were, you know, 30 years ago. Everything's very different to almost 30 years ago . . . And also no one's tried to improve it for the last 20 years. These programs shut down

---

[14] LEU is low-enriched uranium, generally containing 3%-5% U-235. In contrast, HALEU is high-assay low-enriched uranium, generally containing 5%-20% U-235.

over 20 years ago. And . . . in general in isotope enrichment, very few people invested in this industry over the last 20 years, there has been very little innovation.

109.    Gianarikas further questioned Mann about the feasibility of laser enrichment, and technical problems with ASPI's stated approach. Again, Mann's response was vague and did not refer to any work ASPI conducted on uranium to overcome those problems:

> **Gianarikas:** There have been some papers written that have skepticism around your approach to laser enrichment. You know, maybe it gets a little too hot. Maybe using uranium metal isn't the right feedstock. Can you just make us feel comfortable that it doesn't get too hot or the uranium metal is the right the right feedstock? And also, you're using the process for Ytterbium, right. Can you help us understand or give us comfort that jumping from that to uranium is, I don't call it easy, but not that much of a leap?

> **Mann:** . . . We're [unintelligible] process uranium at about 3000 Kelvin, that's where it vaporizes. And again we can change that temperature a little bit, change some of the attributes inside where we process it. And, you know, none of the chemicals we process are particularly friendly chemicals. Would I rather process uranium at 3000 Kelvin or UF$_6$ gas at 70 degrees C? I'm not sure. Neither are particularly pleasant . . . we're very used to dealing with challenging chemistries. None of the chemicals we process are particularly friendly. So uranium is just one other challenging chemical. You just have the right abatement systems in place and the right safety processes in place.

110.    Gianarikas pressed Mann for a direct answer to his questions, asking "But so can you talk about those technical questions. Is 3000 Kelvin too hot? Is there something that breaks down at that level, heat level? And also is uranium metal too difficult to work with as a feedstock?" Mann responded with more vague assertions of confidence unsupported by any real-world experience processing uranium:

> So is 3000 Kelvin hot? Yes, it is hot. Is it too hot? There are materials that handle 3000 Kelvin. You have to heat it up slightly differently as well. You can't use thermal heating to heat up to 3000 Kelvin [unintelligible] efficient. So there's different ways to heat it up. And then in terms of is the material challenging process? Most of the chemicals we process are challenging. It's probably, uranium is a metal, its probably less challenging than a lot of the chemicals we currently handle. So our team are very confident they can process uranium metal.

34

111.    As was clear from Mann's interview, ASPI had never worked with uranium, and so had not even come close to solving the challenging technical and scientific problems that had led prior efforts at laser-based uranium enrichment to be discontinued.

112.    On this news, ASPI's share price fell $0.83 as compared to the prior day closing price, or 14.2%, to close at $5.02 per share on November 27, 2024, also on heavy trading volume.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

113.    As alleged herein, Defendants acted with scienter because Defendants: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

114.    As set forth elsewhere herein in detail, Defendant Mann, by virtue of his receipt of information reflecting the true facts regarding ASPI, his control over, and/or receipt and/or modification of ASPI's allegedly materially misleading misstatements and/or his association with the Company which made him privy to confidential proprietary information concerning ASPI, participated in the fraud alleged herein.

115.    The misrepresentations and omissions of ASPI as alleged herein are of such a nature that they would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements and omissions were misleading. The scienter of Defendant Mann is imputable to ASPI. Mann was the Chairman and CEO of ASPI at all relevant times. Mann made many of the misleading statements alleged herein. As a senior officer and director who was acting within the scope of his authority, Mann's scienter is attributable to ASPI.

35

## X.    LOSS CAUSATION

116.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

117.    During the Class Period, Plaintiffs and the Class purchased ASPI common stock at artificially inflated prices. The price of ASPI common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

118.    As discussed *supra* (*see* ¶¶92-112), in response to the publication of the Fuzzy Panda Research report ASPI's share price fell 23.5% on November 26, 2024, and in response to Defendant Mann's interview with Canaccord Genuity to address the Fuzzy Panda Research report ASPI's share price fell 14.2% on November 27, 2024.

## XI.    CLASS ACTION ALLEGATIONS

119.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all personsand entities who purchased the publicly traded common stock of ASPI between September 26, 2024 and November 26, 2024, both dates inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and any trust of which Defendant Mann is the settler or which is for the benefit of Defendant Mann and/or member(s) of his immediate family.

120.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ASPI's shares actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of

members in the proposed Class. Millions of ASPI shares were traded publicly during the Class Period on the Nasdaq. Record owners and other members of the Class may be identified from records maintained by ASPI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

121.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

122.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

123.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of ASPI; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

124.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

125.    The market for ASPI's shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, ASPI's shares traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased the Company's shares relying upon the integrity of the market price of ASPI's shares and market information relating to ASPI, and have been damaged thereby.

126.    During the Class Period, the artificial inflation of ASPI's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about ASPI's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of ASPI and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

127.    At all relevant times, the market for ASPI's shares was an efficient market for the following reasons, among others:

(a)    ASPI shares met the requirements for listing, and were listed and actively traded on the Nasdaq, a highly efficient and automated market;

38

(b)    As a regulated issuer, ASPI filed periodic public reports with the SEC and/or the Nasdaq;

(c)    ASPI regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the press; and

(d)    ASPI was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.

128.    As a result of the foregoing, the market for ASPI's shares promptly digested current information regarding ASPI from all publicly available sources and reflected such information in ASPI's share price. Under these circumstances, all purchasers of ASPI's shares during the Class Period suffered similar injury through their purchase of ASPI's shares at artificially inflated prices and a presumption of reliance applies.

129.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here.

## XIII.  NO SAFE HARBOR

130.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of ASPI who knew that the statement was false when made.

## XIV.  FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### <u>Against All Defendants</u>

131.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

132.    During the Class Period, as set forth herein, Defendants ASPI and Mann made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

133.    As a direct and proximate result of the wrongful conduct of Defendants ASPI and Mann, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

## XV.    SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against Defendant Mann

134.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

135.    Defendant Mann acted as a controlling person of ASPI within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level positions and his ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements disseminated to the investing public, Defendant Mann had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Defendant Mann was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Defendant Mann had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular decisions giving rise to the securities violations as alleged herein, and exercised the same.

136.    Defendant Mann directly or indirectly induced the acts constituting the violations of Section 10(b) of the Exchange Act and Rule 10b-5 by ASPI, and did not act in good faith.

137.    As a direct and proximate result of the wrongful conduct of Defendant Mann, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

## XVI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XVII.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: May 27, 2025

**GLANCY PRONGAY & MURRAY LLP**

By:  */s/ Garth Spencer*
Garth Spencer (GS-7623)
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: gspencer@glancylaw.com
        rprongay@glancylaw.com

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com

*Lead Counsel for Lead Plaintiff Mark Leone and
Plaintiffs Alexander Corredor Prada and Ivan
Agapchev*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On May 27, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 27, 2025.


_s/ Garth Spencer_
Garth Spencer