**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK LEONE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ASP ISOTOPES INC., PAUL E. MANN, and HEATHER KIESSLING, <br><br> Defendants. | Case No. 1:24-cv-09253-CM |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL & PROCEDURAL BACKGROUND .................................................................... 2

ARGUMENT .............................................................................................................................. 4

    I.     Applicable Standards Favor Class Certification .................................................... 4

    II.    The Class Is Ascertainable And Satisfies The Requirements Of Rule 23(a) .......... 5

            A.    The Class Satisfies Rule 23(a)(1): Numerosity ........................................ 6

            B.    The Class Satisfies Rule 23(a)(2): Commonality ..................................... 6

            C.    Plaintiffs Satisfy Rule 23(a)(3): Typicality .............................................. 7

            D.    Plaintiffs Satisfy Rule 23(a)(4): Adequacy .............................................. 8

    III.   The Requirements Of Rule 23(b)(3), Predominance And Superiority, Are
          Met ......................................................................................................................... 9

            A.    Common Questions Of Law And Fact Predominate ................................. 9

                 1.    Plaintiffs Are Entitled To A Presumption Of Reliance
                      Under *Basic* ......................................................................... 10

                      (a)    ASPI Stock Traded On The Nasdaq ................................. 11

                      (b)    Market Efficiency Factors ................................................ 12

                      (c)    The *Cammer* Factors Demonstrate Market
                              Efficiency .......................................................................... 13

                            (i)    ASPI Stock Had A High Weekly Trading
                                  Volume ............................................................... 13

                            (ii)    Financial Analysts, News Media, And
                                    Institutional Investors Followed ASPI .............. 13

                            (iii)    ASPI Stock Had Numerous Market Makers ......... 16

                            (iv)    ASPI Was Eligible To File Form S-3s ................. 16

                            (v)    The Price Of ASPI's Stock Reacted To
                                    New, Company-Specific Information ................... 17

i

(d)     The *Krogman* Factors Further Support Efficiency ........... 20

(i)     ASPI Had Substantial Market Capitalization ....... 20

(ii)    ASPI Stock Had A Narrow Bid-Ask Spread ........ 21

(iii)   A Large Percentage Of ASPI's Shares Were Available For Public Trading................................ 21

2.     Potential Individual Questions Of Damages Do Not Predominate .................................................................. 22

3.     The Same Common Issues Predominate As To The § 20(a) Claims ........................................................................... 23

B.     A Class Action Is Superior To Other Available Methods For The Fair And Efficient Adjudication Of This Action ..................................... 23

CONCLUSION........................................................................................................ 25

# TABLE OF AUTHORITIES

CASES

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997).................................................................................... 4, 10, 23

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)........................................................................................ 4, 11

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ................................................................................... 11

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ............................................................................................ 10

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) ........................................................................ 22

*Borteanu v. Nikola Corp.*,
348 F.R.D. 239 (D. Ariz. 2025) .......................................................................... 21

*Brown v. Kelly*,
609 F.3d 467 (2d Cir. 2010)................................................................................ 10

*Cammer v. Bloom*,
711 F. Supp. 1264 ................................................................................ 12, 13, 16, 17

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................ 11, 12, 18

*Cheney v. Cyberguard Corp.*,
213 F.R.D. 484 (S.D. Fla. 2003)......................................................................... 21

*Corp. v. Behrend*,
569 U.S. 27 (2013)............................................................................................... 23

*Dodona I, LLC v. Goldman, Sachs & Co.*,
296 F.R.D. 261 (S.D.N.Y. 2014) .......................................................................... 5

*Erica P. John Fund, Inc. v. Halliburton Co.,*
563 U.S. 804 (2011)......................................................................................... 4, 10

*Gary Plastic Packaging Corp. v. Merrill Lynch*,
903 F.2d 176 (2d Cir. 1990)................................................................................. 5

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
  594 U.S. 113 (2021) ....................................................................................................... 11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ....................................................................................................... 11

*In re Allergan PLC Sec. Litig.*,
  2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021) ....................................................... *passim*

*In re Alstom SA Sec. Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008) .................................................................................. 20

*In re Aphria, Inc. Sec. Litig.*,
  342 F.R.D. 199 (S.D.N.Y. 2022) ............................................................................ *passim*

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ............................................................................. 10, 22

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
  2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ............................................................. 24

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) ............................................................................................. 8

*In re Interpublic Sec. Litig.*,
  2003 WL 22509414 (S.D.N.Y. Nov. 6, 2003) ............................................................. 24

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
  2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ............................................................... 8

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. L*iab. Litig.,
  241 F.R.D. 435 (S.D.N.Y. 2007) .................................................................................. 23

*In re Petrobras Secs.*,
  862 F.3d 250 (2d Cir. 2017) ............................................................................ 5, 12, 17, 24

*In re Pfizer Inc. Sec. Litig.*,
  282 F.R.D. 38 (S.D.N.Y. 2012) .................................................................................... 10

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2019 WL 3001084 (S.D.N.Y. July 10, 2019) ......................................................... 6, 13

*In re Smith Barney Transfer Agent Litig.*,
  290 F.R.D. 42 (S.D.N.Y. 2013) ..................................................................................... 5

*In re Winstar Commc'ns Sec. Litig.,*
    290 F.R.D. 437 (S.D.N.Y. 2013) .................................................................................. *passim*

*In re Xcelera.com Sec. Litig.,*
    430 F.3d 503 (1st Cir. 2005) ................................................................................................ 14

*Krogman v. Sterritt,*
    202 F.R.D. 467 (N.D. Tex. 2001) .................................................................................. 12, 20

*McIntire v. China MediaExpress Holdings, Inc.,*
    38 F. Supp. 3d 415 (S.D.N.Y. 2014) ............................................................................. *passim*

*Merryman v. Citigroup, Inc.,*
    2018 WL 1621495 (S.D.N.Y. Mar. 22, 2018) ....................................................................... 5

*Pearlstein v. BlackBerry Ltd.,*
    2021 WL 253453 (S.D.N.Y. Jan 26, 2021) ................................................................... *passim*

*Strougo v. Barclays PLC,*
    312 F.R.D. 307 (S.D.N.Y. 2016) ........................................................................... 10, 11, 17

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,*
    546 F.3d 196 (2d Cir. 2008) ............................................................................................... 12

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
    551 U.S. 308 (2007) ............................................................................................................. 4

*Todd v. STAAR Surgical Co.,*
    2017 WL 821662 (C.D. Cal. Jan. 5, 2017) ................................................................... 14, 16

*Venkataraman v. Kandi Techs. Grp., Inc.,*
    2024 WL 4345571 (S.D.N.Y. Sept. 30, 2024) ....................................................................... 9

*Vida Longevity Fund, LP v. Lincoln Life & Annuity Co. of New York,*
    2022 WL 986071 (S.D.N.Y. Mar. 31, 2022) ......................................................................... 6

*Villella v. Chem. And Mining Co. of Chile, Inc.,*
    333 F.R.D. 39 (S.D.N.Y. 2021) ............................................................................................ 7

*Vinh Nguyen v. Radient Pharms. Corp.,*
    287 F.R.D. 563 (C.D. Cal. 2012) ....................................................................................... 14

*Wallace v. IntraLinks,*
    302 F.R.D. 310 (S.D.N.Y. 2014) ................................................................................... 22, 23

v

*Weiner v. Tivity Health, Inc.*,
334 F.R.D. 123 (M.D. Tenn. 2020) ....................................................................................... 19

*Wilson v. LSB Indus., Inc.*,
2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)............................................................... 9, 15, 22

STATUTES

15 U.S.C. § 78u-4(b)(3)(B)........................................................................................................ 4

RULES

Fed. R. Civ. P. 23 .............................................................................................................. *passim*

OTHER AUTHORITIES

*Benchmarking Market Efficiency Indicators for Securities Litigation*,
2020 U. ILL. L. REV. ONLINE 96 (2020)..................................................................................... 13

*The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*,
19 J. CORP. L. 285 (1994) ....................................................................................................... 15

Lead Plaintiff Mark Leone and plaintiff Ivan Agapchev (together, "Plaintiffs" or "Class Representatives") respectfully submit this memorandum in support of their motion for class certification, seeking (i) certification of this case as a class action; (ii) the appointment of Plaintiffs as Class Representatives; and (iii) the appointment of Glancy Prongay & Murray LLP ("GPM" or "Lead Counsel") as Class Counsel.

## PRELIMINARY STATEMENT

This action asserts claims on behalf of a putative class of investors pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, against ASP Isotopes Inc. ("ASPI" or the "Company") and its CEO Paul Mann (together, "Defendants"). Plaintiffs seek certification of the following "Class":

> All persons and entities who purchased the publicly traded common stock of ASPI between September 26, 2024 and November 26, 2024, both dates inclusive (the "Class Period"), and who were damaged thereby.

> Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and any trust of which Defendant Mann is the settler or which is for the benefit of Defendant Mann and/or member(s) of his immediate family.

The Second Circuit favors class actions in securities fraud cases, and class certification is appropriate here. The Class satisfies each requirement for certification under Fed. R. Civ. P. 23(a) and 23(b)(3). ASPI stock was widely held and traded on the Nasdaq Capital Market ("Nasdaq") during the Class Period, and the Class is believed to number in the thousands, satisfying Rule 23(a)(1)'s numerosity requirement. *See* Section II.A. The nature of the proposed Class Representatives' injuries, which resulted from Defendants' common course of conduct, is identical to that of the proposed Class members, and no Class Representative suffers from a conflict of interest that would impede the vigorous prosecution of this action, satisfying the commonality,

typicality, and adequacy requirements of Rule 23(a)(2)-(4). *See* Sections II.B – II.D. GPM has the skill, experience, and resources to successfully prosecute this action, further supporting adequacy under Rule 23(a)(4), and justifying its appointment as Class Counsel under Rule 23(g).

This action also satisfies Rule 23(b)(3)'s requirements of predominance and superiority. Each of the elements of Plaintiffs' claims are susceptible to Class-wide proof based upon common facts. *See* Section III.A. Not only are the questions of the falsity of Defendants' statements and their mental state in making those statements common to all Class members, the Class is entitled to a presumption of reliance based on the "fraud-on-the-market" doctrine because ASPI's stock traded in an efficient market. *See* Section III.A.1; Expert Report of Zahn Bozanic, Ph.D. (the "Bozanic Report"), at ¶¶3, 18-76, 94 (filed herewith as Exhibit 1 to the Declaration of Garth Spencer ("Spencer Decl.")). Thus, any potential individual questions of reliance do not predominate over common issues in this case. Moreover, the calculation of damages is susceptible to a Class-wide methodology, further supporting the predominance of common issues. *See* Section III.A.2; Bozanic Report ¶¶3, 77-94. Finally, a class action is a superior means of litigating Class members' claims because it is manageable, provides redress to investors who would otherwise be unable to pursue individual claims, and will conserve judicial resources. *See* Section III.A.3.

For all of these reasons and those discussed below, Plaintiffs respectfully request that the Court grant their motion, certify the Class, appoint Plaintiffs as Class Representatives, and appoint GPM as Class Counsel.

## FACTUAL & PROCEDURAL BACKGROUND

This securities fraud case is about Defendants' misleading statements and omissions concerning the use of ASPI's technology to enrich uranium. ASPI is a small, unprofitable company based in South Africa that is listed on the Nasdaq and obtains cash from U.S. investors to fund its

operations. *See* Amended Class Action Complaint For Violations Of The Federal Securities Laws (ECF No. 28) ("Complaint") at ¶¶9, 31-38. Its business centers on isotope enrichment—the costly and complex process of separating slightly different types of atoms of the same chemical element. *Id.* at ¶¶18-30, 39-46.

Defendants misleadingly touted ASPI's technology for enrichment of uranium to supply fuel for nuclear power generators. *Id.* at ¶¶57-90. For example, Defendant Mann told investors "we think our quantum enrichment technology is perfect for enriching uranium," and ASPI published data comparing uranium enrichment using its technology to other enrichment methods. *Id.* at ¶¶59-61. ASPI stated that "*[o]ur team have used lasers to enrich . . . Uranium,*" that its technology for uranium enrichment was already in the "R&D Stage," and that it had "Proven Proprietary Technology" allowing it to meet growing demand in the nuclear energy industry. *Id.* at ¶¶63-67. ASPI published misleading press releases promoting the commissioning of its first "quantum enrichment" plant, and its entry into a term sheet to supply a U.S.-based nuclear energy company with High Assay Low Enriched Uranium ("HALEU"). *Id.* at ¶¶69-80.

These statements dramatically inflated ASPI's stock price, and the Company promptly sold $18.6 million of artificially inflated stock. *Id.* at ¶¶54-56. However, the truth began to emerge on November 26, 2024, when Fuzzy Panda Research published a report revealing significant problems facing ASPI's claimed uranium enrichment technology, causing a 23.5% decline in ASPI's stock price. *Id.* at ¶¶92-102. When Defendant Mann participated in an interview with a Canaccord Genuity stock analyst the next day, in an attempt to rebut the Fuzzy Panda Research report, he revealed that *ASPI had never enriched uranium or tested its technology on uranium. Id.* at ¶¶103-111. On this news, ASPI's share price fell 14.2% on November 27, 2024. *Id.* at ¶112.

3

This action was commenced on December 4, 2024. *See* ECF No. 1. On May 2, 2025, the Court appointed Mark Leone as Lead Plaintiff, appointed GPM as Lead Counsel, and set the case schedule. *See* ECF No. 21. GPM then filed the Complaint. *See* ECF No. 28.[1] Defendants' motion to dismiss is due to be filed on the same day as this motion, and briefed on the same schedule. *See* ECF No. 21 at 2; ECF No. 36 (revised schedule) at 1. Because of the PSLRA's discovery stay, 15 U.S.C. § 78u-4(b)(3)(B), discovery has not yet commenced, though the Parties have scheduled the Plaintiffs' depositions to take place by July 11, 2025, per the Court's scheduling orders.

## ARGUMENT

### I.      Applicable Standards Favor Class Certification

The Supreme Court has long recognized that securities fraud claims are particularly well suited for class treatment. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (noting that predominance of common issues "is a test readily met in certain cases alleging . . . securities fraud"). Indeed, the Supreme Court continues to favor class certification in securities fraud cases. *See Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 812-13 (2011) (vacating appellate court denial of class certification); *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 464-67 (2013) (affirming class certification); *cf. Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313-14 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions").

"The Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general

---

[1] The Complaint was timely filed by the May 27, 2025 deadline. ECF No. 25. To comply with the clerk's notice issued on May 28, 2025, the Complaint was re-filed on that day. ECF No. 28.

preference is for granting rather than denying class certification." *Merryman v. Citigroup, Inc.*, 2018 WL 1621495, at \*13 (S.D.N.Y. Mar. 22, 2018). This is particularly so in securities fraud actions, as class treatment is an efficient way to vindicate investors' rights. *See In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45 (S.D.N.Y. 2013) ("Generally, claims alleging violations of Section 10(b) of the Exchange Act are especially amenable to class certification.") (cleaned up). Moreover, "[i]n light of the importance of the class action device in securities fraud suits, [the Rule 23] factors are to be construed liberally." *Gary Plastic Packaging Corp. v. Merrill Lynch*, 903 F.2d 176, 179 (2d Cir. 1990); *accord Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 266 (S.D.N.Y. 2014) ("The Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this that involve alleged manipulation of public markets, to maximize the benefits to the public provided by class actions").

## II.    The Class Is Ascertainable And Satisfies The Requirements Of Rule 23(a)

Rule 23(a) of the Federal Rules of Civil Procedure establishes four requisite elements for class certification:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

The proposed Class meets each of these requirements.

In addition, the Second Circuit imposes an implied requirement that the Class is ascertainable. *In re Aphria, Inc. Sec. Litig.*, 342 F.R.D. 199, 203-04 (S.D.N.Y. 2022). "The ascertainability requirement, as defined in this Circuit, asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries. This modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *In re Petrobras Secs.*, 862 F.3d 250, 269

5

(2d Cir. 2017). Ascertainability is readily established in securities fraud cases because "securities purchases identified by subject matter, timing, and location [] are clearly objective." *Aphria*, 342 F.R.D. at 205. "Determining who is a putative class member is easily accomplished through reference to investor records during the class period, which are readily available and can be searched." *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *7 (S.D.N.Y. Sept. 8, 2021).

A.      **The Class Satisfies Rule 23(a)(1): Numerosity**

Numerosity is satisfied when a class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the Second Circuit, numerosity is presumed when a class consists of 40 members or more. *Vida Longevity Fund, LP v. Lincoln Life & Annuity Co. of New York*, 2022 WL 986071, at *3 (S.D.N.Y. Mar. 31, 2022). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *7 (S.D.N.Y. Jan 26, 2021).

During the Class Period, ASPI common stock was actively traded on the Nasdaq, with an average of 68.8 million shares outstanding and an average turnover of 40.96% per week. Bozanic Report ¶30, 67. Thus, there are likely thousands of Class Members at the very least. The numerosity requirement is met. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *8 (S.D.N.Y. July 10, 2019) (numerosity satisfied where "Signet had between 60.5 million and 80.5 million shares out stock outstanding, and an average of 1.34 million shares of Signet stock were traded each day").

B.      **The Class Satisfies Rule 23(a)(2): Commonality**

Class treatment requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). In securities class actions, this requirement has been characterized as a "low hurdle" that is met "when plaintiffs allege that class members have been injured by similar material

6

misrepresentations and omissions." *Aphria*, 342 F.R.D. at 204;[2] *see also In re Winstar Commc'ns Sec. Litig.,* 290 F.R.D. 437, 443 (S.D.N.Y. 2013) (same).

Plaintiffs' claims readily meet this standard as the allegations in the Complaint raise numerous questions common to the Class. These questions include, *inter alia*, whether:

(a)     Defendants made misleading statements and concealed that ASPI had never enriched uranium or tested its technology on uranium;

(b)     Defendants acted with scienter;

(c)     the price of the ASPI's stock was artificially inflated during the Class Period because of the Defendants' conduct;

(d)     Defendants' conduct caused Class members to suffer damages; and

(e)     Defendant Mann was a "controlling person" of ASPI within the meaning of §20(a) of the Exchange Act.

As such, "[t]his case – as is typical of most securities fraud putative class actions – raises common questions of law and fact." *Pearlstein*, 2021 WL 253453, at *7. Because all Class members' claims depend on the answers to these common questions, commonality is established.

### C.     Plaintiffs Satisfy Rule 23(a)(3): Typicality

Claims of the representative parties must be "typical" of those of the class. Fed. R. Civ. P. 23(a)(3). As with commonality, the test for typicality "is not demanding." *Villella v. Chem. And Mining Co. of Chile, Inc.*, 333 F.R.D. 39, 55 (S.D.N.Y. 2021). "In a securities class action, when plaintiffs will necessarily seek to develop facts relating to . . . the dissemination of allegedly false or misleading statements underlying their claims, the claims and nature of evidence are generally considered sufficient to satisfy the typicality requirement." *Allergan*, 2021 WL 4077942, at *6.

---

[2] Unless otherwise indicated, internal quotation marks and citations are omitted in this brief.

Here, Plaintiffs' claims are typical of the proposed Class as they arise out of the same course of conduct, *i.e.*, that Defendants artificially inflated the prices of ASPI's stock through misleading statements and omissions concerning use of its technology for uranium enrichment. "Clearly, all class members will seek to offer the same evidence to establish [Defendants'] liability." *Id.* at *7. As courts consistently recognize, trivial "[f]actual differences involving the date of acquisition . . . and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009). All of Plaintiffs' claims—*i.e.*, the alleged violations of §§ 10(b) and 20(a) of the Exchange Act—will be proven by the same evidence on a Class-wide basis. Therefore, the typicality requirement is satisfied.

### D.    Plaintiffs Satisfy Rule 23(a)(4): Adequacy

Finally, the class representatives must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "In assessing this requirement, courts make two principal inquiries: 'whether (1) plaintiff's interests are antagonistic to the interest of other members of the class; and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation'." *Aphria*, 342 F.R.D. at 204-05 (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)). Both prongs are satisfied here.

Plaintiffs' interests are aligned with the Class. Plaintiffs' claims are based on Defendants' same misconduct that gives rise to the claims of the Class, and "Plaintiffs' theory of fraud, if vindicated, would vindicate the interests of the class." *Pearlstein*, 2021 WL 253453, at *11. Plaintiffs have suffered significant financial losses. *See* ECF Nos. 28-1, 28-3. They have demonstrated their commitment to prosecuting this action on behalf of all Class members, including by regularly communicating with GPM, preparing for their depositions, and supervising

8

and monitoring the progress of the litigation. *See* Declaration of Mark Leone (Spencer Decl. Ex. 2) at ¶¶7-8, 11; Declaration of Ivan Agapchev (Spencer Decl. Ex. 3) at ¶¶7-8, 11. Plaintiffs understand that by seeking appointment as Class Representatives they have duties to act in the best interests of the entire Class of ASPI investors, and they are committed to continue actively participating in the case, and to seek a recovery that is fair and beneficial to the Class. *See id.*

"Moreover, as is always the case, in securities fraud class actions the best measure of whether a plaintiff will adequately represent the interests of a class is whether his lawyers are equipped to handle the matter." *Pearlstein*, 2021 WL 253453, *13. Plaintiffs retained counsel who are "are qualified, experienced and able to conduct the litigation." *Aphria*, 342 F.R.D. at 204-05. GPM has over 35 years of experience representing investors, consumers, and employees, has successfully prosecuted class action securities litigation in courts throughout the country, and has recovered billions of dollars for investors and other plaintiffs injured by corporate wrongdoing. *See* Spencer Decl. Ex. 4 (Firm résumé of GPM); *see also Venkataraman v. Kandi Techs. Grp., Inc.*, 2024 WL 4345571, at *3 (S.D.N.Y. Sept. 30, 2024) ("Glancy Prongay & Murray LLP is qualified, experienced and generally able to conduct the litigation"); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *18 (S.D.N.Y. Aug. 13, 2018) ("GPM has had extensive experience serving as lead or co-lead counsel in class action securities litigation"). GPM's vigorous pursuit of the Class's interests has already been demonstrated in its advancement of the Class's claims in this action to date, and GPM is fully committed to dedicating the time and resources necessary to continue prosecuting the action. *See* Spencer Decl. ¶6. For these reasons, GPM also satisfies the considerations of Rule 23(g) and should be appointed Class Counsel.

## III.    The Requirements Of Rule 23(b)(3), Predominance And Superiority, Are Met

### A.    Common Questions Of Law And Fact Predominate

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "[T]he predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010). "Predominance is a test readily met in certain cases alleging . . . securities fraud." *Amchem*, 521 U.S. at 625.

In cases under §10(b) of the Exchange Act and SEC Rule 10b-5, the elements of falsity, materiality, scienter, and loss causation are subject to class-wide proof. *See In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) (all elements of a Section 10(b) claim, "other than reliance in cases that are not premised on fraud-on-the-market, are subject to class wide proof in securities litigation"). Therefore, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *See Halliburton I*, 563 U.S. at 810. In this case, reliance may be presumed on a class-wide basis pursuant to the fraud-on-the-market presumption under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). *See Strougo v. Barclays PLC*, 312 F.R.D. 307, 312 (S.D.N.Y. 2016) ("The predominance requirement is typically met in securities fraud class actions by plaintiffs' invocation of one of two presumptions developed by the Supreme Court" including "the '*Basic* presumption' of reliance in fraudulent misrepresentation cases"); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 101 (S.D.N.Y. 2016) (similar).

### 1.    Plaintiffs Are Entitled To A Presumption Of Reliance Under *Basic*

Pursuant to the *Basic* fraud-on-the-market doctrine, a proposed class representative may:

> satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283 (2014). To invoke this presumption, plaintiffs must show: "(1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021). However, while Plaintiffs must prove materiality at trial, "materiality should be left to the merits stage because it does not bear on Rule 23's predominance requirement." *Id.* at 119 (citing *Amgen*, 568 U.S. at 466-68).

Plaintiffs here readily make the required showing. First, Defendants' statements were publicly known, because they were made in ASPI's published investor presentations, press releases, conference calls, and interviews. Second, while Plaintiffs need not show materiality at this stage, the subject of Defendants' fraud (*i.e.*, ASPI's ability to use its technology to enrich uranium) would be highly significant to a reasonable investor. Third, as discussed in detail below, the preponderance of the evidence establishes that ASPI's common stock traded in an efficient market. Fourth, Plaintiffs and all other Class members purchased ASPI common stock during the Class Period, before the truth was revealed. Plaintiffs and the Class are therefore entitled to a presumption of reliance under *Basic*.

### (a)    ASPI Stock Traded On The Nasdaq

ASPI's stock is listed and trades on the Nasdaq. Courts in this district have held that a stock's listing on the Nasdaq indicates that the market for the stock is efficient. *See Strougo*, 312 F.R.D. at 318 ("While other courts have been reluctant to conclude that a stock was traded efficiently *solely* because it was traded on the NYSE or NASDAQ, most courts in this Circuit agree that such listing is a good indicator of efficiency") (collecting cases); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015) (similar); *cf. Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 85 (2d Cir. 2023) (under "the fraud-on-

the-market theory . . . a stock trading on theoretically efficient markets like the . . . Nasdaq,

incorporates all public, material information").

### (b) Market Efficiency Factors

Neither the Supreme Court nor the Second Circuit has adopted a formal test for market

efficiency. *Petrobras*, 862 F.3d at 276. District courts in this Circuit and elsewhere, however,

routinely consider the non-exhaustive factors derived from *Cammer v. Bloom*, 711 F. Supp. 1264

(D.N.J. 1989), in determining whether a security trades in an efficient market:

> (1) a large weekly trading volume; (2) the existence of a significant number of
> analyst reports; (3) the existence of market makers and arbitrageurs in the security;
> (4) the eligibility of the company to file an S–3 registration statement; and (5) a
> history of immediate movement of the stock price caused by unexpected corporate
> events or financial releases.

*McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014); *see*

*also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 204 n.11

(2d Cir. 2008) ("The *Cammer* factors have been routinely applied by district courts considering

the efficiency of equity markets."); *Petrobras*, 862 F.3d at 276 (affirming finding of market

efficiency pursuant to *Cammer* factors).

The *Cammer* factors are not exclusive and "are meant to be an analytical tool to assist in

the evaluation of market efficiency, not a rigid checklist." *McIntire*, 38 F. Supp. 3d at 432; *see also*

*Carpenters*, 310 F.R.D. at 83 ("While the Second Circuit endorsed the use of the *Cammer* factors

in *Bombardier*, it has not required their use or held that any one of them is dispositive."). Courts

may consider other factors that indicate market efficiency, including "(1) the capitalization of the

company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders

(the 'float')." *See Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001); *Petrobras*, 862 F.3d

at 276 (acknowledging these "three additional" factors comprised part of the efficiency analysis);

*Signet*, 2019 WL 3001084, at *11 ("the Court looks to the *Cammer* and *Krogman* factors, the prevailing tests for market efficiency").

An analysis of each of the foregoing factors, evaluated both individually and collectively, shows that ASPI's common stock traded in an efficient market.

### (c)   The *Cammer* Factors Demonstrate Market Efficiency

#### (i)   ASPI Stock Had A High Weekly Trading Volume

During the Class Period, ASPI common stock had an average weekly turnover of 40.96% of the outstanding shares. Bozanic Report ¶30. That turnover rate far surpasses the 2% threshold set by *Cammer* as giving rise to a "strong presumption" of market efficiency. *See Cammer*, 711 F. Supp. at 1286; *see also Allergan*, 2021 WL 4077942, at *10 (3.9% weekly turnover "indicate[s] market efficiency"). As further evidence of efficiency, ASPI's common stock had a daily turnover rate of 8.03% during the Class Period, placing it well above the 95th percentile of NASDAQ and NYSE listed companies over 2016-2018.[3] Bozanic Report ¶31. Accordingly, ASPI's trading volume supports a strong presumption that its common stock traded in an efficient market. *Id.* at ¶¶30-31.

#### (ii)   Financial Analysts, News Media, And Institutional Investors Followed ASPI

The presence of analyst coverage on a security "supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market." *Winstar*, 290 F.R.D. at 446. This factor is measured alternatively by the number of

---

[3] Several of Dr. Bozanic's comparisons to metrics for other NYSE and NASDAQ listed companies are based on data from the article: Bharat Bhole, Sunita Surana, and Frank Torchio, *Benchmarking Market Efficiency Indicators for Securities Litigation*, 2020 U. ILL. L. REV. ONLINE 96 (2020). The 2016-2018 time period is the most recent period reported in the article. Bozanic Report ¶31 n.28.

analysts covering the company or security, or by the number of analyst reports published about the company or security, during the relevant period. *Compare, e.g., id*. ("the number of securities analysts") with *McIntire,* 38 F. Supp. 3d at 431("the existence of a significant number of analyst reports"). Courts also consider the extent of analyst coverage in connection with related factors, including the amount of news coverage on a company and the degree of institutional ownership. *E.g., In re Xcelera.com Sec. Litig.,* 430 F.3d 503, 514-15 (1st Cir. 2005) (affirming district court's determination of market efficiency, where only one analyst followed the company's stock and issued only one report during a 16 month class period, but information about the company was widely distributed through other sources, including news articles, press releases, and SEC filings, and institutional investors invested in the stock); *Todd v. STAAR Surgical Co*., 2017 WL 821662, at *7 (C.D. Cal. Jan. 5, 2017) (ownership of company's stock by major institutions bolstered determination that efficiency was indicated by second *Cammer* factor).

Here, at least seven analyst firms, including Canaccord Genuity and H.C. Wainwright & Co., published 47 reports on ASPI from September 26, 2023 (one year before the beginning of the Class Period) until the November 26, 2024 Class Period end, and at least five analyst firms issued 13 reports within the Class Period. Bozanic Report ¶34 & n.30. Dr. Bozanic used the 14-month "Analysis Period" to obtain a more accurate and representative assessment of analyst coverage of ASPI. Because the Class Period is only two months long, some analysts covering ASPI may have published few or no reports during the Class Period, making comparison to other cases with longer class periods difficult if based solely on the two-month Class Period here. *See Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 571 (C.D. Cal. 2012) (crediting use of year-long analysis period where class period was only 46 days, and finding efficiency supported where two analysts issued seven reports in the class period, and ten analysts issued 58 reports in the analysis period).

14

Courts have repeatedly found that comparable or lesser levels of analyst coverage support efficiency. *See Wilson*, 2018 WL 3913115, at *11 (efficiency supported where "at least five analyst firms published 45 or more reports during the Class Period" of approximately one year); *Winstar*, 290 F.R.D. at 446 (efficiency supported where "[t]here were at least three analysts who reported directly on the merits of Winstar's bonds during the class period"). Empirical research demonstrates that coverage by even one or two analysts strengthens efficiency. *See* Brad A. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. 285, 302, 310-11 (1994); Simona Mola, P. Raghavendra Rau, Ajay Khorana, *Is There Life after the Complete Loss of Analyst Coverage?*, 88 (2) THE ACCOUNTING REVIEW, 667–705 (2013). Moreover, coverage by seven analysts during the Analysis Period places ASPI between the 50th and 75th percentiles of companies listed on the NASDAQ and NYSE during 2016-2018. Bozanic Report ¶36.

In addition to analyst reports, information about ASPI was disseminated to the market through other means such as ASPI's presentations, conference calls, press releases and SEC filings. Dr. Bozanic searched the Factiva database for news about ASPI, which identified approximately 61 articles published during the Class Period, and 174 articles during the Analysis Period, including from prominent and widely distributed sources such as Reuters and Dow Jones Newswires. Bozanic Report ¶37. Also, on November 26, 2024, Fuzzy Panda Research published its report, introducing additional information about ASPI into the market.

Furthermore, at least 128 unique institutional investors owned ASPI stock throughout the Class Period, including sophisticated institutions such as Vanguard, BlackRock, and State Street. Bozanic Report ¶76. On average during the Class Period 43.37% of ASPI's common stock was held by institutional investors, placing it between the 25th and 50th percentile of NYSE and

15

NASDAQ listed companies during 2016-2018. *Id*. This implies that significant buy-side analysis was likely available to institutional investors and bolsters the conclusion that ASPI's stock traded in an efficient market. *See Todd,* 2017 WL 821662, at *7 (finding of efficiency strengthened where 122 institutions owned company's stock during class period). All of these facts, in addition to ASPI's analyst coverage, further support the conclusion that ASPI's financial performance was "closely watched by investment professionals," whose views were rapidly incorporated into the stock price, and therefore support a finding of market efficiency. *Winstar*, 290 F.R.D. at 446; Bozanic Report ¶38.

### (iii)    ASPI Stock Had Numerous Market Makers

The third *Cammer* factor concerns whether there are sufficient numbers of market makers and/or arbitrageurs to facilitate the efficiency of the market. *See McIntire*, 38 F. Supp. 3d at 431-32. During the Class Period, there were at least 65 market makers for ASPI stock, including well known financial firms such as Morgan Stanley, UBS, and JP Morgan. Bozanic Report ¶42. That number far exceeds the ten market makers the *Cammer* court found to justify a substantial presumption of efficiency. *See Cammer*, 711 F. Supp. at 1283 n.30; *see also id.* at 1293. Therefore, the third *Cammer* factor also supports efficiency. Bozanic Report ¶42.

### (iv)    ASPI Was Eligible To File Form S-3s

Eligibility for S-3 registration with the SEC is an indicator of market efficiency because it is associated with characteristics that correlate with efficiency, including size, transparency, and the availability of relevant financial information. *See Cammer*, 711 F. Supp. at 1284-85. In order to be eligible for an S-3 registration, a company must be "seasoned," *i.e.*, it must have filed Exchange Act reports with the SEC for twelve months, and it must meet a certain minimum threshold for public float (currently set at $75 million). *See id.*; SEC Form S-3 (available at https://www.sec.gov/files/forms-3.pdf); Bozanic Report ¶44.

During the Class Period, ASPI's float ranged in value from $129 million to $468 million, which was well above the minimum requirement for S-3 registration. Bozanic Report ¶45. ASPI also regularly and timely filed financial reports with the SEC from more than one year before and throughout the Class Period. *Id*. As such, ASPI was eligible for S-3 registration for all Class Period trading days, and ASPI in fact filed a Form S-3 on October 31, 2024, during the Class Period. *Id*. Therefore, this *Cammer* factor weighs in favor of finding market efficiency. *See Allergan*, 2021 WL 4077942, at *10 (efficiency found where defendant "was eligible for S-3 registration and filed a Form S-3 prior to and during the class period"); Bozanic Report ¶45.

### (v) The Price Of ASPI's Stock Reacted To New, Company-Specific Information

The fifth *Cammer* factor examines whether empirical evidence demonstrates "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287. Empirical evidence of this kind provides direct evidence of market efficiency, whereas the other *Cammer* factors examine indirect evidence of market efficiency. *See Petrobras*, 862 F.3d at 276-79. This factor, however, is also one of the most fraught, as it often involves dueling expert reports and event studies, in which "methodological constraints limit their utility." *Id*. at 278. As such, "when determining whether a plaintiff has proven market efficiency, a district court should not 'view direct and indirect evidence as distinct requirements and should, instead, conduct a holistic analysis based on the totality of the evidence presented'." *Aphria*, 342 F.R.D. at 206 (quoting *Petrobras*, 862 F.3d at 277-278).

Indeed, where other factors "strongly support a presumption of market efficiency," this "obviates the need to examine the empirical evidence necessary to evaluate the fifth *Cammer* factor." *Allergan*, 2021 WL 4077942, at *10; *see also Strougo*, 312 F.R.D at 319-23 & n.85 (noting that the court had previously decided that the fifth *Cammer* factor was not necessary to establish

17

efficiency and "in the interim additional courts have reached the same conclusion"); *Carpenters*, 310 F.R.D. at 84 & n.97 (holding that the fifth *Cammer* factor "is not dispositive," and collecting cases where "courts have found market efficiency" even "in the absence of an event study or where the event study was not definitive"). Here, while other factors already make a strong showing that ASPI stock traded in an efficient market, Dr. Bozanic's empirical analysis of the fifth *Cammer* factor provides additional strong support for that conclusion.

Dr. Bozanic performed an event study to observe the relationship between the price of ASPI common stock and market and industry indices, and then used the event study to compare the behavior of ASPI's common stock price on days when company-specific news was issued with its behavior on days when no such news was issued. Bozanic Report ¶¶47-49. Dr. Bozanic concluded that "[t]his analysis demonstrates that ASPI's Common Stock price reacted rapidly to company-specific news and, thus, further supports the conclusion that the Company's Common Stock traded in an efficient market throughout the Class Period." *Id.* at ¶47.

Event studies are widely used by economists, including to assess market efficiency and damages in securities litigation. *Id.* at ¶48. Dr. Bozanic's event study was performed using generally accepted economic methods, specifying a regression model to predict daily returns of ASPI common stock based on a market index (the S&P 1500 Composite Index) and an industry index (the Range Nuclear Renaissance Index), and to measure the "abnormal" portion of the return attributable to company-specific news rather than market-wide or industry-wide factors. *Id.* at ¶¶50-55. Dr. Bozanic then calculated the statistical significance of the abnormal return by comparing it to the usual volatility in ASPI's stock price. *Id.* at ¶56.

Dr. Bozanic used the event study to compare the behavior of ASPI's common stock on a group of News Days with its behavior on a group of No News Days, which is a generally accepted

and peer reviewed approach to evaluating whether a stock price responds to company-specific news. *Id.* at ¶¶57-59. Based on this analysis, Dr. Bozanic concluded that "the price of ASPI's stock was statistically significantly more volatile on news days than on no news days," and that "[t]his result supports the conclusion that there was a cause and effect relationship between company disclosures and resulting movements in stock price for ASPI's Common Stock." *Id.* at ¶59.

Specifically, Dr. Bozanic analyzed dates with news relating to the development of ASPI's business ("News Days"), such as new security offerings, strategic partnerships, and milestones in plant construction and isotope production. *Id.* at ¶60. Dr. Bozanic identified 21 such News Days during the Analysis Period (of which five were within the Class Period). *Id.* at ¶61 & Ex. 6. As with Dr. Bozanic's review of analyst coverage under the second *Cammer* factor, his event study and cause and effect analysis use the 14-month Analysis Period to ensure a more accurate and representative result as compared to the two-month Class Period. *See* Bozanic Repot ¶¶52, 59; *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 134-136 (M.D. Tenn. 2020) (finding that event study based on 3.5 year analysis period, as compared to half-year class period, supported efficiency, and rejecting defendants' argument that information beyond the class period was irrelevant).

Dr. Bozanic compared the News Days to No News Days, which contained the least news about ASPI during the Analysis Period, identifying 189 such dates. Bozanic Report ¶¶61-63. He found that ASPI's stock price had abnormal returns in his event study that were statistically significant at the 95% level for 7 of the 21 News Days (33.33%), as compared to only 6 of the 189 No News Days (3.17%). *Id.*; Bozanic Report Ex. 7. Because statistically significant abnormal returns to ASPI's common stock on News Days occurred at a rate more than *ten times* greater than on No News Days, with the difference in rates being statistically significant at the 99% level, Dr.

19

Bozanic determined that "[t]hese results provide strong evidence of a cause-and-effect relationship between new information and ASPI's Common Stock price movements." *Id.* at ¶63.

Courts have repeatedly found similar comparisons of news days to no news days to support market efficiency. *See McIntire*, 38 F. Supp. 3d at 430 (courts have endorsed "comparing the percentage of days with news that have a statistically significant price movement to the percentage of days without news that have a statistically significant price movement"); *id.* at 433 ("because CCME's stock price was six to eight times more likely to change on News Days than on Non–News Days, Plaintiffs have satisfied the fifth *Cammer* factor"); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (efficiency found where "Alstom was over 6 times more likely to have a statistically significant stock return on a day with news than on a day with no news").

In sum, Dr. Bozanic concluded that his analysis of ASPI's stock price movements on News Days and No News Days "establishes a clear cause-and-effect relationship between new company-specific information and ASPI's Common Stock price movements." *Id.* at ¶64. Accordingly, the fifth *Cammer* factor is satisfied and weighs heavily in favor of finding market efficiency.

### (d)    The *Krogman* Factors Further Support Efficiency

Courts have also considered three other factors identified in *Krogman*: (1) the company's market capitalization; (2) the typical bid-ask spread; and (3) the stock's float. 202 F.R.D. at 478.

### (i)    ASPI Had Substantial Market Capitalization

Market capitalization, which is the total value of a company's outstanding shares, is equal to the number of shares outstanding multiplied by the price per share. During the Class Period, the aggregate market value of ASPI's common stock averaged $377.2 million, placing it between the 25th and 50th percentiles of NASDAQ and NYSE listed companies during 2016-2018. Bozanic Report ¶67. As such, ASPI's market capitalization was sufficiently large to attract analyst and news coverage, and gain the attention of investors, all of which further shows market efficiency.

*See Borteanu v. Nikola Corp.*, 348 F.R.D. 239, 258 (D. Ariz. 2025) (market capitalization averaging $230.5 million over the class period supported efficiency); *McIntire*, 38 F. Supp. 3d at 433 (market capitalization ranging from $292 million to $585 million supported efficiency); Bozanic Report ¶67.

### (ii) ASPI Stock Had A Narrow Bid-Ask Spread

The bid-ask spread is the difference between the prices at which an investor can purchase and sell the stock in question. Bozanic Report ¶69. A narrow bid-ask spread indicates lower transaction costs to trade the stock and indicates a more efficient market. *See id*. Here, the average bid-ask spread for ASPI common stock during the Class Period was only 0.24%, placing it between the 50th and 75th percentiles of NASDAQ and NYSE listed companies during 2016-2018. *See id.* at ¶¶70-71. This factor thus supports market efficiency. *See McIntire*, 38 F. Supp. 3d at 433 (finding that a bid-ask spread of 0.27% supported a finding of an efficient market); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (bid-ask spread of 2.44% supported efficiency); Bozanic Report ¶72.

### (iii) A Large Percentage Of ASPI's Shares Were Available For Public Trading

A stock's float is the number of shares outstanding less shares held by insiders, which is generally the number of shares available for trading by outside investors in the open market. During the Class Period, ASPI had outstanding shares averaging 68.8 million. Bozanic Report ¶74. ASPI's float ranged in value from $129 million to $468 million. *Id.* at ¶45. Only 32.64% of ASPI's stock was held by insiders, such that 67.36% of shares were included in the float, *i.e.*, freely tradeable by outside investors. *Id.* at ¶74. Under *Krogman*, ASPI's substantial public float supports a finding of an efficient market. *See Borteanu*, 348 F.R.D. at 258 (float of 55.1% supported

21

efficiency); *McIntire*, 38 F. Supp. 3d at 433 (float of 31% to 43% supported efficiency); Bozanic Report ¶75.

In sum, both individually and when considered together, the *Cammer* and *Krogman* factors strongly show that ASPI's common stock traded in an efficient market. *See, e.g.*, *Wilson*, 2018 WL 3913115, at \*10-16 ("holistic analysis" of the *Cammer* and *Krogman* factors supported finding of market efficiency); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012) ("[S]ubstantial market capitalization with a narrow bid-ask spread, and a large public float . . . strongly indicate . . . an efficient market such that the *Basic* presumption is appropriate.").

### 2.    Potential Individual Questions Of Damages Do Not Predominate

Courts routinely find that damages in securities cases present common questions because they can be calculated by measuring the price impact of corrective disclosures on a class-wide basis. *See Barrick Gold*, 314 F.R.D. at 106 (finding that damages issues did not defeat predominance because calculation of damages called for the application of a damages model across the entire class); *Wallace v. IntraLinks*, 302 F.R.D. 310, 318 (S.D.N.Y. 2014) (fact that class members who purchased and sold at different times would be entitled to different recoveries does not defeat predominance because "[p]laintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis."). At class certification plaintiffs are not required to quantify damages, rather "a plaintiff's burden at this stage is simply to propose a methodology for calculating damages that corresponds to its theory of liability." *Allergan*, 2021 WL 4077942, at \*15.

Here, damages can be readily calculated on a class-wide basis in this action using the same kind of event study methodology that is often employed in securities class actions. *See id.* ("there is no reason why an event study – the generally accepted method for measuring damages in a securities fraud class action – cannot work in this case"); Bozanic Report ¶¶77-93. Using such an

event study, the artificial inflation in ASPI's stock price can be measured on a class-wide basis by analyzing the price changes caused by corrective disclosures. *Id.* at ¶81. Once the Class Period levels of price inflation have been calculated, a Class member's actual trading activity in ASPI stock can be used to mechanically apply common calculations to arrive at the Class member's damages. *Id.* at ¶79-80. Because this methodology is entirely consistent with the Class-wide theory of liability and allows for measurement of damages on a Class-wide basis, common issues predominate. *See Wallace*, 302 F.R.D. at 318 ("Plaintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis that conforms to its theory of liability, thus meeting the requirements of *Comcast* [*Corp. v. Behrend*, 569 U.S. 27 (2013)]").

### 3.    The Same Common Issues Predominate As To The § 20(a) Claims

Plaintiffs' showing above that common issues predominate as to their § 10(b) claims applies equally to Plaintiffs' control person claims under § 20(a), and common issues likewise predominate as to each element of the § 20(a) claims. *See Pearlstein*, 2021 WL 253453, at *14 ("Plaintiffs' claim under Section 20(a) indisputably presents common issues of law and fact, as the method for demonstrating whether Defendants exerted control over [the company] varies only based on Defendants' identities, not the Plaintiffs'.").

### B.    A Class Action Is Superior To Other Available Methods For The Fair And Efficient Adjudication Of This Action

Under Rule 23(b)(3), "[s]uperiority is established when 'a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results'." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 241 F.R.D. 435, 449 (S.D.N.Y. 2007) (*quoting Amchem*, 521 U.S. at 615). Securities cases "easily satisfy" this requirement as "the

23

alternatives are either no recourse for thousands of stockholders" or "a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, *11 (S.D.N.Y. Mar. 23, 2020). The following factors are relevant to the superiority assessment:

> A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action.

Fed. R. Civ. P. 23(b)(3). These factors all weigh in favor of class certification in this case.

There is no indication that members of the Class would prefer to prosecute individual claims, and Lead Counsel is not aware of any other case involving the same claims. Moreover, "[c]ourts have long recognized that class actions are a desirable means for resolving claims based on securities laws," and, as is the case here, "[m]ost violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible." *Allergan*, 2021 WL 4077942, at *17. The litigation of separate actions "would be wasteful, and potentially result in delay and an inefficient expenditure of judicial resources." *In re Interpublic Sec. Litig.*, 2003 WL 22509414, at *4 (S.D.N.Y. Nov. 6, 2003). It would also "risk disparate results among those seeking redress." *Id.* Finally, "failure to certify an action under Rule 23(b) (3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *Petrobras*, 862 F.3d at 268. Securities class actions like this one generally raise no unusual manageability issues, and Plaintiffs do not foresee any management difficulties. Thus, a class action is the superior method for the efficient adjudication of the Class's claims.

24

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion in its entirety, certify the Class, appoint Plaintiffs as Class Representatives, and appoint GPM as Class Counsel.

DATED: June 27, 2025                    **GLANCY PRONGAY & MURRAY LLP**

By:   /s/ Garth Spencer
Garth Spencer (GS-7623)
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: gspencer@glancylaw.com
          rprongay@glancylaw.com

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email:  glinkh@glancylaw.com

*Lead Counsel for Lead Plaintiff Mark Leone and Plaintiff Ivan Agapchev*

25

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On June 27, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 27, 2025.

*s/ Garth Spencer*
Garth Spencer