# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

— — —

MARK LEONE, individually    :
and on Behalf of All         :
Others Similarly Situated    :
                             :
            Plaintiff,       :
                             :
        vs.                  :
                             :
ASP ISOTOPES, INC., PAUL     :
E. MANN, and HEATHER         :
KIESSLING,                   :
                             :
            Defendants.      : No. 1:24-cv-09253-CM

— — —

THURSDAY, JULY 10, 2025

— — —

Video-recorded deposition of
MARK LEONE, taken via Zoom, at West Deptford,
New Jersey, commencing at 10:02 a.m., before
Kimberly A. Rue, a Registered Professional
Reporter, New Jersey Certified Court Reporter
(License No. X102235) and Notary Public.

- - -

VERITEXT LEGAL SOLUTIONS
MID-ATLANTIC DIVISION

Page 2

APPEARANCES:  (Via Zoom)

GLANCY PRONGAY & MURRAY, LLP
BY:  GARTH SPENCER, ESQUIRE
1925 Century Park East
Suite 2100
Los Angeles, California 90067
gspencer@glancylaw.com
Representing the Plaintiffs


MORGAN, LEWIS & BOCKIUS, LLP
BY:  LAURA HUGHES MCNALLY, ESQUIRE
    (pro hac vice)
2222 Market Street
Philadelphia, Pennsylvania 19103
laura.mcnally@morganlewis.com
Representing the Defendants

        - - -

ALSO PRESENT:

Michael Barankovich, Videographer

Page 4

EXHIBITS

        - - -

NUMBER            DESCRIPTION            PAGE
Exhibit 10  X Post re: role of SMRs in the      92
        furture of nuclear energy from
        @POWERmagazine
Exhibit 11  Fuzzy Panda report, 11/24        95
Exhibit 12  Fuzzy Panda on X: "New Short"      95
Exhibit 13  Email string              120
Exhibit 14  11/26/24, ASP Isotopes, Inc.      123
        Responds to Short Seller Report

Page 3

            INDEX
        - - -
WITNESS                PAGE
MARK LEONE
By Ms. McNally            9
By Mr. Spencer            131
        - - -
        EXHIBITS
        - - -
NUMBER        DESCRIPTION        PAGE
Exhibit 1  Sworn Certification of Plaintiff,    48
        2/3/25

Exhibit 2  Initial Complaint        51

Exhibit 3  Sworn Certification of Plaintiff,    55
        5/23/25
Exhibit 4  Amended Complaint        56
Exhibit 5  Declaration of Lead Plaintiff      60
        Mark Leone in Support of
        Plaintiffs' Motion for Class
        Certification

Exhibit 6  ASP isotopes Corporate Overview,    85
        September 2024
Exhibit 7  10/17/24 press release        88
Exhibit 8  10/30/24 press release        90
Exhibit 9  "Mobility, Flexibity, Scalability:  92
        SMRs Forging Nuclear's Future

Page 5

        DEPOSITION SUPPORT INDEX

        - - -
INSTRUCTION NOT TO ANSWER:
Page  Line
--



REQUEST FOR PRODUCTION OF DOCUMENTS:
Page  Line            Description
--

STIPULATIONS:
Page  Line
--

QUESTIONS MARKED:
Page  Line
--

2 (Pages 2 - 5)

Page 6

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that in lieu of an oath administered in person, I will administer the oath remotely.

The parties and their counsel further agree that the witness may be in a state where I am not a Notary and stipulate to the witness being sworn in by an out-of-state Notary.

If any party does have an objection to this manner of reporting, please state so now.

(No objections stated)

THE VIDEOGRAPHER: Good morning. We are going on the record at 10:02 on July 10th, 2025. Please note that this deposition is being conducted virtually. Quality of

Page 7

recording depends on quality of camera and Internet connection of participants. What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video deposition of Mark Leone in the matter of Mark Leone, et al., versus ASP Isotopes, et al., filed in the U.S. District Court, Southern District of New York, Case Number 1 24-CV-09253-CM.

My name is Michael Barankovich representing Veritext and I am the videographer. The court reporter is Kimberly Rue of the firm Veritext. I am not authorized to administer an oath, I am not related to any party in this action, nor am I financially interested in the outcome.

Would counsel please announce

Page 8

their appearance for the record.

MS. MCNALLY: Good morning. This is Laura McNally, counsel for the defendants, from the law firm of Morgan Lewis & Bockius.

MR. SPENCER: Garth Spencer from Glancy Prongay & Murray on behalf of Mr. Leone and the plaintiffs.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

MARK LEONE, having been duly sworn, was examined and testified under oath as follows:

_ _ _

THE COURT REPORTER: And can you please tell me the city and state that you're testifying from today.

THE WITNESS: New Jersey.

THE COURT REPORTER: And the city?

THE WITNESS: We're in West Deptford.

_ _ _

Page 9

EXAMINATION

_ _ _

BY MS. MCNALLY:

Q.    Good morning, Mr. Leone. As I mentioned, my name is Laura McNally. I'm with the law firm of Morgan Lewis and I represent defendants in this case.

I am going to start by just running through a handful of kind of instructions, ground rules, that your counsel has probably already told you, but we are just going to get them on the record.

So -- and first of all, thank you for making the time for us today. I am hoping to keep this as tight as I can and get you in and out.

A.    Okay.

Q.    So first of all, let's make sure that we can both hear each other the whole time. So if for any reason you can't hear me or I am not speaking clearly enough, just let me know. And I will do the same for you. And the court reporter will let both of us know if she can't hear us. Does that work

3 (Pages 6 - 9)

Page 10

for you?

A. Sounds good, yes.

Q. With that said, the court reporter is taking down everything that we say. So we have to speak clearly and make sure that we give each other the space to answer and ask the next question, even if it is sometimes feels a little awkward with some pauses. Does that work?

A. Sure.

Q. All of your answers must be verbal. I often tend to speak with my hands and nod my head and everything, but the court reporter can't get that down. So it's always a challenge for me and I know it's a challenge for lots of witnesses, but please make sure that your answers are verbal. So even if you are shaking your head yes, say yes as well. Does that work?

A. It does, yes.

Q. Great. Is there any reason why you cannot answer my questions truthfully and accurately today?

A. No.

Page 11

Q. All right. With that, we will take a break about every hour or so. I call them personal comfort breaks. If you need a personal comfort break at any time, though, just let me know and we'll take a break, as long as you've answered the question pending. So we can't take a break while a question is pending. Does that work for you?

A. Yes.

Q. Let's see. All right. So turning a little bit more to substance, what did you do to prepare for this deposition today?

A. I studied up on the company like I did when I invested in it, through basic research, go over all the facts. That's about it.

Q. What did you -- what did you review to study up on the company?

A. What did I review? Let's see. I reviewed a lot of the -- a lot of PRs that were put out by the company, reviewed the price it was charted when I started buying it, sold it, what it's at now.

Page 12

Q. When you did you say PDRs?

A. No, the PRs --

Q. PRs?

A. -- of the company.

Q. Meaning press releases?

A. Correct.

Q. You looked at, you said, price charts you mentioned?

A. Yes.

Q. Those price charts, what kind of platform do you use?

A. I use Robinhood mostly.

Q. Now, are those documents that you printed out and kept in a file somewhere?

A. No.

Q. Did you review any documents provided by your attorneys?

A. Yes.

Q. Did you meet with your attorneys?

A. Yes. We spoke weekly, email, yes.

Q. And when did you meet with your attorneys to prepare for this deposition?

Page 13

A. Weekly. I mean, we would discuss things weekly, email weekly.

THE WITNESS: We're meeting for first time today, actually, correct, in person.

BY MS. MCNALLY:

Q. When you say you met weekly, I think I am drawing the distinction between preparing for this deposition versus perhaps ongoing discussions that you had with your attorneys. And perhaps it's a distinction that I should not be drawing, so let me try to clarify.

Let's back up. How did you first get involved in the lawsuit?

A. Well, you know, looking online I saw that there was a class action going to be started after what happened on November 25th, 26th, and 27th and I put my name in to be a lead plaintiff.

Q. And do you remember what you put your name into? Like, did you respond to an ad that you saw or something like that?

A. Yeah. It was a legal ad, yes.

4 (Pages 10 - 13)

Page 14

Q.    And do you remember what law firm that was for?

A.    Frank Cruz was his name.

Q.    How soon after -- how soon after or in the late November time period did you put your name in?

A.    I don't remember, to be honest.

Q.    So you put your name in in response to the online ad, correct?

A.    Yes. There were -- I saw several. There were several different firms. I just happened to pick Frank Cruz's ad. That was it.

Q.    And how long did it take for you to hear back?

A.    I don't remember exactly, but I don't believe it was that long.

Q.    And who did you hear back from?

A.    From Frank.

Q.    And what happened next?

A.    He asked me to send him -- I'm sorry. Go ahead.

MR. SPENCER: Don't say what the communications were between you

Page 15

and any of your lawyers. That's considered by attorney/client privilege.

THE WITNESS: Okay.

BY MS. MCNALLY:

Q.    You can generally tell me what happened next without telling me the specifics of your communications.

A.    What happened next. I can't tell you the specifics.

Q.    Let me ask you this: So you threw your name in the hat for the lead plaintiff position?

A.    Yes. Correct. Yes.

Q.    And in connection with that did you provide information to Mr. Cruz?

A.    I believe I did. Maybe not. I could have. I know I sent all my trades and everything, but -- it probably was Frank. I don't remember, honestly.

Q.    When did you first have any discussions with the Glancy team?

A.    I believe when they officially got the case.

Page 16

Q.    When was that?

A.    I don't remember exactly.

Q.    And since then, how many -- scratch that.

What had been your primary modes of communication with the Glancy team?

A.    Email.

Q.    And do those -- again, without telling me kind of the substance of the emails, can you generally describe the cadence of the emails, how often do you guys email back and forth?

A.    Usually weekly, but then we had, you know, phone conversations, discussions.

Q.    About how many phone calls have you had?

A.    Several, like I said, weekly. I don't know the exact amount.

Q.    You said first it was -- it was emails. And then has it been more recently that you have engaged in more phone calls?

A.    Last two months, maybe. I'm guessing.

Page 17

Q.    And so you've had weekly calls for the last two months?

A.    Pretty much. I mean, you know, I don't count them, to be honest with you, but we spoke.

Q.    Can you remember the first call that you had?

A.    Not offhand, no.

Q.    Can you remember any of the calls that you've had?

A.    Yes.

Q.    Okay. Tell me about the timing or when any of the calls were.

A.    I don't know. On a Tuesday, you know, we would set a time up to talk and discuss the case on a Thursday.

Q.    What Tuesday?

A.    I don't remember.

Q.    Well, I'm trying -- you're saying could be weekly, but you can't remember --

A.    Honestly, it's not something -- we spoke, you know. I can't tell you exactly when we spoke and -- you know, several times.

5 (Pages 14 - 17)

Page 18

Q. What is several to you?

A. Weekly, three, four, five times.

Q. So you think you've spoken to the Glancy team three to five times?

A. Sounds about right.

Q. Was one of those calls -- did one of those calls involve a Mr. Agapchev?

A. Ivan, yes.

Q. Let's talk about your -- your kind of background a little bit. Let's switch gears.

Do I understand it correctly that you work in the restaurant industry?

A. That's correct, yes.

Q. And what's your kind of current position or role?

A. Well, I have been owning and operating pizzeria restaurants probably for close to 30 years. Right now, I sold my last shop that I had to my partner. Looking for my next project. I mean, I buy and sell them, build them up, sell them off. And I'm just working part-time right now for my partner as

Page 19

a manager when he's not there -- my old partner, I should say.

Q. What pizza shop is that?

A. Pine Hill, Pine Hill, New Jersey. Pine Hill Pizza it's called.

Q. Okay. I am in the Philadelphia area, so --

A. Okay. You have probably never been to Pine Hill.

Q. No.

A. It's a cool place.

Q. It sounds like a place I would drive through going down the shore or something.

A. Yeah. It's close. It's close to the expressway.

Q. All right. Where did you attend university.

A. Rowan University in Glassboro.

Q. And what is your degree from?

A. Accounting.

Q. Do you have any advanced degrees?

A. No.

Page 20

Q. And are you also involved in investing?

A. My own personal investing, yes.

Q. So you just manage your own personal investments. Do you manage anybody else's?

A. No, just mine.

Q. How did you get into investing?

A. Well, let's see. I have been married 27 years. So my father is a CPA for many years and a financial planner, so when I got married pretty much started investing in mutual funds -- everything through him for the most part -- and individual stocks, really, myself. So I'm -- 25 years, maybe, 26, since I have been married, so 27 years this year.

Q. But you didn't go into the family business?

A. No. No. I am not cut out for that.

Q. When did you start investing in individual stocks?

A. I would say probably early 2000s. Not much back then. More probably

Page 21

about five and a half, six years ago I got really more heavy into individual stocks.

Q. How heavy are you into individual stocks?

A. What do you mean by heavy?

Q. Let's talk percentage of your investments, versus mutual funds kind of things.

A. I would say less than half of my net worth.

Q. And what's your investment strategy with respect to the individual stocks?

A. I like -- now I stick with a lot of ETFs, dividend stocks. I do like to, you know, occasionally dabble in our stocks, but after the lesson I learned in November I pretty much stick to the ETFs.

Q. And when you trade in individual stocks, are you buying and holding, for the long term, are you day trading, are you kind of somewhere in the middle there? What's your --

A. Somewhere in the middle. I

6 (Pages 18 - 21)

Page 22

swing trades sometimes. Sometimes I hold for months. So a little bit of everything.

Q. How do you pick and choose which companies you individually invest in?

A. Usually I look at sectors, you know, technology. Nuclear is one, which led me to ASPI. So yeah, usually sectors.

Q. What got you interested in nuclear?

A. Well, I have -- my best friend I always -- we have coffee once a week. We always discuss stuff like that. His brother-in-law suggested months and months back, "Hey, you should look into energy sector, especially with AI. You know, AI is really, really big and you need energy for that" and that's how I got started in the energy sector.

Q. Do you distinguish energy from nuclear or are we talking about the --

A. No, I think that's the same. To me that's -- nuclear is the future of it, so ...

Q. What else in the -- what I'll

Page 23

call energy sectors does -- I'm not trying -- I am purposely not drawing a distinction between energy and nuclear since we've decided that they are the same. What else are you invested in?

A. Like I said, mostly ETFs.

Q. Let me be more specific. What other specific companies are you invested in in the nuclear/energy sector?

A. Oklo was a big one for me.

Q. How do you spell that?

A. O-K-L-O, is the symbol. I think the company is Oklo, Inc.

Q. How do you decide whether you're going to day trade a particular stock?

MR. SPENCER: Objection to form of the question. You can answer.

THE WITNESS: Okay. So you objected, then.

MR. SPENCER: Unless I tell you not to answer, after I make my objection just go ahead and answer.

THE WITNESS: Okay. I don't day trade a lot. You know, I will buy

Page 24

something and sell it the next day, two days later, sometimes same day but rarely. So I am not real a day trader per se, although I have done that.

BY MS. MCNALLY:

Q. Even for, you know, a day, taking the time between just a couple of days versus just buying and sitting on it for, you know, weeks and months at a time, is that just kind of a function if you have the time at the moment? You seem like a busy guy. You have got restaurants. Right now it seems like you're not in the midst of owning a restaurant. Can you just give me kind of a sense of how that works with your life and lifestyle?

MR. SPENCER: Objection. Form. Go ahead.

BY MS. MCNALLY:

Q. It was a very long-winded question, but I am going to stand on the question. I think you got the point of it.

A. Right. So you're asking me when do I decide to sell, buy, hold the stock,

Page 25

is what you're saying?

Q. Yes.

A. Sometimes the stock will run up real quick and you're, like, "Hey, I can make a few dollars," you sell it. Sometimes it dips and you have to hold it longer. Sometimes you really like a company and you just sit on it. So it just varies on what you buy.

Q. When did you first learn about ASPI?

A. Let's see. I first started with Oklo -- researching Oklo, and that led me to ASPI, to be honest. So Oklo was probably close to a year ago, so that -- and it kind of led me to ASPI. So I can't say exact time, but I would say I first heard about it in September, probably, of last year.

Q. September of '24?

A. I don't know the exact date. I'm guessing sometime -- '24, I'm sorry, 2024, yes, I'm sorry. I thought you said September 24.

Q. Yes, September 2024, not --

7 (Pages 22 - 25)

Page 26

A.    Yes.

Q.    -- not September 24th.

Okay.  So you think you started to learn about ASPI around September 2024, generally speaking, yes?

A.    Generally, yes.  Correct.

Q.    And that came from your investment in and awareness of Oklo, yes?

A.    Correct.  Correct.

Q.    Do you remember what it was that you first read about with respect to ASPI or how you first heard about ASPI?

A.    Vaguely.  I mean, can I give you a general sense?  Are you looking for that?

Q.    Start with the general.

A.    Okay, in general.  So I really liked Oklo.  I invested in Oklo, which -- I will use the acronym SMR, small modular reactor company.  There were several of those out there.  I don't remember exactly how ASPI came up, but when it came up and -- basically what I read was they produced this HALEU.  Can I call it that, H-A-L-E-U, the acronym?

Page 27

Q.    Yes.

A.    Okay.  And they were the only company, really, that was supposed to be producing this HALEU for these SMRs.  And because Oklo did so well, I felt like ASPI could be a company that everybody needs in nuclear.  And again, like I said, I am very high on nuclear -- I think nuclear is going to be our future -- and I really started turning my attention towards them.

Q.    When you say you turned your attention towards them, what exactly did you do?

A.    You know, read about them.

Q.    What did you read?

A.    I'm sorry?

Q.    What did you read?

A.    Let's see.  They produce HALEU.  And nobody produces HALEU in the world except Russia, so there seemed to be a strong need for a company like them.  So that was the first thing that really grabbed my attention with them.

Q.    What, like, specific types of

Page 28

documents did you look at, press releases --

A.    Yes.

Q.    -- articles?  Tell me about that?

A.    Of course.  I use Barchart.  I use Yahoo.com or Yahoo Business, whatever it's called and also -- I'm trying to remember the other one I use.  I have the app on my phone.  But several different things.  But a lot of times I go on Twitter, I go on LinkedIn, I look at companies, I look at their press releases, I look at what the CEO is saying and get information that way.

Q.    What was -- when you mentioned Barchart?

A.    Yes, Barchart.

Q.    B-A-R-C-H-A-R-T?

A.    Correct.  Yes.

Q.    And then you mentioned Yahoo.com, correct?

A.    Uh-huh.  Yes.

Q.    And then you mentioned another app, but you're --

A.    I am trying to remember the

Page 29

name of it.  I have it on my phone, but I don't know if I am allowed to look at my phone, but --

MR. SPENCER:  No.

THE WITNESS:  I'm not looking at my phone.

BY MS. MCNALLY:

Q.    If it comes to you, just --

A.    I will.  I will.  I see it.  I just can't remember the name offhand.

Q.    It's going to come to you at some point in time in this deposition or right after the deposition you're going to --

A.    Or after my next bathroom break, one or the other.

Q.    And then you mentioned Twitter and LinkedIn, correct?

A.    Correct.

Q.    What would you have looked for on Twitter?

A.    Well, if you follow certain companies, you know, if you are following them, a lot of times it will just pop on the phone.  Whenever they post it, it pops up on

8 (Pages 26 - 29)

Page 30

your phone. So if I am busy at work and something pops up on my phone I read it.

Q. So would you follow -- who or what with respect to the ASPI did you follow?

A. ASPI? Well, the CEO was always making, you know, PRs. Whenever PRs came out they put it right on Twitter or LinkedIn, so -- that would be Mann and he apparently had a lot to say, so I would follow that.

Q. So did you follow ASPI -- let me step back.

Did ASPI and Paul Mann keep separate -- have separate Twitter accounts?

A. I don't believe so.

Q. So it's just the main ASPI account that you would follow?

A. Yes, pretty much.

Q. And then on LinkedIn you would also follow the company?

A. LinkedIn I probably got most of my information from, but a lot of it overlapped. You know, what was said on Twitter was already said on LinkedIn and vice versa.

Page 31

Q. What about the company's website?

A. Have I been on their website? Is that what you're asking me? What do you mean?

Q. Well, you mentioned that you went to these different places to get information about the company before deciding to invest, correct?

A. Correct.

Q. So I'm just wondering if you went to the company's website directly in that time?

A. I could have -- I don't remember particularly -- possibly once or twice.

Q. What about SEC filings? Did you read those?

A. Did I read them?

Q. Yes.

A. I know that they reported them, yes, 10-Ks, 8-Ks, 10-Qs.

Q. Did you ever actually read those, though?

Page 32

A. Like, the fine print? Is that what you're talking about, like, little stuff, or just the basic --

Q. You tell me. You're obviously aware of SEC filings. Give me a sense of whether and how you would have approached them.

A. Right. Generally, you know, when you're researching stock -- I am not that deep, deep into it -- if a company files a 10-K that's good to know. If they are not filing it that's a red flag, in my opinion. So as long as they are filing all their updated filings, that's pretty much the most I pay attention to them, to be honest with you.

Q. What about analyst reports? Did you ever review those?

A. Like, which analyst would you be speaking of?

Q. Any -- broadly speaking.

A. Like someone on TV or --

Q. Sure, someone on TV.

A. Yeah. I have the stock channel on probably all day long at work. So yeah,

Page 33

it's always on.

Q. And I think that I've been focusing my questions on what you reviewed prior to investing in the company. Did your review of information change after you were invested or would you kind of still maintain the same types of review of information?

A. Repeat that. I am not really sure what you're asking me.

Q. So you gave me a list of things that you looked at before you chose to invest in ASPI, right?

A. Yes.

Q. And did you continue to look at those same things while you were invested in the company?

A. Yes. I said that a lot of it -- like I said, on LinkedIn and Twitter they are giving you information and you're reading about it. You know, I go on Stock Twitter, to be honest with you, and, you know, people post articles all the time and I read the articles.

Q. What about Reddit?

9 (Pages 30 - 33)

Page 34

A.    I am not on Reddit a lot, but I did read a very positive article on ASPI on Reddit, very positive, and it got me really excited about it.

Q.    And that was posted -- that was a Reddit article posted before you chose to invest?

A.    No.  I think I was -- I think -- I don't know 100 percent if I had owned some at the time or I owned some and sold some or -- I don't really remember exactly.  But the one thing I did read on Reddit was an article that had, you know, like 45 points on why you should buy ASPI.

Q.    Do you remember what the title of the article was?

A.    I don't offhand, no.

Q.    Do you remember what any of the points were?

A.    Specifically, not offhand.  I know, you know, that they talked about HALEU. They talked about TerraPower, Bill Gates' company, wanting to invest in them and building facilities for them and various

Page 35

things like that.

Q.    And do you save the articles anywhere that you review?

A.    The Reddit article I believe I saved, on my phone, probably, maybe sent it to a relative or something like that.

Q.    Who did you talk to about the ASPI investment?

A.    I talk about stocks all the time.  So, I mean, I could be talking to customers, I could be talking to employees, I could be talking to my best friend at coffee once a week, you know.  So I talk -- I talk a lot about stocks.

Q.    And do you -- said you might have emailed a relative about it.  Do you have any relatives or friends who kind of take stock advice from you?

A.    I probably take it more from them than me.  But the specific article you're talking about, I think I just saved it on my phone, you know, took a picture, however you do that.  I am 54.  I am not the most technically sound person in the world.  So I

Page 36

think I sent that that Reddit article to -- I will call it my cousin-in-law.  It's my wife's cousin's husband.  And he was an Ivy League guy.  He's retired.  He's probably 60, 62 years old.  And I actually led him to Oklo and he's done very, very well with Oklo, so I figured I would send this to him and see what his interest was.

Q.    What was his reaction?

A.    His interest was that he had a certain amount invested in nuclear and he's going to stick with that.

Q.    You mentioned that your father is a CPA and financial planner, right?

A.    Correct.  Well, he's retired now, but yes.

Q.    Do you talk with your father about this?

A.    All the time.  I also see him once a week for coffee and maybe more than once a week him and my mother.

Q.    Who has kind of taken over your father's business?

A.    My nephew kind of -- he used to

Page 37

work for Pacific Life and has recently started his own financial planning firm about six months ago.

Q.    Did you ever talk to him about ASPI?

A.    I don't believe so.  You know, he's more into, you know, funds, stuff like that, not individual stocks.

Q.    So what did folks tell you about ASPI when you would talk to them about it?

A.    When you say folks who are you referring to?

Q.    Let's start with your best friend who you have coffee with.

A.    Oh.  You know, they'll say, "It sounds good.  Hey, it looks pretty cool.  Maybe it's something to put money in."

Q.    Did you ever talk to any brokers or financial professionals about ASPI?

A.    I don't believe so, no.

Q.    Was anybody that you spoke with already invested in ASPI?

A.    Meaning, like, my cousin-in-law

10 (Pages 34 - 37)

Page 38

or my best friend, no, neither one was.

Q. So you were the one telling them about ASPI to begin with?

A. Yes. I technically found it for my little group, yes.

Q. Who do you count as a part of your little group?

A. Just those two guys. I shouldn't even call it a group. I should just say those two.

Q. And what's your best friend's name?

A. Chris Scaramuzzi.

Q. And what's your cousin-in-law's name?

A. Steve Brooks.

Q. Wife's cousin --

A. Wife's. I have known him almost 30 years, so I just call him my cousin.

Q. So we talked about how you, it sounds like, reviewed a lot of information online and also spoke with, you know, some people in your trusted circle about investing in ASPI. Did you do anything else before

Page 39

investing in the company?

MR. SPENCER: Objection. Form.

THE WITNESS: Do I answer that?

MR. SPENCER: Yes. Go ahead and answer.

THE WITNESS: Say it one more time. I'm sorry. Did I do anything else, you said?

BY MS. MCNALLY:

Q. I am trying to get a fulsome sense of kind of what you did, what your personal due diligence was before investing in the company. So we talked about how you, you know, reviewed articles and things that you said online, correct? That was one kind of area, right?

A. Yes. To, you know, read articles. It sounds good. Why not buy some. That's my philosophy.

Q. And then separately you spoke with -- with some of, you know, the people in your -- what I am calling your trusted circle?

A. My trusted circle. Well, my best friend is a hairdresser. He doesn't know

Page 40

a lot about stocks. So what he knows is what I usually tell him at coffee. So he's no expert by any stretch.

Q. And then I am just wondering, is there anything else that you did that I am missing, that you did before choosing to invest?

A. Basic research, like I said, and articles.

Q. Did you ever listen to any, like, analyst calls or investor calls with the company?

A. What analyst would you be speaking of?

Q. Let me frame it as investigator calls. You know how there would be, like, quarterly earnings calls that lots of companies have, where the CEO will speak and whatnot? Did you ever listen to those?

A. No, but I've read, like, summaries of some of their calls. You know, like, the September 26 call, I know some information about that call.

Q. What do you remember about that

Page 41

call?

A. Let's see. They talked about their proprietary technology, you know, ASP -- I'm sorry -- ASP and HUI, and they are going to develop this HALEU, they're going to enrich it, they are going to sell it, there is a need for it. The two main companies that they were going to sign MOUs with needed billions of dollars worth over the next 12 years or so, you know, charts they put out on different ways to enrich uranium. A lot of stuff in that call.

Q. Was it after that call that you first invested?

A. Well, that's when the stock really started to melt. I think at the time it was around probably high twos and I started to invest probably after that, when it was around $4 or so.

Q. How much did you put into it?

A. My first purchase, I'm almost positive, but I can't say 100 percent, it was about a thousand shares.

Q. How much more did you put into

11 (Pages 38 - 41)

Page 42

it over time?

A. I put a lot into it over time.

Q. About how much?

A. How many shares did I have total? At what point in time are we talking?

Q. How much of your money did you put into it?

A. I put a good portion of it in there, yes.

Q. About how much?

A. How many shares did I have, is that what you're asking me, at my peak?

Q. No. How much money did you take and put into ASPI? So, you know, you started investing around $4, 1,000 shares, that's about $4,000, right?

A. Right. Correct.

Q. The assumption is that at different points, right, you start buying up more shares. I'm asking monetary-wise how much --

A. Absolutely. I am going to say after the multiple PRs in October and the raises and, you know, and all the

Page 43

institutionals that invested in it, I had over 100,000 shares of it at one time.

Q. What was your plan with respect to that investment, meaning, did you plan to buy and hold or were you going to --

MR. SPENCER: Objection. Form.

THE WITNESS: So yes, I wanted to buy it, hold some of it, sell some of it.

BY MS. MCNALLY:

Q. Can you explain that a little bit more? You said you plan to hold some of it, sell some of it.

A. Okay. So if it's at a profitable level, you sell some, hang onto some for long term. Oklo I didn't have for a long time. I know that shot up from $6 to, I mean, up to $70, really. Right now it's probably in the 50s somewhere. So I kind of made it, like, parallel with that, thinking, hey, if I buy some cheap, maybe sell some off, get my original investment back, and then hang onto the difference.

Q. And when did you decide to --

Page 44

let me ask you this. Scratch that.

Are you fully out of the stock right now?

A. Yes.

Q. When did you go fully out of the stock?

A. In my Robinhood account, November 27th. I am pretty sure it was November 27. That was the day I lost the -- most of the money. Now, can I say -- I don't particularly remember if after that I bought a couple shares back and then -- if it was, it was only a few. I don't remember, to be honest.

Q. But your Robinhood account would be able to confirm that?

A. Correct. Yes.

Q. Did you hold any ASPI shares in any other accounts?

A. I did.

Q. What account was that?

A. I guess it was my Roth.

Q. Is that a retirement account?

A. Yes.

Page 45

Q. Are you out of it in that account as well?

A. I am now, yes.

Q. When did you sell those shares?

A. Well, I actually forgot I even had them. I am going to say maybe a couple months ago.

Q. So what was it about ASPI that made you make your initial investment?

A. What was it?

Q. Uh-huh.

A. All the good information that was coming out, what they were going to produce and their proprietary technology that nobody else had, their dealings with TerraPower, which is Bill Gates' nuclear company, you know, the MOU they had with them, TerraPower is going to build a facility for them and buy all this HALEU from them. It looked like a great investment.

MS. MCNALLY: Let's take just a five-minute break. Does that work for you guys?

THE WITNESS: Sure.

12 (Pages 42 - 45)

Page 46

MS. MCNALLY: I like to take breaks, too, where I think I might be able to take five minutes and tighten up some of my questions to save us time.

THE WITNESS: Fair enough.

THE VIDEOGRAPHER: The time is now 10:45. This concludes media unit one.

- - -

(Off the record)

- - -

THE VIDEOGRAPHER: The time is now 10:51. This begins media unit two.

BY MS. MCNALLY:

Q. Thank you, Mr. Leone. So I want to talk about your trades in ASPI. And are you aware that you have submitted a handful of statements to the court with those trades?

A. Yes.

Q. And are you aware that they differ?

Page 47

A. They differ from what?

Q. Amongst each other with respect to what trades are listed.

A. I'm not sure what you mean by that they differ from --

Q. From each other. Let's take a look -- let's take a look at them.

A. Okay.

Q. All right. So in your binder -- I am going to to be introducing some of the documents in the binder as exhibits.

A. Okay.

Q. And I will try to keep this as clear as possible, because I like to use paper copies and your counsel, I think, likes to use paper copies as well, but it can get a little confusing with referring to tab numbers and stuff. So if we get confused at all, just don't hesitate to stop me and say, "Which doc are you talking about, Laura?"

A. Okay.

Q. So I want to take a look at -- let's look at Tab 3 first.

MS. MCNALLY: So we are going

Page 48

to be introducing this document as Exhibit-1.

THE WITNESS: Can I write on this or --

MR. SPENCER: Let's not.

THE WITNESS: Okay. I wanted to write Exhibit-1 on it. Okay.

_ _ _

(Whereupon, Exhibit-1 was marked for purposes of identification.)

_ _ _

BY MS. MCNALLY:

Q. So the document that is at Tab 3, which is also Exhibit-1, this at the top says "Sworn Certification of Plaintiff" and it has a Document 7-2 running across the top of it. Do you see that?

A. Correct, yes.

Q. Are you familiar with this document?

A. I would have to read it, but yes, it looks familiar.

MR. SPENCER: With any of the

Page 49

documents she shows you, you can feel free to flip through it.

THE WITNESS: All right.

BY MS. MCNALLY:

Q. Yes. Absolutely. Take your time to flip through and familiarize yourself with it.

A. Okay. Yes, I read this before. I did sign it, yes.

Q. And then you see here that -- scratch that.

You signed this on February 3rd, 2025, correct?

A. It looks like it, yes.

Q. And that is your signature down at the bottom?

A. Yes.

Q. Do you remember what type of digital platform you used to sign this?

A. Email, whatever the document, the -- whatever that app is.

Q. Docu-Sign?

A. Docu-Sign, yes. Correct.

Q. And do you remember what law

13 (Pages 46 - 49)

Page 50

firm provided you with this?

A. Glancy Prongay & Murray, I'm assuming. They're my lawyer, so --

Q. Well, I don't want you to assume. Do you remember if it was --

A. I don't remember specifically, because Frank was involved in the beginning and now he isn't. So I'm not sure if Frank sent it or Glancy Prongay & Murray did.

Q. And why isn't Frank involved anymore?

A. I guess he didn't get the case. I don't know. He wasn't approved by the court, I am assuming.

THE WITNESS: Can I ask you that? I don't know. I don't really know why, to be honest. Honestly, I don't know why.

BY MS. MCNALLY:

Q. And I don't want you to assume. What do you know about Mr. Frank's current involvement in the case?

A. He's not involved, as far as I know.

Page 51

Q. So do you see that Paragraph 1 of this says, "I have reviewed the Complaint, adopt its allegation, and authorize the filing of the lead plaintiff motion on my behalf"?

A. I see it.

Q. All right. Let's turn -- on Tab 4. Tab 4 is going to be Exhibit-2.

_ _ _

(Whereupon, Exhibit-2 was marked for purposes of identification.)

_ _ _

BY MS. MCNALLY:

Q. Why don't you take a look at this document, which is the Class Action Complaint for Violations of the Federal Securities Laws. And just tell me if you're familiar with this document.

A. Just scanning it over, yes, I've read this before.

Q. And did you read this before signing this certification that's at Tab 3, which we've marked it as Exhibit-1?

A. I don't remember, to be honest.

Page 52

Q. Looking at the Complaint, which is at Tab 4, which is Exhibit-2, Paragraph 1 of the Complaint says, "This is a class action on behalf of persons and entities that purchased or otherwise acquired ASP Isotope securities between October 30, 2024 and November 26, 2024 inclusive" and then in parentheses "the class period;" is that correct?

A. That's what it says.

Q. So the class period is October 30, 2024 through November 26, 2024, right?

A. That's what it says, but I thought it was September 26 to November 26. Is that incorrect?

Q. We'll look at other documents as well. But as it stands in this document, it defines class period as October 30 through November 26, correct?

A. That's what it says here.

Q. And then in your certification, which is at Tab 3, which is Exhibit-1, you have there, "My transaction in ASP Isotopes,

Page 53

Inc's securities during the class period set forth in the Complaint are as follows" and then it's got --

A. Wait. I'm not seeing that. Tell me where that is. You said it's in Exhibit-1.

Q. It's at Tab 3, Paragraph 4.

A. Am I on the right page? This right here. Oh. Okay. "My transaction" -- correct. Yes.

Q. And then the next few pages have lists of -- a list of buys and --

A. Yes.

Q. Buys of stock?

A. Uh-huh.

Q. How was this list of transactions compiled?

A. I had to contact Robinhood. This is all Robinhood transactions. And this looks like it's just my November -- it looks like this was the week of the 25th transactions, 25th, 26th, and I guess -- yeah, the 25th and 26th. This is not a complete list, obviously.

14 (Pages 50 - 53)

Page 54

Q.    And it also does not include sales, correct?

A.    I don't know. Let me see. It looks like all my buys. That might have been when I asked Robinhood "Send me all my buys for that time period." I had to contact them several times. They are very -- they are difficult to get ahold of.

Q.    But as you said, this was not a complete list, obviously?

A.    No, it wasn't. No, this isn't a complete list.

Q.    So then why in Paragraph 4 did you say that your transactions during the class period were set forth in the attached?

A.    This was the original. I am not sure if it was from -- it might have been Frank. I might have sent this to Frank and he said, "Hey, just send me your" --

MR. SPENCER:  Don't tell --

THE WITNESS:  That's fine. Yeah. It was probably just miscommunication on what I had to send.

Page 55

BY MS. MCNALLY:

Q.    Let's look, then, at Tab 8.

A.    Okay.

Q.    And take a minute to review that.

A.    Okay.

MS. MCNALLY:  I am going to mark Tab 8 as Exhibit-3.

_ _ _

(Whereupon, Exhibit-3 was marked for purposes of identification.)

_ _ _

BY MS. MCNALLY:

Q.    So this is a sworn certification of plaintiff dated 5/23/2025, correct?

A.    You said 5/23/2025?

Q.    Correct.

A.    Correct. Yes, I see.

Q.    And that's your signature?

A.    Yes.

Q.    And based on your review of the transactions here, do you see how they start

Page 56

on October 18 and go through November 26?

A.    I do. Yes, I see it.

Q.    And Paragraph 1 of this says, "I have reviewed the Complaint, adopt its allegations, and authorize the filing of a lead plaintiff motion on my behalf," correct?

A.    Correct.

Q.    And we've looked at the Complaint, which was Exhibit-2, but now I want to -- Exhibit-2 at Tab 4. But now I want to direct your attention to the Amended Complaint, which is at Tab 7, which I will mark as Exhibit-4.

_ _ _

(Whereupon, Exhibit-4 was marked for purposes of identification.)

_ _ _

BY MS. MCNALLY:

Q.    And I'll give you a moment. So take a look at the Amended Complaint at Exhibit-4 and tell me if you're familiar with it.

A.    I'm going back to -- which one

Page 57

is Exhibit-4? Is it Page 4.

Q.    I know. I am going to start focusing just on calling things by their tab number so we'll have it in the record where we introduced it as exhibit. So Tab 7, the Amended Complaint at Tab 7.

A.    Okay. I am there.

Q.    Okay. Are you familiar with this document?

A.    I believe I read this over, correct. It's basically a summary of the dates and -- yes.

Q.    What is your understanding of what it is?

A.    Well, it's a summary of different dates, September 26, October 17, October 30. You know, it's basically a timeline of the case.

Q.    And if you look at Paragraph 1 of the Amended Complaint at Tab 7.

A.    Tab 7. Nature of the Action Overview?

Q.    Correct.

A.    Okay.

15 (Pages 54 - 57)

Page 58

Q.   You'll see there, what's the class period defined as there?

A.   September 26 to November 26.

Q.   So see, you weren't crazy.

A.   Right.  That's what I thought it was, correct.

Q.   So then -- so if we look at -- and again, if you look at the top of this, do you have an understanding that this was filed on May 28, 2025?

A.   That's what it says, yes.

Q.   And then your certification -- that's at Tab 8 of the binder -- that it was filed along with the Amended Complaint, do you understand that?

A.   That's -- yeah, it says 5/28. 5/28, correct.

Q.   And Paragraph 1 says, "I have reviewed the Complaint, adopt its allegations, and authorize the filing of the lead plaintiff motion on my behalf."  Do you know why this references the original Complaint and not the Amended Complaint?

MR. SPENCER:  Objection.

Page 59

THE WITNESS:  Do I answer that?

MR. SPENCER:  You can answer.

BY MS. MCNALLY:

Q.   Yes.

A.   So repeat that one more time. Do I know why --

Q.   Do you know why this Paragraph 1 references the original Complaint and doesn't reference the Amended Complaint?

MR. SPENCER:  Objection.

THE WITNESS:  I don't.  I don't, honestly.

BY MS. MCNALLY:

Q.   And then Paragraph 4 says, "My transactions in ASP Isotope, Inc's Securities during the class period set forth in the Complaint are as follows."  And now it's got a much more robust list of transactions than the prior certification, correct?

A.   Correct.

Q.   Do you know why these were not included in the prior certification?

A.   Only because it was a miscommunication of when I was told to -- what

Page 60

I thought I should have sent.

MR. SPENCER:  Again, I will caution you not to say what lawyers told you.

THE WITNESS:  Oh.  Okay.  I don't remember, to be honest with you. That was, yeah, just a miscommunication.  It would have been just as easy to send this as it would have been the other.

BY MS. MCNALLY:

Q.   And we'll -- we are going to come back to Tab 8 to talk about your trades, but first I want to look at Tab 1.  So Tab 1 is titled "The Declaration of Lead Plaintiff Mark Leone in Support of Plaintiff's Motion for Class Certification;" is that correct?

A.   Correct.  I'm there.

MS. MCNALLY:  And I'm -- don't know if I already said this.  I am going to introduce Tab 1 as Exhibit-5.

_ _ _

(Whereupon, Exhibit-5 was marked for purposes of

Page 61

identification.)

_ _ _

BY MS. MCNALLY:

Q.   So Tab 1, if you look at Paragraph 3, which starts on the bottom of the first page and goes to the top of the second page, it ends in the sentence, "In addition, during the class period I had the following transactions in an individual retirement account which were inadvertently omitted from my prior certification that reflected transactions from my brokerage account."

A.   I see that, yes.

Q.   So why were these not included in the earlier certifications?

A.   Honestly, I completely forgot that they were even there.  That's just an account I look at once, twice a year.  So just slipped my mind.

Q.   All right.  So now let's go back -- well, let me tie up the account that's on -- in Tab 1, which is Exhibit-5, first.

The purchases in the retirement account, do you think that you sold them all

16 (Pages 58 - 61)

Page 62

-- you mentioned that you sold them all more recently?

A.    I did, because I just forgot that I had them.  There wasn't that many.  I mean, in comparison to how many shares I held in my Robinhood account, which was about 120,000 shares at one time, these couple thousand shares didn't make a difference one way or the other.  I had just forgotten that I had them.

Q.    And you are now fully out of ASPI in the retirement account, correct?

A.    Yes.  Correct.  Yes.

Q.    All right.  So let's go to Tab 8., which is Exhibit-3, and let's take some time going through some of these trades here.  Now, I want you to take your time and review this and tell me if you're confident that this does, in fact, reflect your trading during the class period which starts September 26 and runs through November.

A.    I mean, these are my trades.  This is printed right from my Robinhood account, so -- I don't know if specifically if

Page 63

I could pick one out and say, yeah, I did that or I didn't do that.  I am sure I did them all.  But that came -- printed right out of my Robinhood account.  I am pretty confident it's 100 percent accurate.

Q.    Let's look at the first trades on October 18.

A.    Yeah.

Q.    You have got a buy and sell one share.  Why did you do that?

A.    Oh.  So I do that quite often when I want to keep an eye on a stock.  I don't know if you are familiar with the Robinhood structure.  When you own a stock, it's at the top when you first come into your account, it first opens up and, then you have a list of ones you keep an eye on.  The ones I own are always a shorter list than the ones I keep an eye on.  So a lot of times I will buy one share so I can keep an eye on that price.

Q.    You mentioned before that you were aware of a September 26 investor presentation or call about ASPI, right?

A.    Correct.

Page 64

Q.    So I'm just testing a little bit if you truly think that 10/18 was your first purchase?

A.    I believe it was, yeah.  Like I said, I thought I had a thousand shares -- I said that earlier -- was my first purchase.  I forgot about the one share that I purchased earlier in that day.  So I believe that was the first time I purchased it, yes.

Q.    If you buy it and sell it in the same day, will Robinhood still keep it at the top of the app?

A.    Not if it's completely gone.  So in Robinhood sometimes you'll buy a dollar's worth of a stock and it might be, like, .005 of the stock.  So if you have 1,000, .005, and you sell it, it's still listed up there because you still own a dollar's worth of the stock.  Does that make sense, what I just said?

Q.    It does.  But then I am trying to figure out on the 18th you bought -- if the idea was you're buying a little bit of it to keep it high on the app, you buy and sell one

Page 65

share and then you buy and sell a thousand shares and then you don't buy again until October 30.  Do you remember what was going on with your strategy at that point?

A.    I don't remember now.  I might have wanted to move the money somewhere else, to be honest with you.

Q.    And then on the 30th, it looks like that's when you really start buying more, on the 30th, right?

A.    Correct.

Q.    All platforms are different and I don't -- I don't trade in individual stocks.  So can you tell me, how does Robinhood work?  Like, are you -- do you go in and you -- the first line here is -- for the 30th is 909.  Did you go in and put an order in for 909 shares or did you put an order in for a larger number of shares and Robinhood breaks it down?

A.    That particular -- yeah.  Right there, so if you look, it says 909 and 91.  Now my guess -- and I don't want to guess -- but I am almost 100 percent positive I probably put a purchase of a thousand shares

17 (Pages 62 - 65)

Page 66

at a specific price -- and it's called a limit order -- and 909 went through and then maybe a few seconds later the other 91 went through. If you look at the next two, it's another thousand share order, 564 and then 436 at the same time and the same price. Does that make sense to you now? So if you put an order in -- like, a limit order, you will get what's available until you get the amount that you ordered.

Q.    So the first -- the 909, 91, 564, 436, you think were all part of the same order or do you think it was a thousand and then a thousand?

A.    It could have been a thousand and a thousand. That's my guess.

Q.    And then the next two, which were 500 and 500 at the price of 7.15, would those have been a separate order?

A.    It looks like the same order and it went through. It could have been separate orders.

Q.    That's at 7.15, which is different from the 6.95. So those kind of two

Page 67

are considered together, from your perspective?

A.    It looks that way.

Q.    So does that mean that that -- on that day, on the 30th, you're sitting there and saying, okay, I want a thousand at 6.95 and a thousand at 7.15 and, you know, if we take the next thousand it looks like at 7.12, is that the way I should be thinking about those?

A.    That's when the stock was riding up that day. That's when I really was getting really, really high on it, because October 30th there was another PR put out and it was very, very positive and I was excited about it. So I just started buying it up, you know, little chunks at a time.

Q.    Is a thousand kind of a magic number for you or is it a magic number on the Robinhood platform?

A.    No. It's just an even number.

Q.    Do you remember how much of the day -- how much of your time that day it took up?

Page 68

A.    I don't.

Q.    So that was -- we see a lot of buys on the 30th and then more buys on the 4th, correct?

A.    Correct.

Q.    Do you remember what was going on on the 4th that, you know, piqued your interest again?

A.    I don't remember. I do remember -- this is off topic -- that I had an Italy trip. And I might have left on the 4th. I might have left on the the 5th. I was in Italy about nine days with my wife and several friends. So I might have left on the 5th, because I do recall I was not here for the election, which I believe was on the 5th. So that might have been right before I left.

Q.    And then we see you've got buys essentially on the 4th, on the 6th, a buy on then the 12th. Do you see that kind of -- keep going.

A.    Yes, I see the buy on the 12th.

Q.    And then we have got the 14th, correct?

Page 69

A.    Correct.

Q.    The 15th, the 19th, through the 20th. Do you recall for any of those dates what caused you to buy?

A.    No. But looking at the price -- again, I don't want to guess, but looking at the price, when the price dips I generally want to try to buy more and get my average down, my average price down.

Q.    Would you have talked to anybody about your decisions to buy the ASPI during this time period, those first two weeks of November?

A.    I don't remember specifically any conversations.

Q.    Then on the 21st, I start to see sales, right?

A.    Correct.

Q.    Do you remember what was going on then? What made you start selling?

A.    I don't know, to be honest. I mean, I could have had a lot of shares and had an opportunity to cash some out. That could have been one cause. That's probably it.

18 (Pages 66 - 69)

Page 70

Q.   So we see lots of sales from the 21st through the 22nd, correct?  It's all sales?

A.   It is, yes.

Q.   Did you get entirely out of the stock by the 22nd?

A.   At this point, I believe I was entirely out.  22nd was a Friday, if I remember, and generally -- I won't say generally.  I should say sometimes it's a good idea on a Friday to sell, take some profit.  You know, who knows what can happen over the weekend.

Q.   You're right, the 22nd was a Friday.  And then the 25th is a Monday, right?

A.   Correct.

Q.   So you start buying again on Monday?

A.   Yes.

Q.   What is the strategy there?

A.   Well, I had made some money and I still liked the stock, so I started to buy more.

Q.   And then you continued to buy

Page 71

on the 26th, correct?

A.   Let's see.  The 25th I did buy a lot and -- yes.

Q.   And then do you know when the sales -- when you sold out?

A.   I believe the 27th was when I unloaded everything.

Q.   So on that Monday were you trying to get -- kind of invest the same amount that you had been in on Friday?

A.   I don't remember what my mindset was, other than I wanted to get back into the stock.  I still very much liked it at that point.

Q.   Is there anything that you could look at that would refresh your recollection as to why you got back in on that Monday?

A.   No, not really.  It's just, like I said, I was doing well with it and I thought it was still a very positive company, so I wanted to buy back in.

Q.   Let's take a look quickly at -- well, let me just ask you first.  Are you

Page 72

aware of a Fuzzy Panda report that came out on the 26th?

A.   Yes.

Q.   And what can you tell me about that Fuzzy Panda report?

A.   It was considered a short report and at the time I felt like they were just attacking the company because they were trying to short the stock and make money.

Q.   What did you do in response to it?

A.   Well, it looks like I bought more shares.  I did -- I did actually contact the company, if that's what you're asking.  I contacted -- I am not sure who I contacted -- via email and they did get back to me.

Q.   And what did they say?

A.   I asked them when they were going to react to, you know, what this report said.  I am paraphrasing.  I don't know what I called it.  But I was pretty upset about it.  And they said, "Hey, we are putting out a PR now," something to that effect.  I don't know exactly -- I'd have to read the email -- but

Page 73

roughly that's what it said.

Q.   Do you know who it was?

A.   I don't remember his name.  A finance guy.  Somebody in finance, I believe.

Q.   And did you then read the company's response?

A.   I did.

Q.   And what did you think of that?

A.   It sounded like they had something in the works and they were planning an official response.  So I felt pretty confident that the stock was going to come back and that's probably why on the 26th I kept buying.

Q.   What made you decide to then get out on the 27th?

A.   Well, the interview that was done on the 27th obviously wasn't going very well, because during the interview the stock price was plummeting and plummeting and plummeting and at some point I had to just, you know, take my loss and get out.

Q.   What interview on the 27th are you referring to?

19 (Pages 70 - 73)

Page 74

A.    The Canaccord interview.

Q.    How did you access that interview?

A.    I didn't hear it live.

Q.    I'm sorry. You did or did not hear it live?

A.    I did not hear it live, no. Actually, that morning -- my mother was going ███████████████████████ ███████████████████████ ███████████████████████ ████████████████ -- and I was just watching -- I had no access. I was at a hospital, basically. So I was just watching the stock price go down, down, down and at some point I had to make the tough decision to sell off and cut my losses. So I did not hear it live.

Q.    When did you hear about the Canaccord interview?

A.    Well, they said they were going to have an interview. On the 26th I believe they said on the 27th we are going to have a response interview as to what was going on.

Page 75

And my hope was that it was a good strong interview and the stock price would come back and I wouldn't lose the money that I lost.

Q.    Have you ever listened to the Canaccord interview?

A.    I've read -- actually, I have -- I have listened to it. It's about 50 minutes, 55 minutes. It was a while back and it was -- I just shook my head, because I wasn't very happy with the response.

Q.    You weren't very happy with the company's response during the interview?

A.    Correct.

Q.    I wasn't sure if you were referring to you weren't happy with the stock price response during the interview.

A.    I wasn't happy with either, to be honest with you.

Q.    What made you unhappy with what the company was saying during the interview?

A.    Wow. Well, first of all, he was being asked questions like how many modules would it take to, you know, fire up a -- one reactor. And the response from the

Page 76

CEO, Mann, was, "Hey, look we never actually enriched uranium, so we don't really know how many modules it would take." And when you hear something like that and you're basing, your know, your money and your efforts into this company and then all of a sudden they tell you they are not enriching uranium, when that's all they talked about months previous, you know, your heart drops, because you just loss, in my case, about $200,000. So I was not happy, needless to say.

Q.    Have you -- I think you mentioned that you read the interview too?

A.    Yes. Excerpts from it, yes, quotes.

Q.    Where did you read it?

A.    I don't remember.

Q.    You think it was some type of article that excerpted it or quoted afterwards?

A.    Could have been, you know, recent documents. I have been through so many documents, you know, so ...

Q.    Was it a document that was

Page 77

provided by your attorney?

A.    We share documents, yes.

Q.    Have you ever seen, like, an official transcript of it, the full interview?

A.    Not an official transcript, but -- again, I don't want to guess, but, you know, people posting articles, you're reading the articles. It was -- it was not a very fond memory for me. I am sure you can understand that.

Q.    But you've never seen a full -- a transcript of the full interview?

A.    Like I said, I listened to it and it was about close to an hour and, to be honest, the man didn't sound very sure of himself and -- again, not a fond memory for me.

Q.    What makes you think that it was that interview that was causing the stock price to drop that day?

A.    What makes me think that?

Q.    Yes.

A.    Well, I was watching the stock price live and -- like I said, I was sitting

20 (Pages 74 - 77)

Page 78

in the hospital and I am watching the price drop and drop and drop during the time period that he was giving the interview. And if he was saying positive things I don't think it would have been dropping. I think it would have been coming back up. So it doesn't make any sense. It doesn't -- I'm sorry?

Q. I'm sorry. That was one of those things where we started to talk over each other. My apologies.

A. That's okay. It doesn't take a stock analyst to figure out what he is saying is hurting the stock price. And it hurt it real bad, because it was down about five bucks by the end of the day. I was fortunate -- I'm calling it fortunate -- I only lost $200,000, but I was fortunate I was able to sell most of it in the 5.30 to 5.40 range.

Q. How do you know it wasn't kind of a hangover effect from the Fuzzy Panda article the day before for the stock price decrease?

MR. SPENCER: Objection. Go ahead.

Page 79

BY MS. MCNALLY:

Q. You can still answer.

A. So, again, if he had come back strong with a good response, the stock price would have went up. At some point -- I don't know if you ever have been in this position, you said you don't trade individual stocks -- you're faced with losing a couple hundred thousand dollars, maybe 200,000, and if you wait you're looking at 300,000, 400,000. It's a lot of money. I am not a rich man by any stretch.

Q. But you don't know that it wasn't trading based on -- still based on the Fuzzy Panda report itself?

MR. SPENCER: Object to the form of the question.

THE WITNESS: In my opinion, it was trading based on what the CEO was saying.

BY MS. MCNALLY:

Q. At the Canaccord interview?

A. Correct.

Q. Other than watching the

Page 80

Canaccord interview, did you do any other due diligence before deciding to sell the stock?

A. Like I said, I was sitting in a hospital and I watched the stock drop and I had to cut my losses. That was as simple as that.

Q. What about on the day of the Fuzzy Panda report, so that's the day prior, that's the 26th, bringing you back to that day. On the 26th you read the Fuzzy Panda report, correct?

A. Excerpts from it that were online, yeah.

Q. And you were suspicious of it knowing that it was from a short seller, right?

A. I was suspicious that he's done this before on other companies and some of those companies -- I don't remember the names -- came back from it. So to me, I didn't -- never heard of Fuzzy Panda up until that day and I know he was -- he is somewhere based -- he's offshore in the United States -- and that's how he can make his living. That's

Page 81

as far as I knew. I didn't really know much about it. I just --

Q. When you're talking about that's how he can make his living, you're talking about the guy who does Fuzzy Panda?

A. At the time that's what my thought was. This guy makes a living putting out articles like this and shorting the stock and, you know, quick hits.

Q. So you email the company and they gave a response back to you, correct?

A. Correct.

Q. Anything else? Did you do any other research that day, on the 26th?

A. On the 26th? I don't recall that specific day. I am sure I did. I don't recall, though.

Q. But you were at least confident enough in the email response that you got from the company and suspicious enough of Fuzzy Panda to actually make more purchases on the 26th?

A. I was very confident. When they responded back to me as quickly as they

21 (Pages 78 - 81)

Page 82

did, I was confident that they were going to come back with a strong response. The stock was trading a dollar, two dollars up and down for a while. A dollar, two dollars is a difference between breaking even, making money, or losing 200,000. So I was hoping that it was going to come back.

MS. MCNALLY: Okay. I am at a little bit of a break point. I'm just -- let's go off the record for a minute.

THE VIDEOGRAPHER: The time is now 11:33. This concludes media unit two.

- - -

(Off the record)

- - -

THE VIDEOGRAPHER: The time is now 11:48. This begins media unit three.

BY MS. MCNALLY:

Q. All right. Thanks, Mr. Leone. Have you ever emailed -- scratch that.

So we talked about an email

Page 83

that you sent to the company on November 26 after the Fuzzy Panda report, right?

A. Correct.

Q. Did you ever email the company any other time?

A. I don't believe I did, no.

Q. What's your email address?

A. I'll say it and spell it for you. So it's lsixers22@comcast.net. So it's L, like my last name, S-I-X-E-R-S-2-2, @comcast.net, like our basketball team in town, lsixers22.

Q. Who was Number 22?

A. Andrew Toney was number 22. You probably not old enough to remember Andrew Toney.

Q. No. Someone like Alan Iverson --

A. He wasn't as good as Andrew Toney. Trust me. Wasn't as good.

Q. I will have to Google him later.

A. Please do.

Q. So all right. And that was

Page 84

at -- I'm sorry. What was the domain?

A. Comcast.net.

Q. All right. Turning to the lawsuit, back to the lawsuit. What's your understanding of who the defendants are in this case?

A. ASPI and the CEO, Mann.

Q. What about Heather Kiessling?

A. I've heard the name, but I am not totally familiar. I know she has something to do with ASPI.

Q. Are you aware that she's a defendant in the case?

MR. SPENCER: Objection.

THE WITNESS: Can I answer?

MR. SPENCER: Yes.

THE WITNESS: I believe I saw her name somewhere, but I couldn't say for sure.

BY MS. MCNALLY:

Q. So do you know -- do you have any -- can you tell me what she did wrong?

A. I don't know who she is, so I'm not -- like I said, I know I read her name

Page 85

somewhere, but I am not sure if she's the CFO the CO -- I don't know.

Q. And you can't tell me what she allegedly did wrong?

A. I don't know who she is.

Q. All right. Get your binder ready, because we are going to go through some of the tabs, fairly efficiently, let's hope.

A. Okay.

MS. MCNALLY: Let's start with Tab 11, which I will mark as Exhibit-6.

_ _ _

(Whereupon, Exhibit-6 was marked for purposes of identification.)

_ _ _

BY MS. MCNALLY:

Q. Take a moment to review it. Have you seen this document before?

A. Some of it.

Q. When do you think you saw it?

A. I couldn't tell you exactly.

Q. And it's -- it's a slide deck,

22 (Pages 82 - 85)

Page 86

right, that's titled "Corporate Overview"?

A.    Right, from September, I am guessing it was.

Q.    When you said before that you had seen a presentation in September, were you referring to this document?

MR. SPENCER:  Objection.

THE WITNESS:  Is she waiting for an answer from me?

MR. SPENCER:  Yes.

THE WITNESS:  I saw parts of this document, yes, and most recently in some of the information that we shared.

BY MS. MCNALLY:

Q.    So most recently in preparing for the deposition?

A.    That's my recent memory, yes.

Q.    Do you remember seeing this document, though, when you were making your decision whether to invest in ASPI stock?

A.    I don't remember.

Q.    Let's look at the Complaint at -- excuse me -- the Amended Complaint,

Page 87

which is at Tab 7, which has been marked as Exhibit-4.  I want you to turn your attention to Paragraph 58 of that.  Why don't you just read Paragraph 58.  Just to yourself is fine.

A.    Okay.

Q.    And I'll represent to you that the document that is at Tab 11, that presentation that you were just looking at, is this -- is the Exhibit-4 that's referred to in Paragraph 58.  And I can tell that because the header on the top says Document 28-4?

A.    Okay.

Q.    So Paragraph 58 describes how ASPI filed the report, which is at Tab 11, on September 26th, and then also "That morning Defendant Mann spoke on an ASPI conference call hosted by the Emerging Growth Conference paid stock promotion service, in which he gave prepared remarks while presenting the slide deck and then responded to questions."  Does that help you remember if this is the September 26 presentation you were talking about earlier?

A.    Yeah. Correct. Yes.

Page 88

Q.    And do you remember if you listened to that presentation at or around September 26th?

A.    No, I didn't specifically listen to it.  I might have gotten information from, like I said, articles, sharing information with, you know, online, Twitter and that kind of thing.

Q.    And did you rely on the presentation in Tab 11 or the accompanying remarks from Defendant Mann in choosing to purchase ASPI stock?

MR. SPENCER:  Objection.

THE WITNESS:  Can I answer?  So yeah, there was information in here that was very positive for the company and that went into my decision to buy it.

MS. MCNALLY:  Let's go to Tab 12.  I'll mark this as Exhibit-7.

_ _ _

(Whereupon, Exhibit-7 was marked for purposes of identification.)

Page 89

_ _ _

BY MS. MCNALLY:

Q.    This is an October 17th press release that starts out with "ASPI Isotopes, Inc. Enriches Ytterbium-176," spelled Y-T-T-E-R-B-I-U-N, correct?

A.    Correct.

Q.    Have you seen this document before?

A.    I saw is press release before, yes.

Q.    Do you recall seeing the press release at the time was issued?

A.    Yes.  Like I said, on LinkedIn and on Twitter I would get things pop up on my phone as they are sent out pretty much.

Q.    And how did you view this press relations at the time?

A.    Very positive.

Q.    And if you recall -- and feel free to go back to the document that's at Tab 8, which is Exhibit-3, which is your declaration -- it was on the 18th that you bought that one share and then sold it and

23 (Pages 86 - 89)

Page 90

then bought the thousand shares and then sold it?

A.    Correct.

Q.    Does this help you remember -- is this press release that's at Tab 12 why you bought the shares on the 18th?

A.    It could have been --

MR. SPENCER:  Objection.

THE WITNESS:  Yeah, it could have been.  It could have been.  I mean, it was the next day, so very possible.

MR. SPENCER:  In general just try to leave a little bit of time at the end of the question.

THE WITNESS:  No problem.  Got you.

MS. MCNALLY:  Then let's take a look at Tab 13.  And I am going to mark it as Exhibit-8.

_ _ _

(Whereupon, Exhibit-8 was marked for purposes of identification.)

Page 91

_ _ _

BY MS. MCNALLY:

Q.    This is an October 30th press relations entitled "ASPI Isotopes, Inc. Enters into Term Sheet with TerraPower."  Have you seen this document before?

A.    I saw this press release.

Q.    At the time it was issued?

A.    I believe so, yes.

Q.    Did you rely on this in making any decisions as to transacting in ASPI stock?

MR. SPENCER:  Objection.

THE WITNESS:  Absolutely.  Sorry.  The answer is yes, very much so.

BY MS. MCNALLY:

Q.    We see that this is on the 30th.  Were your buys on the 30th, which are again reflected in Tab 8, were they -- do you believe that they were following reading this press release?

A.    I do believe that, but I'm not 100 percent sure.  I'm pretty positive this came out and I made a lot of buys that day and

Page 92

this is probably why I did.  I was very, very positive on the company, knowing that they were basically going to go in business with Bill Gates' nuclear company.

Q.    You have to check your trade confirms to confirm the timing of the trades though, right?

A.    Probably, yes.

Q.    Then let's take a look at Tabs 14 and 15.

MS. MCNALLY:  I will mark 14 as Exhibit-9 and 15 as Exhibit-10.

_ _ _

(Whereupon, Exhibit-9 and 10 were marked for purposes of identification.)

_ _ _

BY MS. MCNALLY:

Q.    But kind of take a look at them both at the same time.  They go hand in hand.  Exhibit-14 [sic] is an article titled "Mobility Flexibility Scalability:  SMRs Forging Nuclear's Future."  I know the date at the top says 5/31/25, 12:36 p.m.  I

Page 93

think that was just what time maybe it was printed out more recently.  But in 15, Tab 15, which is Exhibit-10, is the Twitter or X post on November 25th, 2024 attaching this article.

A.    I see it.

Q.    Looking at the article at Tab 14, are you familiar -- have you ever seen this one before?

A.    I don't recall seeing this one.  I could have, but I'd have to read the whole thing.  I don't believe -- wait a minute.  Hold on.  I think I did at some point read this over online somewhere.  You said it's the different types of SMRs, the mobile ones, right -- correct?  Is that what's in here?  I'd have to read the whole thing.

Q.    You can take a quick skim through it.  Skim or read in as much depth as you want if you think it will help.

A.    Yes, I do remember reading this article.

Q.    Do you remember reading it at the time it was put out by ASPI?

A.    I can't tell you exactly when I

24 (Pages 90 - 93)

Page 94

read it. I am pretty sure somebody posted it and, you know, it was on my phone and I read the article. I do remember the votes. I do remember all this. I did remember Oklo was in here as well and they were just talking about different forms that SMR is coming and different companies developing them. I do remember reading it, yes.

Q. Did you rely on it in making any transactions in ASPI stock?

MR. SPENCER: Objection.

THE WITNESS: I thought it was a very positive article and, yeah, it could have led me to buy more ASPI.

BY MS. MCNALLY:

Q. But you're not sure for certain, because you can't remember exactly when you read it, correct?

A. Correct.

Q. Next I want to take a look at kind of -- the same kind of thing, where I've got an article and a Twitter post. And I apologize, these are far apart in the binder, but its Tab 17, which I am going to mark as

Page 95

Exhibit-11 and the X post is at Tab 5.

A. Sorry. We're in 17, you said?

Q. Yep, 17 and 5, Tab 17 and Tab 5?

A. We are going back to Tab 5, you're saying?

Q. I know. I am going in reverse a little bit. I'm sorry?

A. That's all right.

MR. SPENCER: And is Tab 5 going to be Exhibit-12?

MS. MCNALLY: Correct.

_ _ _

(Whereupon, Exhibit-11 and Exhibit-12 was marked for purposes of identification.)

_ _ _

BY MS. MCNALLY:

Q. So Tab 17 is the Fuzzy Panda report. Is that correct?

A. That's -- it looks like. There's portions of it in here yes, yep.

Q. And Tab 5 is the Fuzzy Panda X post on -- post on X, with the report showing

Page 96

that it came out at 10:00 on November 26th, correct?

A. That's what it says here, yes.

Q. And that's consistent with your memory as to the timing of all of this on the 26th?

A. Well, I didn't see this report on the 26th at 10:00 a.m. I am pretty sure I am positive about that. I did not see it.

Q. Okay. Sorry. You saw other coverage of the report, essentially?

A. Right. Right. Not exactly this per se.

Q. Okay. Okay. So you never actually read the full Fuzzy Panda report? You read other people's coverage of the report?

A. Right, not on the 26th. I know a report came out. Other people were saying what was in the report, that he was trying to short the stock. My feeling was at the time just to make money on the short.

Q. And you became aware of all of that on the 26th, correct?

Page 97

A. I believe so, yeah. That was a Tuesday, I believe so. It was the 26th.

Q. I just wanted to make sure. I think you said in there that you didn't read it at that time. I think you just meant you didn't read the full Fuzzy Panda report on the 26th, but you read the other coverage of the report on the 26th?

A. Yes. Some coverage of it, yes.

Q. Did you ever go back and read the full Fuzzy Panda report, which is again at Tab 17?

A. Portions of it. It's -- you know, to be honest, it's kind of hard to go back. It's not a very good memory for me and so -- I lost a lot of money and, you know, at that point -- you want me to read it a month later, at that point it doesn't matter. A month later the stock was down to $4, so it didn't really matter to me at the time.

Q. When you listened to the Canaccord -- when you've -- scratch that.

With respect to the Canaccord interview the next day on the 27th, did you

25 (Pages 94 - 97)

Page 98

ever have to pay for access to listen to any of that?

A.    No.  I listened to it -- like I said, someone posted it online, I put it on my phone and I listened to it.  But I did not listen to it live.  Like I said, I was in a hospital with my mother.

Q.    Do you remember who posted it?

A.    I don't remember, no.

Q.    Do you remember if it was on Reddit?

A.    No.  Like I said, Reddit I don't really go on.  It was just that one article that I had found on Reddit.  Usually StockTwits I go on.  There's lot of people posting articles and information and just kind of information sharing on there.

Q.    I'm sorry.  Stock, what was that?

A.    StockTwits.  So it's Stock, T-W-I-T-S.  It's short for Twitter, like Stock Twitter.

Q.    Do you have like a handle or user name on that?

Page 99

A.    Yes.

Q.    What's your user name?

A.    Roaddog22.

Q.    R-O-A-D?

A.    I am not sure if there is two D's.  Probably just one D.  I don't look at it that often, my actual name.

Q.    It's not D-A-W-G?  Come on.

A.    No.  No.  No.  I'm not a gangster.

Q.    Or a Philly sports reference?

A.    Right.  No.  No.  No.  Like the Philly dawgs, is that what you're talking about, the Philly dawgs on the Eagles.  I got you.  Although my niece went to Georgia, but that's a whole other story.

Q.    Do you know how your counsel obtained a copy of the  Canaccord interview transcript?

A.    No, I don't.

Q.    What exactly -- you can kind of put that to the side, the binder to the side for now.  Don't put it far away.

A.    Okay.

Page 100

Q.    What exactly is -- what exactly is your contention that the defendants did wrong in this case?

MR. SPENCER:  Objection.

THE WITNESS:  Can I answer?

MR. SPENCER:  Yes.

THE WITNESS:  Well, honestly they very much misled anybody that invested with them.  We were led to believe that -- the class that I represent and I -- that they were enriching uranium, they were producing this HALEU, which every one of these small modular reactor companies needed, and they weren't doing it.  And we didn't really know that until Fuzzy Panda came out and said, "Hey, look, this is old technology, these slides.  Their facilities don't exist in South Africa."  I mean, you saw the report, so you -- and the interview was damning, to be honest with you.  When you ask the CEO how many modules you need for one reactor and his

Page 101

answer is "Well, we don't know.  We have never actually enriched uranium, not even in a lab setting," that's damning and it's damaging to the stock price and to us investors.

BY MS. MCNALLY:

Q.    Let's talk a little bit about how -- kind of going back to your involvement in the case.  So you moved to become lead plaintiff, right?

A.    Correct.

Q.    And what does it mean to you to be the lead plaintiff?

A.    Well, the lead plaintiff, I have done it before, once before.  You represent the class.  You represent all the investors and their interests.  And you have to testify, you testify.  You have to do a deposition, you do a deposition.  You do what you have to do to represent all the people that were hurt in the case.

Q.    What case was it that you moved to be lead plaintiff in before?

A.    So I was in a case, myself

26 (Pages 98 - 101)

Page 102

versus a company called HomeServe. Are you familiar with HomeServe?

Q. No, I am not?

A. So they are a home warranty company and they're pretty much worldwide, very big. Do you want me to tell you about the case or --

Q. Yeah, tell me a little bit about the case.

A. To keep it short, HomeServe -- my old home I lived in nearly 20 years. I received some sort of HomeServe package in the mail. I never signed up for HomeServe. My wife never did. To make a long story short, I contacted them. I found out they were charging me on a monthly basis in my South Jersey Gas account to ensure my gas lines. I don't know what they were ensuring, to be honest with you, but I was getting charged about $20 a month and it turns out for the past 20 years I was being charged, from South Jersey Gas and then when HomeServe took over in 2011 up until about 2019. So I had about, if you figured it out, probably 3,000 to

Page 103

$4,000 that I was charged over those years.

When I contacted the company, they didn't want to give me my money back. Then I talked to another department that wanted to give me half my money back. So of course it upset me. I spoke to a good friend who -- same thing that happened to him and I spoke to my elderly parents, who were also being charged from a company that they never hired and that's when I decided to take action. I found a lawyer and I started a class action suit.

Q. What happened in that suit?

A. The suit, we ended up settling and they -- we didn't go nationwide, worldwide with it. We kept it within the state for whatever reason and that was my counsel's decision. And I don't believe it was a huge settlement, but it was a settlement and, you know, I did receive a fee for being lead plaintiff and I recouped my funds.

Q. When was that?

A. Probably five -- the depositions were during Covid, so I am going

Page 104

to say around 2022 or maybe -- we also had to do it remotely. So we were at the lawyers office together doing it remotely. So I had South Jersey Gas lawyers, I had HomeServe lawyers, my lawyer, and myself.

Q. Who were your lawyers in that case?

A. Steven DeNittis. Are you familiar with Steven?

Q. I'm not?

A. Okay. He's out of Marlton. He's got an office in New York and he's got an office in Pennsylvania.

Q. Okay. So in this case you originally responded to the ad put out by Mr. Cruz's firm, right?

A. Yes. There were several advertisements and I just happened to pick his.

Q. And with respect to Mr. Cruz, did you ever enter into any type of written, like, engagement agreement with his firm?

A. I don't remember. I remember signing documents. I am just not sure if the

Page 105

case was turned over at that point. It could have been him. I don't know. But he didn't get the case yet, as far as I know, but he was the person I contacted.

Q. And do you have some type of agreement regarding representation with the Glancy firm?

A. Yeah. I signed paperwork, yes.

Q. What type of paperwork was that?

A. That I was going to be lead counsel [sic].

Q. That you -- you just said that you were going to be lead counsel.

A. Excuse me. Lead plaintiff. No, I'm not the counsel, not yet.

Q. Haven't been through this quite enough times.

So did you sign an engagement agreement with the Glancy firm that says that they are your lawyers?

A. Yes. I Docu-signed, I guess it was, yes.

Q. And are you paying the Glancy

27 (Pages 102 - 105)

Page 106

firm?

A.    No.

Q.    What's your understanding of how they could get paid in this case?

A.    If it goes to trial, if there is a settlement before trial.

Q.    So they only get paid if they are successful at trial or if the case settled?

A.    That's my understanding.

Q.    No money comes out of your pocket to pay, though?

A.    No.  No.

Q.    The case against HomeServe, that didn't involve securities fraud, correct?

A.    No.

Q.    That wasn't about stock trading or anything like that?

A.    No.  Nothing about stock trading, no, not at all.

Q.    How many plaintiffs are there currently?  Excuse me.  Let me ask that differently.  How many lead plaintiffs are there currently?

Page 107

MR. SPENCER:  Object to the form.

THE WITNESS:  I'm sorry?

MR. SPENCER:  Go ahead.

THE WITNESS:  I believe I am the lead plaintiff and I believe Ivan is a named plaintiff.  I am not sure if he was the lead plaintiff as well.

BY MS. MCNALLY:

Q.    What's your understanding as to why Ivan was added?

A.    I don't know.  To be honest with you, I don't know.

Q.    Do you know Mr. Agapchev outside of this litigation?

A.    We did have a call, Garth myself, and him, and we talked and he told me his experience --

MR. SPENCER:  Don't --

THE WITNESS:  Sorry.

MR. SPENCER:  Things discussed on that call are protected by attorney/client privilege, so don't go into the substance of it.

Page 108

THE WITNESS:  I got you.  Do you mind repeating that question?

BY MS. MCNALLY:

Q.    Do you know Mr. Agapchev outside of this litigation?

A.    No.

Q.    You were connected to him through the Glancy firm, correct?

A.    Correct.

Q.    Have you ever reached out to talk to him without the Glancy firm being present?

A.    No.

Q.    Do you have his contact information?

A.    I do somewhere if we did want to contact each other, but we didn't after that one call.

Q.    Let's go to back to Tab 3, which is Exhibit-1.  This is your certification in connection with the motion to be appointed lead plaintiff.  And Paragraph 3 says, "I am willing to serve as a representative party on behalf of the class

Page 109

and will testify at deposition and at trial if necessary," correct?

A.    Correct.

Q.    And at the point that you moved for appointment as lead plaintiff, you were the only person moving as -- you were moving for that appointment on behalf of just yourself, right?

A.    Yes.  As far as I know, I was the only lead plaintiff, yes.

Q.    Why didn't you ask for anybody else to be appointed lead plaintiff with you?

MR. SPENCER:  Objection.

MS. MCNALLY:  I will ask a different question.

BY MS. MCNALLY:

Q.    Did you feel that you could satisfy the obligations of being a lead plaintiff by yourself?

A.    Yes.

Q.    Has anything changed since the lead plaintiff motion was filed to cause you to change your opinion about whether you're capable of acting as lead plaintiff by

28 (Pages 106 - 109)

Page 110

yourself?

A.    For me nothing's changed.

Q.    Who is Alexander Corredor Prada?  Do you know who Alexander Corredor Prada is?

A.    I know the name.  I know he started the original case, I believe, the class action.

Q.    Do you know whether Mr. Prada moved to be appointed lead plaintiff?

A.    All I know is he was not for whatever reason.

Q.    Have you ever talked to Mr. Prada?

A.    I have not, no.

Q.    Have you ever met Mr. Prada?

A.    No.

Q.    Is Mr. Prada still a plaintiff in this case -- excuse me.  Is Mr. Prada -- let me ask the question a different way.

Is Mr. Prada still a named plaintiff in this case?

MR. SPENCER:  Objection.

THE WITNESS:  I don't know.

Page 111

I'm guessing no, but I don't know.  I don't want to guess, but I don't know.

BY MS. MCNALLY:

Q.    Do you have an understanding of whether Mr. Prada is asking to be named a class representative?

A.    I don't have any knowledge of that.

Q.    Do you have an understanding that you are -- excuse me.  Scratch that.

Do you have an understanding of the difference between a plaintiff and a class representative?

A.    So a lead plaintiff is just a regular plaintiff?  Is that what you're asking me?

Q.    No.  The difference between a plaintiff and a class representative.

A.    Do I know the difference, the legal difference, probably not.  You know, if you are talking legalese, I am not a lawyer, so I can't go there.

Q.    You mentioned that -- the distinction between a lead plaintiff and a

Page 112

plaintiff, what's your understanding of that distinction?

A.    Where do we want to go with this?  The lead plaintiff, like I said, I served as one before and I was basically the only one.  So you know, the lawyer discusses the case with you.  If there is a potential settlement, they discuss it with you.  I don't know if that's the case with just a regular plaintiff or not.  I know what the lead plaintiff's responsibilities are, but not just the regular plaintiff.  I don't know the difference.

Q.    You mentioned a call that you had with Mr. Agapchev.  Do you recall that?

A.    Yes.

Q.    Let's look at Tab 1 which is Exhibit-5.  And take a look at Paragraph six there.  It says, "I participated in a cause call with Mr. Agapchev and our lawyers, Glancy Prongay & Murray on June 19, 2025 and I am in contact with Mr. Agapchev through GPM."  Do you see that?

A.    Yes.

Page 113

Q.    Is that the call that you had been referring to?

A.    That particular, I -- I am assuming that's the day that we spoke.  I can't say for sure.

Q.    About how long was that June 19th call?

A.    An hour, maybe.

Q.    So why do -- why does the court need two lead plaintiffs here?

MR. SPENCER:  Objection.

THE WITNESS:  You're asking me that?

BY MS. MCNALLY:

Q.    Yes.

A.    I don't know.  I'm not a lawyer.  I would not know.

Q.    In Paragraph 8 of the document you write, "I have supervised and participated in this litigation by, for example, receiving updates about the progress of the litigation from GPM," that's Glancy Prongay, "(b), participating in discussions with my lawyers concerning our claims, the litigation process

29 (Pages 110 - 113)

Page 114

and related issues, reviewing court filings, preserving, searching for, and providing documents, and then coordinating with GPM to prepare for and schedule my deposition." Do you see that in Paragraph 8?

A. Yes.

Q. How many updates about the progress of the litigation have you received?

A. We email pretty much weekly.

Q. And that's mostly Glancy emailing you, correct?

A. Yes, basically, back and forth.

Q. What court filings have you reviewed?

A. I believe -- and again, don't hold me to this, you know, we are trying to certify the case. Your firm is trying to get the case thrown out. Again, I don't know all the legalese, but that's where I know we are at this point.

Q. So you mentioned two things there. You said we are trying to certify the case and my firm is trying to get the case thrown out, correct?

Page 115

A. That's correct, yes.

Q. The idea of getting the case thrown out, are you familiar with the phrase motion to dismiss?

A. I am, yes.

Q. Did you read the motion to dismiss filed in the case?

A. Yes, I believe I did.

Q. And then you said, "We are trying to certify the case." Are you referring to the class certification motion?

A. I believe so, yes. Like I said, I don't know all the legal terms. So forgive me if I don't know the proper terms.

Q. No. It's okay. Did you read the motion to certify the class?

A. Yes, I believe so.

Q. About how long did it take you to read the -- that motion to certify?

A. I read a lot of documents. Everything I was sent I read. So I can't tell you how long it took to read one or the other. There was a lot and it all runs together, so -- it's a lot of stuff.

Page 116

Q. Do you read these things before they get filed when -- let me back that up.

The motion to certify, did you read that before it got filed with the court or after it got filed with the court?

A. I couldn't tell you. I don't remember. I don't know.

Q. We looked at the Amended Complaint, which if you want to look at that, that's at Tab 7. It's Exhibit-4.

A. So that's Page 2, here where it says, "In October 2024," that one?

Q. Are you at Tab 7?

A. I am at Tab 7. I am going to Number 4.

Q. I am just saying, I have marked Tab 7 as Exhibit-4.

A. Oh. Okay. All right.

Q. So just look at -- look at as much of the document as you want. We've looked at it before.

A. Okay.

Q. Did you read -- and you recalled reading this previously, correct?

Page 117

A. I am sure I have, but, like I said, it's a lot of reading, so ...

Q. Do you recall if you read this before it was filed, this report?

A. I couldn't tell you. I don't know for sure either way.

Q. What are you doing to supervise the lawyers in this case?

A. I don't know how to answer that, tell you the truth. We are sharing information and working together. I don't know that I am supervising them, but -- I don't know how to answer that.

Q. You haven't -- you had back in the certification, which was at Tab 1 -- which I have marked as Exhibit-5 for purposes of this deposition, but, again Tab 1, you have in there that you have preserved, searched for, and provided relevant documents to your lawyers. Do you see that?

A. Where at? What part of the document one?

Q. We are back at Paragraph 8.

A. Okay.

30 (Pages 114 - 117)

Page 118

Q.   What have you done to preserve documents?

MR. SPENCER:  Objection.  This is getting into privilege and work product.  He's not going to discuss what he did to preserve documents.

MS. MCNALLY:  I'm not asking him for his advice of counsel.  He writes here that he has preserved documents.

MR. SPENCER:  Document preservation and collection is done in conjunction with counsel based on the advice of counsel.  This is privileged and work product area that we won't be discussing.

MS. MCNALLY:  I don't know with that one, Garth.  I disagree.

BY MS. MCNALLY:

Q.   Are you going to follow the advice of your counsel on that, Mr. Leone?

A.   Yes.

MS. MCNALLY:  All right.  Why don't we take a ten-minute -- let's go

Page 119

off the record for a minute.

THE VIDEOGRAPHER:  The time is now 12:33.  This concludes media unit three.

- - -

(Off the record)

- - -

THE VIDEOGRAPHER:  The time is now 12:48.  This begins media unit four.

BY MS. MCNALLY:

Q.   All right.  Thank you, Mr. Leone.  Just hopefully a couple more relatively quick questions.  I am going to share my screen.  And introduce the next exhibit. Okay. Can you see my screen?

A.   Yes.  Can I pull this little closer, because -- is that okay?

Q.   Sure.  I can kind of zoom in on it too.  Let's see.

A.   There you go.  It's a little bigger okay.

MS. MCNALLY:  And so I'll introduce this document as Exhibit-13.

Page 120

_ _ _

(Whereupon, Exhibit-13 was marked for purposes of identification.)

_ _ _

BY MS. MCNALLY:

Q.   Earlier today you talked about a -- you know what, let me let you have a chance to kind of scroll this.  And when I say that, I mean you can direct me to scroll through it.

A.   Okay.

Q.   I'll start from the bottom and move up.  So just tell me when you're ready for me to scroll up.  Ready?

A.   Okay.

Q.   All right.  So that was started with an email from Mark, which is lsixers22@comcast.net to Jason Assad at ASPI, correct?

A.   Correct.

Q.   On Tuesday, November 26th at 3:30.  And then I am scrolling up to the next email in the chain, which is November 26 at

Page 121

3:43, which is Jason's response.

A.   Yeah, I see it.

Q.   And I'm sorry, the first email is -- that's your email address, correct, lsixers22?

A.   Correct.  Yes.

Q.   And so this is the email that you were referring to before when you said that you emailed the company on the 26th?

A.   Yes.  Now his name looks familiar to me Jason, yes.

MR. SPENCER:  Clarify for the record, if I may.  This looks like a Microsoft Word that an email was maybe even copied, pasted into.

MS. MCNALLY:  That's correct.  I will represent that is what it is.

BY MS. MCNALLY:

Q.   And the email from you says, "Jason, I am a big believer in your company and a significant shareholder.  I hold over 100,000 shares.  Could someone please respond to these ridiculous short seller allegations that were so public today.  The fact that no

31 (Pages 118 - 121)

Page 122

one has come out publicly to refute these allegations is killing our stock value. I look forward to your response and the future of ASPI. Thank you. Sincerely concerned, Mark Leone." Did I read that correctly?

A. Correct. Yes.

Q. And then Jason responds to you 13 minutes later saying, "Mark, please see the release we issued a few minutes ago"?

A. Yes.

Q. And then you respond after that at 4:04 p.m. saying, "Thank you for the response. I very much look forward to tomorrow's chat and the days and years going forward. Thank you again"?

A. Correct.

Q. And then Jason -- I think -- I know I have the press release from that day, so we can take a look at that. Jason responds, "The CG call scheduled for tomorrow is limited to Canaccord clients. However, Ocean Wall will be hosting a separate call for Paul tomorrow to discuss several relevant topics. I have copied Nicky from OW who can

Page 123

provide you with the recording as soon as it's available" and you respond, "That's very considerate. Thank you very much. I look forward to hearing the entire talk;" is that correct?

A. Correct, yes.

MS. MCNALLY: And then let me introduce a document as Exhibit-14.

_ _ _

(Whereupon, Exhibit-14 was marked for purposes of identification.)

_ _ _

BY MS. MCNALLY:

Q. This is a press release from November 26th, 2024 titled, "ASPI Isotopes, Inc. Responds to Short Seller Report." Do you recall this is the press release from that day that Jason was referring to in that email?

A. I believe so. Let me read it real quick.

Q. Sure. And I can zoom out or in. Just tell me when.

A. If you can scroll out just a

Page 124

little bit more.

Q. Sure.

A. Can you scroll up a little bit, please.

Q. I am up as high as I can go.

A. I think you went down when you just did that, so maybe go the opposite way.

Q. Oh. Okay. Sorry.

A. It's okay.

Q. I don't know my right from my left either half the time when I'm driving.

A. It's okay. Just don't drive around me. That will be fine. A little bit more, if you could. Okay. Okay.

Q. Okay. So the last paragraph -- the last kind of specific paragraph here, it says, "ASPI Isotopes values, transparency, and open communication. Canaccord Genuity's analyst George Gianarikas, will host a fireside chat with ASPI's chairman and chief executive officer, Paul Mann, at 10:00 a.m. EST on November 27. Please contact your Canaccord Genuity sales representative for dial-in details." Do you see that?

Page 125

A. Yes.

Q. Okay. So if we pop back to the email, Jason -- you raised your concerns to Jason. Jason directs you to the release that they had just issued, which was the press release we were just looking at, and then you respond, "I very much look forward to tomorrow's chat and the days and years going forward." So it sounds like, were you -- when you say tomorrow's chat, is that your reference to the Canaccord chat that's -- the Canaccord fireside chat that's being discussed in the press release?

A. Yes.

Q. And then Jason responsibilities that the "CG call scheduled for tomorrow is limited to Canaccord clients." And CG is, I think, Canaccord Genuity?

A. Correct.

Q. And then he says, "However Ocean Wall will be hosting a separate call for Paul tomorrow to discuss several relevant topics. I have copied Nicky from OW who can provide you with the recording as soon as it's

32 (Pages 122 - 125)

Page 126

available." Does this help you remember whether you listened to -- whether you were, you know, listening to -- whether you listened to pieces of the Canaccord chat versus Ocean Wall chat?

A. I'm sorry. The Ocean Wall chat, separate call. I'm assuming it was the Canaccord chat that I listened to. I didn't listened to it that day. Like I said, I was in the hospital with my mom for an appointment and all I could do is step outside and look at is the stock price falling and make a decision on having to sell it and cut my losses. I did not listen to it live.

Q. So you are not sure whether it was the Canaccord chat or Ocean Wall chat?

MR. SPENCER: Objection.

BY MS. MCNALLY:

Q. Correct.

A. Yeah, I am not sure. The one I listened to was -- eventually, was, like, 50 minutes long, 55 minutes long, so whichever one that was.

Page 127

Q. The Canaccord chat, though, as Jason said, it was limited to Canaccord clients, right?

A. Right.

Q. Are you a Canaccord client?

A. No.

Q. Did this Nicky who -- Nicky from Ocean Wall, do you recall if she provided you a recording of the Ocean Wall chat?

A. I never contacted them for that. Like I said, I was busy that day and I wasn't able to listen live.

Q. Looking down at the -- at your initial email to Jason, do you know how you got Jason's email address?

A. I don't remember exactly. I must have looked it up somewhere. I don't remember how I got it.

Q. And why did you -- why did you call the short seller allegations ridiculous?

A. Well, I just had a lot of shares of stock and I was hoping that they were -- what everyone was saying online, that they were -- you know, it was an attack, it

Page 128

was just to make money on a short, and I was hoping -- honestly, it was more hope than anything else. I was hoping they were ridiculous. I was very much hoping they were ridiculous. I remember being upset, because that morning is when the report came out, around 10:00, I am guessing, and the company didn't respond publicly until, what's this, 3:30, is when they put this out, the PR. That's five and a half hours later. There was a lot of damage done to the stock price between 10:00 a.m. and 3:33, a lot of damage. I felt like I needed to do something. I needed to contact somebody and find out what their plan was.

Q. When the company issued the press release, your response was, "Thank you for the response. I very much look forward to tomorrow's chat and the days and years going forward, thank you again." So were you still positive about the company at that point?

A. I was hoping at that point. I was hoping that everything wasn't true and it would be cleared up the next day and the stock

Page 129

price would be restored to where it was.

Q. So you were optimistic in response to that press release?

A. I would use the word --

MR. SPENCER: Objection. Go ahead.

MS. MCNALLY: I will restate it.

BY MS. MCNALLY:

Q. So you were hopeful in response?

A. I was hopeful exactly. That's the word. I was hopeful, yes.

Q. And you think that you eventually watched the Canaccord -- or you are not sure if you watched the Canaccord interview. Excuse me. I am getting tired too.

You're not sure if you watched the Canaccord interview, correct?

A. I am not sure which interview it was, but like I said, it was afterward and it was 50-something minutes. I am 99 percent sure it was the Canaccord interview.

33 (Pages 126 - 129)

Page 130

Q.   But that said, you have never seen an actual transcript of the Canaccord interview?

A.   No.  I listened to it.

Q.   On the 26th when you said that the -- that the report was killing the stock, that's in the afternoon and that's when you're still buying up the stock, that afternoon, right?

A.   When it was dropping, yeah, I was trying to buy it up to lower my price, to lower my average, so if it did make a comeback I had a better chance of recovering my money.

Q.   Okay.  I am pausing just because I am trying to think if I have anything else.

A.   No problem.

MS. MCNALLY:  Can we just -- let's go off the record for, like, truly one minute.  Just give me a moment -- two to three minutes.  Just give me a moment to collect my thoughts and I think I am going to say I have no further questions.

Page 131

THE VIDEOGRAPHER:  The time is now 1:03.  Going off the video record.

         - - -

(Off the record)

         - - -

THE VIDEOGRAPHER:  The time is now 1:04.  Back on the video record.

MS. MCNALLY:  Mr. Leone, thank you for your time today.  That's all the questions that I have right now unless I have any follow-up questions after Mr. Spencer has his opportunity to ask questions.  But with that, I'll turn over the witness.

MR. SPENCER:  Thank you, Laura.

THE WITNESS:  Thank you, Laura.

         _ _ _

         EXAMINATION

         _ _ _

BY MR. SPENCER:

Q.   Just a few questions for you to clarify some of the things you and Ms. McNally discussed and we'll get you on your way in not long, hopefully.

Page 132

When you emailed ASPI Isotopes IR contact, investigator relations contact, on November 26 had you read the Fuzzy Panda report at that point in time?

A.   No.

Q.   Were you upset about losing money on the stock when you sent that email?

A.   I was extremely upset, yes.

Q.   Currently, sitting here today, what is your opinion of the Fuzzy Panda report?

A.   I'd have to say, it was pretty accurate after hearing the CEO's responses to a lot of the questions that he was asked.  I figured it was pretty accurate, seeing the laser -- picture of the laser that was, God, 20 years old.  Fuzzy Panda pointed out that there was a diagram from 2008 from a company that was basically out of business and ASPI was using the same photograph to describe their technology.  And I saw that and my heart sunk, because it looked like somebody was cheating in high school on a test, you know, using someone else's information.  And it was

Page 133

old -- it was old technology that didn't work and they were using that to say, "Hey, we are going to do it this way" and that was a sinking, bad feeling, terrible.

Q.   Let's take a look in the binder.  I'm going to go to Tab Number 7.  That's the Amended Complaint.  And have you read this one before?

A.   Yes.

Q.   Take a look at Tab Number 8 of your certification that was filed with the Amended Complaint.  Do you see that exhibit?

A.   "This court has jurisdiction," that part?

Q.   No.  I am looking at Tab Number 8.  The title is "Sworn Certification."

A.   Tab 8.  I'm sorry.  I am in Tab 8.  Go ahead.

Q.   Okay.  This is your certification that was filed with the Amended Complaint.  Do you see your name signed at the bottom of this one?

A.   Yes.

Q.   I am going to read Point Number

34 (Pages 130 - 133)

Page 134

1 here. "I have reviewed the Complaint, adopt its allegations, and authorize the filing of a lead plaintiff motion on my behalf." Does reading that refresh your recollection as to whether you did review a version of the Amended Complaint before it was filed?

A. Again, the timeline I'm not 100 percent positive on, but whatever was sent to me to read, I am sure I read it before I signed it.

Q. Once you signed your name on the bottom of that certification, do you think that that statement was true, that you had reviewed the Complaint?

A. I am sure, yes.

Q. Look with me at Tab 1, if you will, the declaration lead plaintiff Mark Leone in support of plaintiff's motion for class certification. The second talks about -- I am going to read part of Paragraph 8. "Supervised and participated in this litigation by, for example, (a) receiving updates about the progress of the litigation from GPM, (b) participating in discussions

Page 135

with my lawyers concerning our claims in the case, the litigation process and related issues, (c) reviewing court filings provided by GPM, (d) preserving, searching for, and providing relevant documents to my lawyers, and (e) coordinating with GPM to prepare for and schedule my deposition." Are those all things that you did, Mr. Leone?

A. Yes.

Q. All right. Do you think it's a fair characterization to say that in doing those things you help to supervise your lawyers in the case?

A. If you want to use supervise, yes. I mean, I did a lot of reading and a lot of research and -- yes.

Q. And when we were in our office writing the court documents, were you standing behind us looking over our shoulder?

A. No.

Q. You weren't supervising us in that?

A. Not in that regard, no. No.

Q. But in another sense of the

Page 136

word, in which you're communicating with counsel, you're following the case, your actively involved --

A. Correct.

Q. -- were you supervising your lawyers in that sense?

A. Yes, I guess I was. I just think of my work experience in supervising, I am usually, you know, hands-on, when I think of the word supervise, but in that case, yeah, that makes sense.

MR. SPENCER: I have no further questions for you at this time, Mr. Leone.

THE WITNESS: Okay.

MS. MCNALLY: I have no further questions.

THE VIDEOGRAPHER: The time is now 1:10. This concludes this video deposition.

THE COURT REPORTER: Mr. Spencer, did you need a copy?

MR. SPENCER: Yes. I will have it on the same speed as Ms. McNally.

Page 137

(Deposition concluded. Time noted, 1:10 p.m.)

35 (Pages 134 - 137)

Page 138

CERTIFICATE
- - -

I do hereby certify that I am a Notary Public in good standing, that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

WITNESS my hand and official seal this 14th day of July 2025.

_____
Kimberly A. Rue
Notary Public

36 (Page 138)