# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK LEONE, Individually )
and on Behalf of All       )
Others Similarly           )
Situated,                  )
                           )
    Plaintiff,             )
                           ) Case No.
V.                         ) 1:24-cv-09253-CM
                           )
ASP ISOTOPES INC., PAUL    )
E. MANN, and HEATHER       )
KIESSLING.                 )
                           )
    Defendants.            )
                           )


ZOOM VIDEOTAPED DEPOSITION OF IVAN AGAPCHEV

Hermosa Beach, California

Wednesday, July 9, 2025

Volume I


Reported by:

LORI M. BARKLEY
CSR No. 6426
Job No. 7468962

Page 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

                                    )
MARK LEONE, Individually )
and on Behalf of All      )
Others Similarly          )
Situated,                 )
                          ) Case No.
        Plaintiff,        ) 1:24-cv-09253-CM
                          )
V.                        )
                          )
ASP ISOTOPES INC., PAUL   )
E. MANN, and HEATHER      )
KIESSLING.                )
                          )
Defendants.               )
                          )
_____)

        Zoom Videotaped deposition of Ivan Agapchev, Volume I, taken on behalf of defendant, at Hermosa Beach, California, beginning at 9:09 a.m. and ending at 1:41 p.m. on Wednesday, July 9, 2025, before Lori M. Barkley, Certified Shorthand Reporter No. 6426.

Page 3

APPEARANCES:

GLANCY PRONGAY & MURRAY LLP
BY:   Garth Spencer
     - and -
     Ex Kano S. Sams
Attorneys at Law
1925 Century Park, East Suite 2100
Los Angeles, CA 90067
310-201-9150
GSpencer@glancylaw.com
Esams@glancylaw.com

MORGAN LEWIS & BOCKIUS LLP
BY:  Laura Hughes McNally
Attorney at Law
1201 North Market Street, Suite 2201
Wilmington, DE 19801
215-963-5257
Laura.mcnally@morganlewis.com

Videographer:  Terrence Weiss

Page 4

I N D E X
WITNESS
IVAN AGAPCHEV
                        PAGE
Examination by Ms. McNally          8
Cross-Examination by Mr. Spencer    97
Redirect Examination by Ms. McNally    113

        EXHIBITS
NUMBER          DESCRIPTION          PAGE
Exhibit 1  Declaration in Support of Motion    15
      for Class Certification

Exhibit 2  Sworn Certification of Plaintiff    40

Exhibit 3  Fuzzy Panda Report On ASPI Stock    52

Exhibit 4  Amended Class Action Complaint For    58
      Violations of the Federal Security
      Laws

Exhibit 5  ASP Isotopes Form 10-K for Year    75
      Ending December 2023
Exhibit 6  September 2024 Corporate Overview    82
      Presentation

Exhibit 7  October 17, 2024 News Release    85

Exhibit 8  October 30, 2024 News Release    87

Exhibit 9  November 19, 2024 Powermag.com    88
      Article
Exhibit 10 X Post on Powermag.com Article    89
Exhibit 11 October 30, 2024 Reuters Article    91

Page 5

INDEX (Continued):

Exhibit 12 February 21, 2024 J Capital    95
        Research Article
Exhibit 13 Defendant's Motion to Dismiss    108
        Class Action Complaint

Exhibit 14 Memorandum of Law in Support of    109
        Motion For Class Certification

2 (Pages 2 - 5)

Page 6

Hermosa Beach, California, Wednesday, July 9, 2025
9:09 a.m.

VIDEO OPERATOR: Good morning. We are on the record at 9:09 a.m. on July 9th, 2025.

Please note that this deposition is being conducted virtually. And the quality of the recording depends on the quality of the camera and the internet connection of the participants.

What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video-recorded deposition of Ivan Agapchev, in the matter of Mark Leone versus ASP Isotopes Inc., et al., filed in the United States District Court, Southern District of New York. Case number 1:24-cv-09253-CM.

The location of this deposition is via Zoom remote meeting. My name is Terrence Weiss, representing Veritext Legal Solutions. And I'm the videographer.

I am not related to any party in this action nor am I financially interested in the outcome.

Page 7

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MS. MCNALLY: Good afternoon. This is Laura McNally from the law firm of Morgan Lewis & Bockius. And I represent the defendants in this action.

MR. SPENCER: Garth Spencer with Glancy Prongay & Murray representing Mr. Agapchev and the plaintiffs.

MR. SAMS: Ex Kano Sams from Glancy Prongay & Murray on behalf of the plaintiffs.

VIDEO OPERATOR: Will the court reporter please introduce yourself. And administer the oath to the witness. And then counsel may proceed.

THE REPORTER: Lori Barkley, CSR No. 6426. Please raise your right hand Mr. Agapchev so I can swear you in.

IVAN AGAPCHEV,
having been administered an oath, was examined and testified as follows:

Page 8

EXAMINATION

BY MS. MCNALLY:

Q. Good afternoon, Mr. Agapchev. Or good morning, I suppose, since you're on the west coast.

As I said, I'm Laura McNally. And I'm counsel for the defendants in this case. Can you hear me okay?

A. Yes.

Q. And am I pronouncing your last name correctly?

A. Yes.

Q. I will try to keep it formal on the record. But apologies in advance if I also call you Ivan.

So we're here today for your deposition.

And first I'm going to go through just a handful of simple instructions. So let's start with those.

So first of all, I'll be asking you questions and you'll be answering. The court reporter is taking down everything that you're saying.

So we both have to try to not speak over each other. And give her time to write down everything that we're saying.

Page 9

Does that make sense to you?

A. Yes.

Q. And is there anything that would keep you from being able to testify truthfully today?

A. No.

Q. We'll go about an hour or so and then I always like to take what I call personal comfort breaks. But if you need a personal comfort break at any point during the deposition, please just let me know and we can take a break as long as a question is not pending.

Does that sound good to you?

A. Yes. Sounds good. Thank you.

Q. Mr. Agapchev, what did you do to prepare for this deposition today?

A. Not really much.

Q. Did you meet with your attorney?

A. Yes. I met my attorneys last week.

Q. Was that a virtual meeting? Or was that in person?

A. Virtual.

Q. When last week was that?

A. Thursday.

Q. Who attended that meeting?

A. On that one was Mr. Garth Spencer.

3 (Pages 6 - 9)

Page 10

Q. Was that the only time you met with your attorneys to prepare for this deposition?
A. No. We met one more time.
Q. When was the other meeting?
A. The week before that.
Q. Was that meeting also virtual?
A. Yes.
Q. And who was present for that meeting?
A. Both Mr. Sams and Mr. Spencer.
Q. That first meeting with Mr. Sams and Mr. Spencer, how long was that meeting?
A. Forty or 50 minutes.
Q. And the meeting last week, how long was that meeting?
A. About the same.
Q. Other than Mr. Sams and Mr. Spencer, was anyone else present for either of those meetings?
A. No.
Q. And another thing isn't that the court reporter has to kind of hear your verbal responses. So if you shake your head yes or no, she can't hear that.
So just make sure you answer with a yes or no.
A. Okay.

Page 11

Q. In those meetings, did you review documents?
A. What documents?
Q. Did you review any documents that your attorneys gave you?
A. Yes. They sent me the documents and I review.
Q. Did you review any other documents?
A. No.
Q. Did you bring any documents with you to those meetings?
A. Only the documents they sent me.
Q. So they sent you documents in advance and then you brought copies of those to the meeting?
A. Yes.
Q. Was that the first time that you had met Mr. Spencer and Mr. Sams?
A. Yes. It was the first time.
Q. What other attorneys have you worked with on this case?
A. I didn't work with anybody else.
Q. I'm going to -- I'm not going to share a document yet.
Let's just talk a little bit about your background. I understand you're from Ukraine; is that correct?

Page 12

A. That's correct.
Q. When did you come over to the US?
A. 2017, in January 12.
Q. How old are you?
A. I'm 34.
Q. Where in Ukraine did you grow up?
A. So I grew up in small town named Kamianets-Podilskyi. Then I got education in Kiev.
Q. And what education did you receive?
A. I got a master's degree in enterprise economics.
Q. And is that like the equivalent of a master's degree in the US? Or is that equivalent of like a bachelor's degree in the US?
A. No. It's equivalent to master's degree in US.
Q. Did you get a bachelor's degree from the same university?
A. Correct.
Q. What was your bachelor's in?
A. Same. Enterprise economies.
Q. Is enterprise economies like entrepreneurship?
A. Yes. Exactly.
Q. In connection with your education did you

Page 13

take finance?
A. Yes.
Q. What type of finance courses did you have to take?
A. Business finance. So finance of the company.
Q. Have you ever taken any additional course work beyond your university work?
A. No. I didn't.
Q. Other than what I think of as kind of corporate finance 101, did you take any more advanced courses in finance?
A. No. I didn't.
Q. What about any courses in investing?
A. I didn't take any paid course or unpaid course.
Q. And after you finished your course work and received your degrees, did you work in Ukraine?
A. Yes. I worked.
Q. What were your jobs after college in Ukraine? And then we'll kind of transition to 2017 on.
A. So in Ukraine, first I worked as a salesperson at the company who sold surveillance systems. Then I became head of sales.

4 (Pages 10 - 13)

Page 14

After that, the war started in Ukraine.  So I had to relocate from Ukraine.

Q.  Which war are you referring to?

A.  Between Russia and Ukraine.

Q.  So that was back in 2012?

A.  In 2014.

Q.  2014.  Obviously the more recent war I don't want to -- trying to put a time marker on it that we're not referring to the more recent war.

So then the war started 2014 time period and you came over in 2017, right?

Between 2014 and 2017, what were you doing then?

A.  So before I moved to Dubai in the United Arab Emirates in 2014.  I stayed there for about a year and I worked for Apple Store.

And then in 2015, I moved to Cypress, a beautiful island in the Mediterranean.

Q.  What did you do in Cypress?

A.  So in Cypress I sold real estate.

Q.  And how long were you in Cypress?

A.  Three years.

Q.  Two or --

A.  Two or three years.  Almost two years.

Q.  And were you selling real estate that entire

Page 15

time in Cypress?

A.  Yes.

Q.  Then you went from Cypress to the US?

A.  Correct.

Q.  And what brought you to the US?

A.  I came here as a tourist.  Got relocation on my job in Cypress.  And I came as a tourist and really just liked the place and decided to stay here.

MS. MCNALLY:  Garth, has that binder come in for you?

MR. SPENCER:  Yes.  I've received it.  Thank you.

MS. MCNALLY:  Let's turn to tab one of the binder that's in front of you.  I will mark this as Exhibit 1.

(Exhibit 1 was marked for identification by the court reporter and is attached hereto.)

BY MS. MCNALLY:

Q.  Mr. Agapchev, this is the declaration of plaintiff Ivan Agapchev in support of plaintiff's motion for class certification.

Are you familiar with this document?

A.  Yeah.  I guess so.

Q.  You can take your time to flip through it.

Page 16

(Whereupon a discussion was held off the record.)

MS. MCNALLY:  I find it nicer to be able to look at Mr. Agapchev bigger on my screen by not sharing screen.  But if people prefer, I can share my screen.  I've got it up on the other screen as well.

Q.  Turning back to the document which you have in front of you as tab 1 and it is marked as Exhibit 1, what's your understanding of what this document is?

A.  It's about me, my experience, my education, and how I traded in stock.  That's my understanding in this case.  And my losses, yeah.

Q.  If you turn to the last page, you'll see it says executed this 25th day of June 2025 in Hermosa Beach, California.  And then under that is your signature?

A.  It is mine.

Q.  How did you execute this?  How did you sign it?

A.  Via Docusign.  So I believe Garth Spencer -- I believe they send me this document via Docusign.  And I signed it.

Page 17

Q.  All right.  So if we turn to the first page of this.  And the second paragraph -- and do you want to take a moment and kind of put the binder together.  It looks like some of the pages might have fallen out?

A.  It's fine.  I mean, they've all fallen out so.

Q.  Paragraph two says that you reside in Hermosa Beach, California; is that correct?

A.  That's correct.

Q.  And it says that you're (as read):

An entrepreneur in the automotive industry, owning and operating an auto dealer and rental company, as well as a collision center, in which I manage 13 employees in total.

Is that accurate?

A.  That's accurate.

Q.  What's the name of your company?

A.  So I'm running two businesses.  The first company, which is a car dealer and car rental place named Techiia Motorsports.  And the auto body shop or

5 (Pages 14 - 17)

Page 18

collision center named Calibri Motorsport.

Q. Can you spell the car dealer rental?

A. T-E-C-H-I-I-A. So Techiia, second word, Motorsports.

Q. Then the collision center, what's that?

A. C-A-L-I-B-R-I, so Calibri, second word Motorsport, no "S." Just Motorsport.

Q. I never thought of Calibri as being a word other than the name of a font, you know, in Microsoft Word. Like it's the name of a font like Times Roman and you can choose Calibri as another one.

What does it mean? Do you know what it means?

A. So it means -- I combined two words like California and cabriolet. So we started wrapping cars, like convertible cars in beautiful design vinyl wraps.

So it's just basically combined two words, Cali, and Brio. So Calibri.

Q. Interesting. And are these two businesses at the same physical location? Or are they at two different locations?

A. Two different locations.

Q. Where are they?

A. Techiia Motorsports is located in Inglewood,

Page 19

California. And Calibri motor sport is located in Hawthorne, California. They are both like ten minutes away from each other.

Q. Turning back to paragraph 2 here in your certification, you noted, "I attended the University of State Fiscal Service in Irpin, Ukraine where I received a master's degree in enterprise economics."

Is that correct?

A. Yes.

Q. And that's what we've already talked about a couple minutes ago, right?

A. Yes.

Q. Then you go on to say, "I've been investing for five years and manage my own investments," correct?

A. Correct.

Q. What got you started in investing?

A. Yeah. So I started in 2021. I remember like at that time everybody like spoke about Robinhood and all these company growing and making money.

So, I mean, I was like at that time didn't know anything about investing. But I started like reading some info, some articles, some videos on

Page 20

YouTube.

Just educating myself about it before I started investing. And that how I got into this.

Q. What type of articles and videos would you read or watch?

A. What kind of -- I really liked to read like technical charts, you know, the trendline to see where is the top or the bottom, resistance line or the support line.

So that's what kind of like material I review. Because I have a, like, math. So like I think like a math guy so it's really interesting for me.

Q. I think you mentioned that you like reading about did you say resistance line?

A. Yeah. There's a resistance.

Q. What is that?

A. So let's say there is a trendline and the stock is going up. But then some resistance line, the line at which this stock cannot break.

So that's what I spoke about.

Q. What do you consider your investment strategy?

A. Usually I don't invest for a long time, like long-term investor. I consider myself more like a

Page 21

short-term investors, sometimes even day trader.

So it all depends on the market. Bull market, bear market. So I don't have just one strategy. It all depends on the timing and my mood.

Sometimes I want to see the trade and work on like one-minute chart. And sometimes I don't have time for trading.

So I pick up the company in the sector which I believe is going to grow or collapse.

So I go from there.

Q. How much kind of time do you spend trading versus running your businesses?

A. So right now, I spend 100 percent of my time for my business. And I don't trade any more since I got big loss here with this company. Yeah.

So right now it's 100 to zero.

Q. Meaning right now that you spend 100 percent of your time on your other companies and zero percent of your time trading, correct?

A. Correct. If we are talking about the work, I mean, the work time. Because I have family so I spend lot of time with my family as well.

Q. Good. Do you typically then invest in one -- up until recently as I understand you're not trading right now, do you typically invest in one

6 (Pages 18 - 21)

Page 22

company a time?
   A.  Yes.  It's true.
   Q.  And what are you looking for in choosing a company to invest in?
   A.  So did you ask what I'm looking for when I invest in a company?
   Q.  Yeah.
   A.  I'm looking to make money.
   Q.  So for this company, which I'll call -- when we say this company, we're talking about ASPI, is that fair to call it ASPI?
   A.  Yes.
   Q.  How long were you invested in ASPI?
   A.  I believe the first time I heard about the company and I purchased stock was somewhere in maybe end of September or beginning of October of the 2024.
   Q.  Prior to ASPI, what had you been trading in?
   A.  There were like many stocks I invested in for last five years since 2021.  But the major stock was like Moderna or else -- Biofrontera, Ardelyx.
       Yeah.  Like many stocks.  I need to go to my Robinhood account and see.  But I remember those stocks.
   Q.  And would you be trading -- excuse me, would you be trading in just one stock at a time?

Page 23

   A.  Yes.  But like for the most part, I was like investing or trading just one stock.
   Q.  Then you would get typically get completely out of that stock and transition your attention to a new company?
   A.  So it depends.  If I keep trading, I would find another stock.  If I stop trading for some time, I would just stop.
   Q.  And by just stop, would you get out of the stock entirely?
   A.  Yes.
   Q.  What's the goal of a day trader?
       MR. SPENCER:  Objection to form.
BY MS. MCNALLY:
   Q.  You can answer the question.  The question was what's the goal of a day trader?
   A.  To make money.
   Q.  And you mentioned that you sometimes engage in day trading, right?
   A.  Sometimes, yes.
   Q.  And I think you described that as looking almost at a minute-by-minute price fluctuation in a stock; is that correct?
       MR. SPENCER:  Object to the form.  You can answer.  Unless I tell you not to, you can answer

Page 24

after I object.
       THE WITNESS:  Yes.  So sometimes like in the past, I day traded like one minute chart, five minute chart.
BY MS. MCNALLY:
   Q.  Did you say chart, C-H-A-R-T?
   A.  Yes.
   Q.  What do you use to follow the stock prices during the day?
   A.  Not much.  I have like a Robinhood account and Webull.
   Q.  What was the second one?
   A.  W-E-B-U-L-L account.
   Q.  Do you trade in both of those accounts?
   A.  So I don't.  But years ago, I did trade using Robinhood and Webull.
   Q.  Where did you trade most recently?  What account?
   A.  Only Robinhood.
   Q.  Were all your trades in ASPI in the Robinhood platform?
   A.  Yes, correct.
   Q.  Do you stay logged in and track prices through Robinhood?  Or do you just use Google Finance or are you tracking them somehow else through another

Page 25

platform?
   A.  So I really like to track the price in Webull because it's gives you more like professional view.  And, yes, so I use Webull to track the price.
   Q.  When I asked you what is the goal of a day trader, you said to make money, right?
   A.  Yes.
   Q.  Beyond that, what are you generally looking for when you were engaged in day trading?
       MR. SPENCER:  Objection, form.
       THE WITNESS:  So besides making money?  So to not lose money, right.
BY MS. MCNALLY:
   Q.  Let me ask the question a different way.  How do you make money day trading?
   A.  I would say buy cheaper than you sell.
   Q.  So when you're day trading, are you just -- you go and you buy the stock, correct?  Step one, buy the stock?
   A.  Not just go there and buy stock.  You need to pick up the timing.  And a lot of things before I buy stock.  I don't just go to the app and buy stock.
   Q.  What type of things are you looking for?
   A.  So first before I make any trading or investment, I choose a sector which I believe can

7 (Pages 22 - 25)

Page 26

grow like substantially or exponentially.

Usually I can see maybe wait a year or up to a year. And then I start my research about the sector, what companies are presenting. What are the most strong players in the sector.

What companies can become like big deals in that sector. So then I choose a couple companies. And also like when I spoke about support and resistance, so I decide and choose on what timeframe I want to trade or invest this company.

So then I see where the support is and where the resistance is. So I don't buy from -- I don't buy at the resistance, I buy more at the bottom, where the support line is, which to my opinion is support line.

Q. Do either Robinhood or Webull provide you with the support lines for different stocks?

A. No. As I said, it's only my opinion.

Q. But you mentioned that you're looking to the support line and the resistance line. Where are you actually getting that data?

A. So I look on the Webull. I open the chart of one stock on different timeframes. And let's say I want to trade the stock for one timeframe.

Then I open the chart and I see where is the

Page 27

support is. Support in my understanding is the line the price doesn't go lower. It can go lower sometime. But it comes back to the support line.

And the resistance is a line again in my view the price which the stock going to break or it can break and then fall back to support line. I mean to the resistance line.

Q. And then we started to kind of talk about your choice in buying the stock. Does anything else go into your choice to purchase the stock on any given day?

A. I read the statements from the company. I also read the SEC filings sometimes. What CEO says about the company and the future. And I do some kind of due diligence before I decided to trade some kind of company, the stock.

Q. And then in choosing in your -- when engaging in day trading, in choosing to sell, how do you decide when to sell?

A. So first of all when I day trade, it means I'm going to close my position on no matter what before the end of the day.

So when I day trade I put the stop loss, like limits, stop limit orders. And also it doesn't matter if the price go up or down.

Page 28

So basically I put the stop limit also when the stock is going up, same when it's going down. So even with the day trade like, you know, it all depends on the company.

Because as I said, sometimes I trade the company on one minute chart. And some of the trades I do like for three, four hours.

So I can just basically go from the -- from my mood, I can invest all of my money in the -- I mean, I can buy the stock with all of my money and put a limit sell order for like 10, 15 percent up.

If it sells, then I make money and I move off. If the price goes down, the stop loss order will execute. And I also put the stop loss about 10 percent down so.

Q. How did you first learn about ASPI?

A. So the first time I learned about company was when I opened the Robinhood account, the app, and sometimes I go to the -- there is like a daily moves, daily movers, the tab.

So I opened the tab and I saw that ASPI tabs like ASPI stock moved like -- I don't remember, like, 15 or 20 percent a day.

So I opened the ticker. And I just read like a brief description about the company. That's

Page 29

how I approached the stock.

Q. Do you remember when that was?

A. I don't remember the date.

Q. Do you remember roughly when it was? The month?

A. Yeah. End of September or beginning of October. Kind of --

(Reporter Clarification.)

So end of September or beginning of October. I just don't remember exactly the date.

Q. So you learned about it on Robinhood first?

A. Um-hmm.

Q. And what did you learn about ASPI?

A. There is a brief description that this company specialize in isotopes like uranium enrichment. But I don't really remember exactly what.

But my basic understanding was that the company is dealing on the isotopes, with isotopes.

Q. And at this point, what were you invested in? So you were not -- you had just been looking into ASPI.

But what had you been invested in right before ASPI?

A. Right before ASPI, there was a company named

8 (Pages 26 - 29)

Page 30

Ardelyx.

Q. Can you spell that?

A. A-R-D-E-L-Y-X.

Q. What did ARDELYX do?

A. So Ardelyx is a pharmaceutical company. And they manufacture and distribute like different medical products.

But main source of revenue for this company is -- I don't remember the drug name. But it's for the kidney disease.

Q. And how long have you been investing in Ardelyx?

A. I started in early 2023. I would say maybe March of 2023. And then I quit the stock somewhere summer 2024.

Q. What did you do to research ASPI?

A. What did I do? I opened my laptop. And first I went to YouTube. I believe I went to YouTube.

I just typed ASPI Isotopes. And there were some videos about the company, which I don't really remember.

Then I went to their website to see what kind of information they say about the company. Then I read some articles about Bill Gates support of this

Page 31

company.

So that's actually what I did.

Q. The YouTube videos, were they videos -- let me just scratch that.

Can you just tell me more about those YouTube videos?

A. I don't really remember. If needed, I can find them.

Q. You can just go back and figure out which YouTube videos you watched?

A. Yeah, I can find them.

Q. Do you remember were they videos of people from the company speaking? Or were they videos of investors talking about the company? Anything like that?

A. I don't really remember. It was the first time I started, like, getting to know about the company. So I didn't even know like the people working for this company or some investors, yeah.

Q. Did you come to have an understanding of who the CEO of the company was?

A. Yes.

Q. And who's that?

A. Mann.

Q. How did you gain an understanding of who the

Page 32

CEO was?

A. So I usually go to the -- on this one, I also went to the website. And on the website, you can always find the information about the officers of the company.

So I read it there.

Q. Did you ever watch any YouTube videos of Mr. Mann speaking?

A. Yes. I did.

Q. What videos do you remember watching of Mr. Mann?

A. Hard to remember. But he was giving some kind of interview to some analyst, yeah. I just don't remember who exactly was in it.

Q. What about articles? You mentioned that you think you read articles about ASPI.

Can you tell me more about those articles?

A. Articles? Let me -- yeah, see I also -- I cannot remember, like, exactly the articles but like articles about sector. And the companies representing the sector. I need also to search for them, for these articles --

Q. And you -- I'm sorry. What were you going to say?

A. Yeah, which I had found --

Page 33

Q. You mentioned before that sometimes you would find a particular sector to invest in. And then you would find the company.

It sounds here like you found ASPI. And then learned more about the sector; is that accurate?

A. It's not really accurate because -- so this sector was in my mind for awhile since I'm Ukrainian as you know and there is a war between Ukraine and Russia.

Russia is under sanctions, right? So I know the biggest player on the market is on the market for nuclear energy is Rosatom, R-O-S-A-T-O-M.

It's a very big company from Russia. And because of the sanctions, I made some assumptions that is going to be like other players emerging from the situation.

And then saw ASPI representing the sector. That's how I got into this stock.

Q. Thank you for that clarification.

So we talked about how you watched YouTube videos, you went to ASPI's website and that you also read articles and that you remember there was one article about Bill Gates supporting ASPI?

A. Yeah, Bill Gates was TerraPower, T-E-R-R-A-P-O-W-E-R.

9 (Pages 30 - 33)

Page 34

Q. Do you remember any other articles about the company?

A. I do remember one after the -- on the short report. I found the link to the article on Stocktwits, it's an app for some investors, I believe.

And found the article. And that article was from, I believe, March 2024, something like that, the beginning of the year in 2024.

So then I read that article about the company.

Q. What was what article?

A. So that was a article -- I can find it as well. It was about unclear future of the company ASPI Isotopes.

Q. And you are read that after the Fuzzy Panda report came out?

A. Yes.

Q. The article about Bill Gates support of TerraPower, was that article -- did you read that article before you chose to invest in ASPI?

A. I don't really remember timing. Yeah, I can't tell you right now exactly the timing.

Q. Do you remember anything else you read before you chose to invest in ASPI?

Page 35

A. So that was it. Then I started investing into the company. And then while I was investing or trading the company, I was gathering material.

Q. Did you believe the stock was undervalued?

MR. SPENCER: Objection, form.

THE WITNESS: So I don't really believe that somebody is overvalued or undervalued. I think the price at the moment represents the real price of the stock.

BY MS. MCNALLY:

Q. When you say the price at any time represents the real price of the stock, do you mean the price at any time represents the real value of the stock?

MR. SPENCER: Objection, form.

THE WITNESS: Again, I don't think about the value. I look at the price, at the chart, and I make projection where the price can go. But I don't think like some companies are undervalued or overvalued.

Is the price -- is the stock -- is the price of stock of one company is worth like $10 today, that means it's the price and it's a fair price of the stock.

BY MS. MCNALLY:

Q. In addition to any articles about ASPI, did

Page 36

you review any analyst reports?

A. On the road, yes.

Q. Did you say on the road?

A. On the road, yes. When I started like investing or trading in these stock, then I read some analyst reports.

Q. Do you remember which ones?

A. I don't.

Q. And did you follow anyone from the company on Twitter or Instagram?

A. No. I didn't.

Q. Did you follow any analysts or reporters who report on the company on Twitter or Instagram?

A. No. I didn't.

Q. Did you talk to anybody about your -- the investment in ASPI?

A. No. I didn't.

Q. Did you post on Reddit about investing in ASPI?

A. No. I didn't.

Q. Do you have a Twitter or X?

A. I may have an account. But I don't even remember password so I don't really go to Twitter. But I think I might have account from years ago on Twitter, not on X, if it's the same.

Page 37

Q. What about Instagram? Do you have an Instagram?

A. I do.

Q. Do you ever post anything related to investing on Instagram?

A. No.

Q. What about Facebook? Do you have Facebook?

A. I do have Facebook.

Q. Do you ever post anything relating to investing on Facebook?

A. I don't.

Q. What about any other social media or online platforms? Are you engaged on any social media or online platforms when it comes to investing?

A. Somewhere in 2021 or 2022, I did couple replies on Stocktwits, where I have the account. But I don't post there or anywhere else about stock, about my opinion of the -- or anything like that.

Q. What were those replies in relation to?

A. I believe it was about the Moderna company, when the stock exploded from like $40 all the way to 400 or more.

I just replied to one guy who said he's going to go down. I just said it's probably going to go up, something like that.

10 (Pages 34 - 37)

Page 38

But I'm not a social media person.

Q. So how much money in the beginning of your investment in ASPI were you planning on investing in the company?

A. As I said, when I trade or invest, I trade or invest through one stock. So I don't delete my finance.

So at the time, I use all available funds, all available funds for investment, which I believe that I can risk, trading these stock.

I don't remember was it 20,000 or 30,000 or more. But then on the road, I was adding money to my account and purchasing more stock.

Q. Do you recall roughly how much you started with?

A. I believe something about $10,000, maybe 8,000.

Q. And how much more did you add on the road?

A. At some point, I believe was about like 100,000, something like that.

Q. And what was your investment strategy with respect to ASPI?

A. As I said before, I like to buy the stock from the support and sell if it breaks the resistance. I just wanted to make money on this

Page 39

stock.

And I felt like some kind of levels where I bought the stock were safe. So I added from that levels. And I was going to sell at some levels reached, because they were actually reached.

MS. MCNALLY: All right. Let's go off the record. I think it's a good time for a five-minute break. And probably give Mr. Weiss a chance to change the tape or split up the segments.

VIDEOGRAPHER: This ends media one. We're now going off the record. The time is 10:14.

(Recess taken.)

VIDEOGRAPHER: This begins media 2. We're now back on the record. The time is 10:33.

BY MS. MCNALLY:

Q. Thank you so much, Mr. Agapchev. Let's keep going with Exhibit 1 here, which is again in tab 1 of your binder.

In paragraph 3, it states (as read):

I purchased publicly traded

Page 40

shares of ASP Isotopes Inc., ASPI common stock between September 26, 2024 and November 26, 2024, both dates inclusive (the class period.

My class period transactions in ASPI stock are listed in my certification dated May 20, 2025, previously filed in this case at docket number 28-3.

Is that accurate? Did I read that correctly?

A. Yes.

MS. MCNALLY: Then if we look at tab 4 -- I'm going to mark this document as Exhibit 2.

(Exhibit 2 was marked for identification by the court reporter and is attached hereto.)

BY MS. MCNALLY:

Q. And at the top of this, do you see that there is a header that says docket 28-3 at the top.

A. I do see it.

Q. Sworn certification of plaintiff ASP Isotopes Inc. Securities Litigation?

A. Yes.

Q. Is it your understanding that this is the

Page 41

document that is referred to in paragraph 3 of Exhibit 1 that we were just looking at?

A. Give me just one moment, please. So can you repeat the question please?

Now I remember this document. Now we go back to...

Q. Yes. Go back to the document that's at tab one. In paragraph 3, it says that (as read):

My class period transactions in ASPI stock are listed in my certification dated May 20, 2025, previously filed in this case at docket number 28-3."

And I'm asking if that language from Exhibit 1 is referring to the certification that we've marked as Exhibit 2?

A. What does it mean docket, D-O-C-K-E-T?

Q. So that's lawyer speak for the number that's running across the top of this page. That 28-3.

A. So you're referring -- (reading inaudibly) -- then yes.

Q. It's not meant to be a trick question. Making sure that this is the certification that you

11 (Pages 38 - 41)

Page 42

were referring to in Exhibit 1; is that correct?

A. Yes.

Q. All right. As we then look at Exhibit 2, which is the certification dated May 20th, you have attached to that a list of transactions in ASPI stock, correct?

A. Yes.

Q. And it looks like these start with November 1st and end with transaction on November 25th; is that correct?

A. Yes.

Q. Did you compile -- the transaction list. Did you compile this? Or did the attorneys compile this list?

A. So I didn't make this list myself. But I believe this is from the Robinhood account, trading history.

(Reporter Clarification.)

Like the stock trading history, transaction by transaction.

Q. This starts at November 1st, 2024, correct?

A. Yes.

Q. I could be wrong. But I thought you had mentioned that you had started trading in ASPI a little bit earlier than that?

Page 43

MR. SPENCER: Object to form.

THE WITNESS: I might be wrong in the timing because it was a while ago.

BY MS. MCNALLY:

Q. Is that something that you could confirm fairly easily on your Robinhood account?

A. Yes.

Q. So on this, the trading history we see -- let's start at the top. And don't worry, I'm not going to go through every one of these.

But the first line has the date, the transaction type being either a buy, bought or sold, the quantity, then the price, correct?

A. Um-hmm, correct.

Q. So if we focus on let's say November 1st.

A. Okay.

Q. I see only buys on November 1st; is that correct?

A. Yes.

Q. And with respect to the quantity -- and this could be, I'm not a trader, I'm not on Robinhood.

But I can understand how you can buy 2,200 shares of stock. But when I see a smaller like a decimal of the stock, how does that work? How can you just buy here the second-to-last one on 11-1 .34

Page 44

shares of stock?

A. So the answer is simple. Robinhood offers you two options. You can buy the quantity, some kind of quantity of the stock, let's say 1,000 shares.

Or you can invest in money. Let's say you decide to invest $5,000. And then that $5,000 to be divided by the price of the one stock.

And then you receive, let's say, 837 shares point something. So when you see the 0.34 stock that means that I decided to invest in dollars, amount, not in the stock amount.

Q. So for these purchases on 11-1, would you -- do you remember how you made -- maybe I should generally speaking: Do you remember how you made the purchases, whether it was dollar approach versus quantity purchased.

A. So I had some kind of amount of money in my Robinhood account when I started buying the stock.

Well, if you can see -- so the first transaction is 2,200 stocks. Then 800 of stocks at the same price, right, 8.6899.

So that means I set a limit order to buy 3,000 stocks at this price, like 8.6, 8.69. So it executed in two transactions. That's why it shows two transactions.

Page 45

Q. Then is the next one down a separate transaction or part of that same limit order?

A. No. It's a different one. It's a different order.

Q. The next one down is the 400 at 849. Is that its own transaction? Or is that part of the handful of transactions below?

A. I think the 400, 64, 50, 486, 100, 200, 100, 200, 400 is all part of the one limit order.

Q. And would that have been like a limit order for $8.50?

A. Yeah, 8.51 because there is one transaction for 851. So I believe it was a limit order for 851.

Q. And then with the 1,000 at 8.52 would have been a separate limit order?

A. I could be wrong. But I think that these are two different orders. But it may be one order, maybe I put a limit for like 8.55 and it sold me all the shares available up to that price.

Q. And if you log into your Robinhood account, could you go back and figure out --

A. Yes.

Q. -- the history of all this?

A. Yes. I can do that.

Q. So just taking a little bit of a

12 (Pages 42 - 45)

Page 46

higher-level view of your trading in November, it looks like some days, you know, you're just buying. And then for example on November 7th, you're in and out throughout the day; is that fair?

A. Yes.

MR. SPENCER: Object to form.

BY MS. MCNALLY:

Q. How did you approach this? You know, I see November 1st, which I'll represent to you is a Friday. Then November 4th is a Monday.

You're just buying and then later on that week, you're in and out. How do you kind of -- how did you approach your investing in ASPI in November?

MR. SPENCER: Object to form.

THE WITNESS: So first I was buying the stock. Then I was selling the stock. Then I was buying again, selling again.

You know, testing the levels. Yeah, that was the beginning of my trading of this stock.

BY MS. MCNALLY:

Q. What do you mean by testing the levels?

A. What I mean as we spoke before about the resistance and support levels. So that's where I was testing like what levels are resistance, what are supports.

Page 47

So I was buying, selling. Trying to make profit.

Q. Does this mean you were just sitting in front of your laptop all day on certain days just trading?

A. No. Usually with my phone. Most of the time on the phone on my Robinhood account.

Q. And to be clear, you didn't work with a broker or anything? This is all your personal trading?

A. Yes. All my personal trading.

Q. Do you remember what it was on November 1st that made you decide to jump in?

A. I don't remember the exact time. It that what you're asking or part of the day?

Q. Just why you did it. What exactly made you invest?

A. I don't remember what made me to buy exactly that day, the stock. I just probably had a good mood and bunch of money in my account which I wanted to invest.

Q. Do you remember if it was an article about the Gates-backed reactor company that had come out at that time?

A. I don't remember.

Page 48

Q. Focusing again on the November transactions. On Friday, November 1st and on Monday, November 4th, you're just buying the stock. On Tuesday, November 5th, you start to sell some of it. But you don't sell out of the full position, right, in that sale of that 723.589 shares?

A. Yes.

Q. Why didn't you sell out of the full position? Why did you just sell a piece?

A. Probably I can't be like so sure about that because it was awhile ago. But what I see from this transaction is that I sold some of the stock, just thinking that if tomorrow the stock opens, like, lower, I can average down my position by using the funds, which I got from the selling the stock and this transaction for 723.

Q. I just have to ask. I thought we had a visitor walk through the room. I assume that person left the room?

A. Yes, they left. It's my girlfriend. She went to work.

Q. And she has not been present and sitting in the room for the other parts of the deposition, correct?

A. No.

Page 49

Q. If I can direct your attention to November 7th and 8th, where we're seeing lots of purchases and sales throughout both of these days.

Can you explain what you were doing on November 7th and 8th?

A. 7th and 8th? I was trading. I was buying and selling. I was -- yes.

Q. Sorry. Let me ask you, is this something where you are staring at your phone all day, going buy, sell, buy, sell.

Or is it that you're setting some type of limit orders and it just looks very active because Robinhood is making all of these trades for you essentially?

A. Yeah. The second thing is correct. So I was not staring at my phone. I was setting up some limit orders and Robinhood executed and shows like transaction by transaction.

Like I can see there are a lot of transactions for the same price. Let's say bought at 8.49 and there are like 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, like about maybe 20 transactions at the same price.

So, yeah, I was not staring at the phone. Was just setting up the limit orders. Usually I buy

13 (Pages 46 - 49)

Page 50

with limit orders and I sell with limit orders.

Q. Were you following what was going on with ASPI in the November timeframe?

A. Yes. I was following.

Q. We talked a lot before what you had reviewed in your due diligence of the company in order to decide to make an investment in the ASPI stock.

Can you explain -- I was more focused during those questions on the time period before you initially chose to purchase.

Once you were in the stock, what were you reviewing and --

A. On the daily basis, when I said that I have a Webull brokerage account -- Webull app shows you like regarding like each stock, if there is any news you will see --

(Reporter Clarification.)

If there is any like news for this stock, you will it in the leads referring to this stock. So like almost every morning when I woke up and the market opens, I went to the Webull app on my phone.

I opened the ASPI ticker stock. And I check if there are like any news about the company.

Q. And then would you -- would Webull then kind of link to other articles and news releases about the

Page 51

company?

A. Yeah. Webull posted links and articles. So you can from Webull, you can tap the link and go to separate website and read the article.

Or they can post the actual article if it's some small like some brief explanation of the article, there are directly on Webull.

Q. Looking at the end of the declaration. So kind of the last page, it goes to transactions on November 25th, 2024. And it has purchases on the 25th, correct?

A. Yes.

Q. You had mentioned that now you're completely out of the stock, right?

A. Yes.

Q. This cuts off at November 25th, correct?

A. Yes. It cuts off on November 25th.

Q. What was your trading in ASPI after November 25th?

A. I need to open my Robinhood account and see. But after that short report, I sold all my stocks. There are like few transactions.

Q. How quickly after the short report did you stop?

A. I believe -- I need to open it to make sure.

Page 52

But I believe like two days later. And not all of the stock, like part of the position was closed two days after the short report. Then after that, I just need to open the account and see exactly.

Q. Tell me more about the short report. How did you become aware of the short report?

A. So I set up alerts on Robinhood if stock goes up 10 percent or down 10 percent. Then the app sends me the notification.

So it happened. And I saw that the stock went down more than 10 percent, like, rapidly.

So I went to Robinhood app to see what's going on. The price was going down. Then I opened Webull and went to the articles about ASPI. And the Fuzzy Panda short report came up.

MS. MCNALLY: And if you go to tab 14 in the binder. I'll mark this as Exhibit 3.

(Exhibit 3 was marked for identification by the court reporter and is attached hereto.)

BY MS. MCNALLY:

Q. The title of the document is "ASPI Sales Tech + Paid Stock Promotion + Microcap Fraudsters = Nuclear Meltdown."

Is this the short report that you were referring to?

Page 53

A. Yes. It is.

Q. And you think that or -- excuse me.

You recall that it was on Webull that would have linked to this report?

A. Yes. First I found out about the short report on Webull. I'm not sure it was a link to the short report or I had to go to Stocktwits app.

So it's either Webull account, Webull app, or Stocktwits app. That's where I found the link to this short report.

Q. And do you recall about what time that was on the 26th? Or excuse me. Scratch that.

Do you recall if the day that -- if when you looked at the actual short report was it the same day that the stock price dropped and it was posted? Or did it take you a couple days?

A. I looked at the short report right after it came out and the stock price started going down.

Q. And do you recall about what time that was on the 26th?

A. It was in the morning, between maybe 8 a.m. and 10 a.m., something like that Pacific Standard Time.

Q. And did you make any more purchases of ASPI after that time that you read the article?

14 (Pages 50 - 53)

Page 54

A. Honestly I don't remember. I have to open my account and look.

Q. Let's have you open your account and look at your trades on the 26th if you don't mind?

MR. SPENCER: I object. We're not going to be going into his accounts.

MS. MCNALLY: On what basis?

MR. SPENCER: On the basis of that this is a deposition. You're here to ask him questions. We're not asking him to go on the computers and open files and find information for you.

This is about what he knows in his head.

BY MS. MCNALLY:

Q. Mr. Agapchev, how long do you think it would take you to be able to open your account right now and tell me what your trades were on November 26th?

A. Maybe about a minute.

Q. And looking at your declaration, which is Exhibit 2, and that's again at tab four of your binder, which lists your transactions during the class period of September 26th, 2024 through November 26th, 2024, right?

September 26th through November 26th, are you confident that this chart reflect everything from September 26th through November 26th given that it

Page 55

stops at November 25th?

A. I don't have any reason to think that it's -- that it doesn't reflect everything. I think it is.

Q. You also think that you started to sell ASPI after you read the short report, right?

A. I said that I started selling the stock probably two or even more days later after the short report.

Q. Why did you wait two or more days?

A. I don't like panic selling. And I wanted to figure out whether that short report made sense or if it all false, you know, false statements about the company.

So took me some time to make, again, like another due diligence and wait until the CEO responds to the short report.

And, yep, that's why it took me some time to sell the position.

Q. And what did you do as apart of that due diligence?

A. Again, first, I read the short report. Then on Stocktwits I found an article that -- the paid article actually, you know, the one you have to pay for it.

Page 56

Found an article from the beginning of 2024. So I read that article. Then I waited until the Paul Mann responds to this short report.

And I took all pieces together and I came to -- made a decision to quit my position.

Q. Why did you decide to quit the position?

A. For simple just because I was confident enough that statements from Fuzzy Panda short report were accurate for two or -- yeah.

Q. What was the paid article from the beginning of 2024 about?

A. It was about the company. And, again, unclear future of the company.

Q. Do you remember anything else about that article?

A. I can find the link to this article. You know, it was about the company having work on uranium. And it will take lot of time for them to -- even if they succeed on working on uranium, it will take a lot of time for them and resources to start actually selling the product and build the revenue.

And the article was about their method of enrichment, which failed years ago. So, yeah, that's why I call it unclear future of the company.

Q. Was that article by a short seller as well?

Page 57

A. I'm not sure. No, no, it was not a short seller. It was an article from some, I believe, analyst or like publisher, I'm not sure where they got it.

Q. When you referred to the Fuzzy Panda report as a "short report," what do you mean by that?

A. What do I mean by that? So short report means that some short seller or like some -- I don't know who, analyst, they make statements about this company and about their business.

Like all of the statements or some of the statements from the company are like false statements.

So to me, short report is when they figure out that the company was telling not the truth about the business, their business.

So basically --

Q. Sorry. Go ahead.

A. So basically that's the short report theory.

Q. Do you always trust what's in a short report?

A. No. I don't. Not always. That's why I didn't sell the stock right away.

Q. And is that because often times the short reporter has a position in the stock?

15 (Pages 54 - 57)

Page 58

A. They may have a position. Or I, you know, I don't really think about them. I read the report. And then make my decision, if it's true or not true.

Q. After you do additional research?

A. Yes.

MR. SPENCER: I just want to note for the record I'm having internet connectivity issues. So I think I'm catching most of this. I'll just continue. I wanted to have that notice.

MS. MCNALLY: Okay. And if you need to stop or go on off the record, just let us know.

MR. SPENCER: Thank you.

BY MS. MCNALLY:

Q. Okay. Let's go to tab 3 in the binder.

A. Yeah. I'm here.

Q. Okay. So tab 3 should be the amended class action complaint for violations of the federal security laws.

Do you see that?

A. Yes.

MS. MCNALLY: We're going to mark this as Exhibit 4, okay?

(Exhibit 4 was marked for identification by the court reporter and is attached hereto.)

///

Page 59

BY MS. MCNALLY:

Q. Have you seen this document before?

A. Yes.

Q. When did you first see it?

A. I believe before the first meeting with Mr. Spencer and Ex Kano or right on the...

Q. Right on the what?

A. Right when we meet or before then.

Q. And that first meeting was about two weeks ago?

A. Yes.

Q. So you saw this at that first meeting? Or around the same time as that first meeting?

A. Around the same time as the first meeting.

Q. So do you think that that would have been in the June time period?

A. It was in June.

Q. So you first saw this document in June 2025, correct?

MR. SPENCER: Objection.

THE WITNESS: I guess so. It was in June.

MS. MCNALLY: I'll ask that again because I don't see how it's possible with the schedule.

Q. So you first saw this document in June 2025, correct?

Page 60

MR. SPENCER: Object to the form of the question.

BY MS. MCNALLY:

Q. You can answer.

A. I'll have to check my e-mail and see when I first. Maybe I received it before. But I believe I saw it somewhere in June.

Q. What is your understanding of what this document is?

A. It's amended class action.

Q. And what's the point of this document?

A. So the point of this document is to show that me and other investors of ASPI who invested their money into the company suffered losses during the class period because of the false statements of the company.

And there are like some statements would show that the company or their employee or CEO like they make some false statements during this period and the stock price was inflated.

So this is about this. And, yeah, that me and other people lost money.

Q. Do you understand that this document has been filed with the court?

A. I do understand this.

Page 61

Q. And have you ever read this document in full? Have you ever sat down and actually read through it?

A. Yes.

Q. When did you read through it?

A. So I don't remember when first time I saw it. But I read it like after -- I read it in full after our second meeting with Mr. Ex Kano and Mr. Spencer.

Q. What made you read it in full then?

A. Just wanted to be sure what we're going to talk about. And nothing special. I like reading.

Q. If we go to the first page of this document. There are a lot different numbers on this document. So let me be more specific.

Looking at the top, the header at the top, let's go to page 4 of 47?

A. Yes.

Q. There do you see we start out with the language, "Lead Plaintiff Mark Leone and plaintiffs Alexander Corredor Prada and Ivan Agapchev (together, "Plaintiffs").

Do you see that language?

A. Yes.

Q. Who is Mark Leone?

16 (Pages 58 - 61)

Page 62

A. Mr. Leone is the same investor as me who invested his funds into ASPI and suffered loss.

Q. And who is Mr. Prada?

A. Same guy as me. Investor of ASPI, who lost money.

Q. Have you ever met Mr. Leone or Mr. Prada?

A. I've never met Mr. Prada. And I did spoke one time with Mr. Leone.

Q. When did you speak with Mr. Leone?

A. So we spoke one time. It was only one time we spoke. I don't remember the day. It was maybe a month ago, maybe a month ago, something like that. And it was me, Mr. Leone, and Mr. Spencer.

Q. I don't want you to tell me anything that your attorney conveyed to you during that call. But at a very high level, what was the purpose of the call?

A. Very simple -- Mr. Spencer just wanted to introduce me --

MR. SPENCER: I'm going to stop you there, Mr. Agapchev. Let's not say anything about what I told you or what my purposes were. That's protected by attorney-client privilege.

If there's a way you can answer the question without saying what I was communicating to you, then

Page 63

go ahead and do it. But if not, you can just say so. And we'll end the question there.

THE WITNESS: As I say, just introduction call.

BY MS. MCNALLY:

Q. About how long did that last?

A. Couple minutes.

Q. And you've not spoken with Mr. Prada, correct?

A. Yeah. I've never spoken to Mr. Prada.

Q. Do you know whether Mr. Prada is still a plaintiff in this case?

A. I think he's not a plaintiff anymore.

Q. Why is he not a plaintiff anymore?

A. Have no idea.

Q. Have you ever looked up Mr. Prada or Mr. Leone on the internet?

A. No.

Q. Have you ever looked them on up on any type of social media?

A. No.

Q. Other than the one call that you had with Mr. Leone, have you ever communicated with him via e-mail, text, any other method of communication?

A. No.

Page 64

Q. If we go back to tab one.

A. Tab one?

Q. Yes. Which is also Exhibit 1.

A. Okay.

Q. And if you look at paragraph 6. Paragraph 6 states (as read):

I understand that the court-appointed Lead Plaintiff, Mark Leone, is also seeking to be appointed as a Class Representative. I participated in a call with Mr. Leone and Glancy Prongay & Murray LLP ("GPM") on June 19, 2025, and I am in contact with Mr. Leone through GPM.

Did I state that correctly?

A. Yes.

Q. Do you have Mr. Leone's contact information?

A. I don't have it.

Q. So if you wanted to contact him, you would have to go through the lawyers?

A. I would have to go through the lawyers.

Q. In paragraph 11 of this same Exhibit 1, it

Page 65

says there, third line down (as read):

I will continue to consult with my lawyers and any other appointed class representatives with respect to significant developments in the case, including important motions, settlement discussions and trial.

Is that correct?

A. Yes.

Q. How often have you consulted with your lawyers up until now?

A. I spoken to them about --

(Reporter Clarification.)

I was asking, we are talking about my lawyer company, Glancy Prongay & Murray.

So I spoke with them. So we had two meetings. And one time we spoke with Mr. Leone and Mr. Spencer, the introduction the phone call.

And got couple e-mails with a DocuSign papers, something like that.

Q. How did you become involved with the lawsuit?

A. So when the short report came out and I sold

17 (Pages 62 - 65)

Page 66

the stock and got a big loss.

So I saw on Webull app there was like an advertisement about the stock that basically saying people who suffered loss can contact us about this matter.

So I saw that ad. And I just e-mailed -- there was an e-mailed provided. So I send an e-mail to the e-mail address. And I got a response.

So that's how I got involved.

Q. When did you respond to that ad?

A. Shortly after I sold the stock. So maybe couple days, maybe four, five days. I don't remember.

I need to find the e-mail, the exact e-mail. Or maybe it took me like a week after the short report. But after ten days, I believe, from the short report.

Q. And how long did it take you to hear back?

A. Oh, actually very quick. Like maybe same day or next day, I got a response from the company.

Q. From what company?

A. I don't remember the company name. But the lawyer or person representing the company was Frank Cruz.

Q. And when did you -- so did you then have a

Page 67

discussion with somebody from Frank Cruz's law firm?

A. I didn't have any discussions. I remember that I was requested for the history of my transaction with trading ASPI stock. And I downloaded it from the Robinhood app. And e-mailed it back as I was requested.

Q. That was like an Excel download?

A. Yes. I believe Excel.

Q. So you sent in the Robinhood download of trades. And then do you recall what your next interaction -- or when your next interaction with counsel was?

A. I remember they send me some paper to sign with an e-mail as well. I don't remember was it DocuSign or you had to print it and sign and scan it and send it back. That was the next step.

Q. Do you have an agreement -- let me ask you this: Is Frank Cruz your lawyer at this point?

A. No.

Q. Is the Glancy Prongay firm your lawyer?

A. Yes.

Q. Do you have an engagement agreement with the Glancy firm?

A. I sign an agreement with Glancy.

Q. What type of agreement was that?

Page 68

A. I don't recall. Some basic agreement that the company is going to represent me in this case.

Q. And do you remember when you signed that agreement?

A. I don't recall. But I can find it.

Q. Did you ever sign an agreement with Frank Cruz's law firm?

A. As I said, I signed something. But I'm not sure -- it was a while ago. I'm not sure it was an agreement or whether they send me some documents as far as I remember. Or maybe it was already with my current attorneys, Glancy Prongay & Murray.

Q. I think it should still be in front of you, Exhibit 1, which is also tab one. Looking at paragraph 8, you write that, "I have supervised and participated in this litigation by, for example, A, receiving updates about the progress of the litigation from GPM."

And GPM stands for Glancy Prongay, right?

A. Yes.

Q. How many updates have you received from GPM?

A. It's hard to count. As I said, we had a couple phone calls, some e-mails. I believe if I asked for any updates that would give it to me right away.

Page 69

Q. B is "participating in discussions with my lawyers concerning our claims in the case, the litigation process and related issues," correct?

A. Yes, it's stated in this.

Q. And we talked about the two calls or, excuse me, virtual meetings that you've had recently to prepare for the deposition, correct?

A. Yes.

Q. Prior to those two calls, how long or how many calls have you had with the Glancy team?

A. So two phone calls. We spoke about one phone call with Mr. Leone. Then before that there was a call. But I don't remember like maybe a month ago before those two calls. Or maybe two months ago. I don't honestly remember.

We spoke with Mr. Spencer. So I introduced myself to him. So that was a phone call. So I believe we had maybe four, five phone calls altogether.

Q. What is your role as a class representative?

A. My role is to represent people like me who invested into ASPI Isotopes company and suffered losses. So my role is to represent them and try to recover our losses.

Q. And how are you going to do that?

18 (Pages 66 - 69)

Page 70

A.  For that, I have my attorneys.  I mean...

Q.  So you'll rely on your attorneys?

A.  I trust my attorneys.  And I rely on them.

Q.  What's your understanding of where the case is in litigation right now?

A.  I'm not really from that kind of -- like I don't have any experience with lawsuit cases.  So I don't know where we at right now.

We are not at the court.  We're in deposition.  So that's where we're at probably.

Q.  Let me ask it a different way.  Do you understand what a motion to dismiss is?

A.  I do understand.

Q.  Do you understand that a motion to dismiss has been filed by the defendants in this case?

A.  I do understand this.

Q.  Have you read that motion to dismiss?

A.  Honestly, I didn't.

Q.  Do you understand what class certification is?

A.  It's some kind of a document we read today, we saw today.

Q.  Do you understand that your counsel has moved -- has moved for what is called class certification?

Page 71

A.  I do understand this as we are sitting here and talking about the case.

Q.  What do you understand class certification to mean?

A.  Class certification.  To my understanding, so what's going on right now, we are asking for a trial and we have something else.

That's that I understand about the things going on.  But I cannot exactly tell you what is class certification.  There are some statements about this case.

Q.  So when you're referring to some statements, are you referring to -- excuse me, when you're referring to some statements and you previously talked about what we've been looking at today, are you referring to the document that is Exhibit 4, which is at tab 3?

A.  No.  I'm referring to the document we -- the very first one you, I believe --

Q.  Tab one, which is Exhibit 1?

A.  Let me find it.  I think I was referring to the document 28-3, the certification of plaintiff.

Q.  You -- so we talked about -- you did not read defendant's motion to dismiss, correct?

A.  I did not read it.

Page 72

Q.  Have you read plaintiff's motion for class certification?

A.  Is the document here?

Q.  It is not.  We have not looked at that document.

A.  Then it's hard to say.  Yeah, I don't recall.  I mean, I need to see the document to tell you.

Q.  What do you recall reading in this case?

A.  I read the document we spoke today --

Q.  The amended complaint, which is at tab 3, Exhibit 4?

A.  The one which had like 47 pages.  Yeah, the document 28.

Q.  So that's at tab 3, correct, Exhibit 4?

A.  Just one second.  Yes tab 3, document 28.  This one I read.

Q.  This is the one that you believe you read in June, correct?

A.  Yes.  This one I read.  Yeah.  This one I read in June.

MS. MCNALLY:  Let's go off the record for a bit, Terrence, if that works for you.

VIDEOGRAPHER:  This ends media two.  We're

Page 73

now going off the record.  The time is 11:49.

(Recess taken.)

VIDEOGRAPHER:  This begins media 3.  We're now back on the record.  The time is 12:09.

BY MS. MCNALLY:

Q.  Mr. Agapchev, can you tell me who are the defendants in this case?

A.  ASPI and Paul Mann.

Q.  Do you know who Heather Kiessling is?

A.  No.  I don't recognize.

Q.  Do you have an understanding that she's named as a defendant as well in this case?

MR. SPENCER:  Object to the form.

THE WITNESS:  No.  I didn't see her name.

BY MS. MCNALLY:

Q.  In your words, what exactly did ASPI and Mr. Mann do wrong?

A.  So in my words, there were like statements from the CEO and news involving the company, that they are the company which specialize and are expert on the isotopes.  And they are also working -- are working on the uranium enrichment.

19 (Pages 70 - 73)

Page 74

And there was statements that the technology of uranium enrichment is a top notch and the best. And there were like some comparisons to other methods of uranium enrichment.

And in that comparison, they -- I believe there are other methods and ASPI stated that their method the most efficient and like one of the best if not the best.

So also they stated that they are building the plant were they were going to enrich uranium. And all these statements from the company made impression this company is already working on this -- on the uranium enrichment and that is why actually I was interested in this company because first I was interested in the sector.

As I said about the competitors from Russia and all these sanctions. So then I got to the sector and ASPI itself. And I was pretty much sure that they are working on uranium enrichment.

However, that was not true.

Q.  I'd like you to go to tab 15 in your binder. And this is ASPI form 10-K.

Do you see that?

A.  Yes.

Q.  Are you familiar with this document?

Page 75

A.  I'm not really sure if I read this one.  But this is some of the SEC filings.  Am I correct?

Q.  Correct.

A.  Yeah. So I may read this one.  Or maybe I read another one.  But I cannot recall if I read this one.  But some of them for sure I read.

Q.  I want you to go to page 28 of the 10-K. And is looking at the number on the bottom.  Because this document does not have that header.

A.  Yeah.

MR. SPENCER:  Are we giving this an exhibit number.

MS. MCNALLY:  I did in my head and on my paper.  But I might not have said it out loud.  I'm going to mark this as Exhibit 5.

(Exhibit 5 was marked for identification by the court reporter and is attached hereto.)

BY MS. MCNALLY:

Q.  I'd like to direct your attention to four paragraphs up from the bottom there.  The paragraph that starts, "we also plan to begin researching the enrichment of uranium."

A.  I can see that.

Q.  And I'd like you to read that paragraph, please.

Page 76

A.  (As read):

We also plan to begin researching the enrichment of uranium, which is a chemical element we believe may have application in the clean, efficient and carbon-free energy industry, using quantum enrichment.

Quantum enrichment has never been used to produce isotopes at a commercial scale and the research that has been conducted using this technique has never been published.

The IAEA has never inspected any facility that leverages this technology and there is no proof that this technology has ever been used to enrich uranium.

There are significant regulatory hurdles associated with enabling our research and development efforts to enter the nuclear energy market.

Multiple regulatory agencies need to provide approvals to allow us to

Page 77

proceed with the research and development necessary to show proof of concept to the market.  If we demonstrate proof of concept, we anticipate that there will be further approvals needed to expand to a larger footprint to support commercial demand.   We may not ever obtain these approvals.  If we are unable to advance our future isotopes in development, obtain applicable regulatory approval and ultimately commercialize our future isotopes (assuming receipt of applicable regulatory approvals), or experience significant delays in doing so, our business will be materially harmed.

Q.  Mr. Agapchev, having read that, do you still think that the company gave the impression that they were already working on uranium enrichment?

A.  Can you tell me what is this document dated on?

Q.  If we go to the first page, it says 10K for

20 (Pages 74 - 77)

Page 78

the year ended December 31, 2023?

A. So what is the date of this? There should be a date, no?

Q. That's a fair question of when it actually was put out. If you go all the way towards the end -- I'm at four pages from the end, at top where it says exhibit 32.1, you see there, dated April 10th, 2024?

A. So this document is dated as April 10th, 2024?

Q. That appears to be what --

A. See, it is very important, you know, because even though the statement is for 2023, we need to be sure when it was released.

Because I started trading of this company as we all saw in November. And in November, the statements from the company were different.

They are building the plant. If you build the plant, that means you at least tested the technology. You cannot just build the plant, invest in like millions of billions of dollars without testing the technology.

So in my understanding, in this world, first you test the technology, you prove that it can work. Then you build the plant to scale and to make

Page 79

production.

So the timing is important. If it's from April, they might say this. But even so, it's -- I don't see where it says that ASPI has never tested the enrichment of uranium.

It says we also plan to begin researching the enrichment of uranium. But I don't see where it says we as a company have never tested this method of enrichment uranium.

So if I saw that they've never tried it, they've never tested it, it's all assumptions, I'm not sure if I would ever invest into this company.

Q. Research companies were testing, right?

MR. SPENCER: Object to form.

THE WITNESS: So, again, as I said, it's all about timing. And when I was trading the company, the company was stating that they are building or going to build the plant where they going to enrich uranium.

So that I was sure that they tried, they tested the method and it was successful.

BY MS. MCNALLY:

Q. The amended complaint refers to an interview that Mr. Mann had with Canaccord, right?

A. Yes. There was.

Page 80

Q. Did you ever listen to that interview?

A. Are we talking about the one after the short report?

Q. Yes.

A. I believe I listened to it.

Q. When did you listen to it?

A. When it came out. Probably the same day.

Q. Have you ever seen or reviewed a transcript of that interview? Like a written transcript of it?

A. I don't recall. But I listened to it.

Q. Do you remember on what platform you listened to it?

A. I don't remember the platform.

Q. Do you remember if you had to login or pay for it?

A. For sure, I didn't pay for it. About login, I don't think that I had to login. But I may be wrong because I listen to a lot of conference call like earnings report from other companies where I had to login. So it may be mixing in my head.

Q. Do you know how you can get a copy of the Canaccord interview?

A. Yeah. I can ask my lawyers. For sure they have it.

Q. Why do you think for sure they have it?

Page 81

A. I mean, that's why they're lawyers, they need to have some information which is related -- I mean, all information related to the claim.

Q. But you did not give them a copy of the Canaccord interview?

A. Me? I didn't give them.

Q. Was that an answer to my question? You did not give them a copy of the Canaccord interview, correct?

A. Yes. It's correct. I didn't give them.

Q. You talked about the statements that the company and Mr. Mann made that you believe were misleading, correct?

MR. SPENCER: Object to form.

THE WITNESS: Correct.

BY MS. MCNALLY:

Q. And you talked about how you were reading things about the company during the time that you were invested in the stock, correct?

A. Correct.

Q. Let's take a look at some of those statements.

I'd like to go to tab 8. We'll be marching through a couple of these if there's any way for you to put your binder together or --

21 (Pages 78 - 81)

Page 82

A.   There is no way.  This one is all --

MR. SAMS:  Do you want to use this one instead?

THE WITNESS:  I can use if you don't mind.

(Whereupon a discussion was held off the record.)

BY MS. MCNALLY:

Q.   You got the good one now?

A.   Yes.

MS. MCNALLY:  So the document that is at tab 8, we'll mark this as Exhibit 6.

(Exhibit 6 was marked for identification by the court reporter and is attached hereto.)

BY MS. MCNALLY:

Q.   And in you'll see numbers on the left-hand side, you'll see that runner across the top of it?

A.   Yes.

Q.   The landscape view I suppose.  Have you ever seen this document before?

A.   I think so.

Q.   And when do you think you saw it?

A.   It was either right before I started trading the stock or right after I started trading the stock.

Page 83

Q.   Did you rely on it in deciding to trade the stock?

MR. SPENCER:  Object to form.

THE WITNESS:  As I said, I relied on different facts.  But this is --

(Reporter Clarification.)

-- this is definitely not something that made me to buy the stock or to sell the stock.

BY MS. MCNALLY:

Q.   I think your answer was slightly different there.  This is something that did make you buy the stock or did not make you buy the stock.

A.   Did not.

Q.   Why would this have not made you buy the stock?

MR. SPENCER:  Object to form.

MS. MCNALLY:  Or let me ask it a different way.

Q.   Are you saying that this document would not have made a difference to your decision whether to buy or sell the stock?

MR. SPENCER:  Object to form.

THE WITNESS:  I would say that I would not rely on this document when I buy or sell the stock.  And, again, it didn't make me to buy or sell the

Page 84

stock.

BY MS. MCNALLY:

Q.   Why not?

A.   Why not?  Because there are a lot of beautiful companies on the market.  And those companies, they have the company over you.

That there's one company made some kind of presentation about the business.  And of course every single company want to show that they have a bright future and, you know, they want you to make investment in their company, this and that.

So I read through this document.  You know, I like it, but it's not something that can make me to buy the stock.

Because stock is -- sometimes the company can be like really, really good but the stock just going down.  Sometimes the company is really, really bad, no future, no nothing and the stock is going up.

So hard to rely on one document when you make a decision to buy or sell the stock.

Q.   This is an investor presentation.  You'd agree with calling it that?

A.   That's what I see.

Q.   You mentioned sometimes you would dial into conference calls.  Were those conference calls that

Page 85

where company people spoke?

A.   Yes.  So, you know, like every company which is public trading like every quarter, like every three months, they give the earnings report.

And once they release the earnings reports, there is a conference call where the CEO and other people are presenting the company.

Talk about the result of this quarter and they give the projections and predictions.  And they are talking about difficulties.

So, yes, I heard some other conference calls where people representing the company spoke about the business and future.

Q.   And did that make a difference to whether you chose to purchase or sell ASPI stock?

A.   No.

MS. MCNALLY:  Let's mark next tab 9.  Go to tab 9 and we'll mark it as Exhibit 7.

(Exhibit 7 was marked for identification by the court reporter and is attached hereto.)

BY MS. MCNALLY:

Q.   This is a press release titled, ASP Isotopes Inc. Enriches Ytterbium-176 During Commissioning Phase of First Quantum Enrichment Facility and Expects to Offer Highly Enriched Ytterbium-176 for

22 (Pages 82 - 85)

Page 86

Commercial Sale in 2025."

Have you seen this press release before?

A. I might have seen it. But I'm not sure.

Q. You see it is dated October 17th, 2024?

A. I see it.

Q. Would you have relied on this in determining whether to purchase ASPI stock?

MR. SPENCER: Object to form.

THE WITNESS: No. I wouldn't rely on this one as well.

BY MS. MCNALLY:

Q. Why not?

A. So for me, ASPI, again, you know, I'm repeating myself. But it's more about the -- if they can do the uranium enrichment and make the haleu, H-A-L-E-U, for the SMRs, small reactors.

That thing is the main one. And on that thing, you can base your investment. But seems like Ytterbium or other things that are not really -- to me, they are not really -- they cannot make my decision to invest in the company.

Q. Because they don't relate to uranium enrichment?

MR. SPENCER: Object to form.

THE WITNESS: It's just different.

Page 87

MS. MCNALLY: Let's go to tab ten. We'll mark that as Exhibit 8.

(Exhibit 8 was marked for identification by the court reporter and is attached hereto.)

BY MS. MCNALLY:

Q. This is an October 30th, 2024 press release. The top line of which is, "ASI Isotopes, Inc., Enters Into Term Sheet with TerraPower LLC, for Construction of a HALEU Production Facility."

Have you seen this document before?

A. I've seen this article.

Q. And this is the day before you first started investing in ASPI, right?

A. October has 30 days, right?

Q. Has 31 days. So two days --

A. Yeah, two days.

Q. Let me clear that up. For the transcript purposes. So this article was two days before you started investing in ASPI, correct?

A. Correct.

Q. Do you recall seeing this article at the time?

A. Yeah. I saw this article after I started trading the stock.

Q. Did this have any impact on your decision

Page 88

whether to trade in ASPI?

A. This article build my impression that the company is working on uranium enrichment and at least has tested its technology.

Again, is going to build the HALEU production facility. That means that they are sure that the technology is working, not will work or something like that.

MS. MCNALLY: Next I want to go to tab 11. And I'll mark this as Exhibit 9.

(Exhibit 9 was marked for identification by the court reporter and is attached hereto.)

BY MS. MCNALLY:

Q. This is an article -- I think the date on that's running across of this, which is 5/31/25 p.m. is not the date of the article.

My understanding is that it's a November 19th, 2024 article. And that's from paragraph 84 of the complaint.

But regardless of the date, do you recall seeing this article at any time?

A. Just hard to recall because I read a lot of material. And this one was posted -- is it the X on the Twitter by ASPI?

Q. Let's look at the --

Page 89

A. At the end you see it's like screenshot from X.

Q. Yeah. That's on tab 12, correct?

A. Yes, tab 12.

Q. Let me just put that in as an exhibit so that we've got it on the record. I'll take the document that is at tab 12 and --

A. Sorry. It's different.

Q. That's okay, that's the danger of --

A. Yeah, sorry. It is different.

Yes, this article --

Q. Hold on, Mr. Agapchev, let me just put in the document that's at tab 12 so we have it for the record.

MS. MCNALLY: So I'd like to introduce the document that's at tab 12 as Exhibit 10.

(Exhibit 10 was marked for identification by the court reporter and is attached hereto.)

BY MS. MCNALLY:

Q. And with that said, go ahead and continue your explanation.

A. Yes. So this article, I might have seen it at some point. But I don't really recall.

Q. Is this the type of article that you would have based an investment decision on?

23 (Pages 86 - 89)

Page 90

MR. SPENCER: Object to form.

THE WITNESS: I need to -- first I need to read through it 'cause I'm not sure if I read it before.

And then -- only then I can give you an answer. If you want me, you know, to -- I would take me -- it would take me some time to read through it so.

BY MS. MCNALLY:

Q. But you don't remember reading this at the time?

A. I don't remember reading this article at the time.

MS. MCNALLY: Give me 30 seconds.

(Whereupon a discussion was held off the record.)

BY MS. MCNALLY:

Q. All right. Can you see my screen now?

A. Yes.

Q. I found this article -- I'm just wondering if this is the one we talked about before?

MS. MCNALLY: I'll introduce this as Exhibit 11.

Page 91

(Exhibit 11 was marked for identification by the court reporter and is attached hereto.)

BY MS. MCNALLY:

Q. And it is an article titled "Gates Backed Reactor Company ASP Isotopes Plan Plant To Make Nuclear Fuel."

And I'm happy to scroll down if it's helpful.

But does this help refresh your recollection about an article surrounding Bill Gates and TerraPower?

A. Yes. It refreshes.

Q. This article came out on October 30th.

Do you see that? Correct?

A. Yes.

Q. And that was two days before you first invested in the stock, correct?

A. Yes.

Q. Does this help refresh you as to whether you read this before you chose to invest?

A. No. I didn't invest based on this article. I think I read it after I started trading the stock.

MS. MCNALLY: I'll stop sharing.

Q. To be clear, you also mentioned an article that you pulled from earlier in 2024, you think. And

Page 92

you pulled it after the short report, correct?

A. Correct.

Q. And you think you had to pay for it?

A. I think I had to pay for it? I'm not sure if I paid for it at that time. I was trying to find an article again. And it's something you have to pay for it.

Q. And that article confirmed for you what you saw in the short report?

MR. SPENCER: Object to form.

THE WITNESS: So that article was a warning -- like kind of a warning to what was on the short report came up with.

BY MS. MCNALLY:

Q. Do you remember what the name of that report was?

A. The article?

Q. Correct, yes.

A. I can find it.

Q. Do you remember what it was -- like who came out with it or anything like that?

A. It was a publisher. So the resource where you can find it -- it's like there are some publishers, you can pay like a subscription to read the articles, read the -- like, yeah, like articles.

Page 93

And, again, I can find the exactly who wrote the article and what was it about and the name of it.

Q. If you had read that article earlier, would you have invested in the stock?

MR. SPENCER: Object to form.

THE WITNESS: Again, the article was from early 2024. And I got into the stock in November when all I was hearing that the company's working on uranium, building the plant, backed by Bill Gates.

So different timeline maybe within the six or seven months they already tested and they're sure that they can do it. And they can build the plant, manufacture it and sell it.

So timing is very important here. So if I read that article and if that article was published on October 30th or October 31st and I read the article on November 1st, there is a small chance that I would buy the stock.

BY MS. MCNALLY:

Q. And that's something that -- you could find that article quickly?

A. I can find it.

Q. If we took a break right now, would you be able to find it?

MR. SPENCER: Same objection as before.

24 (Pages 90 - 93)

Page 94

He's not finding files on his computer.

BY MS. MCNALLY:

Q. If we took a break right now, could you find it?

A. I could.

Q. Are you going to follow your counsel's instruction not to find the article?

A. As I said, I rely and I trust my lawyers. So if he say not to, I would rather not to.

MS. MCNALLY: Mr. Spencer, I would like to give your client the opportunity to find the article now and avoid an unnecessary and kind of silly fight over this.

But if you're not going to allow him to do so, I'll just object and we'll keep the depo opened.

MR. SPENCER: We're not going to keep the deposition opened or argue about this on the record. We can discuss off line.

But as I said, he's not going to be looking at his computer.

MS. MCNALLY: Off the record for a moment.

VIDEOGRAPHER: Is that okay, counsel?

MR. SPENCER: Yes.

VIDEOGRAPHER: This ends media 3. We're now

Page 95

going off the record. The time is 12:55.

(Recess taken.)

VIDEOGRAPHER: This begins media four. We're now back on the record. The time is 1:05.

MS. MCNALLY: Thank you for bearing with me, Mr. Agapchev. I'd like to share my screen and I'm going to mark this document as Exhibit 12.

(Exhibit 12 was marked for identification by the court reporter and is attached hereto.)

BY MS. MCNALLY:

Q. It's an article that I will represent was available from J Capital that says, "Scientific Sounding Technologies, Terrible Financials and Honig Promoter Team." And it is dated February 21, 2024.

Is this the article that you were referencing that you looked up and found after you read the short report?

A. I would have to find the article to see if it's that one.

Q. Would it help you to be able to scroll through it and read this? Or you would really have to compare it --

Page 96

A. If you can scroll a little bit so.

I don't think this is the one because this one says comical pump-and-dump. And that article -- what I remember, it was awhile ago. There was no statements like comical pump-and-dump.

Q. Okay. Well I gave it a try.

A. Thank you.

MS. MCNALLY: I am going to state that I'm leaving the deposition open based on the refusal to cooperate and look up the article that you're thinking about, which I understand that you're doing because counsel's advice.

And we can revisit that with counsel as necessary. But with that said, I am -- I'm concluded but I will turn you over to Mr. Spencer for any questions that he might.

MR. SPENCER: Thank you. And I'll just note in response to that comment, there's no basis for the deposition to be kept open. And Mr. Agapchev has been fully cooperative.

Mr. Agapchev, I just have a few follow up questions to clarify some of the things that were discussed earlier, then we'll get you on your way today.

So thanks for bearing with us.

Page 97

CROSS-EXAMINATION

BY MR. SPENCER:

Q. You know, we've been talking a lot about things that happened back in November of 2024, communications that people had over the last month.

Do you have a perfect memory, Mr. Agapchev?

A. It's not perfect.

Q. Can you tell me what you had for breakfast on December 13th of last year?

A. I don't remember.

Q. Do you recall every stock trade you ever made?

A. No. Definitely not.

Q. Do you remember every call and e-mail you have?

A. No. I don't remember.

Q. Have you been doing your best in today's deposition to answer Ms. McNally's questions to the best of your ability based on your present recollection?

A. Yes. I did my best.

Q. There was some discussion of the timeline of when you and I first met, how many phone calls we had.

25 (Pages 94 - 97)

Page 98

I think it evolved a little bit over the course of the deposition from, you know, at the beginning we were talking about well maybe we met two weeks ago.

Then later in the deposition, I think you mentioned that it might have been a month or two before.

Do you have any clearer understanding of, you know, when we first met?

MS. MCNALLY: Objection.

THE WITNESS: Yes. So now I remember that I wouldn't remember not the day when it happened.

But how I was, I was at police yard to pick up one of our car, which was stolen. And we had a planned phone call with Mr. Spencer.

I just couldn't be available at that time and sit at home and wait for the call because I was at the police yard.

But I took about 10 minutes and stepped away. And we had a conversation on the phone with Mr. Spencer where I introduced myself and we talked about this case --

BY MR. SPENCER:

Q. Let's not discuss the things you and I discussed. That's privileged.

Page 99

Did that conversation take place more than two weeks ago?

A. Yes. That one took place more than two weeks ago.

Q. Another kind of timeline I just wanted to get clarity on. At the beginning of the deposition, you had mentioned well maybe you started buying the stock in September, October of last year, the ASI Isotopes stock.

Later in the deposition, we started talking more about November 1st you started.

Is it clear in your mind now when you started purchasing the ASP Isotopes stock?

A. Now when I see the trading history, I can see clearly that I started trading the stock on November 1st.

Q. You and Ms. McNally talked a bit about some of your different trading strategies. You mentioned some day trading. You mentioned doing research into sectors and finding companies you liked.

What strategies did you use when you were purchasing ASP Isotopes stock?

A. So during this period when I first purchased the stock and I sold the stock, first I was more like trading the stock.

Page 100

And then on the way, I was getting like more knowledge about the company and these articles and statements from the company.

So I was more -- I became more like sure about this company. I would say about their future.

But the strategy was same, to buy cheaper than you sell, to make money like this.

Q. Did you hold positions in ASP Isotopes for more than one day?

A. I did.

Q. You previously mentioned that you read about ASP Isotopes before you started trading the stock; is that right?

A. So before, yes, I read about the company before I purchased the stock.

Q. You did some research before you started buying the stock; is that right?

A. I did research.

Q. I think you may have been joking a little bit. You told Ms. McNally that you brought the stock, oh, you probably had a good mood and you had some money you wanted to invest and you bought the stock.

Would that have been the sole reason you bought the stock? Or would it have also related to

Page 101

research you had done?

MS. MCNALLY: Objection.

THE WITNESS: So that joke was made when we spoke about the day -- day transaction I did. So she asked me why did I make some money, why ordered that day.

So that is what I said. But, of course, when I invest in some company, I do my research. And here I did my research as well about this company.

BY MR. SPENCER:

Q. Take a look at -- or rather I don't think you have a copy it. Do you recall the last exhibit Ms. McNally showed you, Exhibit 12, the J Capital article?

I don't think you have a copy of it. It was over screen share?

MS. MCNALLY: Want me to put it up?

MR. SPENCER: Sure. If you wouldn't mind.

Q. Okay. Mr. Agapchev, do you see Exhibit 12 up on the screen?

A. Yes.

Q. Is it possible that this is the earlier 2024 report on ASP Isotopes that you had been referring to in the deposition? Are you sure one way or another?

A. It is possible. I'm not sure. I just don't

26 (Pages 98 - 101)

Page 102

remember this comical pump-and-dump thing.

Q. You don't remember that particular phrasing; is that right?

A. That particular phrasing, exactly.

MR. SPENCER: That's all I have about that. If you can take it down, please.

Q. All right. Can you look at tab 3 in the binder that was marked as Exhibit 4, the amended class action complaint.

Do you have that in front of you?

A. Yes.

Q. And I think you had mentioned earlier in the deposition that you thought you first saw it about two weeks ago or so; is that right?

A. Yes.

Q. Take a look with me at tab 4 of the binder. It was marked as Exhibit 2, titled sworn certification of plaintiff.

It's got your DocuSign signatures at the bottom, the indicate, May 20th of 2025, correct?

A. Correct.

Q. Do you see the first numbered point says, "I have reviewed the complaint, adopted the allegations and authorized the filing of the lead plaintiff motion on my behalf."

Page 103

A. I can see it.

Q. Does that refresh your memory as to whether you had in fact seen a copy of the complaint before a couple weeks ago?

A. That means yes.

Q. Would you have to check your e-mails and files to see when you first saw a version of the complaint?

A. I would have to check my e-mails to see when the first time got it and reviewed the document.

Q. Have you received some of the case documents from your lawyers in paper form and some e-mail form?

A. Yes. I did receive.

Q. And when you're talking about the one you saw maybe about two weeks ago, do you recall if that was paper or e-mail?

A. The one I was thinking I received like two weeks ago, I was thinking about the paper. But I did receive it like before that.

I just put it on my shelf and it waited for me to get the time to read through it probably. But I was referring to the paper.

Q. You and Ms. McNally discussed our call that you had with Mr. Leone. Do you recall discussing that in the deposition?

Page 104

A. Yes.

Q. She asked you how long it was. And I think you said it was about a couple minutes.

Do you recall saying that?

A. I recall that I said about ten minutes or so.

Q. So do you think it was longer than a couple minutes?

A. Up to ten minutes approximately.

Q. Do you remember exactly how long that call was sitting here today?

A. I don't remember how long exactly. But definitely more than couple minutes.

Q. Is it possible that it was more than ten minutes?

A. It's possible.

Q. And do you recall telling Ms. McNally that you don't have Mr. Leone's contact information?

A. Yeah. I did say that.

Q. Have you ever been copied on the same e-mail as Mr. Leone?

A. I need to check my e-mails.

Q. If you had been copied on the same e-mail as Mr. Leone, would it be fair to say then that you would have his e-mail address?

Page 105

A. Yes.

Q. We had some different discussion with Ms. McNally about the number of calls or meetings you had with your lawyers.

At one point, it sounded like you were talking about two meetings. Later in the deposition, you mentioned four or five phone calls.

Do you remember the exact number?

A. I believe we said five in total. It maybe four. But I think it was five.

Sorry. Like yesterday I had 120 phone calls in one day. So it's really hard to remember.

Q. No problem. This is all par for the course in a deposition.

Let's take a look at tab 1 of the binder. It was marked as exhibit number one. It's the declaration of plaintiff Ivan Agapchev in support of plaintiff's motion for class certification.

A. Okay.

Q. And in particular, I'll direct you to paragraph -- start with paragraph 7.

I'm just going to read that.

(As read):

I understand that if appointed

27 (Pages 102 - 105)

Page 106

as a class representative, I would represent not only myself, but I would also represent the entire proposed class of investors.

I understand that if appointed as class representative, I have a duty to act in interest of all other investors who are members of the class.

Mr. Agapchev, is that a correct statement? Is that your understanding of what you would do as a class representative?

A. Exactly. We all lost money. And I work on this case just as like for all of them.

Q. Take a look at paragraph number 8 in Exhibit 1.

It states (as read):

I have supervised and participated in this litigation by, for example, A, receiving updates about the progress of the litigation from GPM.

B, participating in discussions

Page 107

with my lawyers concerning our claims in the case, the litigation process and related issues.

C, reviewing court filings provided by GPM.

D, preserving, searching for and providing relevant documents to my lawyers.

E, coordinating with GPM to prepare for and schedule my deposition.

Mr. Agapchev, are those all true statements? Are those things that you have done in this case.

A. Yes. Those are all true statements. And we've done it through the case.

Q. Take a look with me at the beginning of paragraph 11, please. "I am committed to continuing to supervise and participate in the prosecution of this case."

Is that a true statement, Mr. Agapchev?

A. Yes.

Q. So you told Ms. McNally that you're relying on your lawyers to represent the class this the case; is that right?

Page 108

A. Yes. I told her.

Q. Are you also yourself actively involved in the case in representing the class?

A. Yes. I'm actively involved with into this. I've been sitting here for like four and a half hours and I got like 20 missed calls all ready. So I think I'm involved.

Q. It's almost over, thank you. We appreciate your time.

Ms. McNally asked you about a few documents but did not show them to you. I'd like to show you a couple of them.

MS. MCNALLY: Objection.

MR. SPENCER: Let me try to see if I can share my screen here. Is that enabled by the way? Okay.

Q. Are you seeing the screen share now?

A. Yes.

MR. SPENCER: We'll mark this as Exhibit 13. It is titled, "ASP Isotopes, Inc., Paul E. Mann and Heather Kiessling's Memorandum of Law in Support of Motion to Dismiss the Amended Class Action Complaint."

(Exhibit 13 was marked for identification by the court reporter and is attached hereto.)

Page 109

BY MR. SPENCER:

Q. I'm just going to scroll a bit so you can see what's in here.

Mr. Agapchev, do you recall having seen this document before?

A. Yes. I've seen the document before.

Q. You told Ms. McNally you haven't read defendant's motion to dismiss?

A. So as I said, probably I've seen it. But I didn't read it.

MR. SPENCER: I'll stop screen sharing there.

I'm going to show you another document I'm going to mark as Exhibit 14.

(Exhibit 14 was marked for identification by the court reporter and is attached hereto.)

BY MR. SPENCER:

Q. Do you see on the screen share a document entitled "Memorandum of Law in Support of Plaintiff's Motion for Class Certification."

A. Yes.

Q. I'm going to scroll through this one a little bit. Have you seen this document before? The class certification motion?

A. I've seen it before.

28 (Pages 106 - 109)

Page 110

Q. Ms. McNally asked you a question using a technical legal term about what is class certification.

Do you recall that?

A. Yes. I recall.

MS. MCNALLY: Objection.

BY MR. SPENCER:

Q. Are you a lawyer, Mr. Agapchev?

A. I'm not a lawyer.

Q. Are you -- strike that.

Is this lawsuit brought just on behalf of yourself, Mr. Agapchev? Or also on behalf of other investors like you?

A. It involves me and other investors same as me.

Q. Do you have an understanding of whether we are asking the court for permission to bring the lawsuit on behalf of all of the investors?

A. Yes. I do understand this.

Q. Do you think it's important for companies to make truthful statements to the investing public?

A. It's critical. It's very important.

Q. When deciding to buy or sell a stock, would it affect your trading decisions if you knew that the company had made untrue statements?

Page 111

A. So the statements from the company, they do -- they have some effect on my decision when I trade or invest.

I don't rely only on those statements. But they are very important and they help me to make a decision whether to buy or to sell the stock.

Q. When you make an investment decision, do you rely on a single piece of information? Or do you rely on a total mix of information that's available to you?

A. Mix of information, sentiment of the market, chart. A lot of factors.

Q. Let's take a look at tab 9 in the binder that was marked as Exhibit number 7, the press release titled, "ASI Isotopes Inc. Enriches Ytterbium 176."

A. Yes.

Q. Scroll down with me to -- strike that.

Do you see in the title of this document where it refers to a quantum enrichment facility?

A. Yes. I can see.

Q. You understand that a -- strike that.

In this press release was ASP Isotopes telling investors that it had used quantum enrichment to enrich Ytterbium?

Page 112

A. Yes.

Q. Scroll down with me to the bottom of the second page under the bold heading, "Quantum Enrichment -- A Novel Enrichment Technique Potentially Capable of? Efficiently Producing Advanced Nuclear Fuels."

Do you see that where I am?

A. Yes.

Q. I'm going to read the first sentence there?

(As read):

ASPI believe its Quantum Enrichment process will be able to produce HALEU (High Assay Low Enriched Uranium) at an attractive price, allowing new nuclear energy to become available at a "green discount" to carbon-intensive electricity production processes.

Is that kind of information that would matter to you as an investor in ASP Isotopes that the company believed it can use quantum enrichment to produce HALEU?

Page 113

A. As I said, to me it's the most important thing about this is company was for me understanding that they are working on these, they have tested and they are going to build the plant and make a production and growing exponentially in revenue.

So, yes, this one matters to me about uranium enrichment the most. Especially at attractive price with a good discount.

MR. SPENCER: Thank you very much, Mr. Agapchev. I have no further questions for you at this time.

MS. MCNALLY: I've got one.

REDIRECT EXAMINATION

BY MS. MCNALLY:

Q. Mr. Agapchev, at the beginning of Mr. Spencer's questions, do you remember that the first conversation you had with him was at some type of police yard, correct?

A. Yeah. I was at the police yard, tow yard.

Q. Sorry. A police tow yard; is that correct?

A. Yes.

Q. In connection with recovering a stolen vehicle from one of your shops, right?

29 (Pages 110 - 113)

Page 114

A.  It was my rental vehicle, the vehicle which we rent to other people.

Q.  What helped you to remember that conversation?

A.  What helped me remember that conversation is?  I remember conversation with, I believe, I'm not sure like if I can talk about it, but --

MS. MCNALLY:  Mr. Agapchev can you stop sharing --

MR. SPENCER:  I'm sorry.  I didn't realize it was still up.

BY MS. MCNALLY:

Q.  Let me ask it in a different way.

When I was originally asking you questions about your communications with counsel, you did not remember that conversation, correct?

A.  At first, I didn't remember.

Q.  And it was when Mr. Spencer asked you a question about the conversation that you then remembered, right.

A.  No.  So first when you asked me about when we met, of course, I remembered two last meetings that we had recently.

And then when you asked about Mr. Leone, then I realized, yeah, there was a phone call with

Page 115

Mr. Leone.

And then when we spoke about total meetings, then I started like -- when we first time met.  So it just helped me to memorize because a lot of things going on in this life.

Q.  Did you have a conversation on a break in this deposition today with Mr. Spencer or Mr. Sams regarding the conversation that you had at the police tow yard?

A.  No.  At all.

MR. SPENCER:  I'm just going to state for the record that he's answered it.  But I don't know if that was an appropriate question.  That's potentially we're not waiving any privilege.

MS. MCNALLY:  You broke up.  But I believe you said that I was asking a question that was potentially privileged and you weren't waiving any privilege.

Conversations during deposition are entirely inappropriate and are not privileged.  And are properly the subject of examination.  But that said, it is an area where I choose not to tread.

Because I trust counsel and Mr. Agapchev has stated that it was not a conversation during a break in this deposition that caused him to refresh his

Page 116

recollection on that.  So I think it's a nonissue.

MS. MCNALLY:  So with that said, thank you for your time.  And I have no further questions.

THE WITNESS:  Thank you.

MR. SPENCER:  Off the record?

VIDEOGRAPHER:  Before we go off the record Mr. Spencer would you like a copy of the transcript?

MR. SPENCER:  Yes.  We would.

VIDEOGRAPHER:  Would you like a copy of the video?

MR. SPENCER:  Not at the moment.  We might order it later.

VIDEOGRAPHER:  You can order it at any time.

We are off the record at 1:41 p.m.  And this concludes today's testimony given by Ivan Agapchev.

Total number of media used was four.  And will be retained by Veritext Legal Solutions.

Page 117

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on _____, 2025, at

_____, _____.


_____

SIGNATURE OF WITNESS

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 118

STATE OF CALIFORNIA        ) ss.
COUNTY OF LOS ANGELES      )

          I, Lori M. Barkley, CSR No. 6426, do hereby
certify:
          That the foregoing deposition proceedings
were taken before me at the time and place therein
set forth and were recorded stenographically by me,
and were thereafter transcribed under my direction
and supervision, and that the foregoing pages contain
a full, true and accurate record of all proceedings
and testimony to the best of my skill and ability.
          I further certify that I am neither counsel
for any party to said action, nor am I related to any
party to said action, nor am I in any way interested
in the outcome thereof.
          IN WITNESS WHEREOF, I have subscribed my
name this 11th day of July, 2025.

          _____
          LORI M. BARKLEY, CSR No. 6426

31 (Page 118)