**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK LEONE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ASP ISOTOPES INC., PAUL E. MANN, and HEATHER KIESSLING, <br><br> Defendants. | Case No. 1:24-cv-09253-CM |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 2

ARGUMENT ..................................................................................................................... 3

    I.     PLAINTIFFS ALLEGE FALSE AND MISLEADING STATEMENTS ............. 3

          A.     September 26, 2024 Investor Presentation And Investor Call ................... 4

          B.     October 17, 2024 QE Facility Press Release ............................................. 7

          C.     October 30, 2024 TerraPower Agreement Press Release .......................... 7

          D.     October 30, 2024 Investor Call ................................................................. 8

          E.     November 19, 2024 POWER Magazine Article ......................................... 9

          F.     November 22, 2024 Revised Investor Presentation ................................. 10

    II.     DEFENDANTS FAIL TO DISPROVE MATERIAL FALSITY ........................ 10

          A.     Defendants Cannot Establish Truth On The Market ............................... 10

          B.     Defendants' Opinion Statements Are Actionable .................................... 14

          C.     The Challenged Statements Are Not Puffery ........................................... 16

    III.    PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER ................. 18

          A.     Defendants Misled Investors With Conscious Recklessness ................... 18

          B.     Motive Adds To The Already Strong Inference Of Scienter .................... 20

          C.     Defendants Fail To Offer A More Plausible Competing Inference .......... 21

    IV.    PLAINTIFFS ALLEGE LOSS CAUSATION ...................................................... 22

          A.     The November 26, 2024 Fuzzy Panda Research Report .......................... 22

          B.     Defendant Mann's November 27, 2024 Canaccord Genuity
               Interview ................................................................................................. 23

    V.     PLAINTIFFS ALLEGE CONTROL PERSON LIABILITY .............................. 25

    VI.    IF NECESSARY, THE COURT SHOULD ALLOW A MOTION FOR
          LEAVE TO AMEND ......................................................................................... 25

CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

**CASES**

*Batwin v. Occam Networks, Inc.*,
   2008 WL 2676364 (C.D. Cal. July 1, 2008) ............................................................................... 19

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014) ..................................................................................................... 23

*City of Providence v. Aeropostale, Inc.*,
   2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ........................................................................ 18

*Cruz v. Zucker*,
   116 F. Supp. 3d 334 (S.D.N.Y. 2015) ................................................................................. 7, 15

*Diabat v. Credit Suisse Grp. AG*,
   2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024) ....................................................................... 24

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ................................................................................................................. 22

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................................................. 8, 23

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000) ..................................................................................................... 13

*Goldman v. Belden*,
   754 F.2d 1059 (2d Cir. 1985) ................................................................................................... 19

*Hunt v. Enzo Biochem, Inc.*,
   530 F. Supp. 2d 580 (S.D.N.Y. 2008) ..................................................................................... 25

*In re Allergan PLC Sec. Litig.*,
   2019 WL 4686445 (S.D.N.Y. Sept. 20, 2019) .................................................................. 22, 23

*In re Alstom SA*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ............................................................................... 14, 18

*In re Arqit Quantum Inc. Sec. Litig.*,
   774 F. Supp. 3d 505 (E.D.N.Y. 2025) ....................................................................................... 8

*In re Avon Sec. Litig.*,
   2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ................................................................... 15, 20

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ................................................. 18, 19, 21

*In re Intercept Pharms., Inc. Sec. Litig.*,
   2015 WL 915271 (S.D.N.Y. Mar. 4, 2015) ................................................. 21

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017) ................................................. 4

*In re Lottery.com, Inc. Sec. Litig.*,
   765 F. Supp. 3d 303 (S.D.N.Y. 2025) ................................................. 20

*In re MBIA, Inc., Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010) ................................................. 6, 12, 14, 18

*In re Mullen Auto. Sec. Litig.*,
   2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) ................................................. 5

*In re Pareteum Sec. Litig.*,
   2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ................................................. 19

*In re Plug Power, Inc. Sec. Litig.*,
   2022 WL 4631892 (S.D.N.Y. Sept. 29, 2022) ................................................. 20

*In re Signet Jewelers Ltd. Sec. Litig.*,
   389 F. Supp. 3d 221 (S.D.N.Y. 2019) ................................................. 16

*In re Vaxart, Inc. Secs. Litig.*,
   576 F. Supp. 3d 663 (N.D. Cal. Dec. 22, 2021) ................................................. 8

*In re Vivendi Universal, S.A.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003) ................................................. 14

*Iwa Forest Indus. Pension Plan v. Textron Inc.*,
   14 F.4th 141 (2d Cir. 2021) ................................................. 5

*Kusnier v. Virgin Galactic Holdings, Inc.*,
   639 F. Supp. 3d 350 (E.D.N.Y. 2022) ................................................. 17

*Lapin v. Goldman Sachs Grp., Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006) ................................................. 12

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ................................................. 24

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)................................................................................................ 25

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)................................................................................................. 4

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ........................................................................................ 19

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)........................................................................................................... 15

*Setzer v. Omega Healthcare Invs., Inc.*,
  968 F.3d 204 (2d Cir. 2020)............................................................................................... 18

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
  348 F. Supp. 3d 313 (S.D.N.Y. 2018)................................................................................ 20

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020) ................................................................... 20

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 4208442 (S.D.N.Y. July 21, 2020) .................................................................... 20

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)................................................................................................. 18, 20, 21

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991).......................................................................................................... 14

## RULES

Fed. R. Civ. P. 15(a)(2)............................................................................................................ 25

Lead plaintiff Mark Leone ("Lead Plaintiff") and plaintiff Ivan Agapchev (together, "Plaintiffs") respectfully submit this memorandum in opposition to the motion to dismiss and memorandum of law ("MTD"), ECF No. 41, filed by defendants ASP Isotopes, Inc. ("ASPI" or the "Company"), its CEO Paul E. Mann (together, "Defendants"), and by Heather Kiessling.[1]

**INTRODUCTION**

Defendants severely misled investors concerning the state of ASPI's so-called "Quantum Enrichment" ("QE") technology for the enrichment of uranium for use in nuclear power generators. Defendants told investors, *inter alia*, that "[o]ur team have used lasers to enrich . . . Uranium," that ASPI's technology for uranium enrichment was already in the "R&D Stage," that it had "Proven Proprietary Technology" allowing it to meet growing demand in the nuclear energy industry, and that the technology was "fully prepared" for commercial deployment. None of this was true. Defendants even went so far as to publish hard data comparing uranium enrichment using QE to other enrichment methods. However, as Defendants would later admit, much to the dismay of the Company's investors and to the surprise of an experienced financial analyst covering the Company, *ASPI had never tested the QE technology on uranium*.

Defendants primarily attempt to rely on a handful of opaque "disclosures" in ASPI's SEC filings as a get-out-of-jail-free card, though none of these disclosures revealed ASPI's failure to test QE on uranium. Even if ASPI had vaguely disclosed that fact (again, it was not disclosed *at all*), this was superseded by Defendants' later statements, which succeeded in convincing investor and analyst alike, that *by the Class Period*, Defendants *had* successfully tested QE on uranium.

---

[1] Kiessling is not named as a defendant in the operative Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint" or "¶_"), ECF No. 28, so her motion is moot. Capitalized terms used but not defined herein have the same meanings as in the Complaint. Unless otherwise noted, all internal quotes and citations are omitted, and all emphasis is added.

Defendants' misleading statements caused ASPI's stock price to skyrocket. Capitalizing on this artificial inflation, ASPI, which generated multimillion-dollar losses and depended almost entirely on funding from investors to survive, promptly sold $18.6 million of stock to the public. However, toward the end of the Class Period, Fuzzy Panda Research published a report including interviews with nuclear energy industry executives and consultations with an applied physicist, which revealed significant problems facing ASPI's claimed uranium enrichment technology, and caused a 23.5% same-day decline in ASPI's stock price. The following day, Defendant Mann participated in an interview with Canaccord Genuity stock analyst George Gianarikas, in an attempt to rebut the claims made in the report. But in the course of the interview Mann revealed that ASPI had never enriched uranium or tested its technology on uranium, not even on a laboratory scale. This caused ASPI's share price to fall an additional 14.2%.

Plaintiffs and the class suffered large losses due to Defendants' fraud. The Complaint plausibly alleges falsity and loss causation, and raises a strong inference of Defendants' scienter. Defendants' motion should be denied, and this case should proceed to discovery on the merits.

## STATEMENT OF FACTS

***ASPI Goes Public and Struggles Financially***. ASPI was formed to acquire assets and IP related to Aerodynamic Separation Process ("ASP") technology from Klydon, a small, financially distressed company in South Africa. ¶¶23-30. ASPI completed its IPO in 2022, selling 1.25 million shares of stock for $4.00 each. ¶31. ASPI generated little or no revenue and large, growing losses. ¶¶32-34. As such, ASPI's 2023 financial statements included a going concern warning. ¶34. ASPI repeatedly sold stock and other securities to fund its operations, in the aggregate totaling tens of millions of dollars. ¶¶35, 37. Just prior to the Class Period, ASPI's stock traded for only $2.83 per share. ¶55. To attract investors and bolster its share price, ASPI paid for stock promotion services.

2

¶36. Defendants highlighted the primary importance to ASPI's business of its QE technology, and uranium enrichment for the nuclear energy industry. ¶¶39-46.

***Defendants Make Misleading Statements Throughout the Class Period.*** Defendants repeatedly made false and misleading statements (*see infra* Parts I-II) touting ASPI's QE technology for uranium enrichment, and leading investors to believe that ASPI had successfully tested QE on uranium. ¶¶58-68 (Sept. 26, 2024 slide deck and conference call); ¶¶69-73 (Oct. 17, 2024 press release); ¶¶74-80 (Oct. 30, 2024 press release); ¶¶81-83 (Oct. 30, 2024 conference call); ¶¶84-88 (Nov. 19, 2024 interview); ¶¶89-90 (Nov. 22, 2024 revised slide deck).

***ASPI Sells Stock At An Inflated Price.*** Only *one day* after ASPI's October 30 announcements, which caused a 19.8% surge in its stock price, the Company published a prospectus supplement for the sale of additional stock. ¶¶55-56. By November 4, 2024, ASPI had sold 2,754,250 shares at $6.75 per share, raising gross proceeds of $18.6 million. *Id*.

***The Truth Emerges.*** On November 26, 2024, Fuzzy Panda Research published a report discussing interviews with nuclear energy industry executives and an applied physicist, which revealed significant problems with using QE to enrich uranium. ¶¶91-102. ASPI published a placeholder response, casting vague aspersions on the report while failing to address its particular claims. ¶101. That day ASPI's stock price plummeted 23.5%. ¶102. To rebut the report, Mann gave an interview to Canaccord analyst George Gianarikas. ¶103. In the interview Mann revealed that ASPI had never tested its technology on uranium, not even on a laboratory scale. ¶¶104-11. On this news, ASPI's share price fell another 14.2% in a single day. ¶¶5, 112.

## ARGUMENT

## I.    PLAINTIFFS ALLEGE FALSE AND MISLEADING STATEMENTS

Defendants made multiple false and misleading statements during the Class Period concerning ASPI's use of QE to enrich uranium. ¶¶57-90. Defendants parse certain statements to

argue their literal truth, but "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).[2]

Falsity and materiality are generally questions for the jury unless "reasonable minds could not differ." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609-10 (S.D.N.Y. 2017). Here, reasonable minds were misled by Defendants' statements, and viewed ASPI's failure to test QE on uranium as critically important. *See* ¶52 & n.7 (Canaccord analyst believed ASPI had used lasers to enrich uranium at "lab scale," which had "enormous promise" if commercialized); Spencer Decl. (filed herewith) Ex. 1 (Leone deposition) at 75:19-76:11 ("all of a sudden they tell you they are not enriching uranium, when that's all they talked about months previous, you know, your heart drops, because you just loss, in my case, about $200,000"); *id.* at 100:1-101:5 (same); Spencer Decl. Ex. 2 (Agapchev deposition) at 73:19-74:20 ("all these statements from the company made impression this company is already working on . . . uranium enrichment and that is why actually I was interested in this company . . . However, that was not true.").

A.      **September 26, 2024 Investor Presentation And Investor Call**

***Comparison of uranium QE data.*** Defendants compared various uranium enrichment methods, presenting data for each method's energy required per separative work unit ("SWU"), and "Selectivity," *i.e.* the factor by which uranium is enriched after a single stage. ¶¶61-62. ASPI even explicitly labelled the energy per SWU for a *different* enrichment method as an "[e]stimate," while making no such disclosure for QE, implying that the numbers for QE were *not* estimates. *Id.* Mann stated in his accompanying remarks that "selectivity is greater than 50," in stark contrast to his end-of-Class-Period admission that "until we've actually tried the process out with uranium

---

[2] Defendants' other arguments, regarding truth-on-the-market, opinion statements, and puffery, are addressed in Part II, *infra*, along with relevant challenged statements.

and worked out an enrichment factor . . . difficult for us to know exact numbers." ¶104. Defendants had no basis to make claims about the selectivity or energy per SWU for QE of uranium, because they had never tried it, and so had *no data* to support the claims. ¶¶51-52; *cf. In re Mullen Auto. Sec. Litig.*, 2023 WL 8125447, at *8 (C.D. Cal. Sept. 28, 2023) (claims about electric car battery misleading where extrapolated from single test of prototype cell).

Defendants claim the table in ¶61 was not misleading because it did not include the word "uranium." This is belied by the table's references to "U Metal 3000K," *i.e.*, uranium's chemical symbol, "U," and the temperature of 3,000 degrees Kelvin at which solid uranium vaporizes into gas, as repeatedly discussed by Mann. ¶¶61 n.8, 109-110. The table also refers to "reactor grade," *i.e.*, the level of uranium enrichment needed to create fuel for a nuclear reactor. Moreover, in context the table clearly refers to the enrichment of uranium, as that portion of the presentation was dedicated to the use of QE to produce "HALEU" for the "Nuclear Energy" industry. ECF No. 25-4 at 23-33; *see Iwa Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021) (statements must be evaluated "by context and manner of presentation"). Defendants claim these statements only related to lithium enrichment, but that is not what the statements say. On the contrary, ASPI stated that lithium had "the only isotopes where results have been *published*," implying that ASPI had *confidential* uranium enrichment results, ¶63, and Mann distinguished the QE selectivity of "greater than 50" for uranium from lithium's "enrichment factor of 112," ¶61.

**Real word QE experience with uranium.** On a slide tilted "*Quantum Enrichment: Real World Experience*," ASPI claimed "*[o]ur team have used lasers to enrich*" metals including "*Uranium*." ¶63. Ignoring the statements' clear context, Defendants argue literal truth, claiming they did not state that *ASPI* had ever enriched uranium or used QE to do so. Viewing the slide as a whole, given the "context and manner of presentation," *Textron*, 14 F.4th at 145, a reasonable

investor would understand it to mean that ASPI had real world experience using lasers to enrich uranium in the QE process. This is especially true in the context of Defendants' repeated statements that QE was "proprietary" to ASPI, including in the same slide deck. *E.g.*, ¶¶59, 70. If ASPI's proprietary technology had been used to enrich uranium, only ASPI could have done it. That the "experience" admittedly occurred *decades* ago, ¶105, prior to the existence of ASPI and QE, and so did not even involve the same (untested) technology, is a highly misleading omission.

*Uranium QE in R&D Stage.* Defendants represented that use of QE to enrich U-235 was already in the "R&D Stage," ¶65, which a reasonable investor would understand to mean that QE had *at a minimum* been tested on U-235 on a laboratory scale, not that ASPI was merely conducting preliminary *theoretical* work. Defendants resist this clear meaning based on *ipse dixit*, but their own statements defeat their argument. The table in ¶65 shows that ASPI's QE work on Lithium-6 was in the same "R&D Stage" as U-235, and Defendants simultaneously touted test results of "Lithium 6" enrichment using QE, showing experimental work had begun. ¶61; ECF No. 25-4 at 29. The statement that QE for Lithium-6 and Uranium-235 were in the same "R&D Stage" must be understood in the context of the slide deck, which provided data for QE of uranium and touted "Real World Experience" using lasers to enrich uranium. *Id.* at 28-29. Defendants fail to establish *as a matter of law* that reasonable investors would understand "R&D Stage" to mean ASPI had conducted only theoretical work for QE of uranium. *See In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 581 (S.D.N.Y. 2010) ("the Court will not decide on a motion to dismiss the fact-intensive inquiry of what meaning the market ascribed to the term").

*Proven technology for nuclear energy.* Defendants touted ASPI's "Proven Proprietary Technology" supposedly "allowing it to meet the growing demand in the . . . Nuclear Energy industr[y]." ¶67. This "growing demand" in the nuclear industry referred to demand for enriched

uranium. *See* ECF No. 25-4 at 26 (charting "Annual US Demand Growth for HALEU"); *id.* at 30 ("demand for front-end nuclear fuel ($U_3O_8$, $UF_6$, EUP [enriched uranium product]) continues to grow"). Of course, QE was far from "[p]roven" for uranium enrichment—it had never even been tested. Defendants' motion fails to engage with Plaintiffs' clearly articulated falsity theory for this statement (*see* ¶68), instead challenging out of context the "growing demand" excerpt as puffery and arguing the "leverage 20 years of R&D history" snippet is literally true. In context and viewed as a whole, the ¶67 statements are highly misleading and material. Because Defendants fail to challenge the statement about "Proven Proprietary Technology" for the nuclear energy industry, they waive any such argument on this motion. *See Cruz v. Zucker*, 116 F. Supp. 3d 334, 349 n.10 (S.D.N.Y. 2015) (arguments not raised in opening brief are waived).

### B.       October 17, 2024 QE Facility Press Release

These statements and Defendants' corresponding arguments are discussed *infra* in Part II.

### C.       October 30, 2024 TerraPower Agreement Press Release

***HALEU facility and supply agreement.*** ASPI announced that it had "entered into a term sheet with TerraPower . . . related to the construction of a uranium enrichment facility capable of producing [HALEU]", ¶75, and anticipated "entering into a long-term supply agreement for the HALEU expected to be produced at this facility." ¶76. ASPI's stock price surged 19.8% on the day of this announcement. ¶79.These statements materially misled investors because ASPI lacked any basis *whatsoever* to support the premise that it could construct a functioning, commercially viable HALEU facility. *See* ¶49 (ASPI's former Assistant to the Manager of R&D: "[i]f a project is not even, on a laboratory scale, proved, then it's a long time before it can be used in a plant").

Defendants argue it was true literally that ASPI had entered into the term sheet and anticipated entering into a supply agreement. But again, "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather

than mislead." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010). In context, Defendants created the misleading impression that ASPI's uranium enrichment technology was ready for commercialization, when it had never even been tested. *See In re Vaxart, Inc. Secs. Litig.*, 576 F. Supp. 3d 663, 670-71 (N.D. Cal. Dec. 22, 2021) (press release concerning memorandum of understanding with vaccine manufacturer "created the materially misleading impression that Vaxart stood at the precipice of pioneering a successful coronavirus vaccine").

### D.        October 30, 2024 Investor Call

***ASPI enriches uranium in batches.*** Defendant Mann was asked "[i]s criticality an issue with your QE process enriching U-235?" ¶82. Criticality refers to the point at which a nuclear chain reaction becomes self-sustaining, which can give rise to a dangerous release of energy and/or radiation. ¶82 n.10. Mann responded in relevant part, "one of the advantages of our QE process is that *we do it in batches*, so rather than having a continuous process of hundreds of kilograms of product inside the plant at any time, *you only have a small amount of product being enriched at a time*," eliminating the risk of reaching criticality. ¶82. Mann's present-tense statements about ASPI's use of QE in the context of uranium enrichment strengthened the misleading impression, already created by Defendants' prior statements, that ASPI was *presently* using QE to enrich uranium. *See In re Arqit Quantum Inc. Sec. Litig.*, 774 F. Supp. 3d 505, 536 & 544 (E.D.N.Y. 2025) (present-tense statements about capabilities of undeveloped technology were misleading).

Defendants argue Mann's statement about "do[ing] it in batches" was only about elements other than uranium, and so was literally true. But the statement was a direct response to a question about "your QE process enriching *U-235*," Mann's response begins by discussing "*U-235*," and the discussion's central topic of "criticality" *only* applies to enrichment of fissile material, *i.e.* uranium. ¶82. Defendants' argument that Mann's last sentence was an opinion is a red herring. The relevant part of his statement was a misleading assertion of presently existing fact.

### E.       November 19, 2024 POWER Magazine Article

***Current technology for uranium.*** ASPI executive Viktor Petkov gave an interview to POWER Magazine for an article about the nuclear energy industry, titled "Mobility, Flexibility, Scalability: SMRs Forging Nuclear's Future." ¶84. The interviewer asked "[w]hat *current technology* is your company working on with regard to supporting the market for SMRs?". Petkov replied in part that ASPI "is focusing on producing critical nuclear fuels necessary for the operation of small modular reactors. These include HALEU, . . ." ¶85. However, ASPI had no "current technology" that had even been shown capable of enriching uranium, let alone producing HALEU for use in an SMR. Defendants argue the statement was literally true because, despite never having worked with uranium, ASPI was still "focusing" on it. Again, this ignores the key context of the question about "current technology" that ASPI was presently "working on." ¶84.

***Fully prepared for commercial deployment.*** In response to the question "[d]o you have a timeline for *commercial operation* of your technology?", Petkov stated that "*[o]ur technology is fully prepared for deployment*, pending the necessary approvals" and that "ASPI is actively engaged in discussions with multiple governments to secure authorization for the construction of a uranium enrichment plant, which will produce HALEU." ¶86. But, because ASPI's technology had never been tested on uranium, it was nowhere near "fully prepared for deployment" in "commercial operation" to produce HALEU. Defendants argue that "[o]ur technology" merely referred to use of QE on elements other than uranium, again ignoring the context of the statement, in an interview about nuclear energy, with Petkov's response expressly referring to uranium enrichment. Defendants argue the statement that ASPI was working to secure approval *to build a HALEU plant* made clear that ASPI had never enriched uranium. That is false. Petkov stated that ASPI's "technology is fully prepared for deployment, pending the necessary approvals" and that ASPI was working to "secure authorization *for the construction*," meaning that the technology was

ready to use, and all that was required for it to be *deployed* was approval to build the plant. ¶86.

F.       **November 22, 2024 Revised Investor Presentation**

Defendants' misstatements were identical to the September 26, 2024 version of the investor presentation, and so were materially misleading for the same reasons. ¶89; *see supra* Part I.A.

## II.      DEFENDANTS FAIL TO DISPROVE MATERIAL FALSITY

A.       **Defendants Cannot Establish Truth On The Market**

***ASPI never disclosed its failure to test QE on uranium.*** While Defendants now argue that ASPI transparently disclosed it had never used or tested QE on uranium, that is merely their made-for-litigation paraphrase of ASPI's actual disclosures, none of which say what Defendants claim.

Defendants rely on a disclosure that they state was repeated in ASPI's Form 10-Qs from the first quarter of 2023 through the third quarter of 2024, which says in relevant part:

> If we receive permits and licenses to enrich U-235 (which in itself is highly uncertain), we do not expect U-235 to be commercially available for at least several years, if ever. As a result, we may need substantial additional financing to support our continuing operations and further the development of and commercialization of our future isotopes.

ECF No. 43-2 at 29. Nothing in this statement reveals that ASPI has never tested QE on uranium. The statement speaks only to the "commercial[] availab[ility]" of ASPI's U-235, and does not address testing ASPI has or has not done on a laboratory scale. In fact, the statement describes "further[ing]" development and commercialization, implying that process had already begun. Nor do the references to "permits and licenses" disclose: (i) whether such permits and licenses are even necessary for laboratory scale experiments as opposed to commercial production; or (ii) whether, if required, ASPI had obtained such approvals for such pre-commercial experiments.

Defendants argue that the Fuzzy Panda Research report's citation to this 10-Q excerpt proves that ASPI disclosed its failure to test QE on uranium, but the report does not support their argument. Rather, the report's implication that ASPI had not tested QE on uranium comes from

"[a] former Klydon executive," *i.e.*, a highly placed employee of ASPI's predecessor who therefore had inside knowledge of Klydon's and its successor's lack of testing on uranium. ECF No. 25-5 at 18. Indeed, given the small size of Klydon and ASPI, and that ASPI simply took over Klydon's personnel, ¶¶23-30 & 38, it is highly likely that the Klydon executive's statement was based on information from his former colleagues who remained at ASPI. Nowhere does the report indicate that his statement was based on the 10-Q excerpt. Rather, the Klydon executive's statement provides key factual context (previously unknown to the public) informing the report's discussion of the 10-Q excerpt. Further showing that this excerpt did not reveal ASPI's failure to test QE on uranium, the analyst who interviewed Mann about the report (which contains the 10-Q excerpt) *after* the report was published *still* believed that ASPI had enriched uranium. ¶¶50-53. The Fuzzy Panda Research report does not change the fact of the 10-Q's vague non-disclosure.

Defendants also rely on a handful of statements in ASPI's Form 10-K for 2023. ECF No. 43-1 at 28. Once again, *none* of these disclosures state that ASPI has not tested QE on uranium. For example, that regulatory approval was required for "production" of U-235 says nothing about whether ASPI had previously *tested* QE on uranium at a lab scale. *Id.* at 25. In stark contrast, ASPI *did* state that "[ASP] technology *has not yet been used to enrich . . . Uranium.*" *Id.* at 9. A reasonable investor would understand the clear disclosure regarding ASP technology, coupled with the lack of similar disclosure regarding QE, to mean that QE *had* been used to enrich uranium.

Defendants' cited disclosures themselves imply that ASPI has performed *confidential, laboratory-scale* testing of QE on uranium. That QE "has never been used to produce isotopes at a *commercial scale* and the *research that has been conducted* using this technique has never been published," implies that QE *has* been used at a smaller scale, and that research *has* been conducted using QE. *Id.* at 28. Similarly, in the context of the foregoing statements, that "there is no *proof*

11

that this technology has ever been used to enrich uranium" would lead a reasonable investor to understand that ASPI *had* used QE to enrich uranium, but that fact simply had not been publicly *proven* because such valuable research was proprietary, confidential, and trade secret. *Id.* That ASPI planned to "begin research and development for the enrichment of uranium to *demonstrate our capability* to produce HALEU," implies ASPI already had a capability to produce HALEU, and just needed to conduct additional R&D to *demonstrate* that fact to the public. *Id.* at 8. And that regulatory approval was needed to "proceed with" ASPI's nuclear research implies such research had already begun. *Id.* at 8, 28. Defendants' disclosures do not say what they now claim.

      ***ASPI's disclosures were superseded by Class Period statements.*** Even if ASPI had vaguely disclosed its failure to test QE on uranium (to be clear, this was *not* disclosed), for reasonable investors this was superseded by Defendants' Class Period statements creating the misleading impression that, *by the time of the Class Period*, ASPI had tested QE on uranium (*see supra* Part I). *Cf. MBIA*, 700 F. Supp. 2d at 582 (even if defendant's disclosures "suggested" the truth, "such information was counteracted by [its] *contemporaneous* statements"); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (similar). The 2023 Form 10-K was published on April 10, 2024. By the start of the Class Period the 10-K was over five months old. ASPI emphasized its "advanced" and "innovative" technology and ongoing R&D, leading investors to believe the Company was actively advancing its technology. ECF No. 25-4 at 3, 32. Therefore, reasonable investors would not assume that the state of ASPI's technology remained the same from over five months ago, when faced with newer disclosures to the contrary.

      For example, while the 10-K stated "[w]e plan to begin research and development . . . to demonstrate our capability to produce HALEU," ECF No. 43-1 at 8, during the Class Period ASPI told investors that use of QE on U-235 was *by then already* in the "R&D Stage," ¶65. And while

12

the 10-K stated there was no "proof" that QE had been used to enrich uranium, ECF No. 43-1 at 28, during the Class Period ASPI told investors on a slide tilted "*Quantum Enrichment: Real World Experience,*" that "*[o]ur team have used lasers to enrich . . . Uranium,*" ¶63. Certainly, reasonable investors could resolve any potential tension in Defendants' statements by believing their more recent and salient Class Period assertions.

Defendants' cited 10-Q disclosure had appeared in ASPI's quarterly reports since the one published May 19, 2023, which *nowhere* even mentions QE. *See* MTD 7 n.7 (link to 10-Q). ASPI first publicly discussed QE on September 28, 2023. *See* ¶44. That ASPI repeated verbatim the same disclosure, both before *and* after first discussing QE, shows that it says nothing about the testing they had or had not done with QE. For that information, investors would naturally look to Defendants' detailed Class Period statements, not vague, recycled boilerplate.

**Defendants fail to establish truth on the market.** Defendants' argument is in essence an attempt to assert a truth-on-the-market defense, which is directly refuted here by the fact that investors and even a professional stock analyst understood that ASPI *had* tested QE on uranium. Under this defense "[a] defendant may rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000). But the corrective information "must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information." *Id.* The defense is "intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Id.*; *see also id.* at 167-68 (rejecting argument that SEC filings established truth on the market).

As shown *supra*, Defendants' cited disclosures were as clear as mud. They did not convey the truth at all, let alone with a degree of "intensity and credibility" sufficient to neutralize

13

Defendants' misleading statements. Indeed, the Canaccord analyst who followed ASPI (who specialized in the renewable energy industry, with 24 years of finance experience) believed that ASPI had "enrich[ed] uranium . . . at a lab scale" and was "using some laser beams . . . to enrich uranium." ¶¶50 n.4, 52 & n.7. His surprise at Mann's belated admissions in the November 27 interview was plainly evident. ¶52 ("So what would TerraPower base their optimism on then?").

As the Supreme Court has held, "not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991). Here, *even the financial analyst was misled*. That such a sophisticated analyst covering ASPI was deceived by Defendants' statements is powerful evidence of material falsity, and defeats Defendants' truth-on-the-market defense. *See MBIA*, 700 F. Supp. 2d at 583 (rejecting truth on the market based in part on analyst reactions); *In re Alstom SA*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (rejecting argument that SEC disclosures revealed the truth where "financial professionals were taken by surprise" by later revelations).

Gianarikas was not alone in being fooled by Defendants. Plaintiffs were also taken in. Spencer Decl. Ex 1 at 75:19-76:11; Spencer Decl. Ex. 2 at 73:19-74:20. ASPI's stock price movements following the Fuzzy Panda Research report and Mann's admissions are further evidence that investors were reacting to new, previously unknown information. ¶102 (23.5% price decline); ¶112 (14.2% price decline); *MBIA*, 700 F. Supp. 2d at 582 (rejecting truth on the market where stock price dropped "almost immediately after" a corrective disclosure); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) (similar). Defendants' disclosures did nothing to counteract the falsity or materiality of their repeated misleading statements.

## B.    Defendants' Opinion Statements Are Actionable

Opinion statements are actionable if "(1) the speaker did not hold the belief she professed,

(2) the supporting facts she supplied were untrue, or (3) the stated opinion, though sincerely held and otherwise true as a matter of fact, omitted information whose omission made the stated opinion misleading to a reasonable investor." *In re Avon Sec. Litig.*, 2019 WL 6115349, at \*17 (S.D.N.Y. Nov. 18, 2019) (cleaned up); *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015) (a reasonable investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession"). Defendants entirely omit the third prong, MTD 11, and waive any argument as to this prong by failing to address it, *see Zucker*, 116 F. Supp. 3d at 349 n.10. While Defendants' opinion argument consists solely of pointing to statements containing "believe" or "think," those are not "magic words" insulating them from liability. *Omnicare*, 575 U.S. at 193.

*Ideal single stage HALEU solution.* Defendants stated "[w]e believe that our proprietary Single Stage Quantum Enrichment Technology provides an ideal solution" to supply HALEU and "we think our quantum enrichment technology is perfect for enriching uranium." ¶59. Reasonable investors would understand Defendants to have *at least* tested QE on uranium, especially in light of the factual reference to "proprietary Single Stage [QE] Technology." Only by testing QE on uranium could Defendants know that a *single stage* of QE (opposed to multiple stages, as with a cascade of centrifuges, *see* ¶20) would suffice to enrich uranium to the required levels.

*Enriching nuclear waste.* Defendants stated "[w]e believe that our technology can process this [depleted uranium tails] waste into HALEU." ¶65. Reasonable investors would understand Defendants to have a factual basis for this belief, even more so because depleted tails have a lower proportion of U-235 and are therefore more difficult to enrich than normal uranium enrichment feedstock. The false impression that Defendants' belief had a factual basis is reinforced in context with a quantifiable claim on the same slide, "[i]f we can secure access to this nuclear waste at an

15

attractive cost, we should be able to produce HALEU at highly competitive prices." *Id.*

*HALEU at a green discount.* Defendants stated that "ASPI believe its [QE] process will be able to produce HALEU . . . at an attractive price, allowing new nuclear energy to become available at a 'green discount' to carbon-intensive electricity production processes." ¶71. Reasonable investors would understand, particularly due to the factual claim that nuclear energy using HALEU produced with QE would be *cheaper* than fossil fuel energy, that ASPI had *at least* tested QE on uranium, so as to have data to support cost estimates for commercial production.

*Time and cost to build HALEU facility.* ASPI stated that it "believes that its enrichment technologies can be deployed in a new HALEU facility for considerably lower capital costs, and in much less time, compared to the construction of an enrichment facility using a traditional centrifuge process of HALEU production." ¶77. Reasonable investors would understand the comparison to existing facilities with known construction costs and timeframes, to mean that ASPI had data from which it could estimate the time and cost required to outfit a facility with QE equipment capable of enriching uranium, *i.e.* that ASPI had tested QE on uranium. As with Defendants' other opinion statements, that was not true, and investors were misled.

### C.    The Challenged Statements Are Not Puffery

Defendants challenge de-contextualized excerpts of various statements as puffery, but "determining whether certain statements constitute puffery entails looking at context, including the specificity of the statements and whether the statements are clearly designed to distinguish the company to the investing public in some meaningful way." *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 229 (S.D.N.Y. 2019) (cleaned up). The context of Defendants' statements, touting the use of QE to enrich uranium, shows that such statements were not immaterial puffery. ASPI led investors to view uranium enrichment with QE as key to the Company's future. Such statements were clearly meant to distinguish ASPI from other uranium enrichment providers, who

16

did not have access to ASPI's "proprietary" QE technology. Defendants' cases did not involve similar phrasing or context to the statements they now dispute.

*QE is perfect for uranium enrichment.* Mann stated "we think our quantum enrichment technology is perfect for enriching uranium." ¶59. Mann was presenting a slide deck with statements touting ASPI's "Real Word Experience" and "Proven" technology for uranium enrichment, and even provided technical data favorably comparing QE to other uranium enrichment methods. ¶¶61, 63, 65, 67. In this context, reasonable investors would rely on Mann's statement. *See Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 374 (E.D.N.Y. 2022) (descriptions of flight as "successful," "perfect" and "flawless" were not puffery in context).

*QE's capital efficiency.* In a press release "announc[ing] the successful enrichment of Ytterbium-176 using [QE]," ASPI stated its belief that its "proprietary technology is not only more efficient and scalable than other enrichment technologies, but also has considerable advantages with respect to capital efficiency and industrial pollution." ¶70. But comparing QE to other technologies on concrete metrics such as "capital efficiency" is not puffery. Regardless, the argument overlooks the most important part of the statement, that ASPI believes "it is likely that other important isotopes," *i.e.* enriched uranium, "can be produced using [QE]," which is materially misleading for the reasons discussed *supra* in Part II.B regarding opinion statements.

*ASPI's advanced enrichment technologies.* In its press release announcing the term sheet with TerraPower for construction of a HALEU facility, ASPI stated that its scientists "have developed some of the world's most advanced isotope enrichment technologies" and "[t]his term sheet is further validation of our belief that ASP Isotopes can offer scalable and capital efficient technology solutions to the supply challenges which exist in global isotope markets." ¶78. Touting ASPI's enrichment technology as "advanced," "scalable," and "efficient," was not mere puffery

17

in this context. These statements would lead reasonable investors to believe that ASPI had uranium enrichment test data to back up the premise that it could construct a commercially viable HALEU facility, an objective fact capable of being disproved. Defendants' puffery arguments fail.

## III.    PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER

Plaintiffs sufficiently plead scienter "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020). Scienter allegations are considered holistically, and "need not be . . . of the 'smoking-gun' genre." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324-26 (2007). As ASPI's CEO acting within the scope of his position, Mann's scienter is imputed to the Company. *See In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at \*26 (S.D.N.Y. Dec. 2, 2013).

### A.    Defendants Misled Investors With Conscious Recklessness

"[P]laintiffs can plead conscious misbehavior or recklessness by alleging that defendants knew facts or had access to information suggesting that their public statements were not accurate." *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at \*16 (S.D.N.Y. Mar. 25, 2013). That standard is easily met here. On November 27, 2024 Defendant Mann admitted that "we haven't actually enriched uranium." ¶104; *see also* ¶105. By far the strongest inference is that Mann knew this critically important fact throughout the Class Period, which began only two months earlier. Defendants do not argue otherwise. Indeed, Defendants' argument that they *disclosed* ASPI's failure to test QE on uranium, although the argument is not true, concedes their knowledge. *See MBIA*, 700 F. Supp. 2d at 591 ("Defendants' cannot simultaneously argue that the vendor financing arrangements were disclosed to the investing public, but that Alstom's CEO and CFO were unaware of those commitments"); *Alstom*, 406 F. Supp. 2d at 460 n.21 (similar).

While Defendants' admissions alone are sufficient to support a strong inference of scienter,

other facts bolster the inference. In addition to being ASPI's CEO, Mann was the CEO and Chairman of Quantum Leap Energy LLC, the wholly owned subsidiary formed to conduct ASPI's QE operations. ¶15. Mann oversaw ASPI's activities involving QE and uranium enrichment, repeatedly holding himself out as knowledgeable on these subjects. ¶¶42-43, 58-59, 61, 78, 81-82, 103-10. These facts support his scienter. *See Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir. 1985) ("defendants portrayed themselves in their public statements during the class period as persons highly knowledgeable about the industry and [defendant company's] role in it").

Furthermore, "allegations of a company's core operations . . . can provide supplemental support for allegations of scienter." *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011). "Core operations include matters critical to the long term viability of the company." *Hi-Crush*, 2013 WL 6233561, at *26. Mann knew that investors viewed uranium enrichment as the most important of ASPI's three business lines, ¶42, and Defendants repeatedly touted the importance of QE and uranium enrichment to ASPI, ¶¶39-46, 58-90. Scienter is similarly supported by ASPI's small size, with about 76 employees during the Class Period, meaning that information as vitally important as whether the Company had enriched uranium was known to executives like Mann. ¶38. *See Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *12 (C.D. Cal. July 1, 2008) ("small company, with 80 to 100 employees" supported scienter).

The unusually close proximity in time between the misstatements and the corrective disclosures, ranging from two months to only one week, shows Defendants knew the truth earlier. *See In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) (seven months from misstatement to correction strengthened scienter). Considering the facts holistically, the inference that Mann knew throughout the Class Period that ASPI had not tested QE on uranium is inescapable. Indeed, given Mann's involvement with ASPI's QE and uranium efforts, it would be

19

"absurd to suggest" he did not know this paramount fact. *Avon*, 2019 WL 6115349, at \*20.

### B.    Motive Adds To The Already Strong Inference Of Scienter

While motive is not required to plead scienter, *see Tellabs*, 551 U.S. at 325, Plaintiffs here allege a concrete financial motive. ASPI had to sell stock to survive, because it incurred *increasing* annual losses in the tens of millions of dollars, and generated minimal revenue. ¶¶32-37; *see Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at \*11 (S.D.N.Y. June 16, 2020) ("[C]ourts have found allegations of motive adequate where the company[] needed to fundraise to survive."); *Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 326 (S.D.N.Y. 2018) (motive alleged by the company's "dependence on sales of its stock to cover its operating losses.").

ASPI's stock price began the Class Period at $2.83 per share, and was significantly inflated by Defendants' misleading statements, including single day gains of 15% and 20% after the statements on October 17 and October 30. ¶55. Only *one day* after the October 30 misstatements, ASPI filed to sell more stock to the public, completing the offering on November 4 at a price of $6.75 per share, for proceeds of $18.6 million. ¶56. The misstatements and *immediate* stock sale were perfectly timed to enrich ASPI at investors' expense.

Defendants argue that corporate stock sales may be "insufficient" to establish scienter, but as their own cases show, that is not a bright-line rule, and is a different question from whether such stock sales are a *relevant part* of the scienter inquiry. *See In re Lottery.com, Inc. Sec. Litig.*, 765 F. Supp. 3d 303, 347 (S.D.N.Y. 2025) ("It is true that, in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter"); *In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892, at \*12 (S.D.N.Y. Sept. 29, 2022) ("Whether such an interest . . . is sufficient to plead scienter is *extremely contextual*").

Moreover, the "argument that [ASPI's] financial position is irrelevant to the scienter inquiry deviates from *Tellabs*," and the required holistic inquiry. *Skiadas v. Acer Therapeutics*

20

*Inc.*, 2020 WL 4208442, at *5 (S.D.N.Y. July 21, 2020). This is not a case of routine corporate actions—ASPI released misleading statements that boosted its stock price by 20% in one day, the *next day* filed to sell stock, and closed the offering days later to obtain $18.6 million. These incriminating facts are highly unusual, are properly considered as part of the holistic scienter inquiry, and add to the already strong inference of Defendants' conscious recklessness.

### C.    Defendants Fail To Offer A More Plausible Competing Inference

The scienter inquiry is "inherently comparative" and involves weighing "competing inferences." *Tellabs*, 551 U.S. at 323-24. However, Defendants offer none. The closest they come is to suggest that the Court might conclude their statements were "sloppy, contradictory and poorly drafted," though they expressly deny that is the case. MTD 24.

Defendants' pattern of concealment of the fact that ASPI had never tested QE on uranium, and repeated, selective disclosure of exclusively positive information about QE and uranium enrichment, rules out any inference of mere negligence. *See In re Intercept Pharms., Inc. Sec. Litig.*, 2015 WL 915271, at *7 (S.D.N.Y. Mar. 4, 2015) (scienter pled where defendant "chose . . . only to report the positive development, engaging in the sort of selective disclosure that creates a real possibility of misleading investors"); *Hi-Crush*, 2013 WL 6233561, at *22 ("strong inference of recklessness is adequately pled [] where the corporation chooses to selectively reveal positive information on a specific topic while concealing closely-related negative information").

Defendants claim that the challenged statements do not suggest scienter, but the statements' grave risk of misleading investors is clear. For example, on the slide comparing data for different enrichment methods ASPI did not label any of the QE data as "estimates," though it expressly did so for a *different* method. ¶61. On a slide titled "*Quantum Enrichment: Real World Experience*," ASPI claimed "[o]ur team have used lasers to enrich . . . Uranium," without disclosing that QE had never been tested on uranium. ¶63. When asked by an investor about ASPI's risk of criticality

21

when enriching U-235, instead of saying that it was not presently a risk because ASPI was not enriching uranium, Mann said "you only have a small amount of product being enriched at a time," and "we do it in batches." ¶82. And when asked in an interview focused solely on nuclear energy, "[d]o you have a timeline for *commercial operation* of your technology?", ASPI's executive stated that "[o]ur technology is fully prepared for deployment," instead of saying that ASPI first had to test QE on uranium to see if it would be commercially viable. ¶86. The list of obvious falsehoods goes on and on, and demonstrates *at least* conscious recklessness.

Defendants' reaction to the stock-price surge following their false statements further rules out mere negligence. ASPI's stock gained 19.8% on the heels of the misleading announcement of a term sheet to build a HALEU facility and supply its production to TerraPower for 10 years. ¶¶74-79. Although Defendants had *no data* to indicate whether QE of uranium would be commercially viable, they did not pause to ask themselves, in light of the extraordinary price surge, whether investors understood that ASPI had never tested QE on uranium. Instead, their *immediate* reaction was to sell $18.6 million of stock. ¶¶54-56. In sum, Plaintiffs allege a strong inference of Defendants' scienter, and Defendants fail to offer *any* plausible innocent inference.

## IV.    PLAINTIFFS ALLEGE LOSS CAUSATION

Loss causation "may be established by pleading either a corrective disclosure or a materialization of a concealed risk." *In re Allergan PLC Sec. Litig.*, 2019 WL 4686445, at *29 (S.D.N.Y. Sept. 20, 2019). At the pleading stage, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection," which "is not meant to impose a great burden upon a plaintiff." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

### A.    The November 26, 2024 Fuzzy Panda Research Report

The Fuzzy Panda Research report contained elements of both corrective disclosure and materialization of the risk. As to the latter, the report revealed daunting and unresolved challenges

22

facing use of QE on uranium, for example that it must vaporize uranium metal at temperatures of thousands of degrees, which will destroy the equipment containing the uranium such that the process is not commercially viable. ¶¶93-100. Certainly such revelations of problems ASPI had not solved were within the "zone of risk," concealed by Defendants when they led investors to believe that ASPI had successfully tested QE on uranium (and would soon enter into commercial HALEU supply agreements). *See Allergan*, 2019 WL 4686445, at \*29. Revelations that "mirror image" misstatements are not required. *Freudenberg,* 712 F. Supp. 2d at 202.

Puzzlingly, Defendants center their argument on the report's statement that, "[a] former Klydon executive pointed out that if the technology was as good as ASPI claims, someone surely would have by now found a way to get the necessary licenses and test it on uranium to prove its worthiness." ECF No. 25-5 at 18. But this statement is a corrective disclosure that *proves* loss causation. ASPI never *disclosed* its failure to test QE on uranium and the report does not say otherwise. What the report says is that the quoted 10-Q excerpt "admit[s] they don't have any licenses to enrich uranium." *Id*. It is only the previously *undisclosed* statement of the Klydon executive, likely based on inside information and nowhere claimed to be based on ASPI's disclosures, that implies ASPI's lack of testing. *See supra* Part II.A.

On the day of the report, ASPI's stock plummeted 23.5%, showing the market's reaction to this new information, and establishing loss causation. ¶¶101-02; *see, e.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 234 (2d Cir. 2014) ("plaintiffs have alleged that the market reacted negatively to the . . . corrective disclosure by a significant (12%) decline").

**B.      Defendant Mann's November 27, 2024 Canaccord Genuity Interview**

Mann's interview with Canaccord analyst George Gianarikas is the most straightforward of corrective disclosures. Mann admitted the information previously concealed by Defendants—that ASPI had *never* enriched uranium—and ASPI's stock price promptly fell by 14%. ¶¶104-05,

23

112. Defendants attempt two arguments in response, neither of which withstand scrutiny.

First, Defendants claim that ASPI's failure to test QE on uranium was previously disclosed, in ASPI's SEC filings (which is refuted above in Part II.A), and in the Fuzzy Panda Research report. While the report cites a former Klydon executive as implying that ASPI had not enriched uranium, it is well-established that loss causation can be pled through "a series of disclosing events" and "the relevant truth . . . leaking out." *Diabat v. Credit Suisse Grp. AG*, 2024 WL 4252502, at *147 (S.D.N.Y. Sept. 19, 2024) (cleaned up). While the truth began to emerge with the Fuzzy Panda Research report, on the same day ASPI announced that it "believes the report includes speculative conjecture and claims that are inaccurate," thereby partially counteracting the new information. ¶101; Spencer Decl. Ex. 3 (press release). The next day's direct admission of the concealed truth by ASPI's CEO would naturally be viewed as more authoritative, and providing additional information as compared to a short-seller's report that was disputed (albeit generically) by the Company. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1211 (9th Cir. 2016) (loss causation alleged when subsequent disclosure "confirmed" earlier market fears). It bears repeating that the analyst who interviewed Mann about the report *after* it was published *still* believed that ASPI had enriched uranium, showing that the report only partially revealed the truth to investors. ¶¶50-53.

Second, Defendants argue that ASPI's 14% same-day price decline on heavy trading volume (¶112) may not have been a reaction to Mann's interview, because the interview may not have been "publicly disseminated." Defendants offer no explanation for the extraordinary price move, and their argument is readily disproved. The entire point of the interview was for ASPI to *reassure investors* by rebutting the report. As stated in ASPI's November 26 press release:

> [ASPI] values *transparency and open communication*. Canaccord Genuity's analyst, George Gianarikas, will host a fire side chat with ASP Isotopes's Chairman and Chief Executive Officer, Paul Mann, at 10am EST on November 27, 2024. Please contact your Canaccord Genuity sales representative for dial in details.

24

Spencer Decl. Ex. 3. Defendants now backtrack on "transparency," however Canaccord clients (including those to whom Canaccord, as sole underwriter and bookrunner, sold $18.6 million of ASPI stock in the offering less than a month earlier, *see* ¶¶56, 51 n.4) clearly had access. Others did as well. Plaintiff Agapchev listened to it "[p]robably the same day." Spencer Decl. Ex. 2 at 79:23-80:7. Plaintiff Leone recalls watching ASPI's stock price fall *during* the interview, which shows a clear causal relationship. Spencer Decl. Ex. 1 at 73:15-74:18; *id.* at 77:18-79:23. Unlike the facts in Defendants' inapposite cases, this shows loss causation. *See Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 597 (S.D.N.Y. 2008) (that private placement memorandum became available to limited group of investors, coinciding with stock price decline, pled loss causation).

## V.    PLAINTIFFS ALLEGE CONTROL PERSON LIABILITY

Defendants' only argument as to the Section 20(a) claim is that Plaintiffs supposedly fail to allege a predicate violation of Section 10(b). As shown *supra*, Defendants are wrong.

## VI.    IF NECESSARY, THE COURT SHOULD ALLOW A MOTION FOR LEAVE TO AMEND

This is the first time the Court has evaluated Plaintiffs' claims and Defendants' arguments for dismissal. If the Court grants Defendants' motion, Plaintiffs respectfully request that the Court allow them to file a motion for leave to amend, along with a proposed second amended complaint. *See* Fed. R. Civ. P. 15(a)(2); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("[w]ithout the benefit of a ruling, many a plaintiff will not . . . be in a position to weigh the practicality and possible means of curing specific deficiencies").

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion should be denied.

DATED: July 25, 2025                    Respectfully submitted,

                                        **GLANCY PRONGAY & MURRAY LLP**

                                        By: */s/  Garth Spencer*
                                        Garth Spencer (GS-7623)
                                        Robert V. Prongay
                                        John C. Roberts
                                        1925 Century Park East, Suite 2100
                                        Los Angeles, CA 90067
                                        Telephone: (310) 201-9150
                                        Facsimile: (310) 201-9160
                                        Email: gspencer@glancylaw.com
                                                 rprongay@glancylaw.com
                                                 jroberts@glancylaw.com

                                        Gregory B. Linkh (GL-0477)
                                        230 Park Ave., Suite 358
                                        New York, NY 10169
                                        Telephone: (212) 682-5340
                                        Facsimile: (212) 884-0988
                                        Email: glinkh@glancylaw.com

                                        *Lead Counsel for Lead Plaintiff Mark Leone and*
                                        *Plaintiff Ivan Agapchev*

26

## PROOF OF SERVICE

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On July 25, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 25, 2025.


*/s/ Garth Spencer*
Garth Spencer