# Exhibit 1

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

— — —

MARK LEONE, individually    :
and on Behalf of All         :
Others Similarly Situated    :

                             :

            Plaintiff,       :

                             :

        vs.                  :

                             :

ASP ISOTOPES, INC., PAUL     :
E. MANN, and HEATHER         :
KIESSLING,                   :

                             :

            Defendants.    : No. 1:24-cv-09253-CM

— — —

THURSDAY, JULY 10, 2025

— — —

            Video-recorded deposition of
MARK LEONE, taken via Zoom, at West Deptford,
New Jersey, commencing at 10:02 a.m., before
Kimberly A. Rue, a Registered Professional
Reporter, New Jersey Certified Court Reporter
(License No. X102235) and Notary Public.

- - -

VERITEXT LEGAL SOLUTIONS
MID-ATLANTIC DIVISION

Page 73

roughly that's what it said.

Q.    Do you know who it was?

A.    I don't remember his name.  A finance guy.  Somebody in finance, I believe.

Q.    And did you then read the company's response?

A.    I did.

Q.    And what did you think of that?

A.    It sounded like they had something in the works and they were planning an official response.  So I felt pretty confident that the stock was going to come back and that's probably why on the 26th I kept buying.

Q.    What made you decide to then get out on the 27th?

A.    Well, the interview that was done on the 27th obviously wasn't going very well, because during the interview the stock price was plummeting and plummeting and plummeting and at some point I had to just, you know, take my loss and get out.

Q.    What interview on the 27th are you referring to?

A.    The Canaccord interview.

Q.    How did you access that interview?

A.    I didn't hear it live.

Q.    I'm sorry.  You did or did not hear it live?

A.    I did not hear it live, no. Actually, that morning -- my mother was going through a ███████ ███████ and my sister and I had taken her to a doctor's appointment and I remember walking outside of the appointment -- my sister was with her -- and I was just watching -- I had no access.  I was at a hospital, basically.  So I was just watching the stock price go down, down, down and at some point I had to make the tough decision to sell off and cut my losses.  So I did not hear it live.

Q.    When did you hear about the Canaccord interview?

A.    Well, they said they were going to have an interview.  On the 26th I believe they said on the 27th we are going to have a response interview as to what was going on.

And my hope was that it was a good strong interview and the stock price would come back and I wouldn't lose the money that I lost.

Q.    Have you ever listened to the Canaccord interview?

A.    I've read -- actually, I have -- I have listened to it.  It's about 50 minutes, 55 minutes.  It was a while back and it was -- I just shook my head, because I wasn't very happy with the response.

Q.    You weren't very happy with the company's response during the interview?

A.    Correct.

Q.    I wasn't sure if you were referring to you weren't happy with the stock price response during the interview.

A.    I wasn't happy with either, to be honest with you.

Q.    What made you unhappy with what the company was saying during the interview?

A.    Wow.  Well, first of all, he was being asked questions like how many modules would it take to, you know, fire up a -- one reactor.  And the response from the

CEO, Mann, was, "Hey, look we never actually enriched uranium, so we don't really know how many modules it would take." And when you hear something like that and you're basing, your know, your money and your efforts into this company and then all of a sudden they tell you they are not enriching uranium, when that's all they talked about months previous, you know, your heart drops, because you just loss, in my case, about $200,000. So I was not happy, needless to say.

Q.    Have you -- I think you mentioned that you read the interview too?

A.    Yes.  Excerpts from it, yes, quotes.

Q.    Where did you read it?

A.    I don't remember.

Q.    You think it was some type of article that excerpted it or quoted afterwards?

A.    Could have been, you know, recent documents.  I have been through so many documents, you know, so ...

Q.    Was it a document that was

Page 77

provided by your attorney?

A.    We share documents, yes.

Q.    Have you ever seen, like, an official transcript of it, the full interview?

A.    Not an official transcript, but -- again, I don't want to guess, but, you know, people posting articles, you're reading the articles.  It was -- it was not a very fond memory for me.  I am sure you can understand that.

Q.    But you've never seen a full -- a transcript of the full interview?

A.    Like I said, I listened to it and it was about close to an hour and, to be honest, the man didn't sound very sure of himself and -- again, not a fond memory for me.

Q.    What makes you think that it was that interview that was causing the stock price to drop that day?

A.    What makes me think that?

Q.    Yes.

A.    Well, I was watching the stock price live and -- like I said, I was sitting

Page 78

in the hospital and I am watching the price drop and drop and drop during the time period that he was giving the interview.  And if he was saying positive things I don't think it would have been dropping.  I think it would have been coming back up.  So it doesn't make any sense.  It doesn't -- I'm sorry?

Q.    I'm sorry.  That was one of those things where we started to talk over each other.  My apologies.

A.    That's okay.  It doesn't take a stock analyst to figure out what he is saying is hurting the stock price.  And it hurt it real bad, because it was down about five bucks by the end of the day.  I was fortunate -- I'm calling it fortunate -- I only lost $200,000, but I was fortunate I was able to sell most of it in the 5.30 to 5.40 range.

Q.    How do you know it wasn't kind of a hangover effect from the Fuzzy Panda article the day before for the stock price decrease?

MR. SPENCER:    Objection.    Go ahead.

Page 79

BY MS. MCNALLY:

Q.    You can still answer.

A.    So, again, if he had come back strong with a good response, the stock price would have went up.  At some point -- I don't know if you ever have been in this position, you said you don't trade individual stocks -- you're faced with losing a couple hundred thousand dollars, maybe 200,000, and if you wait you're looking at 300,000, 400,000.  It's a lot of money.  I am not a rich man by any stretch.

Q.    But you don't know that it wasn't trading based on -- still based on the Fuzzy Panda report itself?

MR. SPENCER:  Object to the form of the question.

THE WITNESS:  In my opinion, it was trading based on what the CEO was saying.

BY MS. MCNALLY:

Q.    At the Canaccord interview?

A.    Correct.

Q.    Other than watching the

Q.    What exactly is -- what exactly is your contention that the defendants did wrong in this case?

MR. SPENCER:   Objection.

THE WITNESS:   Can I answer?

MR. SPENCER:   Yes.

THE WITNESS:   Well, honestly they very much misled anybody that invested with them.  We were led to believe that -- the class that I represent and I -- that they were enriching uranium, they were producing this HALEU, which every one of these small modular reactor companies needed, and they weren't doing it. And we didn't really know that until Fuzzy Panda came out and said, "Hey, look, this is old technology, these slides.  Their facilities don't exist in South Africa."  I mean, you saw the report, so you -- and the interview was damning, to be honest with you. When you ask the CEO how many modules you need for one reactor and his

Page 101

answer is "Well, we don't know.  We
have never actually enriched uranium,
not even in a lab setting," that's
damning and it's damaging to the stock
price and to us investors.

BY MS. MCNALLY:

Q.    Let's talk a little bit about how -- kind of going back to your involvement in the case.  So you moved to become lead plaintiff, right?

A.    Correct.

Q.    And what does it mean to you to be the lead plaintiff?

A.    Well, the lead plaintiff, I have done it before, once before.  You represent the class.  You represent all the investors and their interests.  And you have to testify, you testify.  You have to do a deposition, you do a deposition.  You do what you have to do to represent all the people that were hurt in the case.

Q.    What case was it that you moved to be lead plaintiff in before?

A.    So I was in a case, myself

Page 138

CERTIFICATE

- - -

I do hereby certify that I am a Notary Public in good standing, that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

WITNESS my hand and official seal this 14th day of July 2025.

_____
Kimberly A. Rue
Notary Public