# Exhibit 25

# LICENCE AGREEMENT

between

## ASP Isotopes UK Limited

and

## Quantum Leap Energy LLC

and

## Quantum Leap Energy Limited

CONFIDENTIAL

# INDEX

| NO | CLAUSE HEADING | PAGE |
|----|---------------|------|
| 1 | DEFINITIONS AND INTERPRETATION | 2 |
| 1.1 | Definitions | 2 |
| 1.2 | Interpretation | 5 |
| 2 | GRANT OF LICENCE | 6 |
| 3 | EXCLUSIVITY AND LICENCE RESTRICTIONS | 6 |
| 4 | DURATION | 7 |
| 5 | INTELLECTUAL PROPERTY RIGHTS AND IMPROVEMENTS | 7 |
| 5.1 | Intellectual Property Rights | 7 |
| 5.2 | Improvement | 10 |
| 6 | TECHNICAL INFORMATION AND QUALITY CONTROL | 10 |
| 6.1 | Technical Information and Assistance | 10 |
| 6.2 | Quality control | 12 |
| 7 | PAYMENTS | 13 |
| 7.1 | Upfront Payment | **Error! Bookmark not defined.** |
| 7.2 | Royalties and Sublicensing Revenue | 13 |
| 8 | WARRANTIES, EXCLUSION OF LIABILITY AND INDEMNITY | 13 |
| 8.1 | Warranties | 13 |
| 8.3 | Indemnity | 14 |
| 9 | FORCE MAJEURE | 15 |
| 10 | TERMINATION OF EXCLUSIVITY | 15 |
| 11 | CONFIDENTIALITY AND PROTECTION OF INFORMATION | 16 |
| 12 | BREACH | 18 |
| 13 | DISPUTE RESOLUTION | 18 |
| 14 | NOTICES AND *DOMICILIA* | 21 |
| 15 | MISCELLANEOUS WARRANTY OF AUTHORITY | 22 |
| 15.1 | Warranty of Authority | 22 |
| 15.2 | Independent Advice | 22 |
| 15.3 | Implementation | 23 |
| 15.4 | Payment | 23 |
| 15.5 | Whole Agreement | 23 |
| 15.6 | Variation | 23 |
| 15.7 | Relaxation | 23 |
| 15.8 | Counterparts | 24 |

ASPI_00025221

LICENCE AGREEMENT

This Agreement is made and entered into between -

(1)      **ASP Isotopes UK Limited** of 128 City Road, London, United Kingdom, EC1V 2NX, a company duly registered and incorporated with limited liability in accordance with the laws of England and Wales (Company Number 14252657) ("**Licensor**");

(2)      **Quantum Leap Energy LLC** of New Castle, Delaware, United States, a company duly registered and incorporated with limited liability in accordance with the laws of the State of Delaware (Company Number 7658532) ("**QLE**"); and

(3)      **Quantum Leap Energy Limited** of 631 The Linen Hall, 162-168 Regent Street, London, United Kingdom, W1B 5TG, a company duly registered and incorporated with limited liability in accordance with the laws of England and Wales (Company Number 15171623) ("**QLEUK**").

## RECITALS

A.      The Licensor owns the Intellectual Property and Technology which it continues to develop, and has the right to grant a licence to use and exploit the Intellectual Property and Technology.

B.      The Licensor has agreed to grant to the Licensee (as defined below) the exclusive and irrevocable right to use the Intellectual Property Rights and Technology in the Territory.

C.      The Licensee wishes to acquire from the Licensor the exclusive and irrevocable right to use the Intellectual Property Rights and Technology to produce distribute, market and sell Subject Isotopes.

Accordingly, the Parties agree as follows:

1

CONFIDENTIAL                                                                                        ASPI_00025222

# 1    DEFINITIONS AND INTERPRETATION

## 1.1    Definitions

In this Agreement and the recitals, unless clearly inconsistent with or otherwise indicated by the context -

1.1.1    **"Agreement"** means the agreement set out in this document and the appendices hereto;

1.1.2    **Business Day** means any day other than a Saturday, Sunday or official public holiday in England or Delaware;

1.1.3    **"Confidential Information"** means all and any information or data in whatever form (including in oral, written, electronic and visual form) relating to a Party or the Technology which by its nature or content is identifiable as, or could reasonably be expected to be, confidential and/or proprietary to either Party and includes, (even if not marked as being confidential, restricted, secret, proprietary or any similar designation), any and all information in respect of the Technology;

1.1.4    **"Copyright"** means copyright in the Territory in respect of the Technology;

1.1.5    **"Designs"** means any registered designs and design applications in respect of the Technology;

1.1.6    **"Effective Date"** means 16 February 2024;

1.1.7    **"Improvement"** means any change, development, improvement or modification to any aspect of the Technology or any method of development of the Technology, use or application of the Technology including any change, improvement or modification which makes the Technology more efficient or adaptable or enables the Technology to be manufactured more economically or efficiently or to a higher standard;

1.1.8    **"Independent Auditors"** means such independent auditors as may be agreed between the Licensor and the Licensee, or failing agreement within 10 (ten)

2

ASPI_00025223

business days from the date of a request by any Party for such agreement, appointed by the Executive President for the time being of the South African Institute of Chartered Accountants from one of the 4 (four) largest (based on number of partners) independent firms of auditors in England at the time;

1.1.9    **"Intellectual Property Rights"** means all existing and future proprietary rights of the Licensor relating to the Technology, whether or not such rights have been registered, including the –

1.1.9.1    Copyright;

1.1.9.2    Designs;

1.1.9.3    Know-how;

1.1.9.4    Patents;

1.1.9.5    Trade Marks; and

1.1.9.6    Improvements.

1.1.10    **"Know-how"** means all information and knowledge of whatever nature relating to the approval, manufacture, distribution, marketing, use and/or sale of the Technology owned or controlled by the Licensor, including technical information, production data, drawings, specifications, engineering and scientific information, manufacturing and tooling information, testing and quality control procedures, secret processes, formulae, marketing and application information, relationship information  and other Confidential Information;

1.1.11    **"Licensee"** means either QLE or QLEUK acting individually and independently, or jointly should they elect to utilise or sublicence the Intellectual Property Rights and Technology jointly;

1.1.12    **"Parties"** means the Licensor, QLE and QLEUK and "**Party**" shall mean either one of them as the context requires;

3

    ASPI_00025224

1.1.13     "**Patents**" means any registered patents and patent applications in respect of the Technology;

1.1.14     "**Prime Rate**" means the publicly quoted basic rate of interest, compounded monthly in arrears and calculated on a 365 (three hundred and sixty five) day year irrespective of whether or not the year is a leap year, from time to time published by the Bank of England from time to time as being its prime rate;

1.1.15     "**QLESA**" means Quantum Leap Energy Proprietary Limited of Unit 19, 1 Melrose Blvd, Melrose Arch, Johannesburg, Gauteng, South Africa, a company duly registered and incorporated with limited liability in accordance with the laws of South Africa (Registration Number 2024/016724/07);

1.1.16     "**Revenue**" means the amount of fees (excluding out of pocket expenses and disbursements) net of (i) any client refunds, discounts or rebates suffered or incurred by the Licensee (ii) the value of all free offers or discounts made or given by the Licensee as part of any special promotion, and (iii) any applicable VAT or similar sales tax in any jurisdiction, invoiced by the Licensee (whether or not payment of such sums is made or received) in utilising the Intellectual Property Rights and the Technology (but not any amount that is invoiced by the Licensee that relates to any other business carried on from time to time by the Licensee) calculated in accordance with normal accounting practice for revenue recognition in the jurisdiction where the Licensee is required to file its accounts or, if the Licensee is not required to file accounts, in the jurisdiction where the Licensee's registered office or principal place of business is located;

1.1.17     "**Subject Isotopes**" means Uranium-235 and Lithium-6 and any other isotopes produced using the Technology as approved by the Licensor in writing;

1.1.18     "**Technology**" means all the Licensor's proprietary technologies and methods used to separate Subject Isotopes (including but not limited to the Quantum Enrichment and Aerodynamic Separation Process technologies);

1.1.19     "**Term**" means a period of 999 (nine hundred and ninety nine) years, unless this Agreement is terminated in accordance with its terms;

4

1.1.20      **"Territory"** means worldwide for the development of the Technology; and worldwide for the distribution, marketing and sale of Subject Isotopes. All future production of Subject Isotopes will only be in countries whose governments are participating governments of the Nuclear Suppliers Group of countries as updated from time to time; and

1.1.21      **"Trade Marks"** means the registered trade marks, trade mark applications and/or common law trade marks in respect of the Technology.

1.2      **Interpretation**

1.2.1      In this Agreement and the recitals, unless clearly inconsistent with or otherwise indicated by the context -

1.2.1.1           any reference to the singular includes the plural and *vice versa*;

1.2.1.2           any reference to natural persons includes legal persons and *vice versa*; and

1.2.1.3           any reference to a gender includes the other genders.

1.2.2      Where appropriate, meanings ascribed to defined words and expressions in clause 1.1, shall impose substantive obligations on the Parties.

1.2.3      The clause headings in this Agreement have been inserted for convenience only and shall not be taken into account in its interpretation.

1.2.4      Words and expressions defined in any sub-clause shall, for the purposes of the clause of which that sub-clause forms part, bear the meanings assigned to such words and expressions in that sub-clause.

1.2.5      This Agreement shall be governed by and construed and interpreted in accordance with the laws of England.

5

                                                    ASPI_00025226

## 2    GRANT OF LICENCE

The Licensor hereby gives and grants to the Licensee, which hereby accepts, an exclusive and irrevocable licence to use, develop, modify, improve, sub contract and sub license (to QLESA or any other subsidiary of a Licensee) the Intellectual Property Rights and Technology during the Term for the production, distribution, marketing and or sale of the Subject Isotopes in the Territory.

## 3    EXCLUSIVITY AND LICENCE RESTRICTIONS

3.1    Exclusivity

The licence granted by the Licensor under this Agreement is exclusive, such that, whilst this Agreement remains in force, the Licensor shall not be entitled, directly or indirectly, to use, grant or otherwise license any Intellectual Property Rights and Technology rights to any other party for use within the Territory.

Licence Restrictions

3.1.1    The Licensee will not, without the prior written consent of the Licensor, use the trade names of the Licensor or Trade Marks in combination with any other trade names or trade marks, nor use trade names, symbols or letters which are confusingly similar to the trade names or Trade Marks.

3.1.2    The Licensee will respect and obey all global and regional regulations governing the production of the Subject Isotopes and the development and transfer of any technology associated with the Technology.

3.2    Irrevocability

3.2.1    The license granted by the Licensor to the Licensee under this Agreement is irrevocable and cannot be cancelled, changed or modified without the written agreement of all Parties.

6

ASPI_00025227

## 4    DURATION

4.1    This Agreement shall commence on the Effective Date and shall continue in full force for the Term.

4.2    The duration of this Agreement shall not be affected by –

4.2.1    the lapsing of one or more of the Intellectual Property Rights, whether by effluxion of time or otherwise;

4.2.2    any Patent, Design, Copyright or Trade Mark comprising the Intellectual Property Rights failing to proceed to grant or final prosecution or being held to be invalid;

4.2.3    any change in control or status of the Licensor or Licensee or disposition, sale, devolvement, or assignment of the Intellectual Property Rights and/or Technology; or

4.2.4    the insolvency, liquidation, termination of business or dissolution ("**Insolvency Event**") of the Licensor, it being agreed that the Licensee shall be granted a perpetual, licence free, irrevocable right and licence to continue using and developing the Intellectual Property Rights and the Technology after the occurrence of an Insolvency Event for the Licensee's own benefit and account. For purposes of this clause, the Licensor undertakes to keep all records and information in respect of the Intellectual Property Rights and the Technology safe and undertakes to hand over all such information to the Licensee on the occurrence of an Insolvency Event.

## 5    INTELLECTUAL PROPERTY RIGHTS AND IMPROVEMENTS

5.1    **Intellectual Property Rights**

5.1.1    The Licensee acknowledges and agrees that the Intellectual Property Rights and Technology is and are and shall remain the sole and absolute property of the Licensor and further acknowledges that the reputational use thereof in terms of this Agreement shall enure for the benefit of the Licensor.

7

ASPI_00025228

5.1.2    The Licensee shall not anywhere in the Territory, whether during or after the Term -

5.1.2.1    oppose or contest any intellectual property application by the Licensor or the ownership of the Licensor therein;

5.1.2.2    dispute, contest or question the validity of the Intellectual Property Rights and Technology and shall not assist or counsel any other person to do so;

5.1.2.3    directly or indirectly register the Trade Marks, or any confusingly similar trade marks, anywhere in the Territory; or

5.1.2.4    directly or indirectly use any trade marks confusingly similar to the Trade Marks anywhere in the Territory.

5.1.3    No right, title or interest in and to the Intellectual Property Rights and Technology is hereby assigned except the right to use the Intellectual Property Rights and Technology during the Term of this Agreement in the manner and subject to the terms and conditions set out in this Agreement.  The Licensor shall have no right to sell, assign, transfer, alienate, hire, lease, pledge, hypothecate, otherwise dispose of or encumber or to reproduce the whole or any part of the Intellectual Property Rights and Technology without the specific prior written consent of the Licensee.

5.1.4    The Licensee shall not in any way represent that it has any rights of any nature in and to the Intellectual Property Rights and Technology, other than those which it enjoys in terms of this Agreement.  The Licensee shall only use the Intellectual Property Rights in respect of the Technology, as permitted by this Agreement.

5.1.5    The Licensor shall have the right from time to time to lay down in writing or otherwise reasonable standard and/or specific procedures for the use of the Intellectual Property Rights and Technology and from time to time to add to, amend, vary, supplement, change, alter or repeal such standard and/or specific procedures with the prior written consent of the Licensee.

8

ASPI_00025229

5.1.6    The Licensee shall not do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of the Licensor's exclusive right, title and interest in and to the Intellectual Property Rights and Technology.

5.1.7    The Licensee undertakes to use its reasonable endeavours to ensure that the reputation and goodwill of the Intellectual Property Rights and Technology are protected, maintained and wherever possible enhanced.

5.1.8    The prosecution and/or defence of any claim in relation to the Intellectual Property Rights and Technology shall be the sole responsibility and shall be undertaken within the sole and absolute discretion of the Licensor, provided that the Licensee shall forthwith notify the Licensor of any claims or possible infringements of the Intellectual Property Rights and Technology of which the Licensee becomes aware and the Licensee shall, if required by the Licensor and at the Licensor's cost, join with the Licensor as a party to such proceedings, and/or assist the Licensor in any such proceedings in the manner and to the extent reasonably required by the Licensor.  The Licensee shall not be entitled to make any admissions of liability in regard to any such claim or to negotiate any settlement in respect thereof without the specific prior written consent of the Licensor.  Notwithstanding the aforesaid, the Licensee shall be entitled to defend any claim as contemplated in this clause 5.1.8 if the Licensor fails to take any steps in relation to such claim or assert the Intellectual Property Rights and/or Technology if the Licensor fails to do so provided that any action taken by the Licensee is at its cost.

5.1.9    The Licensor shall, at the Licensor's expense maintain the Intellectual Property Rights and Technology and the Licensor shall pay all renewal fees and do such other acts as may be necessary for this purpose.  Notwithstanding the aforesaid, the Licensee shall have the right to do such other acts and make any such payment and recover the payment from the Licensor if the Licensor fails to make any such payments or do such other acts.  Should the Licensee wish for any aspect or right forming part of the Intellectual Property Rights and/or Technology to be protected via a patent, trade mark, copyright, design and/or like intellectual property protection, the Licensor shall do so and maintain same at the Licensee's cost.

9

ASPI_00025230

5.1.10    Both Parties acknowledge that the objective of this Agreement is to develop and enhance the protection of the Intellectual Property Rights and the Technology. Both Parties hereby agree to use their best endeavours and take all such steps and do all such acts as are necessary toward achieving this purpose, including where appropriate, filing formal applications for the registration of the Intellectual Property Rights, monitoring and policing trade secrecy, non-disclosure or similar agreements, maintaining intellectual property registers, maintaining, facilitating and enhancing regulatory approvals and international assistance, and disclosing information to each other necessary for this purpose.

5.2    **Improvement**

If at any time during the Term –

5.2.1    the Licensor makes, or receives the benefit of any Improvement or Know-how to the Technology, the Licensor undertakes to inform the Licensee of such Improvement or Know-how and the Licensee may make use of such Improvement or Know-how under the provisions of this Agreement. If such Improvement involves additions to the Know-how, such additions will also be deemed to be part of the Intellectual Property Rights licensed in terms of this Agreement; and

5.2.2    the Licensee makes any Improvement to the Technology, the Licensee will promptly inform the Licensor thereof in writing and all rights in such Improvement shall belong to the Licensee and the Licensor will assist the Licensee to obtain patent, design, trade mark, copyright and all similar forms of protection for such Improvement at the expense of the Licensee.

6    **TECHNICAL INFORMATION AND QUALITY CONTROL**

6.1    **Technical Information and assistance**

6.1.1    The Licensor shall on the Effective Date and during the Term supply, free of charge, to the Licensee -

10

ASPI_00025231

6.1.1.1          copies of all such documents containing technical information as may be required or necessary to enable the Licensee to use the Intellectual Property Rights and Technology for the production, distribution, marketing and or sale of the Subject Isotopes in the Territory; and

6.1.1.2          such further information and Know-how relating generally to the materials, methods and processes required by the Licensor for the production, distribution, marketing and or sale of the Subject Isotopes in the Territory.

6.1.2          The Licensor shall –

6.1.2.1          provide, sufficient adequately skilled technical staff able to provide technical assistance to the Licensee in establishing the plant and production facilities necessary to develop the Technology and produce, distribute, market and sale of the Subject Isotopes;

6.1.2.2          advise the Licensee on all matters relating to the purchase of suitable plant, machinery, tools, fixtures and fittings necessary to establish plant and production facilities;

6.1.2.3          advise the Licensee on matters relating to the purchase of suitable sources of raw materials necessary for the use of the Technology;

6.1.2.4          during the Term provide ongoing technical expertise, support, assistance and advice to the Licensee for the purpose of enabling the Licensee to develop the Technology and to produce, distribute, market and sale of the Subject Isotopes.  The Licensor will, at the reasonable request of the Licensee make available, for such period as the Licensor in its sole reasonable discretion may determine, technical and other staff for the purposes of fulfilling the Licensor's obligations in terms hereof;

6.1.2.5          provide the Licensee with such assistance as the Licensee may reasonably require, at no charge to the Licensee, to obtain any regulatory approvals as may be required for the Licensee to use the Intellectual

11

ASPI_00025232

Property Rights and the Technology and to produce, distribute, market and sell the Subject Isotope; and

6.1.2.6    do all things and acts that are necessary to ensure that the Licensee can enjoy the full benefits of the license granted under this Agreement and transfer of Know How which shall include allowing the Licensee access to locations where the Know How and other Intellectual Property Rights and/or Technology is kept or stored and generally enabling the Licensee to enjoy those benefits through the release of any passcodes, locks, encryptions or other protection mechanisms designed to secure the Know How and to educate and provide full disclosure on how the Intellectual Property Rights and Technology can be exploited under this Agreement.

6.1.3    It is expressly recorded that the Licensor shall not be responsible or liable for consequential damages or loss of profit which might arise out of the use by the Licensee of any technical information or advice furnished to the Licensee under this Agreement, unless the Licensee can prove on a balance of probabilities that the technical information or advice was wrong or misleading, and that an expert in the field would have known it to be wrong or misleading.

6.2    **Quality control**

The Licensee shall –

6.2.1    use the Technology and produce, distribute and market the Subject Isotopes strictly in accordance with the specifications and quality standards from time to time prescribed by the Licensor;

6.2.2    ensure that the highest standards of workmanship and material available are employed in the use of the Intellectual Property Rights and Technology for the production of the Subject Isotopes; and

6.2.3    upon receipt of reasonable notice, permit the Licensor's duly authorised representatives at all reasonable times to enter the premises where the Technology is being used, or the Subject Isotopes are being produced in order to ascertain whether the Licensor's quality control standards are being adhered

12

ASPI_00025233

to and for this purpose will also have the right to take necessary samples of the Subject Isotopes for examination, testing and analysis.

## 7   PAYMENTS

### 7.1   Royalty

7.1.1   In consideration of the rights and licenses granted under this Agreement, the Licensee shall pay to the Licensor a royalty of 10% (ten percent) of all Revenue, subject to a right of set-off against any other liability owed to the Licensee by the Licensor. The liability of QLE and QLEUK under this clause 7.1.1 shall be joint and several and the Licensor shall, in its sole discretion, be entitled to claim payment of the royalty due from either QLE or QLEUK, and QLE and QLEUK herby waive any defences or counter-claims they may have in respect of their liability under this clause 7.1.1.

## 8   WARRANTIES, EXCLUSION OF LIABILITY AND INDEMNITY

### 8.1   Warranties

8.1.1   The Licensee expressly acknowledges that under this Agreement the Licensor does not in any way warrant or guarantee either expressly or impliedly the merchantability or fitness of the Technology or the Subject Isotopes.

### 8.2   Exclusion of liability

8.2.1   Subject to this Agreement and to the extent permitted by applicable law, the Licensor disclaims all warranties and representations not recorded in this Agreement, either express or implied with respect to the Intellectual Property Rights and Technology, including but not limited to any implied warranties of merchantability or fitness for any particular purpose.

8.2.2   Save for any claim for damages arising from a breach of warranty in terms of this Agreement, and subject to clause 8.2.3, the Licensor shall not be liable for any loss or damage whatsoever or howsoever caused arising directly or

13

ASPI_00025234

indirectly in connection with the use, or licensing of the Intellectual Property Rights and Technology in any manner by the Licensee.

8.2.3    Save for any claim for damages arising from a breach of warranty in terms of this Agreement, neither Party will be liable to the other Party for any indirect, special, incidental or consequential loss or damage which may arise in respect of the Intellectual Property Rights and Technology, its use or licensing or in any manner by the other Party.

8.3    **Indemnity**

8.3.1    The Licensee hereby indemnifies the Licensor, against all claims, costs, damages, losses and expenses which the Licensor may suffer arising from the use of the Intellectual Property Rights and Technology by the Licensee, any breach by the Licensee of its statutory obligations or any breach by the Licensee of its obligations as set forth in clause 11.

8.3.2    The Licensor hereby indemnifies and holds the Licensee harmless against all claims, costs, damages, losses and expenses which the Licensee may suffer or sustain as a direct result of any claim –

8.3.2.1    against the Licensee arising as a result of the failure of any warranty given in this Agreement to be true and correct;

8.3.2.2    that the conduct of the Licensee contemplated in this Agreement has resulted in an infringement of the intellectual property rights of any third party; or

8.3.2.3    that to their knowledge any third party has a prior right in respect of any of the Intellectual Property Rights.

8.3.3    The Licensee undertakes that it will not continue using the Intellectual Property Rights and Technology and will cease producing, distributing, marketing and selling the Subject Isotopes where these activities will increase the potential damages which the Parties could suffer as a result of any claim against them, unless:

14

ASPI_00025235

8.3.3.1                    the Licensee is obligated to do so in terms of any agreement, or

8.3.3.2                    the Independent Auditors confirm that the potential damages award will be less than potential profits from ongoing activities such that the risk is mitigated.  The Independent Auditors shall act as experts and not as arbitrators, and their determination shall be final and binding on the Parties.  The cost of the Independent Experts shall be borne equally by the Parties, or

8.3.3.3                    the claim is spurious as agreed between the Parties

## 9    FORCE MAJEURE

9.1      Delay or failure to comply with or breach of any of the terms and conditions of this Agreement if occasioned by or resulting from an act of God or public enemy, fire, explosion, earthquake, perils of the sea, flood, storm or other adverse weather conditions, war declared or undeclared, civil war, revolution, civil commotion or other civil strife, riots, strikes, blockade, embargo, sanctions, epidemics, act of any government or other authority, compliance with government orders, demands or regulations, or any circumstances of like or different nature beyond the reasonable control of the Party so failing (*"force majeure")*, will not be deemed to be a breach of this Agreement nor will it subject either Party to any liability to the other.

9.2      Should either Party be prevented from carrying out its contractual obligations by reason of *force majeure* lasting continuously for a period of 30 (thirty) days, the Parties will consult with each other regarding the future implementation of this Agreement.  If no mutually acceptable arrangement is arrived at within a further period of 10 (ten) days after the expiration of such 30 (thirty) day period, either Party will be entitled to cancel this Agreement forthwith on written notice to the other Party.

## 10    TERMINATION OF EXCLUSIVITY

The Licensor may terminate the exclusivity of this Agreement or the Agreement itself in its discretion with immediate effect upon written notice to the Licensee in the event that the Licensee ceases to use the Intellectual Property Rights and Technology or carry on activities related to isotope enrichment for a period longer than 24 consecutive months

15

                                                                                ASPI_00025236

(except for reasons of extended force majeure or circumstances beyond the Licensee's control).

## 11    CONFIDENTIALITY AND PROTECTION OF INFORMATION

11.1    Each Party undertakes that during the operation of, and after the expiration, termination or cancellation of, this Agreement for any reason, it will keep confidential all Confidential Information of the other Party.

11.2    If the receiving Party is uncertain about whether any information is to be treated as confidential in terms of this clause 11, it shall be obliged to treat it as such until written clearance is obtained from the disclosing Party.

11.3    Each Party undertakes, subject to clause 11.4, not to disclose any Confidential Information of the other Party, nor to use such information for its own or anyone else's benefit.

11.4    Notwithstanding the provisions of clause 11.3, the Licensee shall be entitled to disclose any Confidential Information if and to the extent only that the disclosure is *bona fide* and necessary for the purposes of using the Intellectual Property Rights and Technology and/or producing, distributing, marketing and selling the Subject Isotopes pursuant to this Agreement, and only if the party to whom the information is disclosed provides a written undertaking to both the Licensee and Licensor that such information shall be kept confidential.

11.5    The obligation of confidentiality placed on the receiving Party in terms of this clause 11 shall cease to apply to the receiving Party in respect of any Confidential Information which –

11.5.1    is or becomes generally available to the public other than by the negligence or default of the receiving Party or by the breach of this Agreement by the receiving Party;

11.5.2    the disclosing Party confirms in writing is disclosed on a non-confidential basis;

16

11.5.3      has lawfully become known by or come into the possession of the receiving Party on a non-confidential basis from a source other than the disclosing Party having the legal right to disclose same, provided that such knowledge or possession is evidenced by the written records of the receiving Party existing at the Effective Date; or

11.5.4      is disclosed pursuant to a requirement or request by operation of law, regulation or court order, to the extent of compliance with such requirement or request only and not for any other purpose,

             provided that –

11.5.5      the onus shall at all times rest on the receiving Party to establish that information falls within the exclusions set out in clauses 11.5.1 to 11.5.4;

11.5.6      information will not be deemed to be within the foregoing exclusions merely because such information is embraced by more general information in the public domain or in the receiving Party's possession; and

11.5.7      any combination of features will not be deemed to be within the foregoing exclusions merely because individual features are in the public domain or in the receiving Party's possession, but only if the combination itself and its principle of operation are in the public domain or in the receiving Party's possession.

11.6        In the event that the receiving Party is required to disclose Confidential Information as contemplated in clause 11.5.4, the receiving Party will –

11.6.1      advise the disclosing Party thereof in writing prior to disclosure, if possible;

11.6.2      take such steps to limit the disclosure to the minimum extent required to satisfy such requirement and to the extent that it lawfully and reasonably can;

11.6.3      afford the disclosing Party a reasonable opportunity, if possible, to intervene in the proceedings;

17

                                                           ASPI_00025238

11.6.4       comply with the disclosing Party's  reasonable requests as to the manner and terms of any such disclosure; and

11.6.5       notify the disclosing Party of, and the form and extent of, any such disclosure or announcement immediately after it is made.

11.7       All documentation concerning the Intellectual Property Rights remains the exclusive property of the Licensor and upon termination of this Agreement will be returned to the Licensor.  The Licensee undertakes to prevent the unauthorised use of such documentation and will not make copies of any such documentation without the prior written consent of the Licensee.

## 12   BREACH

Should any Party ("**Defaulting Party**") commit a breach of any of the provisions of this Agreement, then the other Party ("**Aggrieved Party**"), shall be obliged to give the Defaulting Party 10 (ten) Business Days written notice or such longer period as may be reasonably required in the circumstances, to remedy the breach.  If the Defaulting Party fails to comply with the notice, the Aggrieved Party shall be entitled to claim immediate payment and/or specific performance by the Defaulting Party of all the Defaulting Party's obligations without prejudice to the Aggrieved Party's rights to claim damages.  The foregoing is without prejudice to any other rights as the Aggrieved Party may have at law, provided that the Aggrieved Party shall not be entitled to cancel this Agreement for any breach by the Defaulting Party.

## 13   DISPUTE RESOLUTION

13.1       The Parties agree that the terms of this Agreement will be performed in the spirit of mutual co-operation, trust and confidence. The Parties further agree to use their reasonable endeavours to resolve, through mutual consultation, without involving any third party or parties, any dispute which may arise under, out of, or in connection with or in relation to this Agreement. If following such mutual consultation, the dispute still remains outstanding, the matter shall be referred to the chief executive officer of each Party to the dispute or their respective representatives, who shall negotiate for a period of up to 5 (five) Business Days from the date of such referral in an attempt to resolve such dispute.  If following the expiry of such 5 (five) Business Day period, the

18

ASPI_00025239

dispute is still unresolved, then, save where otherwise provided in this Agreement, the matter shall be referred to arbitration in accordance with the remaining provisions of this clause 13.

13.2    This clause 13 is a separate, divisible agreement from the rest of this Agreement and shall -

13.2.1    not be or become void, voidable or unenforceable by reason only of any alleged misrepresentation, mistake, duress, undue influence, impossibility (initial or supervening), illegality, immorality, absence of consensus, lack of authority or other cause relating in substance to the rest of the Agreement and not to this clause 13, which issue, the Parties intend, shall be subject to arbitration in terms of this clause 13;  and

13.2.2    remain in effect even if the Agreement terminates or is cancelled.

13.3    Any dispute between the Parties as referred to in clause 13.4 that revolves around a factual matter, shall be referred to an expert for determination, which determination in the absence of manifest error in calculation, shall be final and binding on the Parties, and shall not be referred to arbitration. If the Parties cannot agree on the identity of such an expert, or whether the matter is a factual matter for determination, those determinations shall be referred to a person appointed in accordance with the provisions of clause 13.5 below.

13.4    Save to the extent to the contrary provided for in this Agreement, any dispute arising out of or in connection with this Agreement or the subject matter of this Agreement including, without limitation, any dispute concerning –

13.4.1    the existence of this Agreement apart from this clause 13;

13.4.2    the interpretation and effect of this Agreement;

13.4.3    the Parties' respective rights or obligations under this Agreement;

13.4.4    the rectification of this Agreement;

19

ASPI_00025240

13.4.5        the breach, termination or cancellation of this Agreement or any matter arising out of such breach, termination or cancellation;

13.4.6        damages in contract, in delict, compensation for unjust enrichment;  or

13.4.7        any other claim whether or not the rest of this Agreement apart from this clause 13 is valid and enforceable,

shall be decided by arbitration as set out in this clause 13.

13.5        The Parties to this dispute shall agree on the arbitrator.  If agreement is not reached within 10 (ten) Business Days after any Party to the dispute in writing calls for agreement, the arbitrator shall be appointed by the London Court of International Arbitration (**LCIA**) at the request of any Party to the dispute.

13.6        The request to nominate an arbitrator shall be in writing outlining the claim and any counterclaim of which the Party to the dispute concerned is aware and, if desired, suggesting suitable nominees for appointment, and a copy shall be furnished to the other Parties to the dispute who may, within 5 (five) Business Days, submit written comments on the request to the addressor of the request.

13.7        The arbitration shall, unless otherwise agreed between the Parties to the dispute, be held in London and the Parties shall endeavour to ensure that it is completed as soon as reasonably possible after notice requiring the claim to be referred to arbitration is given.

13.8        The proceedings in the arbitration shall as far as practicable take place in private and be kept confidential.

13.9        The arbitration shall take place in accordance with the LCIA Arbitration Rules.

13.10        The decision resulting from such arbitration shall be subject to a right of appeal to a panel of 3 (three) arbitrators as provided for in the LCIA Arbitration Rules whose decision shall, or, in the event that the single arbitrator's decision shall not have timeously been taken on appeal, the decision of the single arbitrator shall, in the absence of manifest error, be final and binding upon the Parties to the dispute, and may be made an order of any court of competent jurisdiction.

20

ASPI_00025241

13.11    This clause 13 shall not preclude any Party to a dispute from obtaining interim relief on an urgent basis from a court of competent jurisdiction pending the decision of the arbitrator or panel of arbitrators, on appeal.

## 14    NOTICES AND ADDRESSES

14.1    The Parties choose as their respective addresses set out in the pre-amble to this Agreement for all purposes arising out of or in connection with this Agreement, at which addresses all the processes and notices arising out of or in connection with this Agreement, its breach or termination, may validly be served upon or delivered to the Parties.

14.2    Any notice given in terms of this Agreement shall be in writing and shall -

14.2.1    if delivered by hand, be deemed to have been duly received by the addressee on the 1st (first) Business Day following the date of delivery;

14.2.2    if transmitted by facsimile, be deemed to have been duly received by the addressee on the 1st (first) Business Day following the date of despatch;  and

14.2.3    if delivered by recognised international courier service, be deemed to have been duly received by the addressee on the 1st (first) Business Day following the date of such delivery by the courier service concerned,

provided that the relevant notice is marked for the attention of the relevant Party's designated person for receipt of any processes and notices in connection with this Agreement as contemplated in 14.2.

14.3    Notwithstanding anything to the contrary contained in this Agreement, a written notice or communication actually received by the relevant Party's designated person for receipt of any processes and notices in connection with this Agreement as contemplated in 14.2 from another Party, shall be adequate written notice or communication to such Party.

21

    ASPI_00025242

## 15    MISCELLANEOUS AND WARRANTY OF AUTHORITY

### 15.1    Change of control or status

If there is a change of control or status of the Licensor or Licensor commits an act of insolvency or the ownership of the Intellectual Property Rights and/or Technology become vulnerable to claims by third parties, the Licensee shall have the right to call for the immediate and permanent assignment of the Intellectual Property Rights and Technology into its name for no additional consideration and the Licensor shall, if called upon to do so, assign over such Intellectual Property Rights and Technology.

### 15.2    Non- Assignment

Neither Party may assign, directly or indirectly, this Agreement or any of the rights under it to a third party without the other Party's prior written consent which cannot unreasonably be withheld, except that the Licensee may assign such rights for the purpose of re-structuring without the need for the consent of the Licensor.

### 15.3    Warranty of Authority

Each Party warrants to each of the other Parties that it has the power, authority and legal right to sign and perform this Agreement and that this Agreement constitutes valid and binding obligations on it in accordance with the terms of this Agreement and, in respect of each Party that is a company, has been duly authorised by all necessary actions of its directors.

### 15.4    Independent Advice

Each Party hereto acknowledges that it has been free to secure independent legal advice as to the nature and effect of all of the provisions of this Agreement and that it has either taken such independent legal advice or dispensed with the necessity of doing so.  Further, each Party hereto acknowledges that all of the provisions of this Agreement and the restrictions herein contained are fair and reasonable in all the circumstances and are part of the overall intention of the Parties in connection with the Company.

22

CONFIDENTIAL

15.5    **Implementation**

The Parties undertake to do all such things, perform all such acts and take all steps to procure the doing of all such things and the performance of all such acts, as may be necessary or incidental to give or be conducive to the giving of effect to the terms, conditions and import of this Agreement.

15.6    **Payment**

15.6.1    Any payment payable in terms of this Agreement shall be net of any withholding taxes, other taxes, duties or levies, if any, payable in respect of such payment except to the extent that value added tax (**VAT**) is payable on such amount in which case the relevant amount shall include the relevant VAT amount.

15.6.2    Any amount not paid when due and payable under this Agreement shall bear interest at the Prime Rate from the due date to date of payment in full.

15.7    **Whole Agreement**

This Agreement constitutes the whole agreement between the Parties as to the subject matter hereof and no agreement, representations or warranties between the Parties other than those set out herein are binding on the Parties. This Agreement may only be varied by mutual written agreement.

15.8    **Variation**

No addition to or variation, consensual cancellation or novation of this Agreement and no waiver of any right arising from this Agreement or its breach or termination shall be of any force or effect unless reduced to writing and signed by each of the Parties or their duly authorised representatives.

15.9    **Relaxation**

No latitude, extension of time or other indulgence which may be given or allowed by either Party to the other Party in respect of the performance of any obligation hereunder or enforcement of any right arising from this Agreement and no single or partial exercise of any right by either Party shall under any circumstances be

23

ASPI_00025244

construed to be an implied consent by such Party or operate as a waiver or a novation of, or otherwise affect any of that Party's rights in terms of or arising from this Agreement or estop such Party from enforcing, at any time and without notice, strict and punctual compliance with each and every provision or term hereof.

15.10   **Counterparts**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall be taken together and deemed to be one instrument.

Signed on this the        16th day of February 2024

*Robert Ainscow*

_____        For:   **ASP Isotopes UK Limited**

Duly Authorised

Name:        Robert Ainscow

Designation:      Director

24

CONFIDENTIAL

ASPI_00025245

_____
Paul Mann (Feb 16, 2024 14:12 GMT+2)

Duly Authorised

**For: Quantum Leap Energy LLC**

Name:        Paul Mann

Designation: Chairman and CEO

_____
Paul Mann (Feb 16, 2024 14:12 GMT+2)

Duly Authorised

**For: Quantum Leap Energy Limited**

Name:        Paul Mann

Designation: Director

25

                                                                                ASPI_00025246

# ASPI QLE IP Licence 16 February 2023

Final Audit Report                                                         2024-02-16

| | |
|---|---|
| Created: | 2024-02-16 |
| By: | Robert Ainscow (rainscow@aspisotopes.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAihIhgYxdWUFaborr1tXnfcsWL1Qpdun4 |

# "ASPI QLE IP Licence 16 February 2023" History

Document created by Robert Ainscow (rainscow@aspisotopes.com)
2024-02-16 - 12:09:43 PM GMT

Document emailed to Paul Mann (pmann@aspisotopes.com) for signature
2024-02-16 - 12:10:34 PM GMT

Email viewed by Paul Mann (pmann@aspisotopes.com)
2024-02-16 - 12:11:57 PM GMT

Document e-signed by Paul Mann (pmann@aspisotopes.com)
Signature Date: 2024-02-16 - 12:12:24 PM GMT - Time Source: server

Agreement completed.
2024-02-16 - 12:12:24 PM GMT

 Adobe Acrobat Sign

CONFIDENTIAL                                                         ASPI_00025247