# Exhibit 26

I1CHCHRC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHRISTINE ASIA, CO., LTD., *et al.*,

                    Plaintiffs,

          v.                              15 MD 2631 (CM)

ALIBABA GROUP HOLDING LIMITED,
et al.,

                    Defendants.           Conference

------------------------------x

                                          New York, N.Y.
                                          January 12, 2018
                                          10:15 a.m.

Before:

                    HON. COLLEEN MCMAHON,

                                          Chief Judge

                         APPEARANCES

THE ROSEN LAW FIRM P.A.
     Attorneys for Plaintiffs
BY:  LAURENCE M. ROSEN
     PHILLIP C. KIM
     JING CHEN

SIMPSON THACHER & BARTLETT LLP (NY)
     Attorneys for Defendants
BY:  JAMES G. KREISSMAN
     STEPHEN P. BLAKE

I1CHCHRC

(Case called)

MR. ROSEN:  Good morning, your Honor.  Laurence Rosen from the Rosen Law Firm on behalf of Christian Asia and the class.

MR. KIM:  Good morning, your Honor Phillip Kim Rosen Law Firm, for the plaintiffs.

MS. CHEN:  Good morning, your Honor.  Jing Chen, for the plaintiffs, Rosen Law Firm.

MR. KREISSMAN:  Good morning, your Honor.  Jim Kreissman from Simpson Thacher & Bartlett LLP on behalf of defendants.

MR. BLAKE:  Good morning, your Honor.  Stephen Blake, also from Simpson Thacher, on behalf of defendants.

THE COURT:  Have a seat.

So here we are.  I would like to know how the plaintiffs intend to prove this case.

MR. ROSEN:  Your Honor, of course, there are a number of different pieces of evidence that we require.

THE COURT:  I am asking you for how -- I mean, we are going to get down to a witness list.  We are going to get down to everything today.

Then I am going to talk to Simpson Thacher about something that I remember that I think it was Mr. Youngwood at the time said at an earlier conference.

So let's talk about how you are going to prove this

I1CHCHRC

case.  I had a long time to think about it.  How are you going to prove this case?

MR. ROSEN:  Your Honor, we will start with the attendees at the July meeting with the SAIC and from that we would look at internal memoranda.

THE COURT:  Wait a minute.  Attendees at the SAIC meeting in July of what?  2015?  What is the date?

MR. ROSEN:  I think July 16, 2015.

THE COURT:  '15.  Who was there?

MR. ROSEN:  Well, I know for one there was their chief regulatory officer, I believe -- I forget his first name, but his name is in the complaint.

THE COURT:  I would like to know who was there.

MR. ROSEN:  But I don't know who was there.

THE COURT:  Well --

MR. ROSEN:  That's something we need from discovery.

THE COURT:  Who do you know of who as in attendance at that meeting?

MR. ROSEN:  Well, the chief regulatory officer.

THE COURT:  Of Alibaba?

MR. ROSEN:  Of Alibaba, who reported to I believe the CFO, and then other senior business unit leaders.  We don't know their names.  So when they say senior business unit leaders, we don't know if that includes the president of the company, we don't know if that includes the president of

certain divisions.  We don't know exactly who they are, but that is something we need, of course, to start with.

THE COURT:  OK.  What government people were at that?

MR. ROSEN:  Well, the individuals in the complaint, there's a gentleman who was in charge -- he was the director of online businesses at the SAIC.  He was at the meeting we know for sure.

There were also the senior leaders of the provincial SAIC departments as well as the senior leader of the department in which Alibaba was headquartered, that particular city.

THE COURT:  Which is?

MR. ROSEN:  Off the top of my head I don't remember the name of the city.

THE COURT:  Do you know anything about your case?  I mean here we are, and I'm prepared to set a very, very detailed discovery schedule today with a very, very hard deadline and issue a very, very clear warning to the people at the back table about compliance.  And I want to do that.  Otherwise, it means nothing to me to have this conference.  So you are the plaintiff.  You have the burden of proof.  I am looking to you to tell me exactly what you want to do.

MR. ROSEN:  Yes, your Honor.

We want to get the attendees.  I believe there were 17 attendees at the meeting from the company as well as -- look, we cannot subpoena the SAIC.  Subpoenas in PRC are not going to

I1CHCHRC

work.

So the best --

THE COURT:  I asked you how you are going to prove your case.

MR. ROSEN:  We start with the 17 attendees who were from the company.

THE COURT:  And they are in China, right?

MR. ROSEN:  Yes.

THE COURT:  Right.

MR. ROSEN:  So --

THE COURT:  And how are we going to get them?

MR. ROSEN:  Because presumably they still work for the company or are under the company's control.  To the extent they are not under the company's control, we will try to find out where they're located.  If they're located in a jurisdiction where we can serve them, we will serve them.

THE COURT:  I have had the misfortune to have done cases with Chinese companies that set up dummy corporations in the United States in order to raise money in the stock markets before.  I have done this, been around this racetrack.  I told you that two years ago, and never, ever have I had an instance in which the plaintiffs' lawyers could tell me how they planned to get discovery and most of them didn't get discovery from the people in China.

MR. ROSEN:  Well, if they work for the company, the

I1CHCHRC

company will be under the jurisdiction of this Court.

THE COURT:  You think?

MR. ROSEN:  If they are no longer working for the company, and they are not under the company's control, we probably won't be able to get them unless they are in a jurisdiction that we can serve them with a subpoena.  That's something we will have to live with.  There's going to be third-party discovery of the underwriters.

THE COURT:  All they know is what they were told.

MR. ROSEN:  Right.

To the extent there is any mention in the due diligence materials of that meeting, that would be something we would want; or anything addressing the regulatory climate at the time, we would want that.  We would also want to have all ongoing communications with the SAIC and other regulators in China that oversaw their online business.

THE COURT:  By ongoing communications, you mean written communications?

MR. ROSEN:  Yes.  Post-IPO.  Any documents that memorialize communications between representatives of the company and either the SAIC or other regulatory agencies in China that would bear on these issues.

So I assume there were ongoing communications.  The complaint alleges that there were additional SAIC actions concerning pirated sale of pirated goods on the website.  Those

communications, those interactions and even following the issuance of the white paper by the SAIC, there would have been ongoing communications between the company, its representatives, and the SAIC, because there was a sort of hubbub or, you know, scandal, surrounding the issuance of the white paper.

All of that back and forth between the SAIC and the company, we'll want to get ahold of and review. And, you know, for some maybe two months after that. At some point, you know, we will cut that off, but the communications with the SAIC I think would extend beyond the class period to some extent based on when those issues were resolved. We would also want communications with analysts, because when these issues came to the fore, the company had communications with analysts. We want that.

THE COURT: I'm sorry. Why do you need discovery about communications with analysts?

MR. ROSEN: Well, what was the company telling the analysts about these problems and the SAIC regulatory issues? I think that's something of importance. There was an SEC investigation related to these issues of source. We are going to want those materials and the stock sales of the officers and directors. I think we would want evidence of that for trial.

And, of course, what actions the company took internally to deal with the July 16 meeting, and, you know,

both before the meeting and after the meeting the response to what the SAIC told them.

THE COURT:  You are going to get that information how?

MR. ROSEN:  From the defendants.

THE COURT:  Through?

MR. ROSEN:  Through discovery requests.

THE COURT:  Documents?  Depositions?

MR. ROSEN:  Yes.

THE COURT:  How are you planning to do it?

MR. ROSEN:  Of course, we want to start with depositions.  We met and conferred, defense counsel and plaintiff's counsel met and conferred over the last week on two occasions, and we discussed them giving us a initial set of documents that they produced to the state court litigation, there's a Section 11 case in San Mateo, the Superior Court in California.  There's about 100,000 pages there that cover --

THE COURT:  It's really easy.  Everything that was produced to the SEC and everything that was produced in the San Mateo litigation should be turned over to you and will be turned over to you by the end of next week.

How is that?

MR. ROSEN:  I think that gets us off to a good start, your Honor.

THE COURT:  Good.

MR. ROSEN:  And we may have, I think we will have some

I1CHCHRC

additional requests because our case is not a perfect overlap of the state court case. We have to prove scienter and loss causation. There are misstatements or statements by the company that are relevant throughout the class period.

So, we will have some broader requests, but I don't think it's going to be -- it's not 5 million pages. It will be targeted requests, your Honor. I think if we can have a method to expedite any disputes, that would go a long way to --

THE COURT:  Here's your expedited method:  Call me.

MR. ROSEN:  Yes, your Honor.

Another thing that defendants pointed out is that the state court case is stayed pending the decision in *Cyan*. They suggested we should hold off on depositions until --

THE COURT:  No.  Got it?

MR. ROSEN:  Yes, your Honor.

THE COURT:  This case is going to move.

MR. ROSEN:  So, your Honor, I think that if they give us the initial production from the SEC and the state court matter --

THE COURT:  By the end of next week.

MR. ROSEN:  -- we will be in a position, we will issue some interrogatories, we'll get the names of who was at the meeting, we will have some follow-up targeted requests, and hopefully within four or five months we will be done with the document review and can begin depositions.

I1CHCHRC

I think that depositions would have to occur in Hong Kong.  That's the standard practice with these cases.  A fair amount of it can be tricky scheduling, you know, everyone going to Hong Kong and spending a week or two.

THE COURT:  You brought the case.  You are going to go when I tell you to go.

MR. ROSEN:  Yes, your Honor.

But the depositions take longer.  What happens, your Honor, is with the interpreters, I assume there's going to be interpreters --

THE COURT:  I assume.

MR. ROSEN:  -- everything takes twice as long.

THE COURT:  I understand.  We do that all the time.  I try cases with interpreters all the time.

MR. ROSEN:  So it takes a little bit longer.  There are state secrecy laws which defendants have mentioned to be an issue.

THE COURT:  Yes.  The defendants have mentioned those to me sometime ago.  My position is very clear.  If you want to raise money in the United States of America, the only laws that matter to me are the laws of the United States of America.

If you don't want to cooperate with discovery as directed by this Court pursuant to the laws of the United States of America, we have the rule, Rule 37, and it calls for remedies for the refusal to cooperate including but not limited

I1CHCHRC

to preclusion on any and all issues.  I am not allergic to that rule.

MR. ROSEN:  Yes, your Honor.

So, defense counsel and plaintiffs counsel met and conferred --

THE COURT:  I must tell you, if it were Alibaba's position that this involved state secrets, I would have a real hard time swallowing that.

I was warned about this when the case first walked in the door.  The representation was made to me by a lawyer from Simpson Thacher that they would cooperate with discovery to the extent they could do so under Chinese law.  I said no, no, no, no, then, and I say no, no, no, no now.  If you choose to raise money in the United States, you choose to subject yourself to the laws of the United States, including the litigation laws of the United States.  That's my position.  You should be happy about that.

MR. ROSEN:  Yes, your Honor.

We have worked with Simpson Thacher before on these types of cases.  I think that, based on our initial meet-and-confer we've come up with a schedule that we would like to propose to your Honor.

THE COURT:  OK.  Let me talk to the folks from Simpson Thacher first and get some idea of what kind of protests they are going to utter to the discovery ideas that you have.

I1CHCHRC

Good morning.

MR. KREISSMAN:  Good morning, your Honor.

THE COURT:  How are you?

MR. KREISSMAN:  I am doing excellent.

THE COURT:  Wonderful.  Happy new year, Mr. Kreissman.

MR. KREISSMAN:  The same to you.

Your Honor, if I could start by saying your suggestion, more than suggestion, your statement that we will be turning over those 100,000 pages plus the SEC production by the end of next week, we had already offered that to Mr. Rosen. We completely agree.  It makes sense.

We will be submitting a protective order that follows the form that your Honor has previously approved.  We have sent a draft to Mr. Rosen.  We hope to have that to you early next week, and then there's no reason we cannot comply precisely with the schedule set.

THE COURT:  Terrific.

MR. KREISSMAN:  Having said that, before we turn to discovery, I just want to take a moment to talk about the California action, because this may ultimately be an issue that your Honor has to deal with, and I just want to explain why.

THE COURT:  I have to deal with California?  It is easier to deal with China.

MR. KREISSMAN:  I think your Honor is aware of the *Cyan* case pending before the Supreme Court, which relates to

I1CHCHRC

the question of whether state courts maintain jurisdiction over purely '33 Act claims.

THE COURT:  Yes.

MR. KREISSMAN:  The Supreme Court heard argument on that two months ago.

THE COURT:  Yes, I know.  They have done nothing yet.

MR. KREISSMAN:  Right.

On an average timetable, in March or April we'll hear from the Court, although you don't know when it's going to be. If the Supreme Court accepts either the position of the SEC or the position of petitioner in this case, then the state case is going to the out of state court, and it's going to, in all likelihood, wind up in federal court, your Honor, and that means in all likelihood it is going to be transferred to you.

THE COURT:  Like San Francisco or something?

MR. KREISSMAN:  I would suggest, your Honor, that it would make sense for these two cases to be litigated together and that case would be transferred to this Court.

THE COURT:  Well, right now, it's in state court in California.  I can't get it here.  If it will stay in state court in California or presumably it's going to be refiled in -- I don't know -- the Northern District of California. Where is it pending in state court right now?

MR. KREISSMAN:  San Mateo County.

THE COURT:  What district is that in?

I1CHCHRC

MR. KREISSMAN:  That is in the Northern District.

THE COURT:  In the Northern District.  Especially if we are chugging along, I'm sure that the very busy judges in the Northern District of California, who have never hesitated to send work east in appropriate circumstances, might well be willing to do that, to entertain that notion, but somebody is going to have make a motion.  I am not stopping this case.

MR. KREISSMAN:  Sure.  And, your Honor, I don't want you to stop the case at all.  What I suggest, and we don't have to cross the rubicon on this yet, but we would like to proceed very expeditiously on all document discovery, on all written discovery.

I want to talk to your Honor in a moment about narrowing the scope of the case in light of what the Second Circuit did, and, if your Honor will permit me, I will get to that in a moment.

THE COURT:  What the Second Circuit did was send it back.

MR. KREISSMAN:  Yes, your Honor.

But what happened is there were 23 misrepresentations and omissions in the complaint.  Plaintiffs only appealed three of them.  We would like to either move to the Court or ask the Court's guidance on how we can have the scope of this case on an ongoing basis limited to what it is that they appealed.

We have raised the waiver argument in the Second

I1CHCHRC

Circuit. They didn't respond. The Second Circuit didn't address those other 20 misreps and omissions.

I think that the case is down to its core, which is should the company have disclosed the July 16 meeting and the aftermath and the facts relating to the white paper.

There's all this other stuff that your Honor dismissed relating to the Red Shield program, relating to issues about whether a material portion of the company's revenues come from the sales of counterfeit goods.

Our position is that is all out of the case. I just wanted to ask your Honor how your Honor would like either us to bring that issue to you or ask the plaintiffs to do something to narrow their claims. I would like to do that expeditiously as well, but I didn't want to be presumptuous and just file a motion. We could file a motion for judgment on the pleadings or a motion to strike or your Honor could say plaintiffs should issue a new complaint.

THE COURT: Oh, please. Oh, God, no. No more pleadings. No more pleadings.

MR. KREISSMAN: In that case I would suggest with your Honor's --

THE COURT: Here's what I would suggest. I would suggest that over the next couple of days you all get together and talk and you see if it is the plaintiff's position that it will deem its case narrowed to the issues that you think are

I1CHCHRC

encompassed by the appeal and the Second Circuit's decision.

If they don't -- and I will be shocked if they agree with you, I would be pleasantly surprised, very happy -- if they don't, then I am afraid you are going to have to make a motion.

MR. KREISSMAN:  Yes.

THE COURT:  You should make it immediately, because until I have decided that motion, we are chugging along on discovery on the complaint that got sent back to me.

MR. KREISSMAN:  I understand, your Honor.  We've already started a meet-and-confer on this.

THE COURT:  Great.

MR. KREISSMAN:  I don't know whether it will succeed or not, but we will move expeditiously if we cannot reach agreement.

I take it, your Honor, a motion for judgment on the pleadings would be acceptable to you?

THE COURT:  In my life I have never told Simpson Thacher & Bartlett how to practice law.

MR. KREISSMAN:  Very well, your Honor.

Your Honor, getting back to the discovery point, my point was simply there's a lot to be done now.  We can do class certification, document discovery, interrogatories, requests for admission.  I would just say on the depositions, because we don't have to decide it today, let's wait and see what happens

in *Cyan*.  Obviously, if we're ready for depositions and *Cyan* still hasn't been decided --

THE COURT:  I didn't understand your opponent to be suggesting that he wanted to take depositions before he had documents.

MR. KREISSMAN:  I agree, your Honor.

THE COURT:  In fact, I thought I heard him say exactly the opposite.

MR. KREISSMAN:  He did, your Honor.

THE COURT:  Right.  Because he's a good and sensible lawyer.  So certainly by the time he's ready to take some depositions, even if that is a little sooner than he would like it to be, *Cyan* will be decided.

MR. KREISSMAN:  I certainly hope so, your Honor.

THE COURT:  Unless the Court puts it off into the next term.

MR. KREISSMAN:  Right.  We are in a hundred percent agreement on that, your Honor.

THE COURT:  OK.

MR. KREISSMAN:  We will address it at that time.

THE COURT:  OK.

What are we going to do about class cert.?

I mean it is a IPO Case.  It is not a terribly complicated class cert. motion.

MR. ROSEN:  Yes, your Honor.  In the schedule we

discussed, we had our motion being filed for class cert. on May 11.

THE COURT:  Let's see what the schedule looks like.

Do you happen to have a copy for me.

MR. ROSEN:  I have a copy.  If I may, your Honor.

THE COURT:  Sure.

I have to tell you, this is an IPO case.  There are no complicated issues on class certification here.  This is the increasingly rare kind of case where everybody's in the same boat.  What's the big deal?

MR. ROSEN:  Your Honor, I don't think there's any big deal.  I think we will want to submit an expert report with our opening papers, and defendants will want to have a rebuttal report and then we will issue a reply, probably issue a reply report.

THE COURT:  I am not prepared to let this case go into September of 2019.  This is a very leisurely discovery schedule.

MR. ROSEN:  The reason we built, have an ending in the first month, I think it's the first month of 2019, your Honor, is --

THE COURT:  No.  I don't care.  Fact, expert, I only care about the end of discovery.  You have the end of discovery by the end of May of 2019.

MR. ROSEN:  If you include the expert discovery, I

I1CHCHRC

see, your Honor.

THE COURT:  Discovery is discovery.

MR. ROSEN:  Yes, I see.

Your Honor, if we could, you know, I think we can move it earlier if we can continue the fact discovery, because what sometimes happens is there are lingering disputes that --

THE COURT:  You see there aren't going to be lingering disputes.  The reason there aren't going to be lingering disputes is that I'm going to set a whole bunch of very firm dates which I will never extend.  If there is a dispute and you don't raise it before the deadline, the dispute doesn't exist. We will resolve the disputes quickly and informally over the telephone, and if there's noncompliance I will expect a Rule 37 motion.  It is that simple.

MR. ROSEN:  Yes.

THE COURT:  We are not going to have long briefs.  We are not going to have five-page letter briefs.  We are going to have you talk, I decide.

MR. ROSEN:  Yes, your Honor.

I understand your standard schedule is very short.

THE COURT:  I understand that it has to be longer than my standard schedule, but this is more than a year and a half until you file summary judgment motions, more than a year and a half.

MR. ROSEN:  Could we file summary judgment motions in

I1CHCHRC

15 months.

THE COURT:  Sure.  15 months sounds a lot better to me.

MR. ROSEN:  Thank you, your Honor.

MR. KREISSMAN:  Your Honor, would you like the parties to work out a revised schedule that shows summary judgment filed in 15 months and submit it to the Court for review?

THE COURT:  I think that would be a great idea.

MR. KREISSMAN:  We would be happy to meet and confer today.

THE COURT:  Otherwise, I have to say you seem to have ticked off all the boxes.  I would move up the class cert. motion.  It is a very simple motion.  My position on it, I'm waiting for the defendants to explain to me why I shouldn't grant it.

MR. KREISSMAN:  On class cert., your Honor, sitting here today, I anticipate an issue with the class period.  I may anticipate some other issues, but without committing myself definitively, I'm not anticipating opposing class certification as a general matter.

THE COURT:  See, I thought he was going to say that. That being so, we don't need to have a deposition of the class plaintiff.  This is an IPO case.

So you are going to come up with a better schedule that gets me summary judgment motions by March 29, 2019, and I

I1CHCHRC

will sign off on that.

I will sign your protective order as soon as you submit it to me, as long as it has my magic language in it.

And what else?

MR. ROSEN:  Nothing from the plaintiffs, your Honor.

THE COURT:  Good.

MR. KREISSMAN:  The only thing I had left --

THE COURT:  You are going to keep me advised of what is going on in California.

MR. KREISSMAN:  Absolutely.

THE COURT:  But, believe me, the California people have to understand, we can end up doing it one of two ways. That really could possibly include the state court as well.  We can coordinate, but they have to do it on my schedule; or, if the case gets ends up in federal court and somebody wants to move it here, they have to get on the train.

MR. KREISSMAN:  I understand, your Honor.  I was going to raise the issue of coordination.  If *Cyan* comes out in favor of the respondent, I think it makes sense, but we would raise that with you.

THE COURT:  It does, except I don't slow down the train.  I don't know anything about the California state courts.  I know a lot about the New York state courts, in which I have both litigated and judged.  We move a little faster over here than they tend to across the street.  I am not prepared to

I1CHCHRC

slow down.

MR. KREISSMAN:  I completely understand, your Honor. For what it's worth, my instinct is that, given the fact that we've already had six or seven months of document and written discovery in California that you would not need to slow down if, in fact, we coordinate.

THE COURT:  Which would be great.  Since that is going to be turned over, you folks have to start reading.  Just start reading.

MR. KREISSMAN:  The last thing I wanted to mention to your Honor, I think Mr. Rosen and I are in agreement on this, is that we want to defer filing our answer until we've resolved the question of what misrepresentations are and are not in the case.

THE COURT:  I think that is a great idea.

On the 25 rules that I give to my law clerks over the course of their clerkship, the one that most of them take away as the most unusual rule is the answer is the least important document in the case, and it is.  So I don't care when you file your answer.

MR. KREISSMAN:  Thank you, your Honor.

I have nothing further, unless your Honor has any questions for me.

THE COURT:  I don't.

OK.  Great.

I1CHCHRC

Welcome back.

MR. KREISSMAN:  Thank you, your Honor.

THE COURT:  Let's see if I can get rid of you again.

(Adjourned)