UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK LEONE, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

ASP ISOTOPES INC., *et al.*,

Defendants.

Case No. 1:24-cv-09253-CM

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**

**TABLE OF CONTENTS**


I. INTRODUCTION ........ 1

II. FACTUAL AND PROCEDURAL HISTORY OF THE LITIGATION ........ 4

III. STANDARDS FOR FINAL APPROVAL UNDER RULE 23(e) ........ 4

IV. ARGUMENT ........ 5

A. The Settlement Is Fair, Reasonable, And Adequate And Warrants Final Approval ........ 5

1. Lead Plaintiff And Lead Counsel Adequately Represented The Settlement Class ........ 5

2. The Settlement Is The Result Of Arm's-Length Negotiations ........ 7

3. The Settlement Is A Fair And Reasonable Result For The Settlement Class In Light Of The Benefits Of The Settlement And The Risks Of Continued Litigation ........ 8

(a) Complexity, Expense, And Duration of Litigation ........ 9

(b) Risk Of Establishing Liability ........ 11

(c) Risk Of Establishing Loss Causation And Damages ........ 14

(d) Risk Of Maintaining Class Action Status ........ 15

(e) Range Of Reasonableness In Light Of The Best Possible Recovery And Attendant Risks Of Litigation ........ 16

4. Rule 23(e)(2)(C)(ii)-(iv) Factors Either Support Final Approval Or Are Neutral ........ 17

5. The Settlement Treats All Members Of The Settlement Class Equitably Relative To Each Other ........ 19

6. The Remaining *Grinnell* Factors Favor Final Approval ........ 20

B. The Notice Program Satisfies Rule 23 And Due Process ........ 22

C. Certification Of The Settlement Class Remains Appropriate ........ 23

D. The Plan Of Allocation Is Fair And Reasonable And Treats Class Members Equitably ........ 23

V. CONCLUSION ........ 25

**TABLE OF AUTHORITIES**

CASES

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) .......... 15

*Becker v. Bank of New York Mellon Trust Co., N.A.*,
2018 WL 6727820 (E.D. Pa. Dec. 21, 2018) .......... 18

*Chatelain v. Prudential-Bache Sec., Inc.*,
805 F. Supp. 209 (S.D.N.Y. 1992) .......... 15

*Christine Asia Co., Ltd. v. Yun Ma*,
2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) .......... 10, 12, 19

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) .......... 5, 9, 12, 16

*City of Providence v. Aeropostale, Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014) .......... 9

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007) .......... 6

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001) .......... 7

*Davenport v. Elite Model Mgmt. Corp.*,
2014 WL 12756756 (S.D.N.Y. May 12, 2014) .......... 17

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006) .......... 6

*Dura Pharms., Inc., v. Broudo*,
544 U.S. 336 (2005) .......... 14

*Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021) .......... 15

*Gordon v. Vanda Pharm. Inc.*,
2022 WL 4296092 (E.D.N.Y. Sept. 15, 2022) .......... 9

*Guevoura Fund Ltd. v. Sillerman*,
2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) .......... 15, 19

*In re 3D Sys. Sec. Litig.*,
2024 WL 50909 (E.D.N.Y. Jan. 4, 2024) .......... 5

*In re "Agent Orange" Prods.* Liab. Litig.,
597 F. Supp. 740 (E.D.N.Y. 1984) .......... 16

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
298 F.R.D. 171 (S.D.N.Y. 2014) .......... 23

*In re AOL Time Warner, Inc.*,
2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) .......... 22

*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012) .......... 21, 23

*In re Blech Sec. Litig.*,
2000 WL 661680 (S.D.N.Y. May 19, 2000) .......... 22

*In re China Sunergy Sec. Litig.*,
2011 WL 1899715 (S.D.N.Y. May 13, 2011) .......... 10

*In re Citigroup Inc. Sec. Litig.*,
965 F. Supp. 2d 369 (S.D.N.Y. 2013) .......... 9

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) .......... 15

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) .......... 14

*In re GSE Bonds Antitrust Litig.*,
414 F. Supp. 3d 686 (S.D.N.Y. Nov. 7, 2019) .......... *passim*

*In re Hawaiian Elec. Indus., Inc., S'holder Deriv. Litig.*,
2026 WL 1500862 (D. Haw. May 28, 2026) .......... 8

*In re Indep. Energy Holdings PLC Sec. Litig.*,
2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) .......... 10

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .......... 12, 15

*In re Metlife Demutualization Litig.*,
689 F. Supp. 2d 297 (E.D.N.Y. 2010) .......... 22

*In re Patriot Nat'l, Inc. Sec. Litig.*,
828 F. App'x 760 (2d Cir. 2020) ... 6

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
330 F.R.D. 11 (E.D.N.Y. 2019) ... 5

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
962 F. Supp. 450 (D.N.J. 1997) ... 12

*In re Signet Jewelers Ltd. Sec. Litig.*,
2020 WL 4196468 (S.D.N.Y. July 21, 2020) ... *passim*

*In re Tenaris S.A. Sec. Litig.*,
2024 WL 1719632 (E.D.N.Y. Apr. 22, 2024) ... 21

*In re Veeco Instruments Inc. Sec. Litig.*,
2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ... 25

*In re Vivendi Universal, S.A. Sec. Litig.*,
284 F.R.D. 144 (S.D.N.Y. 2012) ... 17

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005) ... 23

*Jones v. Singing River Health Servs. Found.*,
865 F.3d 285 (5th Cir. 2017) ... 7

*Lea v. Tal Educ. Grp.*,
2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021) ... 6, 7, 18, 19

*Leone v. ASP Isotopes Inc.*,
811 F. Supp. 3d 563 (S.D.N.Y. 2025) ... 6, 7, 11, 13, 23

*Lozada v. TaskUs, Inc.*,
2025 WL 4633942 (S.D.N.Y. June 13, 2025) ... 8

*Maley v. Del Global Techs. Corp.*,
186 F. Supp. 2d 358 (S.D.N.Y. 2002) ... 13, 20

*Mild v. PPG Indus., Inc.*,
2019 WL 3345714 (C.D. Cal. July 25, 2019) ... 7

*Morris v. Affinity Health Plan, Inc.*,
859 F. Supp. 2d 611 (S.D.N.Y. 2012) ... 8

*Pearlstein v. BlackBerry Ltd.*,
2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022) ........ *passim*

*Rabbi Jacob Joseph Sch. v. Allied Irish Banks, P.L.C.*,
2012 WL 3746220 (E.D.N.Y. Aug. 27, 2012)........ 9

*Robbins v. Koger Props., Inc.*,
116 F.3d 1441 (11th Cir. 1997) ........ 13

*Shapiro v. JPMorgan Chase & Co.*,
2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ........ 2, 21

*Silverman v. Motorola Sols., Inc.*,
739 F.3d 956 (7th Cir. 2013) ........ 2

*Strougo v. Bassini*,
258 F. Supp. 2d 254 (S.D.N.Y. 2003) ........ 9

*Vitale v. City of New York*,
2026 WL 1906262 (S.D.N.Y. July 1, 2026)........ 8

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005) ........ 20

STATUTES

15 U.S.C. § 78u-4(a)(7) ........ 22

Rules

Fed. R. Civ. P. 23........ *passim*

OTHER AUTHORITIES

Advisory Committee Notes to 2018 Amendments,
324 F.R.D. 904 ........ 5

Court-appointed lead plaintiff Mark Leone ("Lead Plaintiff"), on behalf of himself and the Settlement Class, respectfully submits this memorandum of law in support of his unopposed motion for final approval of the proposed Settlement and Plan of Allocation.[1]

## I. INTRODUCTION

On July 9, 2026, the Court issued its order preliminarily finding the Settlement to be fair, reasonable and adequate. *See* ECF No. 94 ("Preliminary Approval Order"). Since then, Lead Counsel has diligently overseen the notice program and, to date, no shareholders have objected to the Settlement or requested exclusion from the Settlement Class. As nothing has transpired to disrupt the Court's preliminary findings, the Court should grant final approval to the Settlement.

The Settlement is substantively fair. Lead Plaintiff has agreed to settle all claims against Defendants in exchange for a non-reversionary, all cash payment of $9,350,000 for the benefit of the Settlement Class. As explained herein, the Settlement represents a recovery of approximately 11.8% of the maximum recoverable damages related to the pending claims, which is more than two and a half times the 4.4% median settlement value for securities class actions with comparable maximum damages. *See* Ex. 4, NERA Report excerpts at p. 27 (Fig. 23). This is an excellent result when balanced against the many risks of continued litigation.

While Lead Counsel believe their claims are meritorious, they recognize the substantial challenges to establishing liability, proving damages, and collecting a greater amount. Among the many risks to Plaintiffs' case were that: (i) Defendants argued, and were likely to continue to argue, that falsity and scienter were lacking because they disclosed the allegedly concealed information; (ii)

[1] Unless otherwise noted, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated July 2, 2026 (the "Stipulation"; ECF No. 93-1), or in the concurrently filed Declaration of Garth Spencer ("Spencer Declaration"). Citations to "¶__" or "Ex. __" in this memorandum refer to paragraphs in, or exhibits to, the Spencer Declaration.

Defendants likewise were expected to continue to argue that investors' losses were caused by non-fraud-related factors such as a short seller's efforts to depress ASPI's stock price, and substantial confounding information; (iii) Defendants were likely to attempt to develop information in discovery they could use to decertify the class; (iv) ASPI is unprofitable and suffered increasing losses, which presented potential collectability risks after years of litigation and appeals; and (v) developing the facts needed to prove Lead Plaintiff's claims would have been made more difficult, expensive, and uncertain given that most of ASPI's employees and operations are located in South Africa, and certain discovery may have been delayed or precluded by the Hague Evidence Convention and/or South African nuclear secrecy laws.

Considering the risks, costs, and delays of continued litigation, including the substantial risk of no recovery whatsoever, the Settlement is substantively fair. *See Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *11 (S.D.N.Y. Mar. 24, 2014) (settlement amount must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case"); *see also Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) ("Defendants prevail outright in many securities suits.").[2]

The Settlement was also achieved in a procedurally fair manner. Lead Counsel's substantial efforts and well-developed understanding of the strengths and weaknesses of the Action informed the decision to settle. Prior to settlement, Lead Counsel, *inter alia*:

- conducted an extensive investigation into ASPI's allegedly wrongful acts, which included, among other things: (a) reviewing and analyzing (i) ASPI's filings with the U.S. Securities and Exchange Commission ("SEC"), (ii) research reports prepared by securities and financial analysts, news articles, and other information available online concerning Defendants, (iii) ASPI's investor presentations, interviews, and investor call transcripts, and (iv) other publicly available material concerning Defendants; (b) retaining and working with private investigators to

---

[2] Unless otherwise noted, all internal citations and quotations have been omitted, and emphasis has been added.

conduct an investigation involving, *inter alia*, locating and interviewing former ASPI employees and other sources of relevant information, including those in South Africa; and (c) consulting with a loss causation and damages expert;

- drafted the comprehensive Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint");

- thoroughly researched and analyzed Defendants' motion to dismiss, and researched, drafted, and filed an opposition to Defendants' motion;

- filed a motion for class certification and engaged in substantial briefing on the motion;

- procured from Defendants 4,979 documents totaling approximately 31,595 pages concerning the matters alleged in the Complaint, and conducted significant additional discovery through document subpoenas to non-Parties TerraPower LLC, Canaccord Genuity LLC, and Equiniti Trust Company LLC;

- pressed important discovery issues through multiple meet and confers and, where necessary, motion practice;

- researched, drafted, and exchanged with Defendants detailed mediation statements and exhibits addressing issues of liability and damages; and

- participated in a full-day mediation session and follow-up negotiations under the auspices of a well-respected mediator of complex cases (David M. Murphy, Esq. of Phillips ADR Enterprises). *See* ¶¶12-28; 74.

The Settlement is therefore the result of arm's-length negotiations, conducted by informed and experienced counsel, and overseen by a well-respected mediator. Indeed, the Settlement itself was the result of a mediator's proposal. In other words, there was no collusion, and the process by which the Settlement was reached was procedurally fair. Because the Settlement is substantively fair, and was achieved in a procedurally fair manner, final approval is appropriate.

Lead Plaintiff also moves for approval of the proposed Plan of Allocation of the Net Settlement Fund. The Plan of Allocation was developed in conjunction with Lead Plaintiff's consulting damages expert and is designed to distribute the proceeds of the Net Settlement Fund fairly and equitably to Settlement Class Members. No Settlement Class Member is favored over another under the proposed plan; all Settlement Class Members are treated in the same manner. *See* ¶¶62-70. Since the Plan of

Allocation is fair and reasonable, it too should be approved.

Lastly, Lead Plaintiff seeks final certification of the Settlement Class. The Court provisionally certified the Settlement Class in its Preliminary Approval Order, and no pertinent changes have transpired that would upset or alter the Court's earlier findings and determinations. The Court should, therefore, certify the Settlement Class for settlement purposes.

## II. FACTUAL AND PROCEDURAL HISTORY OF THE LITIGATION

The Spencer Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for a detailed description of, *inter alia*: the factual background and procedural history of the Action, the nature of the claims asserted, the negotiations leading to the Settlement, the risks and uncertainties of continued litigation, and the terms of the Plan of Allocation of the Net Settlement Fund.

## III. STANDARDS FOR FINAL APPROVAL UNDER RULE 23(e)

Rule 23(e)(2) of the Federal Rules of Civil Procedure provides that a class action settlement must be presented to the Court for approval and should be approved if the Court finds it "fair, reasonable, and adequate." In making this determination, Rule 23(e)(2), which governs final approval, requires courts to consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Factors (A) and (B) "identify matters . . . described as procedural concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement," while factors

(C) and (D) "focus on . . . a substantive review of the terms of the proposed settlement," *i.e.*, "[t]he relief that the settlement is expected to provide to class members." Fed. R. Civ. P. 23, Advisory Committee Notes to 2018 Amendments, 324 F.R.D. 904, 919; *see also In re 3D Sys. Sec. Litig.*, 2024 WL 50909, at *5 (E.D.N.Y. Jan. 4, 2024) ("In conducting this inquiry, courts consider the substantive and procedural fairness of a proposed settlement to determine whether the terms of the settlement and the negotiation process leading up to it are fair.").

The Rule 23(e)(2) factors "add to, rather than displace, the *Grinnell* factors" traditionally considered by courts within the Second Circuit. *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019). The Second Circuit's traditional factors utilized to evaluate the propriety of a class action settlement (certain of which overlap with Rule 23(e)(2)) are, therefore, still relevant:

> (1) complexity, expense and likely duration of the case; (2) reaction of the class; (3) stage of the proceedings and the amount of discovery completed; (4) risks of proving liability; (5) risks of proving damages; (6) risks of maintaining the class through the trial; (7) ability of defendants to fund a larger judgment; (8) range of reasonableness of the settlement fund in light of the best possible recovery; and (9) range of reasonableness of the settlement fund in light of all attendant risks.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974); *see also In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. Nov. 7, 2019) (evaluating settlement based on factors set forth in Rule 23(e)(2) and *Grinnell*).

As set forth below, the proposed Settlement satisfies the criteria for final approval under the Rule 23(e)(2) factors, as well as the non-duplicative *Grinnell* factors.

## IV. ARGUMENT

### A. The Settlement Is Fair, Reasonable, And Adequate And Warrants Final Approval

#### 1. Lead Plaintiff And Lead Counsel Adequately Represented The Settlement Class

Rule 23(e)(2)(A) requires the Court to consider whether the "class representatives and class

counsel have adequately represented the class." "Determination of adequacy typically entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007); *GSE Bonds*, 414 F. Supp. 3d at 692; *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) ("the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members.").

Here, as the Court previously found, Lead Plaintiff's claims are typical and coextensive with the claims of the Settlement Class, and he has no antagonistic interests. *Leone v. ASP Isotopes Inc.*, 811 F. Supp. 3d 563, 613-14 (S.D.N.Y. 2025). Lead Plaintiff's interests are aligned with other Settlement Class Members' interests because they all allegedly suffered the same injuries—monetary losses resulting from Defendants' alleged violations of the federal securities laws. *See In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 764 (2d Cir. 2020) (finding adequacy where "lead plaintiffs were sufficiently motivated to recover as much as possible for each class member"); *Lea v. Tal Educ. Grp.*, 2021 WL 5578665, at *6 (S.D.N.Y. Nov. 30, 2021) ("Plaintiffs interests are directly aligned with the interests of the Settlement Class as they all involved purchased [defendant's securities] during the Class Period and allegedly suffered harm as a result of Defendants' alleged misdeeds."). "Because of these injuries, plaintiffs have an interest in vigorously pursuing the claims of the class." *GSE Bonds*, 414 F. Supp. 3d at 692. Lead Plaintiff has also demonstrated his commitment to this case by, *inter alia*, overseeing the litigation and communicating with Lead Counsel, providing written discovery responses and objections, sitting for deposition, and participating in settlement discussions with Counsel. ¶102; *see* Ex. 2, Leone Decl., ¶¶3-6. Lead Plaintiff's active participation in, and commitment to, the Action reinforces the reasonableness of the Settlement.

Moreover, Lead Plaintiff has demonstrated commitment to this litigation by "retaining qualified and experienced counsel." *Tal Educ. Grp.*, 2021 WL 5578665, at *6. Lead Counsel has substantial experience in securities class actions, as this Court previously found. *See* Ex. 3 (Glancy Prongay Wolke & Rotter LLP ("GPWR") firm résumé); *Leone*, 811 F.Supp.3d at 614 ("[T]he Court finds that Glancy Prongay & Murray LLP [now known as GPWR] is qualified, experienced, and fully capable of serving as Lead Counsel. The firm has substantial experience in securities class actions, including in this District, and has been found adequate in numerous cases."). In this litigation, Lead Counsel has diligently litigated on behalf of the putative class. Lead Counsel has demonstrated its abilities and commitment to this litigation by, among other things, conducting a thorough investigation into the facts of the case, drafting an amended complaint, successfully responding to a motion to dismiss, obtaining class certification, participating in document and deposition discovery, engaging where necessary in discovery motion practice, and participating in mediation proceedings before a third-party neutral. *See* ¶¶12-28; 74.

In sum, Lead Plaintiff and Lead Counsel have adequately represented the proposed Settlement Class. *See Mild v. PPG Indus., Inc.*, 2019 WL 3345714, at *3 (C.D. Cal. July 25, 2019) (finding adequacy where "Plaintiff's … interest in obtaining the largest possible recovery is aligned with the interests of the rest of the Settlement Class members"; and "Lead Counsel [GPWR] are highly experienced in securities litigation and have vigorously prosecuted the Settlement Class's claims by expending significant time and effort on the case.").

### 2. The Settlement Is The Result Of Arm's-Length Negotiations

Rule 23(e)(2)(B) evaluates whether the proposed settlement "was negotiated at arm's length." In conducting this analysis, courts recognize that a "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001); *see also Jones v. Singing River Health Servs. Found.*,

865 F.3d 285, 295 (5th Cir. 2017) ("[t]he involvement of 'an experienced and well-known' mediator 'is also a strong indicator of procedural fairness.'") (quoting *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 618 (S.D.N.Y. 2012)).

Here, the Parties' settlement negotiations were facilitated by Mr. Murphy, a respected mediator, through an in-person mediation session. ¶25; *see In re Hawaiian Elec. Indus., Inc., S'holder Deriv. Litig.*, 2026 WL 1500862, at *3 (D. Haw. May 28, 2026) (that Mr. Murphy is a "highly experienced" mediator "cannot be questioned," and his involvement in negotiations supported the fairness of the settlement). The settlement negotiations also included follow-up negotiations that ultimately culminated in the Parties' accepting Mr. Murphy's double-blind mediator's recommendation to settle the Action for $9,350,000. ¶25.

The arm's-length nature of the settlement negotiations, and the involvement of a mediator with substantial experience mediating complex securities class actions, supports the conclusion that the Settlement is fair. *See Lozada v. TaskUs, Inc.*, 2025 WL 4633942, at *1 (S.D.N.Y. June 13, 2025) (preliminarily approving settlement that was "the result of informed, extensive arm's-length, and non-collusive negotiations between experienced counsel, including mediation under the direction of an experienced mediator, David Murphy"). The fact that the Settlement is based on a mediator's proposal further supports its fairness. *See Vitale v. City of New York*, 2026 WL 1906262, at *3 (S.D.N.Y. July 1, 2026) (noting that "in reaching a settlement the parties accepted the independent Mediator's proposal").

### 3. The Settlement Is A Fair And Reasonable Result For The Settlement Class In Light Of The Benefits Of The Settlement And The Risks Of Continued Litigation

Under Rule 23(e)(2)(C), the Court must also consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" along with other

relevant factors.[3] As discussed below, each supports final approval.

**(a) Complexity, Expense, And Duration of Litigation**

"As a general matter, the more complex, expensive, and time consuming the future litigation, the more beneficial settlement becomes as a matter of efficiency to the parties and to the Court." *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 381-82 (S.D.N.Y. 2013); *see also Gordon v. Vanda Pharm. Inc.*, 2022 WL 4296092, at *4 (E.D.N.Y. Sept. 15, 2022) ("settlement is favored when the alternative–litigating the case–will be long, complex, and expensive."). "[S]ecurities class actions are by their very nature complicated and district courts in this Circuit have long recognized that securities class actions are notably difficult and notoriously uncertain to litigate." *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *5 (S.D.N.Y. May 9, 2014); *Strougo v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) (it is "beyond cavil that continued litigation in this multi-district securities class action would be complex, lengthy, and expensive, with no guarantee of recovery by the class members.").

Although Lead Plaintiff has already overcome substantial obstacles in this case, prevailing in continued litigation would require him to surmount many more. These obstacles include the fact that key witnesses and documents are in South Africa, which would make continued litigation more complex and expensive. ¶¶36-37. Discovery may require resort to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters. *See Rabbi Jacob Joseph Sch. v. Allied Irish Banks, P.L.C.*, 2012 WL 3746220, at *7 (E.D.N.Y. Aug. 27, 2012) ("Courts in the Second Circuit

[3] Rule 23(e)(2)(C)(i) essentially incorporates six of the *Grinnell* factors: complexity, expense, and likely duration of the litigation (first factor); risks of establishing liability and damages (fourth and fifth factors); risks of maintaining class action status through trial (sixth factor); and range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation (eighth and ninth factors). *See Grinnell*, 495 F.2d at 463; *see also GSE Bonds*, 414 F. Supp. 3d at 693 ("This inquiry overlaps significantly with a number of *Grinnell* factors, which help guide the Court's application of Rule 23(e)(2)(C)(i).").

have widely recognized that obtaining evidence through the Hague Convention and letters rogatory are cumbersome and inefficient"). Defendants also argued that Lead Plaintiff's discovery requests violated legal restrictions regarding nuclear information including the South African Nuclear Energy Act and Non-Proliferation of Weapons of Mass Destruction Act. ECF No. 72; *cf. In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) ("[T]he Company's location in China would have posed a barrier that would have increased the difficulty and expense of discovery, and might have made it impossible to collect some of the evidence or take depositions necessary to prove Plaintiffs' claims."). Depositions with South Africa-based ASPI employees were likely to have been conducted in South Africa, and may have required use of Afrikaans-speaking interpreters. *See* ECF No. 72. Such international travel and foreign-language depositions are significantly more time-consuming and expensive. *See Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *10 (S.D.N.Y. Oct. 16, 2019) (settlement supported where continued litigation "would necessarily require the expense of travelling to Hong Kong to depose Defendant's witnesses though interpreters, and the costly translation of many Chinese documents.").

Finally, this case has been pending for nearly two years. Assuming Lead Plaintiff survived summary judgment, litigating the Action through trial and post-trial appeals would undoubtedly be a long and expensive endeavor that would consume substantial judicial and private resources with a potential recovery—if any—years from now. *See GSE*, 414 F. Supp. 3d at 693 ("even if plaintiffs were to prevail at trial, post-trial motions and the potential for appeal could prevent the class members from obtaining any recovery for several years, if at all."). By contrast, the Settlement provides an immediate and substantial recovery for the Settlement Class. The complexity, expense, and delay of continued litigation thus favors final approval. *See In re Indep. Energy Holdings PLC Sec. Litig.*, 2003 WL 22244676, at *3 (S.D.N.Y. Sept. 29, 2003) (possibility of continued litigation involving expert

discovery, summary judgment motions, pre-trial orders, and trial "weighs heavily in favor of [s]ettlement").

**(b) Risk Of Establishing Liability**

In considering these factors, "a court should balance the benefits afforded the Class, including immediacy and certainty of recovery, against the continuing risks of litigation." *GSE*, 414 F. Supp. 3d at 694. Lead Plaintiff and Lead Counsel believe that the claims asserted against the Defendants have merit. They recognize, however, the very substantial risks they would face in establishing liability. When compared to the certainty of the significant benefit conferred by the Settlement, these risks militate against further litigation and support a determination that the Settlement is fair, reasonable and adequate.

While Lead Plaintiff was able to successfully survive the pleading stage, and Lead Counsel believe they were building a strong evidentiary case, a jury may nevertheless have disagreed. Indeed, Defendants forcefully argued in their motion to dismiss, and would undoubtedly continue to assert at summary judgment and/or trial, that they made no actionable misrepresentations under the federal securities laws. ECF No. 42. More specifically, Defendants argued, and would likely continue to argue, that allegations derived from the Fuzzy Panda Research report or Lead Plaintiff's interviews with former employees did not support the falsity of any challenged statement, but in relevant part merely repeated Defendants' previous accurate disclosures. Indeed, showing the risks to Lead Plaintiff's ability to prevail on the element of falsity, the Court dismissed eight of the fifteen statements challenged by Lead Plaintiff. *See Leone*, 811 F. Supp. at 595.

Lead Counsel also expects that Defendants would continue to press their argument that ASPI repeatedly disclosed that its QE technology had never been used on uranium. At the pleading stage, the Court agreed with Lead Plaintiff that this argument presented a truth-on-the-market defense, and

that such defenses are "intensely fact-specific" and therefore rarely an appropriate basis for dismissal. *Id.* at 590. However, Lead Counsel expects that Defendants would renew their argument at summary judgment and trial, supported by evidence of their public disclosures and what investors understood about the state of the QE technology, and potentially expert testimony concerning the significance of ASPI's disclosures about its lack of regulatory approval to enrich uranium. Lead Counsel expects that if this Action proceeded to summary judgment and trial, the Parties would likely have presented competing expert testimony from nuclear industry experts, introducing further risk and expense to the case. ¶33; *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 539 (D.N.J. 1997) (a "jury's acceptance of expert testimony is far from certain, regardless of the expert's credentials. And, divergent expert testimony leads inevitably to a battle of the experts."), *aff'd,* 148 F.3d 283 (3d Cir. 1998).

Defendants would no doubt also continue to contest scienter. While Lead Plaintiff's counsel believe that they could establish scienter after the development of the evidentiary record, they also recognize that "[p]roving scienter is hard to do." *Christine Asia Co.*, 2019 WL 5257534, at *12; *see also Pearlstein v. BlackBerry Ltd.*, 2022 WL 4554858, at *5 (S.D.N.Y. Sept. 29, 2022) ("proof of state of mind is inherently difficult"); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *6 (S.D.N.Y. Dec. 23, 2009) (same). Defendants were likely to continue to dispute scienter on multiple grounds, including that: (a) Mann did not benefit from the allegedly inflated stock price, and ASPI's stock sale was merely routine corporate fundraising, and (b) Defendants did not engage in conscious misbehavior or recklessness as to the challenged statements. ¶34. Defendant Mann undoubtedly would have testified that he did not intend to mislead investors, and believed Defendants had accurately disclosed the state of ASPI's technology. *Id.* Lead Counsel expects that if the Action continued to be litigated, Defendants would argue that scienter is not supported by the timing of ASPI's

November 2024 stock sale, because: (a) the announcements that triggered a large increase in ASPI's share price were found by the Court to be not actionably misleading, *see Leone*, 811 F. Supp. 3d at 596-97, (b) the prospectus for that stock sale cautioned that ASPI was awaiting approvals necessary for research into QE of uranium, and (c) by the beginning of the class period, ASPI's financial position had improved such that it had sufficient capital to fund its operations. ¶34.

While the Court denied in part Defendants' motion to dismiss, Lead Plaintiff still needed to obtain information in discovery to prove his claims, and Defendants would have likely challenged the sufficiency of Lead Plaintiff's evidence in a motion for summary judgment and at trial. Lead Counsel knows from experience that success is never assured in complex cases like this one. ¶46. For example, GPWR lost a six-week antitrust jury trial after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs. *See In re: Korean Ramen Antitrust Litig.*, Case No. 3:13-cv-04115 (N.D. Cal.).

Simply put, if the litigation were to continue, Lead Plaintiff would need to prevail on multiple elements, and at several stages in order to recover anything. Even if Lead Plaintiff advanced past summary judgment and proceeded to trial, substantial uncertainty remains as to how a trier of fact would view each side's narrative of the events at issue. Thus, there were very significant risks attendant to the continued prosecution of the Action, and even if Lead Plaintiff prevailed, it would entail substantial delay and expense. Further, even if Lead Plaintiff prevailed at all stages before the Court, he would still likely face appeals. *See, e.g.*, *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1446, 1449 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal and judgment entered for defendant). "These risks as to liability militated in favor of the Settlement." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 365 (S.D.N.Y. 2002).

**(c) Risk Of Establishing Loss Causation And Damages**

Even if Lead Plaintiff established liability, he faced significant risks in proving loss causation and damages. *See Dura Pharms., Inc., v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear "the burden of proving that the defendant's misrepresentations caused the loss for which the plaintiff seeks to recover"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) ("It is well-established that plaintiffs alleging claims under Section 10(b) of the '34 Act must prove loss causation.").

The amount of damages that could be attributed to the allegedly false statements would be hotly contested. Defendants argued, and would likely continue to argue, that Lead Plaintiff could not show that investors' losses were caused by the revelation of any previously concealed information, as opposed to other factors such as a short seller's efforts to depress ASPI's stock price that included substantial confounding information. Further, Defendants argued that the November 27, 2024 Canaccord Interview was restricted to a small number of Canaccord clients, was not publicly disseminated, and did not include any new information that had not been disclosed in previous ASPI filings. ECF No. 42 at 20-21. Defendants would also likely argue that none of the statements that survived the motion to dismiss caused a significant stock price increase, and that Lead Plaintiff's falsity allegations were inconsistent with an inflation maintenance theory. ¶39. Had Defendants prevailed on their loss causation arguments, potential class-wide damages would have been significantly reduced or eliminated.

In order to resolve all disputed issues regarding damages and loss causation, the Parties would have relied on expert testimony. Defendants would likely have brought *Daubert* challenges to Lead Plaintiff's experts. ¶42. This creates further litigation risk because Lead Plaintiff could not be certain whether a jury would accept the views of his experts or of the well-qualified experts that Defendants

would no doubt be able to present at trial. *See In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 2015 WL 6971424, at *5 (S.D.N.Y. Nov. 9, 2015) ("[D]amages would be subject to a battle of the experts, with the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount Lead Plaintiff's losses. Under such circumstances, a settlement is generally favored over continued litigation."); *Marsh & McLennan*, 2009 WL 5178546, at *6 ("If there is anything in the world that is uncertain when a case like [a securities class action] is taken to trial, it is what the jury will come up with as a number for damages.").

**(d) Risk Of Maintaining Class Action Status**

While the Court did certify a class, there is always a risk that the class could be decertified at a later stage in the proceedings. *See Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 214 (S.D.N.Y. 1992) ("Even if certified, the class would face the risk of decertification."). Defendants opposed class certification on a price-impact mismatch theory based on *Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113 (2021), and they may have again raised such challenges in post-trial appeals. ¶¶17, 43. Certification was decided at the outset of this case while the PSLRA discovery stay remained in place, so only limited discovery such as Lead Plaintiff's Court-ordered deposition, was available to Defendants when opposing class certification. As such, Defendants may have later sought to decertify the class based on additional information obtained in discovery. ¶44. Thus, the risks and uncertainty surrounding class certification also support final approval of the Settlement. *See Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 105 (2d Cir. 2023) (decertifying a class of investors after 12 years of litigation); *see also Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, at *9 (S.D.N.Y. Dec. 18, 2019) ("Given the recent changes in the law governing Federal Rule 23 and the PSLRA, the risk always exists that a change in the law could occur that would result in decertification of the Class.").

**(e) Range Of Reasonableness In Light Of The Best Possible Recovery And Attendant Risks Of Litigation**

"Courts typically analyze the last two *Grinnell* factors together." *BlackBerry*, 2022 WL 4554858, at *6 (citing *Grinnell*, 495 F.2d at 463). The adequacy of the settlement amount must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prods. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987).

Here, the proposed Settlement provides for a cash payment of $9,350,000 for the benefit of the Settlement Class. This is an excellent result considering the significant risks of continued litigation. Lead Plaintiff's damages expert estimates that if Lead Plaintiff had fully prevailed on all his claims at summary judgment and after a jury trial, including proof of loss causation as to both of the alleged ASPI stock price declines, and if the Court and jury accepted Lead Plaintiff's damages theory—*i.e.*, Lead Plaintiff's best case scenario—the total maximum damages potentially available in this Action would be approximately $79.2 million. ¶51. Thus, the $9.35 million Settlement represents a recovery of 11.8%, which far exceeds the 4.4% median settlement value for securities class actions with comparable maximum damages. *See* Ex. 4 (excerpt from Edward Flores, Svetlana Starykh, and Ivelina Velikova, *Recent Trends in Securities Class Action Litigation, 2025 Full-Year Review* (NERA, Jan. 21, 2026)) ("NERA Report") at 27 (Fig. 23) (median recovery for securities class actions that settled in the last ten years was 4.4% for cases with estimated damages between $50-$99 million). The Settlement is, therefore, an excellent result when balanced against the many risks of continued litigation.

In sum, the risks posed by continued litigation were substantial, and they would be present at every step of the litigation if it were to continue. Even if Lead Plaintiff were successful at trial, Defendants could have challenged the damages of every class member in post-trial proceedings,

substantially reducing any aggregate recovery. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *5 (S.D.N.Y. July 21, 2020) ("In the absence of the Settlement, the continued litigation of the Action likely would have required the Parties to . . . submit post-trial motions, including a contested individual claims procedure"); *see also In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 155 (S.D.N.Y. 2012) (establishing a preliminary framework for a post-trial claims administration whereby class members could submit claims against Vivendi and Vivendi could interpose individualized challenges, including on the basis of a claimant's lack of reliance or damages). Accordingly, this factor also weighs in favor of approving the Settlement.

#### 4. Rule 23(e)(2)(C)(ii)-(iv) Factors Either Support Final Approval Or Are Neutral

Under Rule 23(e)(2)(C), courts also must consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors either supports final approval of the Settlement or is neutral and does not suggest any basis for finding the Settlement inadequate. Even factors that are "neutral" do "not preclude the Court from granting final approval." *Davenport v. Elite Model Mgmt. Corp.*, 2014 WL 12756756, at *7 (S.D.N.Y. May 12, 2014).

**Rule 23(e)(2)(C)(ii)**. The method for processing Settlement Class Members' claims and distributing relief to eligible claimants includes well-established, effective procedures for processing claims and efficiently distributing the Net Settlement Fund. Simpluris, the Claims Administrator selected by Lead Counsel after a competitive bidding process, and approved by the Court (*see* Preliminary Approval Order at 4), will process claims under the guidance of Lead Counsel, allow claimants an opportunity to cure any claim deficiencies or request the Court to review their claim

denial, and, lastly, mail or wire Authorized Claimants their pro rata share of the Net Settlement Fund (per the Plan of Allocation) after Court approval. *See* Stipulation, ECF No. 93-1, ¶¶20-29. Claims processing, like the method proposed here, is standard in securities class action settlements. *See Signet*, 2020 WL 4196468, at *13 (finding procedures for processing claims and distributing settlement proceeds "well-established" and "effective methods that have been widely used in securities class-action litigation," where the claims administrator would process claims under lead counsel's supervision, allow claimants to cure deficiencies, and distribute *pro rata* shares after court approval); *Tal Educ. Grp.*, 2021 WL 5578665, at *11 (same). It is also necessary, because neither Lead Plaintiff nor Defendants possess the individual investor trading data required for a claims-free process. *See Becker v. Bank of New York Mellon Trust Co., N.A.*, 2018 WL 6727820, at *7 (E.D. Pa. Dec. 21, 2018) (holding that "[t]he requirement that class members submit documentation to substantiate their holdings of the bonds as of the record date will facilitate the filing of legitimate claims, yet is not overly demanding given the range of permissible documentation.").[4]

**Rule 23(e)(2)(C)(iii)**. The relief provided for the Settlement Class is also adequate when the terms of the proposed award of attorneys' fees are considered. Lead Counsel's requested fee of 33⅓% is reasonable in light of the work performed and the results obtained, and is consistent with awards in similar complex class action cases. *See* Fee Memorandum, Sec. III.C.1. (percentage of the fund analysis); Ex. 6 (collecting select Second Circuit cases with fee awards of 33% or more). Under the Stipulation, any attorneys' fees and litigation expenses awarded by the Court are payable upon award, subject to Lead Counsel's obligation to repay them to the Settlement Fund, with interest, if the Settlement is terminated or the award is reduced or reversed by a final order. Stipulation ¶16. This

[4] This is not a claims-made settlement. If the Settlement is approved, Defendants will not have any right to the return of a portion of the Settlement based on the number or value of the claims submitted. *See* Stipulation ¶13.

timing does not reduce or delay the relief available to the Settlement Class, and the repayment obligation protects the Settlement Fund. Authorized Claimants will be paid after the Court approves Lead Counsel's motion for distribution of the Net Settlement Fund will be submitted to the Court after the conclusion of claims processing. *Id.*, ¶26. Importantly, approval of the requested attorneys' fees is separate from approval of the Settlement, and the Settlement may not be terminated based on any ruling with respect to attorneys' fees. *Id.*

**Rule 23(e)(2)(C)(iv)**. The Parties entered a confidential agreement establishing conditions under which Defendants may terminate the Settlement if Settlement Class Members who collectively purchased or acquired a certain amount of ASPI shares validly exclude themselves from the Settlement. "This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement." *Christine Asia Co.*, 2019 WL 5257534, at *15; *see also BlackBerry*, 2022 WL 4554858, at *7 ("To protect the Class, the specific terms of the Supplemental Agreement are confidential to avoid creating incentives for a small group of investors to opt out solely to leverage the threshold to exact an individual settlement.").

### 5. The Settlement Treats All Members Of The Settlement Class Equitably Relative To Each Other

Rule 23(e)(2)(D) requires courts to evaluate whether the settlement treats class members equitably relative to one another. The Settlement easily satisfies this standard. Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. ¶66. Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id.* Courts have repeatedly approved similar plans. *See Tal Educ. Grp.*, 2021 WL 5578665, at *11 (finding "methodology is appropriate and consistent with many other securities class action settlements' plans of allocation" where "Class

Members will receive a *pro rata* share of the Net Settlement Fund in the proportion that the Authorized Claimant's claim bears to the total of the claims of all Authorized Claimants."); *BlackBerry*, 2022 WL 4554858, at *8.

### 6. The Remaining *Grinnell* Factors Favor Final Approval

*Grinnell* also outlined several factors that are not coextensive with Rule 23(e)(2)'s factors. These factors also support final approval.

**The Reaction of the Settlement Class**. The second *Grinnell* factor—the reaction of the class—overlaps with Rule 23(c)(2)(B)(vi), on the opportunity for exclusion, and Rule 23(e)(5)(A), on the opportunity to object. As required by Rule 23(c)(2)(B)(vi) and (e)(5)(A), the Settlement affords Settlement Class Members the opportunity to request exclusion from, or object to, the Settlement. *See* Ex. 1-B (Notice) at ¶¶80-92; Preliminary Approval Order at ¶¶13-19. In total, as of November 2, 2026, notice of the Settlement has been disseminated to 11,424 potential Settlement Class Members and nominees. *See* Ex. 1 ("Kamenir Decl.") at ¶12. As of November 2, 2026, Simpluris had received no requests for exclusion, and not a single objection has been filed with the Court. ¶61; *see also* Kamenir Decl. at ¶¶18-19.[5] The Settlement Class's positive reaction strongly supports final approval of the Settlement. *See, e.g.*, *Maley*, 186 F. Supp. 2d at 362 ("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy."); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."); *Signet*, 2020 WL 4196468, at *6 ("The absence of any objections and the small number of requests for exclusion support a finding that the Settlement is fair, reasonable, and adequate.").

[5] The deadline to request exclusion from, or to object to any aspect of, the Settlement is November 20, 2026. If any objections or opt-outs are received after the date of this filing, they will be addressed on reply.

**The Stage of the Proceedings and the Amount of Discovery Completed**: The third *Grinnell* factor examines "whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement." *In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*, 909 F. Supp. 2d 259, 267 (S.D.N.Y. 2012). Lead Plaintiff and Lead Counsel had more than adequate information about their claims at the time of Settlement. Lead Counsel had already: extensively investigated the claims and filed the detailed Complaint; consulted with a loss causation and damages expert; defeated a motion to dismiss; and obtained class certification over Defendants' opposition. They also engaged in substantial discovery, including Lead Plaintiff's deposition, review and analysis of 4,979 documents totaling approximately 31,595 pages produced by Defendants, and additional document discovery from non-parties. ¶¶7, 23. Lead Plaintiff engaged in a formal mediation in which the Parties exchanged briefs and exhibits about the strengths and weaknesses of the case, and argued those differences before an experienced third-party neutral in a full-day mediation session. ¶25. Because Lead Plaintiff and Lead Counsel had sufficient information to evaluate the strengths and weaknesses of the case at the time of settlement, this factor supports final approval. *See In re Tenaris S.A. Sec. Litig.*, 2024 WL 1719632, at *7 (E.D.N.Y. Apr. 22, 2024) ("Plaintiffs' thorough investigation and witness interviews, the parties' settlement negotiations, and the interrogatories and document discovery obtained by Lead Plaintiffs provide the Court with sufficient assurance that Lead Plaintiffs are likely to have obtained adequate information about their claims.").

**The Ability Of Defendants To Withstand A Greater Judgment**: ASPI's ability to withstand a greater judgment (*Grinnell* factor seven) does not counsel against final approval, as "a defendant is not required to empty its coffers before a settlement can be found adequate." *Shapiro*, 2014 WL

1224666, at *11. While ASPI might have perhaps withstood a greater judgment, it still has never reported a profit. Moreover, its insurance policies were eroding (and would only erode more) as litigation proceeded, and there was no assurance that Defendant Mann could personally pay a judgment. ¶¶49-50; *See In re Blech Sec. Litig.*, 2000 WL 661680, at *5 (S.D.N.Y. May 19, 2000) ("While additional years of litigation might well have resulted in a higher settlement or verdict at trial, continued litigation could also have reduced the amount of insurance coverage available and not necessarily resulted in a greater recovery."). Given the significant time required to try this case and resolve any resulting appeals, ability to pay considerations favor the Settlement. *See Signet*, 2020 WL 4196468, at *12 (noting in an ability-to-pay analysis that "the risks to the Company's financial health remain[ed] significant"). In any case, courts have recognized that "[a] defendant's ability to pay is much less important than other factors, especially where the other *Grinnell* factors weigh heavily in favor of settlement approval." *In re Metlife Demutualization Litig.*, 689 F. Supp. 2d 297, 339 (E.D.N.Y. 2010); *see also In re AOL Time Warner, Inc.*, 2006 WL 903236, at *12 (S.D.N.Y. Apr. 6, 2006) ("the mere ability to withstand a greater judgment does not suggest that the Settlement is unfair.").

**B. The Notice Program Satisfies Rule 23 And Due Process**

Due process and Rule 23(c)(2)(B) require that class members be given "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The Notice here provides all the information required by Rule 23(c)(2)(B) and satisfies the requirements of the PSLRA, 15 U.S.C. § 78u-4(a)(7). The Court has already found the notice program to meet these requirements. *See* Preliminary Approval Order at 5-6. Lead Counsel and Court-appointed Claims Administrator Simpluris carried out the notice program as proposed, including individual mailed/emailed notice, publication of the Summary Notice, and the posting of the Notice and other relevant documents on the Settlement Website. *See* ¶¶52-61; Kamenir Decl. at ¶¶3-

17. The notice program fairly apprises Settlement Class Members of their rights with respect to the Settlement, and it is the best notice practicable under the circumstances. *See Signet*, 2020 WL 4196468, at *14 (notice program consisting of individual mailing of notice packets to all class members who could be identified with reasonable effort, publication of summary notice in the Wall Street Journal and over PR Newswire, and posting on the settlement website satisfied Rule 23, the PSLRA, and due process); *In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 182–83 (S.D.N.Y. 2014) (similar). Thus, the notice program here satisfies Rule 23 and due process.

### C. Certification Of The Settlement Class Remains Appropriate

The Court's December 4, 2025 order certified this Action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), *see Leone*, 811 F.Supp.3d at 630, and its July 9, 2026 Preliminary Approval Order certified essentially the same Settlement Class, with minor modifications to the class definition. Preliminary Approval Order at 2. There have been no changes since that time to alter the propriety of class certification for settlement purposes. Thus, Lead Plaintiff respectfully requests that the Court affirm its previous determinations and certify the Settlement Class under Rules 23(a) and (b)(3). *See Bear Stearns*, 909 F.Supp.2d at 264 ("Since there have been no material changes to alter the propriety of these findings regarding the Settlement Class, this action is hereby finally certified, for the purposes of settlement only, as a class action pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).").

### D. The Plan Of Allocation Is Fair And Reasonable And Treats Class Members Equitably

To warrant approval, the Plan of Allocation must meet the same standards "by which the settlement was scrutinized – namely, it must be fair and adequate." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005). "This does not mean that the plan must be perfect; rather, an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *BlackBerry*, 2022 WL 4554858, at *8 (cleaned up).

Approval of the proposed Plan of Allocation is appropriate here.

The Plan of Allocation, as detailed in ¶¶62-69 of the Spencer Declaration and in the Notice (Ex. 1-B at ¶¶60-78), was developed by one of Lead Plaintiff's damages consultants working in conjunction with Lead Counsel. ¶¶10, 26. It is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects an assessment of the damages Lead Plaintiff contends could have been recovered under the theories of liability asserted in the Action. ¶65. The Plan of Allocation reflects, and is based on, Lead Plaintiff's allegation that the price of ASPI stock was artificially inflated during the Settlement Class Period due to Defendants' alleged misrepresentations and omissions. *Id.* It is also based on the premise that the decrease in the price of ASPI stock that followed the alleged corrective disclosures on November 26 and November 27, 2024, may be used to measure the alleged artificial inflation in the price of ASPI stock prior to the disclosures. *Id.* (citing Ex.1-B (Notice) at ¶¶62-63). It was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered that Lead Plaintiff claims were attributable to the conduct alleged in the Complaint. ¶69.

Under the proposed Plan of Allocation, each Authorized Claimant, subject to a $10 *de minimis* provision, will receive their *pro rata* share of the Net Settlement Fund. Specifically, an Authorized Claimant's *pro rata* share is their Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. ¶66 (citing Ex. 1-B (Notice) at ¶71). An individual Claimant's recovery under the Plan of Allocation will depend on a number of factors, including the number of valid claims filed by other Claimants and how many shares of ASPI stock the Claimant purchased, acquired, or sold during the Settlement Class Period, and when that Claimant bought, acquired, or sold the shares. ¶67. If a Claimant purchased shares during the Settlement Class Period, but did not hold any of those shares through the alleged corrective disclosures,

the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the purported revelation of the alleged fraud. *Id.* (citing Ex. 1-B (Notice) at ¶¶63, 67).

Lead Counsel believes that the proposed Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members. *See Signet*, 2020 WL 4196468, at *13-14 (approving plan of allocation developed by lead plaintiff's damages expert that calculated recognized losses based on estimated artificial inflation and distributed the net settlement fund *pro rata*). To date, no Settlement Class Members have objected to the Plan of Allocation, ¶70, further supporting approval of the Plan of Allocation. *See In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *14 (S.D.N.Y. Nov. 7, 2007).

## V. CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate, and certify the Settlement Class for the purposes of settlement.[6]

---

[6] A proposed Final Judgment and Order of Dismissal with Prejudice and a proposed Order Approving Plan of Allocation will be submitted with Lead Plaintiff's reply papers on December 4, 2026, after the deadline for objecting to the motion and requesting exclusion from the Settlement Class has passed.

DATED: November 6, 2026

Respectfully submitted,

**GLANCY PRONGAY WOLKE & ROTTER LLP**

By: */s/ Garth Spencer*
Garth Spencer (GS-7623)
Joseph D. Cohen (*pro hac vice*)
John C. Roberts Jr. (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: gspencer@glancylaw.com
jcohen@glancylaw.com
jroberts@glancylaw.com

Gregory B. Linkh (GL-0477)
745 Fifth Avenue, 5th Floor
New York, New York 10151
Telephone: (212) 682-5340
Email: glinkh@glancylaw.com

*Lead Counsel for Lead Plaintiff Mark Leone and the Settlement Class*

**RULE 7.1 CERTIFICATION**

The undersigned counsel certifies that this document complies with Local Rule 7.1 (permitting departure from its limitations "as otherwise directed by the court") because it complies with the Individual Practices and Procedures of Judge Colleen McMahon, Part V.D, allowing memoranda of law of 25 pages.

Dated: November 6, 2026

*/s/ Garth Spencer*
Garth Spencer

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of November, 2026, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Garth Spencer*
Garth Spencer